**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| UNCONDITIONAL LOVE, INC., *et al.*,[1] | Case No. 23-11759 (MFW) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS**
**TO OBTAIN POSTPETITION FINANCING, GRANTING SENIOR**
**POSTPETITION SECURITY INTERESTS, AND ACCORDING SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE STATUS PURSUANT TO SECTIONS 364(c) AND 364(d)**
**OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH**
**COLLATERAL, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING**
**THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors") file this motion (the "Motion")[2] for the entry of an interim order, substantially in the

form attached hereto as Exhibit A (the "Interim Order") and final order[3] (the "Final Order," and

together with the Interim Order, the "DIP Orders"), (a) authorizing the Debtors to (i) obtain

postpetition secured financing on the terms set forth in the DIP Credit Facility Documents (as

defined below) and (ii) use Cash Collateral; (b) granting liens and providing superpriority claims

with respect to such postpetition financing; (c) approving the form of adequate protection to be

provided by the Debtors to the Prepetition CIT Secured Parties; (d) modifying the automatic stay

to the extent necessary to effectuate the terms and conditions of the Interim Order; (e) scheduling

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, are Unconditional Love Inc. d/b/a Hello Bello (5895), Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc. (9369).  The Debtors' headquarters is located at 17383 Sunset Blvd, Suite B200, Pacific Palisades, CA 90272.

[2]   Capitalized terms used in this Motion but not otherwise defined herein shall have the meanings ascribed to them in the Interim Order or the DIP Credit Agreement, as applicable.

[3]   The Debtors will file the form of Final Order prior to the Final Hearing.

a final hearing (the "Final Hearing") to consider entry of the Final Order; and (f) granting related relief.  In support of this Motion, the Debtors submit the *Declaration of Erica Buxton in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), the *Declaration of Robert J. White in Support of Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, Granting Senior Postpetition Security Interests and According Superpriority Administrative Expense Status Pursuant to Section 364(c) and 364(d) of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "White Declaration"), and the *Declaration of John P. Madden in Support of Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, Granting Senior Postpetition Security Interests and According Superpriority Administrative Expense Status Pursuant to Section 364(c) and 364(d) of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "Madden Declaration"), each of which were filed concurrently herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     As described in the First Day Declaration, the Debtors faced significant challenges in the months leading to the commencement of these Chapter 11 Cases and have been engaged in a robust prepetition marketing process to address their liquidity needs.  This process has been successful, and the Debtors enter these Chapter 11 Cases with a stalking horse asset purchase agreement (the "Stalking Horse APA") that sets a floor for the purchase of the Debtors' assets and facilitates a fair, fulsome, and value-maximizing sale process (the "Sale Process").  Nonetheless,

the Debtors remain in a dire liquidity situation and cannot fund these Chapter 11 Cases and the Sale Process without the relief requested herein.  Until the Sale Process concludes and the Debtors have successfully wound down their estates, the DIP Credit Facility and Cash Collateral are necessary to fund the Debtors' operating and working capital needs.

2.       The Debtors engaged in good-faith, arm's-length negotiations with the Prepetition CIT Secured Parties over the terms of the DIP Credit Facility, which will permit the Debtors to fund these Chapter 11 Cases and continue the Sale Process in an orderly, court-supervised setting to the benefit of their stakeholders.  As discussed more fully below, the DIP Credit Facility will consist of a revolving credit facility in the aggregate maximum principal amount of $47 million, consisting of approximately $12 million in new money commitments to the Debtors and a conversion of approximately $35 million of obligations under the Prepetition CIT Loan Documents into postpetition DIP Credit Facility obligations.

3.       The Debtors' ability to enter into the DIP Credit Facility and utilize Cash Collateral is vital to preserve the value of their business during the course of these Chapter 11 Cases.  As the Debtors do not hold sufficient cash on hand to fund their chapter 11 process, the Debtors must obtain the ability to use the DIP Credit Facility and Cash Collateral to operate their business, maintain business relationships with vendors and suppliers, continue manufacturing products for customers, honor payroll obligations to employees, and satisfy other working capital and operational needs—all with the aim of ensuring a value-maximizing Sale Process for the benefit of all stakeholders.  Without access to the DIP Credit Facility and Cash Collateral—the Debtors' sole postpetition financing option at this time—the Debtors would be unable to achieve these objectives.  Accordingly, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.

3

**JURISDICTION AND VENUE**

4.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory and legal predicates for the relief sought herein are sections 362, 363, 364, 503, 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b) and 4001-2.

**RELIEF REQUESTED**

7.      By this Motion, the Debtors respectfully request entry of the DIP Orders granting, among other things, the following relief, as applicable:

(a)      authorizing the Debtors, as borrowers (the "Borrowers"), to enter into a senior secured, superpriority postpetition credit facility in a principal amount of up to $47,000,000 (the "DIP Credit Facility," and the loans extended thereunder, the "DIP Loans") pursuant to the terms of (i) the term sheet attached as Exhibit D to the Interim Order ("DIP Term Sheet"); (ii) that certain Senior Secured, Super-Priority Debtor-in-Possession Loan, Security and Guarantee Agreement[4] (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), to be executed by and among the Borrowers, CIT Northbridge Funding I LLC (the "DIP Lender"), CIT Northbridge Credit LLC, as administrative

---

[4]      The Debtors will file the DIP Credit Agreement prior to the Final Hearing on the Motion.

and collateral agent (in such capacities, together with its successors and permitted assigns, the "DIP Agent," and together with the DIP Lender, the "DIP Secured Parties"), which will embody the terms set forth in the DIP Term Sheet, (iii) the DIP Orders; and (iv) any and all other Loan Documents (as defined in the DIP Credit Agreement and, together with the DIP Term Sheet, the Interim Order, the Final Order, and such other documents as may be designated by the DIP Agent, collectively, the "DIP Credit Facility Documents"), to fund, among other things, the Sale Process, administrative costs, ongoing working capital, general corporate expenditures and other financing needs of the Debtors;

(b)     granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties on account of the DIP Credit Facility and all obligations owed thereunder and under, or secured by, the DIP Credit Facility Documents, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claim status (the "DIP Superpriority Claim"), with priority over all administrative expense claims and unsecured claims now existing or hereafter arising, against the Debtors;

(c)     authorizing the Debtors to use any and all "cash collateral," as defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), which term shall include, without limitation, all cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all collateral pledged to the Prepetition CIT Secured Parties, in accordance with the terms set forth in the Interim Order;

(d)     authorizing and approving the Debtors to incur obligations under the DIP Credit Facility Documents, including to borrow under the DIP Credit Facility (collectively, the "DIP Obligations"), and to use the proceeds of the DIP Credit Facility on the terms and conditions set forth in the DIP Orders and DIP Credit Facility Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted with respect to the Approved Budget;

(e)     authorizing the Debtors to pay principal, interest, fees, expenses, and other DIP Obligations payable under the DIP Credit Facility Documents as they become due;

(f)     authorizing and approving the form of adequate protection to be provided by the Debtors to the Prepetition CIT Secured Parties, solely to the extent of the aggregate Diminution in Value (as defined below), if any;

(g)     modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement the terms of the DIP Orders and the DIP Credit Facility Documents as set forth herein; waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the DIP Orders; and providing for the immediate effectiveness of the DIP Orders;

(h)     scheduling the Final Hearing on this Motion to consider entry of the Final Order on a final basis and approving the form of notice with respect to such Final Hearing; and

(i)      granting related relief.

## BACKGROUND

### I.    General Background

8.      On the date hereof (the "<u>Petition Date</u>"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>") in the Court.  The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee has been appointed in these Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.  Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

### II.    The Debtors' Prepetition Capital Structure

9.      As of the Petition Date, the Debtors have approximately $64.9 million in outstanding borrowings, consisting of (i) approximately $34.9 million aggregate principal amount outstanding under the Debtors' Prepetition CIT Loan Documents and (ii) approximately $30 million in borrowings under the Debtors' Prepetition Subordinated Notes.  The Debtors also have unsecured obligations consisting of, among other things, trade debt.  The Debtors' outstanding borrowings are set forth below:

| Type of Debt | Maturity | Amount Outstanding |
|---|---|---|
| Prepetition First Lien Credit Agreement | April 12, 2026 | $34,929,332.54 |
| VMG Partners IV Coinvest L.P. Subordinated Note | November 2, 2025 | $17,550,000.00 |
| VMG Partners Mentors Circle IV, L.P. Subordinated Note | November 2, 2025 | $314,645.00 |
| VMG Partners IV, L.P. Subordinated Note | November 2, 2025 | $12,135,355.00 |
| **Total** | | **$64,929,332.54** |

### a.    Prepetition First Lien Credit Facility

10.    The Debtors are party to that certain Loan, Security and Guarantee Agreement, dated as of April 12, 2022 (as amended, supplemented or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement"), by and among Unconditional Love Inc., Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc., as borrowers, the Lenders (as defined therein), and CIT Northbridge Credit LLC, as agent for the Prepetition CIT Lenders (together with the Lenders, the "Prepetition CIT Secured Parties"), pursuant to which the Debtors received a revolving line of credit in an initial aggregate commitment amount of $65 million.    Pursuant to the Prepetition First Lien Credit Agreement and various other Security Documents (as defined in the Prepetition First Lien Credit Agreement), the obligations under the Prepetition First Lien Credit Agreement are secured by a first priority security interest in substantially all of the assets of the Debtors other than certain excluded assets (the "Prepetition Collateral").    As of the Petition Date, the aggregate principal amount outstanding under the Prepetition First Lien Credit Agreement and other documents, instruments, and agreements executed in connection with the Prepetition First Lien Credit Agreement (collectively, the

"Prepetition CIT Loan Documents") is approximately $34.9 million, plus accrued and unpaid interest thereon.

### iii. Prepetition Equipment Leases

11.     Unconditional Love Inc. is also party to multiple master equipment leases, which include: (i) that certain Master Equipment Lease Agreement No. 2022092, dated as of December 12, 2022, by and among CSC Leasing Co. ("CSC") and Unconditional Love Inc., (ii) that certain Master Lease Agreement, dated as of March 10, 2021, by and among 36th Street Capital Partners LLC ("36th Street Capital") and Unconditional Love Inc., (iii) that certain Master Lease Agreement No. 106020, dated as of February 16, 2023, by and among Consultants Group Commercial Funding Corporation (d/b/a Nexseer Capital) ("Nexseer") and Unconditional Love Inc., which Nexseer has subsequently sold and assigned all of its right, title and interest in to NFS Leasing, Inc. ("NFS"), pursuant to that certain Notice and Acknowledgement of Assignment, dated as of February 24, 2023, and (iv) that certain Master Equipment Lease Agreement, dated as of December 1, 2022, by and among SGC Capital Corporation ("SGC") and Unconditional Love Inc. (collectively, as amended, supplemented or otherwise modified from time to time, the "Prepetition Equipment Leases").   The Prepetition Equipment Leases each relate to individual diaper manufacturing lines and certain other equipment, in each case, as scheduled in each applicable Prepetition Equipment Lease.

### III.     The Debtors' Urgent and Immediate Liquidity Needs

12.     As set forth in the First Day Declaration, the Debtors faced significant economic and operational challenges that strained their liquidity in the months prior to the Petition Date.  As a result, the Debtors and their advisors considered several potential restructuring alternatives, including additional debt or equity financing, or an acquisition of the Company.

13.     The Debtors ultimately determined that they would need to file for chapter 11 protection to effectuate any potential transaction given their liquidity situation.  See White Declaration ¶10.  Accordingly, the Debtors, in consultation with their financial advisor, Emerald Capital Partners ("Emerald"), performed a review and analysis of their projected cash needs to operate their business in the ordinary course and fund the administrative expenses associated with pursuing and consummating the Sale Process in chapter 11.  See Madden Declaration ¶12.  The Debtors concluded that the use of Cash Collateral, alone, would be insufficient to meet the Debtors' postpetition liquidity needs and that supplemental postpetition financing would be necessary to fund a chapter 11 process.  See White Declaration ¶11.

14.     In parallel with their prepetition marketing process, the Debtors engaged in discussions with the Prepetition CIT Secured Parties concerning their potential restructuring transaction, the need for relief under the Prepetition CIT Loan Documents, and potential postpetition financing.  During the course of these discussions, the Prepetition CIT Secured Parties informed the Debtors that (a) they would be willing to provide postpetition financing if the Debtors secured a stalking horse bidder, and (b) in such a scenario, the Prepetition CIT Secured Parties would consent to the consensual use of their Cash Collateral.  See White Declaration ¶12.

15.     The Debtors also evaluated whether they would be able to obtain DIP financing from third parties.  In August 2023, the Debtors' investment banker, Jefferies LLP ("Jefferies"), commenced a DIP financing marketing process designed to gauge the availability of postpetition financing alternatives.  Jefferies contacted 86 potential parties active in the debtor-in-possession financing market, 26 of whom signed nondisclosure agreements and were granted access to additional due diligence.  Jefferies received two preliminary indications of interest, but ultimately none of these potential lenders expressed a willingness to provide debtor-in-possession financing

either (a) secured by liens junior to the liens of the Prepetition CIT Secured Parties or (b) secured by priming liens without the consent of the Prepetition CIT Secured Parties, given the attendant cost and delay of a likely priming dispute.  See White Declaration ¶13.

16.    In early October, with their marketing process in advanced stages, the Debtors faced increasing pressure on their cash resources.  The Prepetition CIT Secured Parties provided an interim liquidity solution that enabled the Debtors to conclude negotiations with their stalking horse bidder prior to commencing chapter 11 cases.  On October 12, 2023, the Debtors entered into that certain Limited Agreement Regarding Loan Availability Calculations During Limited Modification Period with the Prepetition CIT Secured Parties (the "Letter Agreement"), which temporarily modified the Prepetition First Lien Credit Agreement's borrowing limits.  Specifically, the Letter Agreement (i) reduced the Rent and Charges Reserve (as defined in the Prepetition First Lien Credit Agreement) by $570,000 during the Limited Modification Period (as defined in the Letter Agreement), and (ii) allowed the total Revolver Usage to exceed the Borrowing Base (each as defined in the Prepetition First Lien Credit Agreement) by $250,000 during the Limited Modification Period.

17.    Although the Letter Agreement with the Prepetition CIT Secured Parties enabled the Debtors to transition smoothly into chapter 11, the Debtors nonetheless need immediate access to additional cash to continue their operations and fund their cases.  To that end, the Debtors and Emerald, in conjunction with the Prepetition CIT Secured Parties, prepared a budget outlining the Debtors' postpetition cash needs (as amended, modified, or supplemented from time to time with the DIP Agent's written consent, the "Approved Budget"), a copy of which is attached as Exhibit A to the Interim Order.  The Debtors believe that the Approved Budget is an accurate reflection of their funding requirements and will allow them to meet their obligations, including administrative

expenses, in these Chapter 11 Cases.  The Debtors also believe that the Approved Budget is fair, reasonable, and appropriate under the circumstances.  Madden Decl. ¶ 14.

18.     The Debtors' marketing efforts and the Prepetition CIT Secured Parties' cooperation ultimately resulted in the proposed postpetition financing terms offered by the DIP Lender, which the Debtors have determined are the most cost-effective and beneficial debtor-in-possession financing terms available to them under the circumstances.  The DIP Credit Facility and use of Cash Collateral are necessary to, among other things, (a) fund the Debtors' working capital and capital expenditure needs during the course of these Chapter 11 Cases and ensure payments to employees, third-party vendors, utilities, and taxing authorities, among others, all of which are critical to operate and maintain the Debtors' business; (b) ensure the timely payment of chapter 11 administrative expenses; (c) pursue the Sale Process; and (d) provide a positive message to the market that these Chapter 11 Cases are sufficiently funded, which is critical to ensure that customers, employees and vendors maintain confidence in the Debtors.  The relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and critical to the Debtors' efforts to maximize value for their stakeholders through their Sale Process.

## SUMMARY OF DIP CREDIT FACILITY AND USE OF CASH COLLATERAL

19.     In accordance with Bankruptcy Rules 4001(b)(1) and 4001(c)(1), and Local Rule 4001-2(a)(i) and (ii), a summary of certain key terms of the DIP Credit Facility and DIP Orders is set forth below.  The below summary is qualified in its entirety by reference to the applicable provisions of the DIP Orders and the DIP Credit Facility Documents, and the DIP Orders and the

DIP Credit Facility Documents will control in the event of any inconsistency between the below summary and such documents, as applicable.

| Summary of Material Terms of DIP Facility[5] | |
|---|---|
| **DIP Facility Parties**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Term Sheet, p. 1 | <u>**Borrowers (or "Debtors")**</u>:<br>(i)      Unconditional Love Inc.<br>(ii)     The Best Training Pants in the World Inc.<br>(iii)    Unconditional Love Canada, Inc.<br><br><u>**Guarantors**</u>:<br>(i)      Unconditional Love Inc.<br>(ii)     The Best Training Pants in the World Inc.<br>(iii)    Unconditional Love Canada, Inc.<br><br><u>**Lenders**</u>: CIT Northbridge Funding I LLC ("<u>DIP Lender</u>")<br><br><u>**DIP Agent**</u>: CIT Northbridge Credit LLC |
| **DIP Facility Amount**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A)<br><br>DIP Term Sheet, p. 1<br><br>Proposed Interim DIP Order, Recitals | The DIP Lender will provide the Borrowers a revolving credit facility in the aggregate, maximum principal amount of forty-seven million dollars ($47,000,000) (such amount, the "<u>Maximum DIP Facility Amount</u>"), consisting of new revolving availability of up to twelve million seventy thousand six hundred sixty seven dollars and forty six cents ($12,070,667.46) (the "<u>Maximum DIP Funding Amount</u>"), and a conversion of thirty-four million, nine hundred twenty nine thousand three hundred thirty two dollars and fifty four cents ($34,929,332.54) of obligations under the Pre-Petition Credit Agreement into post-petition DIP Facility obligations; provided, however, that until entry of the Final Order, the amount of DIP Facility advances shall be limited to an amount that would not cause DIP Facility Usage (i.e., the sum of (a) the total principal amount of obligations under the DIP Facility (prior to giving effect to a proposed DIP Facility revolving advance); plus (b) the total balance of obligations under the Pre-Petition Loan Documents) to exceed the Opening Pre-Petition Loan Balance (i.e., $34,929,332.54) by more than five million five hundred thousand dollars ($5,500,000). |
| **Use of Proceeds**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ii), (iii)<br><br>DIP Term Sheet, p. 6 | Subject to the DIP Term Sheet, proceeds of the DIP Facility shall be available for the Debtors' working capital needs, including but not limited to fund the costs of the administration of these Chapter 11 Cases and to pay professional fees and expenses. |

---

[5]    Capitalized terms used in this summary of the DIP Facility but not defined in the summary shall have the meanings ascribed to them in the DIP Term Sheet.

| | |
|---|---|
| Proposed Interim DIP Order, ¶ 1 | |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>DIP Term Sheet, p. 7<br><br>Proposed Interim DIP Order, ¶ 7 | The DIP Facility (including accrued interest, fees, costs and expenses) shall be secured by first priority senior and priming liens and security interests (the "DIP Credit Liens") in all of the Debtors' property, including, without limitation, all of Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, including accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of each Debtor, excluding only Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds (collectively, the "DIP Collateral"), subject and subordinate only to: (i) any valid, properly perfected, enforceable, non-avoidable prior liens and security interests existing as of the Petition Date (including any Liens that are perfected after the Petition Date that are afforded priority due to the express relation back of the perfection of such lien to a date prior to the Petition Date as permitted by Bankruptcy Code section 546(b)) that are senior to the liens and security interests in favor of the Pre-Petition Agent and/or the Pre-Petition Lenders (the "Permitted Senior Liens"), and (ii) the Carve Out. |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B)<br><br>DIP Term Sheet, p. 4 | **Unused Line Fee**: 50 basis points per annum<br><br>**Collateral Management Fee**: $7,000 per month, fully earned and payable in advance on the first business day of each month<br><br>**Upfront Fee**: $200,000, payable on the date of the first DIP Facility draw. |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B)<br><br>DIP Term Sheet, p. 5 | Interest on all outstanding advances under the DIP Facility shall accrue from and after the Petition Date at a per annum rate equal to Adjusted Term SOFR + 8.00% (the "Non-Default Interest Rate"). The Adjusted Term SOFR rate shall have a floor of 1.50%. |
| **Limitation on Court's Power or Discretion to Enter Future Orders** | N/A |

| | |
|---|---|
| Local Rule<br>4001-2(a)(i)(C) | |
| **Funding to Non-Debtor Affiliates**<br><br>Local Rule<br>4001-2(a)(i)(D) | N/A |
| **Conditions of Closing and Borrowing**<br><br>Bankruptcy Rule<br>4001(c)(1)(B)<br><br>Local Rule<br>4001-2(a)(i)(E)<br><br>DIP Term Sheet, pp. 13-14 | **Conditions Precedent to Closing and Funding Initial Draw**:<br><br>(a) The approval of the Budget by the DIP Agent, together with all financial information and projections regarding the Debtors requested by the DIP Agent, all in form and substance satisfactory to the DIP Agent in its sole discretion,<br><br>(b) The entry of an Interim Order approving the DIP Facility, the DIP Credit Liens, and the DIP Superpriority Claim, and containing such other orders and findings as the DIP Agent may require, including modification of the automatic stay after a specified notice period following the occurrence of an Event of Default enabling the DIP Agent to exercise certain rights and remedies against the DIP Collateral, which Interim Order or Final Order, as applicable, shall not have been modified or amended without approval of the DIP Agent, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to the DIP Agent in its sole discretion,<br><br>(c) The DIP Agent's approval (not to be unreasonably withheld, conditioned, or delayed) of all material first day motions and orders filed in the Chapter 11 Cases relating to the 363 Sale or requiring the expenditure of cash amounts greater than $25,000 in the aggregate,<br><br>(d) The continuation of Debtors' present cash management system,<br><br>(e) The form and substance of the DIP Term Sheet shall be satisfactory to the DIP Agent in its sole discretion,<br><br>(f) The Debtors' delivery to the DIP Agent of an executed asset purchase agreement, prior to the Petition Date, between the Debtors and the Stalking Horse Bidder, in form and substance satisfactory to the DIP Agent at its sole discretion, providing for the Stalking Horse Bidder's purchase of substantially all of the Debtors' assets; and<br><br>(g) No material adverse change in the Debtors' operations (financial, environmental, or otherwise), performance, or properties (other than as a result of (i) the commencement of the Chapter 11 Cases |

|  | or (ii) events or circumstances disclosed to the DIP Agent prior to the Petition Date), has occurred since the Petition Date. |
|---|---|
|  | **Conditions Precedent to Subsequent Draws**: |
|  | (a) There shall exist no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) under any of the DIP Financing Documents, and the representations and warranties therein shall be true and correct in all material respects; |
|  | (b) Compliance with Bankruptcy Rule 4001 and any applicable Local Bankruptcy Rules, the entry of the Interim Order and the Final Order (as applicable), together with any other order requested by the DIP Agent authorizing and approving the DIP Facility in form, substance and amount acceptable to the DIP Agent in its sole discretion; |
|  | (c) Payment of all fees and expenses owing to the DIP Agent in connection with the DIP Facility (which payment may be made from the proceeds of such borrowing); |
|  | (d) Satisfaction of all other borrowings set forth in the DIP credit agreement (which shall be substantially the same as in the Pre-Petition Credit Agreement, including, the absence of any Material Adverse Effect since the Petition Date), and |
|  | (e) the DIP Financing Documents and the Interim and Final Orders shall include such waivers, indemnities, and other provisions as are acceptable to the DIP Agent in its sole discretion. |
| **Budget**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(iii)<br><br>DIP Term Sheet, p. 3-4<br><br>Proposed Interim DIP Order, ¶¶ 1-2 | The Budget is attached as <u>Exhibit A</u> to the Interim Order.<br><br>The Debtors believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget. |
| **DIP Liens on Unencumbered Assets**<br><br>Local Rule 4001-2(a)(i)(G) | See "**Liens and Priorities**" above. |

| | |
|---|---|
| DIP Term Sheet, p. 7<br><br>Proposed Interim DIP Order, ¶ 7 | |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br><br>Local Rule 4001-2(a)(i)(H)<br><br>DIP Term Sheet, pp. 16-17. | The Debtors shall comply with the following milestones:<br><br>(a) On the Petition Date, the Debtors shall have entered into an asset purchase agreement with the Stalking Horse Bidder, in form and substance satisfactory to the DIP Agent, providing for the Stalking Horse Bidder's purchase of substantially all of the Debtors' assets (subject to the Auction and process contemplated in the Sale Procedure Order);<br><br>(b) On or before one business day after the Petition Date, or such later date to which the DIP Agent consents in writing in its sole discretion, the Debtors shall file a motion, in form and substance acceptable to the DIP Agent, requesting entry of the Sale Procedure Order (as defined below) authorizing procedures for the sale of substantially all of the Debtors' assets to the Stalking Horse Bidder (or, if an Auction is held, to the Winning Bidder);<br><br>(c) On or before 30 days after Petition Date, or such later date to which the DIP Agent consents in writing in its sole discretion, the Bankruptcy Court shall have entered the Sale Procedure Order;<br><br>(d) On or before the date that is 72 days after the Petition Date, the Debtors shall have conducted an auction for the sale of substantially all of their assets (if necessary) and selected the successful bidder for the substantially all of their assets;<br><br>(e) On or before the date that is 75 days after the Petition Date, or such later date to which the DIP Agent consents in writing in its sole discretion, the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale; and<br><br>(f) On or before the date that is 77 days after the Petition Date, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which the DIP Agent consents in writing in its sole discretion, the Sale shall be closed. |
| **Prepayment Premiums**<br><br>Local Rule 4001–2(a)(i)(I) | None. |

| | |
|---|---|
| **Joint Liability of Debtors**<br><br>Local Rule<br>4001–2(a)(i)(J)<br><br>DIP Term Sheet, p. 5 | Each of the Debtors, jointly and severally, promises and agrees to pay to the DIP Agent and the DIP Lender all DIP Facility advances, together with interest thereon accruing pursuant to the DIP Financing Documents, in full, in cash. |
| **Payment of DIP Secured Parties Expenses**<br><br>Bankruptcy Rule<br>4001(c)(1)(B)(ix)<br><br>Local Rule<br>4001-2(a)(i)(K)<br><br>DIP Term Sheet, p. 9<br><br>Proposed Interim DIP Order, ¶ 5 | The Debtors shall promptly pay or reimburse the DIP Agent when requested for all reasonable and documented costs and expenses of counsel (including, without limitation, local counsel) and financial advisors for the DIP Secured Parties relating to the DIP Facility and the administration and interpretation of, and the enforcement of remedies under, the DIP Facility, regardless of whether such amounts were incurred prior to or after the Petition Date, including but not limited to, due-diligence, duplication or printing costs, consultation, travel, and attendance at court hearings, regardless of whether the DIP Facility is consummated. The DIP Agent shall have the right to charge the DIP Facility for any such fees and costs. Failure to pay such fees and expenses within ten (10) days of delivery of the applicable fee reimbursement request shall be an Event of Default under the DIP Facility if such failure continues unremedied for more than two (2) business days after written notice of such failure to the Debtors, provided that the DIP Agent shall concurrently provide copies of any fee reimbursement request to the U.S. Trustee and the Committee (if any) and allow such parties and the Debtors ten (10) days to review and object to any fees or expenses requested therein. If any objection is asserted, the Bankruptcy Court shall decide the issue and the Debtors shall not be required to pay any disputed portion of such fees or expenses until the matter is resolved. |
| **Limitations on Investigations of Liens**<br><br>Local Rule<br>4001–2(a)(i)(L)<br><br>DIP Term Sheet, p. 6 | A Committee (if any) and its professionals shall be permitted to investigate the liens of the Pre-Petition Agent and Pre-Petition Lenders in connection with the Pre-Petition Credit Agreement, with such investigation fees not to exceed $25,000. |
| **Events of Default**<br><br>Bankruptcy Rule<br>4001(c)(1)(B)<br>Local Rule<br>4001-2(a)(i)(M)<br><br>DIP Term Sheet, pp. 18-20 | In addition to certain Events of Default consistent with the Pre-Petition Credit Agreement, Events of Default shall mean the occurrence of any of the following:<br><br>a.  The Debtors shall cease to employ a chief executive officer or chief restructuring officer who is reasonably acceptable to the DIP Agent (it being understood that Erica Buxton and John Madden shall be acceptable to the DIP Agent).<br><br>b.  Any of the Chapter 11 Cases shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed.<br><br>c.  Filing or support of a proposed plan of reorganization by any Debtor that does not provide for the indefeasible payment in full |

and in cash of Debtors' obligations outstanding under the DIP Facility, unless otherwise agreed in writing by the DIP Agent in its sole discretion.

d.  The filing by the Debtor of, or the filing of motion or pleading requesting confirmation of, a plan of reorganization that does not require the indefeasible repayment in full, in cash of the DIP Facility as of the effective date of the plan, unless otherwise agreed in writing by the DIP Agent in its sole discretion.

e.  Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of the DIP Agent, or the failure of the Debtors to oppose prior to the applicable objection deadline (as such deadline may be extended from time to time) any motion or other pleading requesting such relief.

f.  Appointment of an examiner with expanded or enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of the DIP Agent, or the failure of the Debtors to oppose prior to the applicable objection deadline (as such deadline may be extended from time to time) any motion or other pleading requesting such relief.

g.  Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order or Final Order approving the DIP Facility, without the prior written consent of the DIP Agent or the failure of the Debtors to oppose prior to the applicable objection deadline (as such deadline may be extended from time to time) any motion or other pleading requesting such relief.

h.  Any Debtor commences an adversary proceeding or files a motion to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the claims of the DIP Agent, DIP Lender, Pre-Petition Agent, or Pre-Petition Lenders, or to subject any of the collateral of the DIP Agent or Pre-Petition Agent to a surcharge pursuant to Section 506(c) of the Bankruptcy Code.

i.  Any Debtor shall request approval of any postpetition financing, other than the DIP Facility, that would not immediately repay all DIP Facility obligations, in full, in cash, on the date of the closing of such postpetition financing.

j.  Any Debtor shall apply for an order substituting any assets for all or any portion of the DIP Collateral.

k.  Subject to the Carve Out and the Permitted Senior Liens, entry of an order granting liens or claims that are senior or *pari passu* to

the liens granted in favor of the DIP Agent and/or the DIP Lender under the DIP Financing Documents.

l.   Any Debtor shall assert in any pleading that any of the DIP Credit Liens are invalid, or any DIP Credit Liens granted to the DIP Agent or DIP Lender shall be determined by the Bankruptcy Court to be invalid.

m.   Any payment on, or application for authority to pay any pre-petition claim owing to terminated employees or lease rejection damages without prior written consent of the DIP Agent or as otherwise set forth in the Budget.

n.   If at any time prior to the conclusion of the sale process, either (i) the Debtors announce or state in writing that the sales process has been terminated or suspended, and such termination or suspension continues for more than seven (7) days without the DIP Agent's consent; or (ii) the DIP Agent has filed a notice with the Bankruptcy Court, at least two (2) business days before the effective date of any declared default, of its intent to declare an event of default as a result of the sales process being terminated or suspended for more than seven (7) days (with the Debtors reserving all rights to seek further order of the Bankruptcy Court concerning whether such alleged suspension is an actionable default).

o.   A final order is entered granting any creditor relief from the automatic stay that would permit the foreclosure of any assets of the Debtors with a value in excess of $500,000 in the aggregate.

p.   Failure to make any payment of (i) principal, interest, or DIP Fees under the DIP Facility when due or (ii) any other amount (other than principal, interest, or DIP fees) where such payment default has continued for five (5) days.

q.   Failure to pay by the applicable due dates (after giving effect to applicable grace periods) any material indebtedness in excess of $500,000 incurred after the Petition Date, which payment is not otherwise stayed.

r.   Breach of any Milestones.

s.   Breach of any other covenant set forth in any DIP Financing Document and such breach shall continue for five (5) Business Days after notice by the DIP Agent to the Debtors.

t.   Any material representation or warranty by any Debtor is incorrect or misleading in any material respect when made.

u.   Exclusivity shall have been terminated or any Debtor shall have

|  | agreed to any such termination. |
|--|---------------------------------|
|  | v. After entry thereof, either of the Sale Procedure Order or the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal or shall have been modified or amended without the prior written consent of the DIP Agent (not to be unreasonably withheld, conditions or delayed). |
|  | w. Unless the Stalking Horse Bidder fails to be the Winning Bidder, or a back-up-bidder, following the conclusion of an Auction, the Stalking Horse Bidder designated in the motion seeking approval of the Sale Procedures Order shall drop out of the sale process or otherwise indicate that it is unable to close the sale process within ninety (90) days of the Petition Date. |
|  | x. Any Debtor shall file a motion to seek (or support any other Person in seeking) an order to restrict or prohibit the DIP Agent, DIP Lender, Pre-Petition Agent, or Pre-Petition Lender from submitting a "credit bid" for any DIP Collateral. |
|  | y. Any Debtor commences any Challenge Action (as such term is defined in the interim or final order approving the DIP Facility) against the Pre-Petition Agent or any Pre-Petition Lender. |
| **Cross-Collateralization**<br><br>Local Rule 4001–2(a)(i)(N) | N/A |
| **Roll-Up**<br><br>Local Rule 4001–2(a)(i)(O)<br><br>DIP Term Sheet, p. 1 | Prior to entry of the Final Order, all collections and proceeds of DIP Collateral shall be applied to reduce, on a dollar for dollar basis, the obligations under the Pre-Petition Credit Agreement and Pre-Petition Loan Documents. Upon entry of the Final Order, all obligations under the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents in an amount equal to $34,929,332.54 shall be deemed and become post-petition obligations under the DIP Facility. |
| **Non-Consensual Priming Liens**<br><br>Local Rule 4001–2(a)(i)(P) | N/A |
| **Debtors' Stipulations**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001–2(a)(i)(Q) | The Debtors shall stipulate in the Interim Order and Final Order that (i) the liens of the Pre-Petition Agent and the other Pre-Petition Lenders securing the Pre-Petition Credit Facility are valid, perfected, encumber all assets of the Debtors, and have first priority, and (ii) the Debtors possess no claims, offsets or any other type cause of action against the Pre-Petition Agent or any of the Pre-Petition Lenders that would impair, in any manner, the liens |

| | |
|---|---|
| DIP Term Sheet, p. 8<br><br>Proposed Interim DIP Order, ¶E | of the Pre-Petition Agent or any of the Pre-Petition Lenders against the Debtors' assets or the obligations of the Debtors to the Pre-Petition Agent and Pre-Petition Lenders under the Pre-Petition Credit Facility. The Debtors' stipulations shall be binding upon all parties in interest in the Chapter 11 Cases, including any Committee that is appointed, unless (i) an adversary proceeding is filed by any party-in-interest (including any Committee appointed in the Chapter 11 Cases) prior to the expiration of seventy-five (75) days after entry of the Interim Order (the "**Review Period**") against the Pre-Petition Agent or the Pre-Petition Lenders (as applicable) challenging the Pre-Petition Agent or the Pre-Petition Lender's liens (as applicable) or otherwise asserting estate claims against the Pre-Petition Agent or the Pre-Petition Lenders (as applicable), and (ii) a final, non-appealable judgment is entered against the Pre-Petition Agent or the Pre-Petition Lenders (as applicable) in such adversary proceeding. Any party-in-interest that fails to file an adversary proceeding within the Review Period shall be forever barred from asserting any claims against the Pre-Petition Agent or the Pre-Petition Lenders on behalf of any Debtor's estate, or challenging in any manner the liens and claims of the Pre-Petition Agent or the Pre-Petition Lenders against any of the Debtors. |
| **Immediate Approval of DIP Documents**<br><br>Local Rule 4001–2(a)(i)(R)<br><br>DIP Term Sheet, p. 1<br><br>Proposed Interim DIP Order, ¶ 1 | The Debtors are authorized, pursuant to sections 363 and 364, to enter into the DIP Credit Facility and DIP Credit Facility Documents pursuant to the terms and conditions of the DIP Credit Facility Documents and the Interim Order; *provided*, however, that until entry of the Final Order, the amount of DIP Facility advances shall be limited to an amount that would not cause DIP Facility Usage to exceed the Opening Pre-Petition Loan Balance by more than five million five hundred thousand dollars ($5,500,000). |
| **Notice of an Event of Default**<br>Local Rule 4001–2(a)(i)(S)<br><br>DIP Term Sheet, pp. 17-18<br><br>Proposed Interim DIP Order, ¶ 19 | Upon the occurrence of: (i) an Event of Default (as such term is defined in any DIP Credit Facility Document); (ii) the Debtors' failure to comply with the terms of the Interim Order or the Final Order (including, without limitation, failure to comply with the Approved Budget, subject to any Approved Budget Variances); or (iii) the Debtors' failure to comply with any of the sale milestones attached to the Interim Order as Exhibit B (such milestones, the "Milestones"), and the giving of written notice thereof by the DIP Agent to counsel to the Debtors, the Statutory Committee (if any), and the U.S. Trustee (which notice may be given by any manner of electronic transmission, the automatic stay being deemed lifted for such purpose) (the "Default Notice"), then (i) the DIP Agent shall be fully authorized, in its sole discretion to immediately cease making DIP Credit Facility advances to the Debtors, (ii) the DIP Agent shall be fully authorized, in its sole discretion to terminate the Debtors' use of the DIP Collateral (including without limitation Cash Collateral) pursuant to the Interim Order and the Approved Budget, which termination shall become effective five (5) days after delivery of a Default Notice indicating an intent to terminate the Debtors' use of Cash Collateral, provided however that the DIP Agent consents to the scheduling of an expedited hearing to consider further Cash Collateral usage by the Debtors, and/or (iii) the DIP |

| | |
|---|---|
| | Agent shall be fully authorized, in its sole discretion to immediately terminate the DIP Credit Facility, accelerate the obligations under the DIP Facility, and demand repayment of the DIP Credit Facility obligations then outstanding. |
| **Limitations on Arguments in the Event of a Default**<br><br>Local Rule 4001–2(a)(i)(T)<br><br>Proposed Interim DIP Order, ¶ 20.B | N/A |
| **Liens on Chapter 5 Causes of Action**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br><br>Local Rule 4001– 2(a)(i)(U)<br><br>DIP Term Sheet, p. 7<br><br>Proposed Interim DIP Order, ¶ 7 | Liens on the DIP Collateral exclude any causes of action that could be brought pursuant to sections 544, 545, 547, 548 of the Bankruptcy Code, or any applicable state fraudulent transfer statutes (the "<u>Avoidance Actions</u>"), but, subject to entry of the Final Order, shall include proceeds of (and property received in respect of) Avoidance Actions ("<u>Avoidance Proceeds</u>"). |
| **Marshalling Waiver**<br><br>Local Rule 4001–2(a)(i)(X)<br><br>DIP Term Sheet, pp. 8-9<br><br>Proposed Interim DIP Order, ¶ 17.E | Upon entry of the Final Order, the DIP Agent, the DIP Lender, the Pre-Petition Agent and the Pre-Petition Lenders shall not be subject to the equitable doctrines of "marshaling" or any similar claim or doctrine with respect to any DIP Collateral or collateral securing the Pre-Petition Credit Agreement or Pre-Petition Loan Documents. |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Proposed Interim DIP Order, ¶ 12, 37 | The automatic stay under Bankruptcy Code section 362(a) shall be modified as necessary to, among other things:<br><br>(a) permit the Debtors and the DIP Agent to implement and perform under the DIP Credit Facility and the DIP Credit Facility Documents, including without limitation the provisions thereof with respect to the collection of Proceeds, and the maintenance and implementation of the Collection Accounts and the Collection Procedures (as such terms are defined below);<br><br>(b) permit the creation and perfection of all Liens granted or permitted by the Interim Order or Final Order; |

| | |
|---|---|
| | (c) permit the Debtors to grant the CIT Adequate Protection Liens and CIT Adequate Protection Claims; |
| | (d) permit the Debtors to perform such acts as the Prepetition CIT Agent may request in their reasonable discretion to assure the perfection and priority of the liens granted under the Interim Order or Final Order; |
| | (e) permit the Debtors to incur all liabilities and obligations to the Prepetition CIT Secured Parties under the terms of the Interim Order or Final Order; |
| | (f) authorize the Debtors to pay, and the Prepetition CIT Secured Parties to retain and apply, any payments made in accordance with the terms of the Interim Order or Final Order; |
| | (g) deliver of a Default Notice in accordance with the terms of the Interim Order or the Final Order; and |
| | (h) permit the DIP Agent to exercise rights and remedies in connection with an Event of Default both prior to and following the expiration of the Remedy Notice Period. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii)<br><br>Proposed Interim DIP Order, ¶ 12 | The Debtors and the holders of any DIP Credit Lien or Prepetition CIT Adequate Protection Lien shall not be required to enter into any additional security agreements to create, memorialize, and/or perfect any such liens, or to file UCC financing statements, mortgages, or other instruments with any other filing authority or take any other action to perfect any such Liens, which Liens shall be and are deemed valid, binding, enforceable and automatically perfected by the docket entry of the Interim Order or Final Order by the Clerk of the Court. |
| **Release, Waiver, or Limitation on Any Claim or Cause of Action Belonging to the Estate**<br><br>Bankruptcy Rule 4001-2(c)(1)(B)(viii)<br><br>DIP Term Sheet, p. 8<br><br>Proposed Interim DIP Order, ¶ 27 | In consideration of and as a condition to, among other things, the DIP Secured Parties making the Interim DIP Advances and providing credit and other financial accommodations to the Debtors, the Prepetition CIT Secured Parties consenting to, among other things, the use of Cash Collateral, and subordination by the DIP Secured Parties and Prepetition CIT Secured Parties of their Liens to the Carve-Out pursuant to the terms of the Interim Order, the Final Order and the DIP Credit Facility Documents, each of the Debtors, on behalf of themselves, their estates, and their affiliated obligors under the Prepeittion CIT Loan Documents (each a "Releasor" and collectively, the "Releasors"), subject to the challenge provisions of the Interim Order, shall absolutely release, forever discharge and acquit each of the Prepetition CIT Secured Parties and their respective successors and assigns, affiliates, officers, directors, employees, attorneys and other representatives (the "Releasees") of and |

| | from any and all claims, demands causes of action, damages, choses in action, and all other claims, counterclaims, defenses, setoff rights, and other liabilities whatsoever (the "Prepetition Released Claims") of every kind, name, nature, and description, whether known or unknown, both at law and equity (including, without limitation, any "lender liability" claims) that any Releasor may now or hereafter own, hold, have or claim against each and every of the Releasees arising at any time prior to the entry of the Interim Order or Final Order (including, without limitation, claims relating to the Debtors, the Prepetition CIT Loan Documents, and other documents executed in connection therewith, and the obligations thereunder); provided, however, that such release shall not be effective with respect to the Debtors until entry of the Final Order, and with respect to the Debtors' bankruptcy estates, until the expiration of the Challenge Period.  In addition, upon the indefeasible payment, in full, in cash, of all DIP Credit Facility obligations owed to the DIP Secured Parties arising under the Interim Order and the DIP Credit Facility Documents, the DIP Secured Parties shall be released from any and all obligations, actions, duties, responsibilities, and causes of action arising or occurring in connection with or related to the DIP Credit Facility Documents. |
|---|---|
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix)<br><br>DIP Term Sheet, p. 20-21 | The Debtors shall, jointly and severally, indemnify and hold the DIP Agent, the DIP Lender, and their officers, directors, employees and agents (including all of their attorneys and other professionals) (each an "<u>Indemnified Party</u>") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and disbursements in respect of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Financing Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, fraud, or willful misconduct.  The indemnification terms and conditions of the Pre-Petition Credit Agreements are hereby incorporated in this DIP Term Sheet and applied to the DIP Facility. |

| **Summary of Material Terms of Use of Cash Collateral[6]** | |
|---|---|
| **Parties with Interest in Cash Collateral** | The Prepetition Secured Parties hold an interest in the cash collateral. |

---

[6]    Capitalized terms used in this summary of the use of Cash Collateral but not defined in the summary shall have the meanings ascribed to them in the DIP Orders.

| | |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Proposed Interim DIP Order, ¶ G | |
| **Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A)<br><br>DIP Term Sheet, p. 6<br><br>Proposed Interim DIP Order, ¶ 9 | Proceeds of the DIP Facility or cash collateral shall not be used (a) to permit any Debtor, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of the DIP Agent, the Pre-Petition Agent, the Pre-Petition Lenders or the DIP Lender or (ii) the enforceability of the obligations of any Debtor or any guarantor under the Pre-Petition Credit Agreement, any other Pre-Petition Loan Documents, or the DIP Facility, (b) to investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against the DIP Agent, the Pre-Petition Agent, the Pre-Petition Lenders, or the DIP Lender and their agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the obligations of any Debtor or any guarantor under Pre-Petition Credit Agreement, any other Pre-Petition Loan Documents or the DIP Financing Documents, (d) to fund acquisitions, capital expenditures, capital leases, or any other expenditure not specifically set forth in the Budget and approved by the DIP Agent, or (e) for any other purpose for which the Carve Out may not be used, provided that a Committee (if any) and its professionals shall be permitted to investigate the liens of the Pre-Petition Agent and Pre-Petition Lenders in connection with the Pre-Petition Credit Agreement, with such investigation fees not to exceed $25,000. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(b)(1)(C)(ii)<br><br>Proposed Interim DIP Order, ¶ 10<br><br>DIP Term Sheet, p. 7, 9 | As adequate protection and in consideration for being primed by the DIP Lender's claims and liens, the Pre-Petition Agent and Pre-Petition Lenders shall receive, to the extent of diminution in value of the interests of the Pre-Petition Agent and Pre-Petition Lenders in the Debtors' collateral securing the amounts due under the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents following the Petition Date, (a) a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to payment of the Carve Out and subject to the superpriority administrative claims of the DIP Agent and the DIP Lender under the DIP Facility (such claim, the "Prepetition Adequate Protection Superpriority Claim"); and (b) valid, binding, enforceable and perfected replacement liens in all DIP Collateral, subject to payment of the Carve Out, Permitted Senior Liens (if any), and the DIP Credit Liens (the "Prepetition CIT Adequate Protection Liens"). |

| | |
|---|---|
| **Carve-Out**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(F)<br><br>Proposed Interim DIP Order, ¶ 14<br><br>DIP Term Sheet, p. 9-11 | The "Carve-Out" shall be an amount equal to the sum of:<br><br>(a)     unpaid, postpetition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) in such amount, with respect to the U.S. Trustee, as agreed to by the U.S. Trustee or as determined by the Court (collectively, the "Statutory Fees");<br><br>(b)     the unpaid postpetition fees and expenses of the professionals retained by the Debtors and by the Committee (if any), whose retentions are approved pursuant to final orders of the Court under sections 327, 328, 363 or 1103(a) of the Bankruptcy Code (the "Chapter 11 Professionals"), but only to the extent that such fees and expenses are (i) incurred prior to delivery of a Carve-Out Trigger Notice (the date of delivery of such notice the "Carve-Out Trigger Date"), (ii) within the aggregate amount set forth in the Budget approved by the DIP Agent for the Chapter 11 Professionals as of the Carve-Out Trigger Date, and (iii) subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code; and<br><br>(c)     after the Carve-Out Trigger Date: (i) postpetition fees and expenses of the Chapter 11 Professionals incurred in an aggregate amount not to exceed $500,000, to the extent such fees and expenses are subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code; and (ii) fees and expenses of a chapter 7 trustee in an amount not to exceed $10,000.<br><br>Provided, however, that (a) the Carve-Out shall only be available to pay fees and expenses set forth in the DIP Term Sheet to the extent that unencumbered funds are not otherwise available; and (b) in no event shall (i) the aggregate pre-Carve-Out Trigger Date amount provided in clause (b) above for all the Chapter 11 Professionals retained by the Debtors exceed the aggregate amount budgeted for such professionals within the Approved Budget and (ii) the aggregate pre-Carve-Out Trigger Date amount provided in clause (b) above for all the Chapter 11 Professionals retained by the Statutory Committee exceed the aggregate amount budgeted for such professionals within the Approved Budget.<br><br>Provided, further, however, that the Carve-Out for Chapter 11 Professional fees shall be first paid from any retainers or any professional expense escrow account established by the Debtor.<br><br>The Carve-Out shall not include payment for any fees and expenses, if any, of the Chapter 11 Professionals incurred directly or indirectly, in respect of, arising from or relating to:<br><br>(i) the initiation, joinder, support, or prosecution of any action contesting the indebtedness owed to the DIP Agent, the DIP Lender, the Pre-Petition Agent, or the Pre-Petition Lenders, or the validity of any liens granted to the DIP Agent, the DIP Lender, the Pre-Petition Agent, or the Pre-Petition Lenders; |

| | |
|---|---|
| | (ii) preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by the DIP Agent or the Pre-Petition Agent of any of its rights and remedies under the Interim Order, Final Order, or documents comprising the DIP Facility, DIP Financing Documents, Pre-Petition Credit Agreements, or other Pre-Petition Loan Documents, including, without limitation, any attempt to prevent, hinder or delay (or supporting any other person or entity in preventing, hindering or delaying) the submission of any credit bid by the DIP Agent, DIP Lender, Pre-Petition Agent, or Pre-Petition Lenders;<br><br>(iii) the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Agent, the DIP Lender, the Pre-Petition Agent, the Pre-Petition Lenders or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the DIP Agent, the DIP Lender, the Pre-Petition Agent, or the Pre-Petition Lenders;<br><br>(iv) any request to borrow money other than pursuant to the terms of the Interim Order, the Final Order, or the DIP Financing Documents;<br><br>(v) with respect to any Debtor, any of the Debtors' Chapter 11 Professionals, or any of their successors or assigns (including, without limitation, any trustee, responsible officer, examiner, estate administrator or representative or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter released or to be released, waived, or to be waived, or specified as not subject to challenge by the Debtors pursuant to the Interim Order or Final Order; or<br><br>(vi) for any other purpose for which proceeds of the DIP Facility may not be used pursuant to this DIP Term Sheet. |
| **506(c) Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Local Rule 4001– 2(a)(i)(V)<br><br>Proposed Interim DIP Order, ¶ 17.A | Except from and pursuant to the terms of the Carve-Out, no person or entity in the course of the Debtors' bankruptcy cases shall be permitted to recover from the DIP Collateral or Prepetition Collateral (whether directly or through the grant of derivative or equitable standing in the name of the Debtors or any Debtor's estate) any cost or expense of preservation or disposition of the Prepetition Collateral or DIP Collateral, including, without limitation, expenses and charges as provided in Bankruptcy Code sections 506(c), 105(a), or any other applicable law. |
| **Section 552(b)(1) "Equities of the Case" Waiver**<br><br>Local Rule | The Prepetition CIT Secured Parties and the DIP Secured Parties shall not be subject to the "equities of the case" exception of Bankruptcy Code section 552(b) with respect to any DIP Collateral or Prepetition Collateral, |

| 4001– 2(a)(i)(W)<br><br>Proposed Interim DIP Order, ¶ 17.E | and the proceeds of the Prepetition Collateral shall be received and applied pursuant to the Prepetition CIT Loan Documents. |
|---|---|

## BASIS FOR RELIEF

### I.    The Court Should Approve the DIP Credit Facility

20.    As set forth above, the Debtors' ability to maximize the value of their estates and successfully market and sell their assets hinges upon the Debtors having access to the postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis.  Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  See 11 U.S.C. § 364(c).  Further, under section 364(d) of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1).

### A.    Entry into the DIP Credit Facility Documents and Payment of Fees Thereunder Is an Exercise of the Debtors' Sound Business Judgment.

21.    The Court should authorize the Debtors to enter into the DIP Credit Facility Documents, obtain postpetition financing under the DIP Credit Facility, and continue using the Cash Collateral of the Prepetition CIT Secured Parties as a sound exercise of the Debtors' business judgment.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit so long as the agreement to obtain such credit does not run afoul of the

provisions and underlying policy considerations of the Bankruptcy Code.  See, e.g., In re L.A. Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

22.     To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also In re Curlew Valley Assocs., 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second-guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

23.     Courts generally will not second-guess a debtor's business decisions when those decisions involve a minimum level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor.  See In re Los Angeles Dodgers LLC, 457 B.R. at 313.  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'"  In re Dura Auto. Sys., Inc., No. 06-11202 (KJC), 2007

WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).  Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also In re Ellingsen MacLean Oil Co., 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization); In re Johns-Manville Corp., 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

24.     The Debtors' entry into the DIP Credit Facility represents a sound exercise of their business judgment.  The Debtors require access to the DIP Credit Facility because access to the proceeds thereof will permit the Debtors to continue to operate their business, navigate the Sale Process in these Chapter 11 Cases to maximize value for all of their stakeholders, and reassure their suppliers, customers, vendors, employees, and other stakeholders that the Debtors have adequate liquidity to satisfy their obligations in the ordinary course in these Chapter 11 Cases.  The terms of the DIP Credit Facility were thoroughly negotiated in good faith and at arm's-length, resulting in proposed postpetition financing on terms that are most favorable to all parties, including the Debtors, their estates, and their stakeholders.  Accordingly, the Court should authorize the Debtors' entry into the DIP Credit Facility as a reasonable exercise of the Debtors' business judgment.

**B. No Comparable Alternative to the DIP Credit Facility Is Reasonably Available.**

25.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections

afforded to potential lenders by section 364(c) of the Bankruptcy Code.  In re Snowshoe Co., Inc.,

789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900

(Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will

extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the

debtor] to conduct such an exhaustive search for financing."  Sky Valley, Inc., 100 B.R. at 113;

see also In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was

unavailable absent the senior lien by establishment of unsuccessful contact with other financial

institutions in the geographic area); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981)

(bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient

to support conclusion that section 364 requirement was met); In re Ames Dep't Stores, 115 B.R.

at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under

section 364(a) and (b)).

26.     Here, the Debtors have made a good-faith effort to seek out optimal postpetition

financing arrangements to meet their short-term liquidity needs and longer-term sale objectives.

As described above and in the White Declaration, prior to the Petition Date, the Debtors

endeavored to identify potential sources of postpetition financing.  During this period, the Debtors

and their advisors discussed debtor-in-possession financing with the Prepetition CIT Secured

Parties and also approached close to 90 additional third-party lenders active in the debtor-in-

possession market.

27.     The DIP Lender was not willing to provide the financing needed on an unsecured,

administrative claim basis.  Nor were the potential investors whom Jefferies contacted during the

marketing process.  In light of their efforts to solicit alternative financing proposals, the Debtors

do not believe that more favorable alternative debtor-in-possession financing is available, due

principally to the Debtors' existing capital structure.  Accordingly, the Debtors determined in their business judgment that the DIP Credit Facility constitutes the best available solution to the Debtors' financing needs.

### C. The Debtors Should Be Authorized to Pay the Fees Required by the DIP Credit Facility Documents.

28.     Under the DIP Credit Facility Documents, the Debtors have agreed, subject to Court approval, to pay certain fees, expenses, and other payments to the DIP Secured Parties.  The Debtors have also agreed to pay the fees and expenses of counsel and other professionals retained by the DIP Secured Parties as provided for in the DIP Credit Facility Documents.

29.     In determining whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.  See In re Farmland, 294 B.R. at 886-89; see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.), 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing debtor may have to enter into "hard" bargains to acquire funds for its reorganization); In re ION Media Networks, Inc., No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) ("Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.").  The propriety of a proposed financing facility should also be considered in light of current market conditions.  See Tr. of Record at 740:4-6, In re Lyondell Chem. Co., No. 09 10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP financing] pricing terms are, I find the provisions [of a DIP financing facility that included a roll-up of prepetition secured debt] reasonable here and now.")

30.     The Debtors submit that the interest, fees, and premiums to be paid under the DIP

Credit Facility are consistent with the market and are reasonable and appropriate, particularly in

light of the circumstances of these Chapter 11 Cases and the robust Sale Process undertaken, and

represent the most favorable terms available to the Debtors.  In particular, the interest rate and fees

contemplated by the DIP Credit Facility are similar to the interest rate and fees in other debtor-in-

possession financing arrangements approved by courts in this District and in other jurisdictions.

See In re Lucky Bucks, Case No. 23-10758 (KBO) (D. Del. July 14, 2023) (approving $20.5

million new money DIP Credit Facility with interest rate of SOFR + 10% (+ 2% for the default

interest rate), 5% new money backstop fee, 4% commitment fee, and 3% exit fee); In re Clovis

Oncology, Inc., Case No. 22-11292 (JKS) (Jan. 24, 2023) (approving a $75 million DIP Credit

Facility with 8% interest rate, 7% backstop fee, 1.5% upfront fee, and 1.5% contingent sale fee);

In re Phasebio Pharmaceuticals, Inc., Case No. 22-10995 (LSS) (Nov. 15, 2022) (approving a $15

million DIP Credit Facility with 14% interest rate, 2% commitment fee, and 5% exit fee); In re

MD Helicopters, Inc., Case No. 22-10263 (KBO) (Bankr. D. Del. Apr. 26, 2022) (approving $60

million new money DIP Credit Facility with 8.25% interest rate, 5.0% exit fee, and 8.0% backstop

fee); In re APC Automotive Technologies Intermediate Holdings, LLC, Case No. 20-11466 (CSS)

(Bankr. D. Del. June 23, 2020) (approving $50 million new money DIP Credit Facility with 10%

new money interest, 5.0% upfront fee, and 10% backstop fee); In re Alpha Media Holdings LLC,

Case No. 21-30209 (KRH) (Bankr. E.D. Va. Feb. 24, 2021) (approving $95 million new money

DIP Credit Facility with 8.0% interest, 2.0% upfront fee, and 5.0% exit fee);

31.     The Debtors considered the fees when determining, in their sound business

judgment, that the DIP Credit Facility constituted the best actionable terms on which the Debtors

could obtain the postpetition financing necessary to continue their operations and pursue the Sale

Process to the benefit of the Debtors' estates.  Accordingly, the Court should authorize the Debtors

to pay the interest, payments, fees, costs, and expenses provided under the DIP Credit Facility

Documents in connection with the DIP Credit Facility.

**D.    The Proposed "Roll-Up" of the DIP Credit Facility Is Appropriate.**

32.    As described above, the DIP Credit Facility contemplates the dollar-for-dollar

conversion of approximately $35 million of existing obligations under the Pre-Petition Credit

Agreement into postpetition DIP Credit Facility obligations upon entry of the Final Order (the

"Roll-Up").

33.    Section 363 of the Bankruptcy Code permits a debtor to use, sell, or lease property,

other than in the ordinary course of business, with court approval.  It is well settled in the Third

Circuit that such transactions should be approved when they are supported by a sound business

purpose.  See In re Abbots Dairies, Inc., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third

Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the

Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification

for the proposed transaction). The business judgment rule shields a debtor's management from

judicial second-guessing. In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)

("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a

presumption of reasonableness attaches to a debtor's management decisions.").

34.    Repayment of prepetition debt (often referred to as a "roll-up") is a common feature

in debtor-in-possession financing arrangements.  Courts regularly approve this practice, including

on the first day of the case. See In re PGX Holdings, Inc., Case No. 23-10718 (CTG) (Bankr. D.

Del. Aug. 4, 2023) (authorizing approximately $12 million new money DIP and a roll-up of

approximately $39.85 million); In re Lucky Bucks, LLC, Case No. 23-10758 (KBO) (Bankr. D.

Del. July 14, 2023) (approving approximately $20.5 million new money DIP and a roll-up of

approximately $61.5 million); <u>In re Charming Charlie Holdings Inc.</u>, Case No. 19-11534 (MFW) (Bankr. D. Del. July 11, 2019) (approving approximately $20 million new money DIP and a roll-up for approximately $40 million).

35.    The Debtors submit that the Roll-Up, as set forth in the DIP Credit Facility, is appropriate in these cases.  The DIP Credit Facility, like the Prepetition First Lien Credit Facility, is structured as an asset-based revolving loan in which the Debtors' receipts are swept to pay down the outstanding debt, with the Debtors able to draw additional loans subject to a borrowing base.  Upon entry of the Interim Order, the Roll-Up would allow all collections and proceeds of DIP Collateral to be applied to reduce, on a dollar-for-dollar basis, the obligations under the Prepetition CIT Loan Documents.  Upon entry of the Final Order, the Roll-Up would allow all remaining outstanding obligations under the Prepetition First Lien Credit Facility to convert into DIP Loans.  The Roll-Up is not only a material component of the consideration required by the Lenders as part of their commitment to provide new money postpetition financing, but a critical part of a global deal among the Debtors, their stalking horse bidder, certain equipment lessors, and the Prepetition CIT Secured Parties.  The Prepetition CIT Secured Parties made clear in their negotiations with the Debtors that the inclusion of this Roll-Up was an essential inducement to their willingness to extend the DIP Credit Facility.  Moreover, no creditors or other parties in interest are prejudiced by the Roll-Up.  To the contrary, without the Roll-Up, the Debtors would have no option but to liquidate their assets in an orderly wind-down to the detriment of their estates and stakeholders.  The Roll-Up will enable the Debtors to instead conduct an orderly, value-maximizing sale process.  For these reasons, the Debtors respectfully submit that the Roll-Up is a sound exercise of the Debtors' business judgment, appropriate under the circumstances, and should be approved.

E.   **The Use of Cash Collateral Is Warranted and Necessary**

36.    In addition to the DIP Credit Facility, the Debtors require use of Cash Collateral to continue operating and conducting an orderly disposition of their assets, to maximize the value thereof, and to avoid a potentially value-destructive wind-down of their businesses on an accelerated timeline.  The Debtors submit that, under the circumstances, their request to use Cash Collateral should be approved.  The Debtors' use of property of their estates, including Cash Collateral, is governed by section 363(c) of the Bankruptcy Code.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)  each entity that has an interest in such cash collateral consents; or
> (B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

37.    Here, the Debtors have negotiated consensual use of Cash Collateral with the Prepetition CIT Secured Parties.  Because the Debtors have the consent of the only entities with an interest in the Cash Collateral (subject to the terms of the DIP Orders), the Court should approve such use under section 363(c)(2)(A) of the Bankruptcy Code.  In re Sorenson Communications, Inc., No. 14-10454 (BLS), 2014 WL 929351, at *5 (Bankr. D. Del. Mar. 4, 2014) ("The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral . . . is vital to the preservation and maintenance of the Debtors' going concern values and successful reorganization."); In re WP Steel Venture LLC, No. 12-11661 (KJC), 2012 WL 5288123 (Bankr. D. Del. 2012) ("The ability of the Debtors to obtain sufficient working capital and liquidity through the use of Cash Collateral . . . is vital to the preservation and maintenance of the value of the Debtors' assets.").  Likewise, courts have recognized that "[a] debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to

rebuild. Without the availability of cash to meet daily operating expenses . . . the congressional policy favoring rehabilitation over economic failure would be frustrated." In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984); In re MFM Delaware, Inc., No. 13-11359 (PJW), 2013 WL 2434211, at *2 (Bankr. D. Del. May 28, 2013) ("The Debtors' need to use cash collateral on an interim basis . . . is immediate and critical to enable the Debtors to continue operations and to administer and preserve the value of their estates.").

38.     Moreover, absent the use of Cash Collateral, the Debtors will not have sufficient working capital to fund their ordinary course operations or these Chapter 11 Cases, and they will not be able to maximize the value of their assets by continuing and efficiently concluding the Sale Process. It is well established that whenever possible, a bankruptcy court should resolve issues in favor of allowing a debtor to continue its business as a going concern. Courts have recognized that "[a] debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to rebuild. Without the availability of cash to meet daily operating expenses . . . the congressional policy favoring rehabilitation over economic failure would be frustrated." Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.), 727 F.2d 1017, 1019 (11th Cir. 1984); In re Sorenson Communications, Inc., No. 14-10454 (BLS), 2014 WL 929351, at *5 (Bankr. D. Del. Mar. 4, 2014) ("The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral . . . is vital to the preservation and maintenance of the Debtors' going concern values and successful reorganization."); In re MFM Delaware, Inc., No. 13-11359 (PJW), 2013 WL 2434211, at *2 (Bankr. D. Del. May 28, 2013) ("The Debtors' need to use cash collateral on an interim basis . . . is immediate and critical to enable the Debtors to continue operations and to administer and preserve the value of their estates."); see also N.L.R.B. v. Bildisco and Bildisco, 465 U.S. 513, 528

(1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.").

### A. The Proposed Adequate Protection Is Reasonable and Appropriate

39.     Additionally, the Debtors submit that the agreed adequate protection package to be provided to the Prepetition CIT Secured Parties is sufficient to approve the use of the Cash Collateral under section 363 of the Bankruptcy Code. Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See* 11 U.S.C. § 362(d)(1); see also In re Cont'l Airlines, 91 F.3d 553, 556 (3d Cir. 1996).

40.     Generally, courts decide what constitutes adequate protection on a case-by-case basis.  See, e.g., In re Swedeland Dev. Grp., Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); In re N.J. Affordable Homes Corp., No. 05-60442, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); In re Columbia Gas Sys., Inc., Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); see also In re Dynaco Corp., 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding") (internal citation omitted).

41.     Adequate protection may be provided in various forms, including a grant of replacement liens or administrative claims.  See, e.g., In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case."); In re Realty Sw. Assocs., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (application of adequate protection is case-specific, but "its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process").  The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor-in-possession.  See In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization.").

42.     Here, the agreed adequate protection package to be provided to the Prepetition CIT Secured Parties is sufficient to approve the use of the Cash Collateral.  The DIP Orders provide the Prepetition CIT Secured Parties with adequate protection liens to the extent of any diminution in value, if any, of their interest in the Prepetition Collateral resulting from, as provided in the Bankruptcy Code, the use, sale or lease by the Debtors of such collateral, including the Cash Collateral, or the imposition or enforcement of the automatic stay pursuant to section 362(a) of the Bankruptcy Code (the "Diminution in Value"), as well as superpriority administrative expense claims to the extent of any Diminution in Value, reimbursement of reasonable and documented professional fees and expenses, and reporting obligations consistent with the Prepetition First Lien Credit Agreement.  Moreover, the use of Cash Collateral to preserve the value of the Prepetition Collateral itself protects the Prepetition CIT Secured Parties against diminution in value of that

collateral.  Without access to the DIP Credit Facility and the use of Cash Collateral, the Debtors would have no choice but to liquidate their business, which would rapidly erode the value of the Prepetition Collateral and eliminate the Debtors' ability to pursue and close a value-maximizing going concern sale.

**F.      The Scope of the Carve-Out Is Reasonable and Appropriate**

43.      The Prepetition CIT Secured Parties' respective interests in the Prepetition Collateral (including the Cash Collateral) are subject to the Carve-Out.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which such professionals may be paid in these Chapter 11 Cases would be restricted. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for payment of the clerk of the Court, trustee fees, and professional fees of the Debtors and any official committee of unsecured creditors appointed in these Chapter 11 Cases.

**G.      Interim Relief Should Be Granted**

44.      Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Bankruptcy Rule 4001(b)(2).  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other

business decisions.  See, e.g., In re Simasko Production Co., 47 B.R. 444, 449 (Bankr. D. Co. 1985); see also In re Ames Dep't Stores Inc., 115 B.R. at 38.  After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent destruction of the debtor's business.  A debtor is entitled to use cash collateral that it believes prudent in the operation of its business.  See, e.g., Simasko, 47 B.R. at 449; Ames Dep't Stores, 115 B.R. at 36.

45.     As set forth above, pending the Final Hearing, the Debtors require immediate access to Cash Collateral to fund all day-to-day operations, including to maintain business relationships with their vendors and suppliers, honor payroll and employee benefits obligations, and satisfy other essential working capital and operational needs.  All of these expenses are required to preserve and maintain the Debtors' business operations for the benefit of all parties in interest.  In addition, the agreed-upon Approved Budget ensures that the Debtors' use of Cash Collateral will not prejudice the Prepetition CIT Secured Parties.

**H.     The Automatic Stay Should Be Modified on a Limited Basis**

46.     The relief requested herein contemplates a modification of the automatic stay solely to permit the Prepetition CIT Secured Parties to deliver written notice by electronic mail stating that they elect to commence the exercise of rights and remedies with respect to the Interim Order, Prepetition First Lien Credit Agreement, and under applicable bankruptcy and non-bankruptcy law, including, without limitation, in respect of their Prepetition Collateral and Replacement Liens. Stay modifications of this kind are ordinary and standard features for the use of cash collateral and, in the Debtors' business judgment, are reasonable and fair under the circumstances.

<u>**IMMEDIATE RELIEF IS NECESSARY**</u>

47.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use the property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within

twenty-one (21) days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. As described above, without access to Cash Collateral, the Debtors would be unable to operate their business and fund these Chapter 11 Cases.

48.     For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 4001(a)(3)

49.     The Debtors request a waiver of the stay of the effectiveness of the order granting the relief requested herein pursuant to Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides, "[a]n order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As explained above and in the Madden Declaration, the use of Cash Collateral is essential to prevent irreparable damage to the Debtor's operations. Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

50.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As provided herein, and to implement the foregoing successfully, the Debtors request that the Interim Order include a finding that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

51.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Interim Order.

## RESERVATION OF RIGHTS

52.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or shall be construed as: (a) an admission as to the validity of any claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; and (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise).

## NOTICE

(a)     Notice of this Motion has been or will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Internal Revenue Service; (iii) counsel for the Prepetition CIT Secured Parties; (iv) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates; and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors will serve copies of this Motion and an order entered in respect of this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.  No previous motion for the relief sought herein has been made to this or any other court.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially in the form annexed hereto as <u>Exhibit A</u>, granting the relief requested herein and such other and further relief as the Court may deem just and equitable.

Dated: October 23, 2023
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Edmon L. Morton*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Heather P. Smillie (Del. No. 6923)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
hsmillie@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Brian S. Lennon (*pro hac vice* pending)
Debra M. Sinclair (*pro hac vice* pending)
Erin C. Ryan (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
blennon@willkie.com
dsinclair@willkie.com
eryan@willkie.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**Exhibit A**

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| UNCONDITIONAL LOVE INC., *et al*,[1] | Case No.  23-11759 (MFW) |
| Debtors. | Ref. Docket No.: __ |

**INTERIM ORDER (I) AUTHORIZING**
**THE DEBTORS TO OBTAIN POST-PETITION FINANCING,**
**GRANTING SENIOR POSTPETITION SECURITY INTERESTS**
**AND ACCORDING SUPERPRIORITY ADMINISTRATIVE EXPENSE**
**STATUS PURSUANT TO SECTIONS 364(c) AND 364(d) OF THE BANKRUPTCY**
**CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL,**
**(III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING**
**THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the above-captioned debtors (each a "Debtor" and

collectively, the "Debtors") seeking, among other things:

(1) authority pursuant to sections 363 and 364(c) and (d) to obtain debtor-in-possession
senior secured financing (the "DIP Credit Facility") pursuant to the following terms and
agreements (collectively, the "DIP Credit Facility Documents"): (a) this interim order (the "Interim
Order"), and any final order entered by the Court with respect to the Motion (the "Final Order"),
(b) the *Terms and Conditions of Proposed Senior Secured, Super-Priority Debtor-in-Possession
Credit Facility*, by and among the Debtors, as borrowers and debtors-in-possession, CIT
Northbridge Credit LLC, as agent (the "DIP Agent") for the lenders and other financial institutions
that will be party to the DIP Credit Agreement (as defined herein), attached hereto as Exhibit D
(the "DIP Term Sheet"); and (c) the *Senior Secured, Super-Priority Debtor-in-Possession Loan,
Security and Guarantee Agreement*, contemplated in the DIP Term Sheet, as amended, modified,
and/or supplemented (the "DIP Credit Agreement"),[2] to be executed by and among the Debtors,
as borrowers and debtors-in-possession, CIT Northbridge Credit LLC, as agent (the "DIP Agent")
for the lenders and other financial institutions party to the DIP Credit Agreement or which extend
credit thereunder (the "DIP Lenders," and collectively with the DIP Agent, the "DIP Secured
Parties"); which DIP Credit Facility will consist of a consolidated, revolving credit facility in the
aggregate, maximum principal amount of forty-seven million dollars ($47,000,000), consisting of
new revolving availability of up to twelve million seventy thousand six hundred sixty seven dollars

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification
number, are Unconditional Love Inc. d/b/a Hello Bello (5895), Unconditional Love Canada, Inc., and The Best
Training Pants in the World Inc. (9369).  The Debtors' headquarters is located at 17383 Sunset Blvd., Suite B200,
Pacific Palisades, CA 90272.

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Term Sheet
or DIP Credit Agreement, as applicable.

and forty six cents ($12,070,667.46), and a conversion of $34,929,332.54 of obligations under the Prepetition First Lien Credit Agreement into post-petition debtor-in-possession financing obligations;

(2) the grant to the DIP Agent, for the benefit of itself and the other DIP Lenders, of superpriority administrative claim status pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code in accordance with the terms of this Interim Order;

(3) authorization for the Debtors' use of cash collateral whenever or wherever acquired, and the proceeds of all collateral pledged to the Prepetition CIT Secured Parties (defined below), as contemplated by section 363 of the Bankruptcy Code in accordance with the terms set forth herein;

(4) authorizing and approving the Debtors to incur obligations under the DIP Credit Facility Documents, including to borrow under the DIP Credit Facility (collectively, the "DIP Obligations"), and to use the proceeds of the DIP Credit Facility on the terms and conditions set forth in the DIP Orders and DIP Credit Facility Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted with respect to the Approved Budget;

(5) authorizing the Debtors to pay principal, interest, fees, expenses, and other DIP Obligations payable under the DIP Credit Facility Documents as they become due;

(6) a grant of adequate protection to the Prepetition CIT Secured Parties (as defined below) under and in connection with the Prepetition CIT Loan Documents (as defined below) in accordance with the terms set forth herein;

(7) modification of the automatic stay to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Federal Rule of Bankruptcy Procedure 4001(a)(3) and 6004(h);

(8) scheduling a final hearing setting for the Motion for entry of an order authorizing the DIP Credit Facility and use of cash collateral on a final basis; and

(9) granting related relief.

Notice of the Motion, the relief requested therein, and the Interim Hearing (as defined below) (the "Notice") having been served by the Debtors in accordance with Rule 4001(c) on: (i) the DIP Agent and the DIP Lenders and the Prepetition CIT Secured Parties; (ii) the U.S. Trustee; (iii) the holders of the thirty (30) largest unsecured claims against the Debtors' estates; (iv) all parties known to the Debtors who hold any liens or security interest in the Debtors' assets who have filed liens or UCC-1 financing statements against the Debtors, or who, to the Debtors'

knowledge, have asserted any liens on any of the Debtors' assets; (v) the Internal Revenue Service and all taxing authorities of states in which the Debtors conduct business; and (vi) certain other parties identified in the certificates of service filed with the Court.

The Court held an interim hearing with respect to the Motion on October [___], 2023 (the "Interim Hearing").

After the Motion and the proceedings before the Court at the Interim Hearing; the Court having considered the Motion, the exhibits attached thereto, the First Day Declaration, the White Declaration, the Madden Declaration, and the evidence submitted and arguments made at the Interim Hearing; notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court as reflected on the record established by the Debtors at the Interim Hearing; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and it is otherwise fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the administration of the Chapter 11 Cases, the continued operation of the Debtors in the ordinary course, and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Facility Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

---

[3]    To the extent, any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

A.      On October 23, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code");[4]

B.      The Debtors have continued in the management and operation of their business pursuant to sections 1107 and 1108, and no trustee or examiner has been appointed;

C.      The Debtors gave appropriate notice under the circumstances of the Motion and hearing in accordance with the Federal Rules of Bankruptcy Procedure and any applicable local rules of this Court;

D.      The Court has core jurisdiction over the Debtors' bankruptcy cases, the Motion, and the parties and property affected by this Interim Order pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference*, dated February 29, 2012, from the United States District Court for the District of Delaware, and venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court may enter a final order consistent with Article III of the United States Constitution; as of the date hereof, the United States Trustee has not yet appointed an official committee of unsecured creditors in this case pursuant to section 1102 (a "Statutory Committee");

E.      The Debtors agree, admit, represent and stipulate for themselves and their estates, subject to the challenge rights of third parties set forth in this Interim Order, the following (collectively, the "Stipulations"):

> (1)      as of the Petition Date, the Debtors were party to each of:
>
>> (x) a Loan, Security and Guarantee Agreement dated as of April 12, 2022 (such agreement, as amended and existing immediately prior to the Petition Date,

---

[4]      Unless otherwise noted, all statutory references are to the Bankruptcy Code.

the "Prepetition First Lien Credit Agreement") with CIT Northbridge Credit LLC as agent and the lenders party thereto;  and

(y)    all other documents, instruments, and agreements executed in connection with the Prepetition First Lien Credit Agreement (such agreements, collectively with the Prepetition First Lien Credit Agreement, the "Prepetition CIT Loan Documents");

(2)    As of the Petition Date, CIT Northbridge Credit LLC serves as agent (in such capacity, the "Prepetition CIT Agent") under each of the Prepetition CIT Loan Documents.  The lenders party to each of the Prepetition CIT Loan Documents shall be referred to in this Interim Order as the "Prepetition CIT Lenders", and the Prepetition CIT Lenders and Prepetition CIT Agent shall be collectively be referred to herein as the "Prepetition CIT Secured Parties";

(3)    As of the Petition Date, the Debtors and other obligors under the Prepetition CIT Loan Documents were indebted to the Prepetition CIT Secured Parties, without defense, counterclaim, recoupment or offset of any kind, in the non-contingent liquidated amount of no less than $34,929,332.54, plus other fees, costs, expenses, and other amounts arising in respect of the Prepetition CIT Loan Document obligations existing immediately prior to the Petition Date (such obligations, the "Prepetition CIT Obligations").  The Prepetition CIT Obligations had been accruing interest at the default rate of interest prior to the Petition Date and the default rate shall continue to be in effect with respect to the Prepetition CIT Obligations from and after the Petition Date.

(4)    As of the Petition Date, the Prepetition CIT Obligations were secured by valid, enforceable, properly perfected, and unavoidable liens on and security interests (the

"Prepetition CIT Liens") encumbering substantially all assets of the Debtors (other than Excluded Assets (as defined in the Prepetition First Lien Credit Agreement)) existing immediately prior to the commencement of the Debtors' bankruptcy proceeding (the "Prepetition Collateral"), which Prepetition CIT Liens are senior, first priority liens and security interests with respect to all Prepetition Collateral, other than Senior Third Party Liens (as defined below);

(5)     The Prepetition CIT Liens were granted by the Debtors to, or for the benefit of, the Prepetition CIT Secured Parties for fair consideration and reasonably equivalent value;

(6)     The Debtors possess no claims, counterclaims, cross-claims, offsets, challenges, objections, defenses, or other rights or causes of action of any kind or nature against the Prepetition CIT Secured Parties including, without limitation, avoidance, disallowance, disgorgement, impairment, reduction, attachment, recoupment, defense, objection, recovery, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or other applicable non-bankruptcy law;

(7)     The Prepetition CIT Obligations constitute valid, binding, and legal obligations of the Debtors, enforceable in accordance with their terms, and the Debtors and all other obligors under the Prepetition CIT Loan Documents will not assert any claims or defenses of any kind or nature that in any way would affect the validity and enforceability of any of the Prepetition CIT Obligations and/or the security interests or liens of the Prepetition CIT Secured Parties upon the Prepetition Collateral, or which would in any way reduce the obligation of the Debtors to pay in full all of the Prepetition CIT Obligations; and

(8)     the use of Cash Collateral (as defined below) and the loans, advances, and other financial accommodations to be obtained pursuant to the DIP Credit Facility are sufficient to fund the projected legitimate and allowable expenses of their Chapter 11 cases from the Petition Date during the period to which the Approved Budget pertains.

F.     The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Agent and DIP Lenders on terms more favorable than the DIP Facility.  The Debtors are unable to obtain sufficient levels of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense necessary to maintain and conduct their business, unable to obtain credit secured solely by a lien on unencumbered property, and unable to obtain credit secured solely by junior liens on property of the Debtors.  The DIP Secured Parties are willing to provide postpetition financing to the Debtors only through DIP Credit Facility and the DIP Credit Facility Documents;

G.     All cash of the Debtors, wherever located (including any cash in deposit accounts), represents (i) proceeds of loans or other financial accommodations provided to the Debtors by the Prepetition CIT Secured Parties under Prepetition CIT Loan Documents; or (ii) proceeds of Prepetition Collateral.  Such funds (the "Cash Collateral") constitute cash collateral within the meaning of section 363 of the Bankruptcy Code;

H.     It is in the best interest of the Debtors' estates that the Debtors be allowed to enter into the DIP Credit Facility in order to obtain postpetition secured financing from the DIP Secured Parties, and use Cash Collateral subject to and in accordance with the terms of this Interim Order and the DIP Credit Facility Documents, and to grant adequate protection to the Prepetition CIT Secured Parties on account of the Debtors' Prepetition CIT Obligations, on an interim basis under

the terms and conditions set forth herein and in the DIP Credit Facility Documents, as such is necessary to avoid immediate and irreparable harm to the Debtors' estate pending the Final Hearing;

I.      The Debtors require access to the funding available under the DIP Credit Facility and the DIP Credit Facility Documents and Cash Collateral in order to satisfy administrative expenses associated with the operation of their business as a going concern, pursuing the Sale Process and other costs relating to the administration of the Chapter 11 Cases, and in order to avoid immediate and irreparable harm to the Debtors' estates pending the Final Hearing.  The priming of the Prepetition CIT Liens on the Prepetition Collateral under section 364(d), as contemplated by the DIP Facility, is necessary for the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their estates and creditors;

J.      The Prepetition CIT Secured Parties are unwilling to consent to use of Cash Collateral by the Debtors, except under the terms of the DIP Credit Facility Documents and this Interim Order assuring that the liens and the various claims, superpriority claims, and other protections granted in this Interim Order will not be affected by any subsequent reversal or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated in the DIP Credit Facility Documents and the use of Cash Collateral pursuant to this Interim Order;

K.      The Prepetition CIT Secured Parties are each entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 362, 363, and 507(b) of the Bankruptcy Code, to the extent of any aggregate diminution in value of their respective interests in the Prepetition Collateral resulting from, among other things, the Debtors' use, of Cash Collateral and other Prepetition Collateral, the subordination of the Prepetition CIT Secured Parties' respective

interests in the Prepetition Collateral (including Cash Collateral) to the Carve Out and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Diminution in Value");

L.     Upon (a) entry of this Interim Order, without any further action by the Debtors or any other party, but subject to Paragraph 28 herein, all collections and proceeds of DIP Collateral shall be applied to reduce, on a dollar-for-dollar basis, the obligations under the Prepetition CIT Loan Documents, and (b) entry of the Final Order, but subject to the other terms herein, all remaining outstanding obligations under the Prepetition CIT Credit Agreement shall be converted into and constitute DIP Credit Facility Document obligations. Such administration and treatment of the Prepetition CIT Credit Agreement Obligations shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the DIP Lenders to fund advances under the DIP Credit Facility Documents and not as adequate protection for, or otherwise on account of, any Prepetition Credit Agreement obligations. The Prepetition CIT Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens as provided herein, and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Credit Facility Document advances or extend credit to the Debtors thereunder without the inclusion of such terms. Moreover, the conversion of all outstanding Prepetition CIT Credit Agreement obligations into DIP Credit Facility Document obligations upon entry of the Final Order will enable the Debtors to obtain urgently needed financing to administer these cases and fund their operations. Because the conversion of Prepetition Credit Agreement obligations into DIP Credit Facility Document obligations is subject to the reservation of rights in Paragraph 28 below, they will not prejudice the right of any other party in interest.

M.     The DIP Secured Parties and Prepetition CIT Secured Parties negotiated in good faith regarding the DIP Credit Facility and the Debtors' use of Cash Collateral to fund the administration of the Debtors' estates, pursuit of the Sale Process, and continued operation of the Debtors' businesses in accordance with the terms of this Interim Order. Based on the Motion and on the record presented to the Court at the Interim Hearing, the terms of the DIP Credit Facility, DIP Credit Facility Documents, proposed adequate protection arrangements and of the use of Cash Collateral as set forth in this Interim Order are (i) consistent with and authorized by the Bankruptcy Code, (ii) fair and reasonable, (iii) reflect the Debtors' prudent exercise of business judgment, (iv) necessary to protect the Prepetition CIT Secured Parties from the Diminution in Value of their respective interests in the Prepetition Collateral, and (v) constitute reasonably equivalent and fair consideration for the Prepetition CIT Secured Parties' consent thereto.  The DIP Secured Parties are entitled to the protections of Bankruptcy Code Section 364(e).

N.     Each of the Debtors is a duly organized, validly existing legal entity and has the requisite power and authority to own, lease, and operate its property, including, without limitation, the DIP Collateral.  Each of the Debtors has the requisite power and authority to enter into, execute, deliver, and perform its obligations under the DIP Credit Facility Documents and this Interim Order and to incur the obligations provided for thereon.  Except as may be explicitly required in the DIP Credit Facility Documents, no consent or waiver of, filing with, authorization, approval or other action by any shareholder, any federal, state, or other governmental authority or regulatory body or any other Person (other than the DIP Secured Parties), which has not already been obtained or done, is required in connection with the execution, delivery and performance by the Debtors of any of the documents required as a condition to the validity or enforceability of the DIP Credit Facility Documents, other than entry by this Court of this Interim Order; and

O.      Good and sufficient cause exists for the issuance of this Interim Order, to prevent immediate and irreparable harm to the Debtors' estates.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:**

1.      The Motion is granted on an interim basis effective as of the Petition Date, as set forth herein.  All objections to this Interim Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled on the merits.  This Interim Order shall be valid, binding on all parties-in-interest and fully effective immediately upon entry.  The Debtors are authorized, pursuant to sections 363 and 364, to enter into the DIP Credit Facility and DIP Credit Facility Documents (and, to the extent executed prior to entry of this Interim Order, such execution is hereby ratified and affirmed), to execute such other and additional documents necessary or desired to implement the DIP Credit Facility or DIP Credit Facility Documents, to obtain postpetition secured financing from the DIP Secured Parties, and to use Cash Collateral, and the proceeds and products thereof, pursuant to the terms and conditions of the DIP Credit Facility Documents and this Interim Order to avoid immediate and irreparable harm to the Debtors' estates pending the Final Hearing.  The Debtors shall use the advances obtained under the DIP Credit Facility and the DIP Collateral (including Cash Collateral) only for the purposes and in the amounts set forth in the DIP Credit Facility Documents and Approved Budget attached hereto as Exhibit A, as such budget may be amended from time to time with the consent of the DIP Agent in its sole discretion, without the need for further Court approval (such budget, the "Approved Budget"), subject to the terms and conditions set forth in the DIP Credit Facility Documents and this Interim Order (including the Approved Budget Variances (as defined below)). The DIP Secured Parties shall have no obligation to make DIP Credit Facility advances in excess of the amounts and times set forth in the Approved Budget and DIP Credit Facility Documents; provided that the obligation to

make DIP Credit Facility overadvances shall be determined in accordance with the DIP Credit Facility Documents.

2.       With respect to the Approved Budget:

(a)  Subject to the Approved Budget Variances (as defined below) (i) the Debtors' aggregate cash receipts budget line item (the "Total Cash Receipts" line item) and (ii) the Debtors' aggregate cash operating disbursement line item (the "Total Operating Disbursements" line item) (which Total Operating Disbursements Line item shall not include line items for fees and expenses of third party professionals engaged by or for the benefit of the Debtor or the Statutory Committee (if any)) shall be adhered to on a weekly basis (for the Total Operating Disbursements line item) and a cumulative basis (for the Total Cash Receipts line item and Total Operating disbursements line item) for the Budget (as defined below) period then ending as described below, provided, however, that amounts not disbursed  under the Budget shall be deemed to roll over to subsequent weeks.

(b) Actual amounts for the Total Cash Receipts line item will be tested weekly beginning with the first full calendar week following the Petition Date and may not be less than the applicable Approved Budget on a cumulative basis for that portion of the Approved Budget period then ending by more than (a) fifteen percent (15.0%) for such line item for the first two testing periods, and (b) ten percent (10.0%) for such line item for each testing period thereafter. Actual amounts for the Total Operating Disbursements line item (which shall not and does not include any Professional Fee line items) will be tested weekly beginning with the first full calendar week following the Petition Date and may not exceed the applicable Approved Budget (including any amounts deemed to roll over from a previous week due to not being spent) by more than ten percent (10.0%) for such line item on a weekly basis or more than ten percent (10.0%) for such

- 12 -

line item on a cumulative basis for that portion of the Approved Budget period then ending (collectively, the "Approved Budget Variances").

(c) The Debtors' disbursements for fees and expenses of third party professionals engaged by or for the benefit of the Debtors or the Statutory Committee (if any), including success or transaction fees (collectively, "Professional Fees") shall be reported within the Approved Budget in a manner so that Professional Fees for each retained professional are reflected on its own line item. The Approved Budget line items for Professional Fees shall not be tested for purposes of compliance with the Approved Budget or calculation of any Approved Budget Variances; *provided*, *however*, that Carve-Out for the respective Chapter 11 Professionals retained by the Debtors or Committee shall nevertheless be governed by the amounts of Professional Fees budgeted for each group's professionals within the Approved Budget).

(d) Any fees payable to professionals retained by the DIP Secured Parties set forth in the Budget shall not be tested for purposes of compliance with the Budget or calculation of any Budget Variances.

3.      No proceeds of the DIP Credit Facility or Cash Collateral shall be used to (a) permit the Debtors or any other party-in-interest to challenge or institute any proceeding to determine (i) the validity, perfection, or priority of any security interests in favor of the Prepetition CIT Secured Parties or the DIP Secured Parties or (ii) the enforceability of the Debtors' obligations or the obligations of any obligor under the Prepetition CIT Loan Documents or DIP Credit Facility Documents; (b) investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against the Prepetition CIT Secured Parties or the DIP Secured Parties or any of their agents, attorneys, advisors or representatives, including, without limitation, claims or causes of

action relating to lender liability or subordination claims; (c) investigate, commence, prosecute, or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the obligations of the Debtors or any other obligor under the Prepetition CIT Loan Documents or the DIP Credit Facility Documents, or (d) fund any acquisitions, capital expenditures, capital leases, or similar expenditures other than those specifically set forth in the Approved Budget; provided, however, that a Statutory Committee (if any) and its professionals shall be allowed to use proceeds of the DIP Credit Facility or Cash Collateral, in an amount not to exceed twenty five thousand dollars ($25,000), to investigate the validity and perfection of the Prepetition CIT Liens (the "Committee Budget"); provided further, however, that any fees and expenses incurred by any Statutory Committee or any of its legal or financial advisors in connection with any such investigation in excess of the Committee Budget, and any fees or expenses incurred by any Statutory Committee or its legal or financial advisors in connection with commencing or prosecuting any Challenge Action, shall not be paid from the proceeds of the Prepetition Collateral, including any Cash Collateral or the Carve-Out, and all rights of all parties in interest are reserved to challenge the status of such fees or expenses as allowed administrative expense claims for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

4.      Pursuant to sections 363 and 364(c) and (d), the DIP Credit Facility funds advanced pursuant to the terms of this Interim Order (collectively, the "Interim DIP Advances") and, upon entry of the Final Order, any further DIP Credit Facility funds advanced pursuant to the terms of the Final Order, shall be allowed administrative expenses of the Debtors' estates, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtors and over all administrative expenses or charges against property arising

in the Debtors' Chapter 11 cases and any superseding Chapter 7 case including, without limitation, those specified in Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114, subject and junior only to the Carve-Out (as hereinafter defined) (such claim, the "DIP Superpriority Claim"); provided, that the DIP Superpriority Claim shall not be asserted against or payable from Avoidance Proceeds (as defined below) prior to entry of the Final Order.  The time of payment of the Interim DIP Advances shall not be altered, extended or impaired without the consent of the DIP Agent by any plan or plans of reorganization that may hereafter be accepted or confirmed or any further orders of the Court which hereafter may be entered.  No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be pari passu with or senior to the DIP Superpriority Claim.

5.    Interest on the Prepetition CIT Obligations shall, to the extent permitted under the Bankruptcy Code, accrue from and after the Petition Date at the rate set forth in the Prepetition First Lien Credit Agreement and be payable along with interest accruing on the Interim DIP Advances, as set forth in the Approved Budget and DIP Credit Facility Documents.  The reasonable and documented fees and expenses of the DIP Secured Parties shall be payable without further notice, motion, or application to, order of, or hearing before, the Court (except such notice as may be required in the DIP Credit Facility Documents); provided, however, the DIP Agent shall submit copies of its professionals' invoices to the Debtors, the U.S. Trustee and counsel for any Statutory Committee, which invoices may be in summary form only (provided, that such invoices contain data regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates), and such parties shall have ten (10) days following the receipt of such invoices to object to the reasonableness of the fees and expenses included in any such invoices. If

any objection is asserted, the Court shall decide the issue and the Debtors shall pay any undisputed portion of such fees or expenses notwithstanding the pending resolution of the disputed portion. Any fees payable to professionals retained by the DIP Secured Parties set forth in the Approved Budget shall not be limited by the amounts set forth in the Approved Budget.

6.      Upon entry of this Interim Order, without any further action by the Debtors or any other party, but subject to Paragraph 28 herein, all collections and proceeds of DIP Collateral shall be applied to reduce, on a dollar-for-dollar basis, the obligations under the Prepetition CIT Loan Documents, and upon entry of the Final Order, but subject to the other terms herein, all remaining outstanding obligations under the Prepetition CIT Credit Agreement shall be converted into and constitute DIP Credit Facility Document obligations.

7.      Pursuant to sections 363, 364(c), and 364(d), as security for the Interim DIP Advances and other postpetition costs payable under the DIP Credit Facility Documents, and, upon entry of the Final Order, any further DIP Credit Facility funds advanced pursuant to the terms of the Final Order, the Debtors are hereby authorized to and are hereby deemed to grant to the DIP Agent a valid, binding and enforceable lien, mortgage and/or security interest (a "Lien," and as so granted to the DIP Agent, the "DIP Credit Lien") in all of the Debtors' presently owned or hereafter acquired property and assets, whether such property and assets were acquired before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and the proceeds and products thereof (collectively, the "DIP Collateral"), including the proceeds of any actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral, but excluding any causes of action that could be brought pursuant to sections 544, 545, 547, 548 of the Bankruptcy Code, or any applicable state fraudulent

transfer statutes (the "Avoidance Actions"), but, subject to entry of the Final Order, including

proceeds of (and property received in respect of) Avoidance Actions ("Avoidance Proceeds").

8.     Pursuant to sections 364(c) and (d), the DIP Credit Lien shall be a first priority

senior and priming lien on the DIP Collateral, subject and junior only to (a) the Carve-Out and (b)

valid, enforceable, properly perfected, and unavoidable prepetition Liens (including any Liens that

are perfected after the Petition Date that are afforded priority due to the express relation back of

the perfection of such lien to a date prior to the Petition Date as permitted by Bankruptcy Code

section 546(b)) that are senior to the Prepetition CIT Liens ("Senior Third Party Liens").  The DIP

Credit Lien shall not be subject or subordinate to any Lien which is avoided and which would

otherwise be preserved for the benefit of the Debtors' estates under section 551, and in no event

shall any person or entity who pays (or causes to be paid) any of the obligations under the

Prepetition CIT Loan Documents or DIP Credit Facility Documents be subrogated, in whole or in

part, to any rights, remedies, claims, privileges, liens or security interests granted to or in favor of,

or conferred upon, the DIP Secured Parties by the terms of the DIP Credit Facility Documents

until such time as the obligations under the DIP Credit Facility Documents and this Interim Order

are indefeasibly paid in full, in cash.  The DIP Credit Lien shall not be subject to sections 510,

549, or 550 of the Bankruptcy Code.  The DIP Credit Lien shall not be subject or subordinate to

Liens arising after the Petition Date, other than Liens granted pursuant to this Interim Order to the

extent set forth in this Interim Order.

9.     All rents, income, profits, cash in accounts and deposits derived from the

Prepetition Collateral constitute Cash Collateral.  Provided that each of the conditions set forth in

this Paragraph are satisfied, the Debtors shall be authorized to use the Cash Collateral only in

accordance with the terms of the Approved Budget (subject to Approved Budget Variances), this

Interim Order, and the other DIP Credit Facility Documents. The satisfaction of each of the following conditions shall constitute a condition to the Debtors' authorization to use any Cash Collateral: (i) no Event of Default under (and as defined in the DIP Credit Facility Documents) shall exist or be continuing; and (ii) the Commitment Termination Date (as defined in the DIP Credit Agreement) or the Termination Date (as defined in the DIP Term Sheet) shall not have occurred.

10.     Until the indefeasible payment in full of the Prepetition CIT Obligations, the Prepetition CIT Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral (including Cash Collateral) solely to the extent of the Diminution in Value of the Prepetition Collateral as a result of (a) the provisions of this Interim Order granting first priority and/or priming liens on such Prepetition Collateral to the DIP Agent for the benefit of the DIP Secured Parties, (b) the Debtors' use of the Prepetition Collateral (including Cash Collateral), (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or (d) otherwise, pursuant to sections 361(a), 363(c), and 364(d)(1) of the Bankruptcy Code. The Prepetition CIT Agent, on behalf of and for the benefit of the Prepetition CIT Secured Parties, is hereby granted, solely to the extent of Diminution in Value of the Prepetition CIT Liens in the Prepetition Collateral from and after the Petition Date the following:

A.     a Lien in all DIP Collateral (the "Prepetition CIT Adequate Protection Lien") junior only to (i) the Carve-Out and (ii) Senior Third Party Liens, and (iii) the DIP Credit Lien; and

B.     a postpetition superpriority administrative expense claim (the "Prepetition CIT Adequate Protection Claim") against the Debtors with recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance

Actions, but, subject to entry of the Final Order, including Avoidance Proceeds) under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates to the extent the Prepetition CIT Adequate Protection Lien does not adequately protect against the Diminution in Value of the Prepetition CIT Liens, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtors or their estates and over all other administrative expenses of any kind, including, without limitation, those specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of the chapter 11 case pursuant to section 1112 of the Bankruptcy Code; subject and junior only to the Carve-Out and the DIP Superpriority Claim; provided, that the Prepetition CIT Adequate Protection Claim shall not be asserted against or payable from Avoidance Proceeds prior to entry of the Final Order.

11.     Nothing herein shall be deemed to be a waiver by any Prepetition CIT Secured Party of its right to request additional or further protection of its interests in any property of the Debtors, to move for relief from the automatic stay (if such relief is required), to seek the appointment of a trustee or examiner or the dismissal of any of the Debtors' bankruptcy cases, or to request any other relief.  The Prepetition CIT Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be pari passu or senior to the Prepetition CIT Adequate Protection Liens or Prepetition CIT Liens.

12.     The automatic stay provisions of section 362 are hereby modified to permit (a) the Debtors and the DIP Agent to implement and perform under the DIP Credit Facility and the DIP

Credit Facility Documents, including without limitation the provisions thereof with respect to the collection of Proceeds, and the maintenance and implementation of the Collection Accounts and the Collection Procedures (as such terms are defined below), and (b) the creation and perfection of all Liens granted or permitted by this Interim Order.  The Debtors and the holders of any DIP Credit Lien or Prepetition CIT Adequate Protection Lien shall not be required to enter into any additional security agreements to create, memorialize, and/or perfect any such liens, or to file UCC financing statements, mortgages, or other instruments with any other filing authority or take any other action to perfect any such Liens, which Liens shall be and are deemed valid, binding, enforceable and automatically perfected by the docket entry of this Interim Order by the Clerk of the Court.  If, however, the holder of any DIP Credit Lien or Prepetition CIT Adequate Protection Lien in its sole and absolute discretion shall elect for any reason to enter into, file, record or serve any such financing statements or other documents with respect to any such Lien, then the Debtors shall execute same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made at the time and on the date of the docket entry of this Interim Order by the Clerk of the Court.  The holders of any DIP Credit Facility obligations or Prepetition CIT Obligations are hereby relieved of any requirement to file proofs of claim in the Debtors' bankruptcy cases with respect to any claims or Liens securing such claims, but any such holder may in its sole and absolute discretion file any such proof of claim.

13.      Each of the DIP Agent and the Prepetition CIT Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument. To the extent that the Prepetition CIT Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card

processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements, or any other collateral documents or relevant Prepetition CIT Documents then automatically and without further action, (i) the DIP Agent shall be deemed to be a secured party under such documents, (ii) the DIP Credit Facility Document obligations, together with any refinancings or replacements thereof, shall be deemed to be secured obligations under such documents, and (iii) the applicable provisions of such documents shall apply to the DIP Credit Facility Documents, the DIP Credit Liens, and the DIP Credit Facility Document obligations, and (iv) such documents shall be deemed to be DIP Credit Facility Documents hereunder; all as fully and completely as if the DIP Agent was an original secured party in such documents and the DIP Credit Facility Document obligations were original secured obligations in such documents. To the extent the Prepetition CIT Agent is listed as loss payee, lender loss payee, mortgagee or additional insured under any of the Debtors' insurance policies, the DIP Agent shall also be deemed to be the secured party under such documents or to be the loss payee, lender loss payee, mortgagee or additional insured, as applicable.

14.     The DIP Credit Liens, DIP Superpriority Claims, Prepetition CIT Adequate Protection Liens, and Prepetition CIT Adequate Protection Claim shall be subject to right of payment of the following expenses (the following subparagraphs, collectively, the "Carve-Out," and all amounts payable in connection therewith, the "Carve-Out Amounts"):

A.     unpaid postpetition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) in such amount, with respect to the U.S. Trustee, as agreed to by the U.S. Trustee or as determined by the Court;

B.     subject to the limits set forth in this Interim Order, unpaid postpetition fees and expenses of professionals of the Debtors and professionals of a Statutory Committee

(if any), which are retained by an order of the Court pursuant to sections 327, 328, 363 or 1103(a) of the Bankruptcy Code (the "Chapter 11 Professionals"), but only to the extent such fees and expenses are (i) incurred prior to delivery of a Carve-Out Trigger Notice (the date of delivery of such notice, the "Carve-Out Trigger Date"), (ii) within the amounts set forth in the Approved Budget approved by the DIP Agent for such Chapter 11 Professional as of the date of the Carve-Out Trigger Date, and (iii) subsequently allowed (whether prior or subsequent to the Carve-Out Trigger Date) by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code; and

C.     after the Carve-Out Trigger Date, postpetition fees and expenses of the Chapter 11 Professionals incurred after the Carve-Out Trigger Date in an aggregate amount not to exceed $500,000, to the extent such fees and expenses are subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code, and fees and expenses of a chapter 7 trustee in an amount not to exceed $10,000;

provided, however, that (a) the Carve-Out shall only be available to pay fees and expenses set forth herein to the extent that unencumbered funds are not otherwise available; and (b) in no event shall (i) the aggregate pre-Carve-Out Trigger Date amount of the Carve-Out provided in clause (b) above for all the Chapter 11 Professionals retained by the Debtors exceed the aggregate amount budgeted for such professionals within the Approved Budget and (ii) the aggregate pre-Carve-Out Trigger Date amount of the Carve-Out provided in clause (b) above for all the Chapter 11 Professionals retained by the Statutory Committee exceed the aggregate amount budgeted for such professionals within the Approved Budget; provided, further however, that the Carve Out for Chapter 11 Professional fees shall first be paid from any retainers or any professional expense escrow account established by any Debtor.  Any amounts paid from the DIP Collateral or the

proceeds thereof, or funded by the DIP Agent or DIP Secured Parties with respect to the Carve-Out prior to the entry of the Final Order shall be Interim DIP Advances and such obligations shall be secured by the DIP Credit Lien.  As used in this Interim Order, the term "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Statutory Committee (if any), which notice is identified as a Carve-Out Trigger Notice and is delivered following the occurrence and during the continuation of an Event of Default under a DIP Credit Facility Document or this Interim Order and the acceleration of the obligations under the DIP Facility.  Further, the payment of the fees or costs of any Chapter 11 Professional and/or Statutory Committee (if any) shall be subject to Court approval, and DIP Agent and the DIP Secured Parties reserve the right to object to any Chapter 11 Professional's application for payment.

15.     Neither the payment of any Chapter 11 Professional fees, nor the Carve-Out shall include payment for any fees and expenses, if any, of the Chapter 11 Professionals incurred directly or indirectly, in respect of, arising from or relating to:

A.     the initiation, joinder or prosecution of any action contesting the indebtedness owed to DIP Secured Parties or the Prepetition CIT Secured Parties, or the validity of any liens granted to any of such parties, provided, however, that a Statutory Committee (if any) and its professionals shall be allowed to use the Committee Budget to investigate the validity of the Prepetition CIT Liens;

B.     preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by DIP Agent or Prepetition CIT Agent of any of its rights and remedies under the Interim Order, Final Order, Prepetition CIT Loan Documents, or DIP Credit Facility

Documents, including, without limitation, any attempt to prevent, hinder or delay (or supporting any other person or entity in preventing, hindering or delaying) the submission of any credit bid by any of the DIP Secured Parties or Prepetition CIT Secured Parties;

        C.      the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Secured Parties, Prepetition CIT Secured Parties, or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the DIP Secured Parties or Prepetition CIT Secured Parties, or any of them;

        D.      any request to borrow money other than pursuant to the terms of the Interim Order, the Final Order, or the DIP Credit Facility Documents;

        E.      with respect to the Debtors, any of the Debtors' Chapter 11 Professionals, or any of their successors or assigns (including, without limitation, any trustee, responsible officer, examiner, estate administrator or representative, or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter to be released, waived or specified as not subject to challenge by the Debtors pursuant to this Interim Order or the Final Order (including, without limitation, Paragraphs 26, 27, and 28 herein); or

        F.      For any other purpose for which proceeds of the DIP Credit Facility may not be used pursuant to the DIP Credit Facility Documents.

16.      The Debtors shall establish and fund a segregated account not subject to the control of the DIP Agent (such account, the "**Carve-Out Account**") for purposes of funding the Carve-

Out.  So long as a Carve-Out Trigger Date shall not have occurred, the Debtor shall transfer to the Carve-Out Account on a weekly basis, the amounts that the Chapter 11 Professionals may be paid pursuant to the Approved Budget for such week.  Such funds shall be held for the benefit of the Chapter 11 Professionals, to be applied to the fees and expenses of such Chapter 11 Professionals that are approved for payment pursuant to one or more orders of the Bankruptcy Court.  Any fees and expenses payable to Chapter 11 Professionals shall be paid first out of the Carve-Out Account, and all amounts deposited in the Carve-Out Account shall reduce, on a dollar for dollar basis, the Carve-Out.  Upon the occurrence of the Carve-Out Trigger Date, the Debtors shall be required to deposit in the Carve-Out Account an amount equal to (a) the unpaid amount (if any) of Chapter 11 Professional fees contemplated in the Approved Budget for such week that should have been paid into the Carve-Out Account during the Approved Budget week in which the Carve-Out Trigger Date occurs (to the extent such amount has not already been paid into the Carve-Out Account during such Budget week); and (b) the $510,000 Carve-Out Trigger Reserve.  To the extent that the cash of the Debtors is not sufficient to fund the amounts set forth in the preceding items (a) or (b), the DIP Lenders shall make advances under the DIP Facility sufficient to deposit such amounts into the Carve-Out Account.  To the extent that the fees and expenses of the Chapter 11 Professionals performed prior to a Carve-Out Trigger Date and allowed pursuant to one or more orders of the Bankruptcy Court are less than the amounts funded into the Carve-Out Account, the excess amounts in the Carve-Out Account shall be remitted to the DIP Agent to reduce the obligations under the DIP Facility.   The DIP Agent shall not foreclose or sweep amounts in the Carve-Out Account unless and until the final, allowed amounts payable to Chapter 11 Professionals have been disbursed to the Chapter 11 Professionals from the Carve-Out Account, and, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall not sweep or foreclose

on cash of the Debtors that would be required to fund the Carve-Out Account after the occurrence of the Carve-Out Trigger Date in the manner set forth in this paragraph. The DIP Agent and DIP Lenders reserve all of their rights to challenge or otherwise object to the allowance of any fees or expenses sought to be paid to any Chapter 11 Professionals.

17.    Subject to the entry of the Final Order, in light of, among other things, the subordination of the liens and superpriority claims of the DIP Secured Parties and Prepetition CIT Secured Parties to the Carve-Out, effective as of the time of commencement of the Debtors' bankruptcy cases on the Petition Date:

A.    each of the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Debtors' Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (each, a "Successor Case") waives, and shall be deemed to waive, irrevocably all claims, causes of action, benefits, and rights, if any, it or its estate might otherwise assert against the Prepetition Collateral, DIP Collateral, Prepetition CIT Secured Parties, and DIP Secured Parties pursuant to Bankruptcy Code sections 506(c), 105(a) or any other applicable law;

B.    except from and pursuant to the terms of the Carve-Out, no person or entity in the course of the Debtors' bankruptcy cases shall be permitted to recover from the DIP Collateral or Prepetition Collateral (whether directly or through the grant of derivative or equitable standing in the name of the Debtors or any Debtor's estate) any cost or expense of preservation or disposition of the Prepetition Collateral or DIP Collateral, including, without limitation, expenses and charges as provided in Bankruptcy Code sections 506(c), 105(a), or any other applicable law;

C.      except from and pursuant to the terms of the Carve-Out, no person or entity shall be permitted to recover from the DIP Collateral or Prepetition Collateral, or assert against any DIP Secured Party or any Prepetition CIT Secured Party, any claim with respect to any unpaid administrative expense of the Debtors' bankruptcy cases, whether or not the Debtors' payment of such administrative claim was contemplated by or included in the Approved Budget;

D.      Nothing contained in this Interim Order shall be deemed a consent by the DIP Secured Parties or Prepetition CIT Secured Parties to any charge, lien, assessment, or claim against, or in respect of, the Prepetition Collateral or DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise, and no consent shall be implied from any other action, inaction, or acquiescence by any such parties; and

E.      the Prepetition CIT Secured Parties and the DIP Secured Parties shall not be subject to the "equities of the case" exception of Bankruptcy Code section 552(b), or to the equitable doctrines of "marshaling" or any similar claim or doctrine, with respect to any DIP Collateral or Prepetition Collateral, and the proceeds of the Prepetition Collateral shall be received and applied pursuant to the Prepetition CIT Loan Documents.

18.     So long as the DIP Credit Facility obligations remain outstanding, unless consented to in writing by the DIP Agent, the Debtors shall not seek entry of any further orders in their Chapter 11 Cases which authorize (a) under section 363 of the Bankruptcy Code, the use of Cash Collateral; (b) the obtaining of credit or the incurring of indebtedness pursuant to sections 364(c) or 364(d) of the Bankruptcy Code that does not indefeasibly repay the DIP Credit Facility in full, in cash, (c) the return of goods pursuant to section 546(h) of the Bankruptcy Code to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's

prepetition indebtedness based upon any such return pursuant to section 553 of the Bankruptcy Code or otherwise, or (d) any other grant of rights against the Debtors and/or their estates that is secured by a Lien in the DIP Collateral or is entitled to superpriority administrative status that does not indefeasibly repay the DIP Credit Facility in full, in cash.

19.     Upon the occurrence of: (i) an Event of Default (as such term is defined in any DIP Credit Facility Document); (ii) the Debtors' failure to comply with the terms of this Interim Order or the Final Order (including, without limitation, its failure to comply with the Approved Budget, subject to any Approved Budget Variances); or (iii) the Debtors' failure to comply with any of the sale milestones attached hereto as <u>Exhibit B</u> (such milestones, the "<u>Milestones</u>"), and the giving of written notice thereof by the DIP Agent to counsel to the Debtors, the Statutory Committee (if any), and the U.S. Trustee (which notice may be given by any manner of electronic transmission, the automatic stay being deemed lifted for such purpose) (the "<u>Default Notice</u>"), then (i) the DIP Agent shall be fully authorized, in its sole discretion to immediately cease making DIP Credit Facility advances to the Debtors, (ii) the DIP Agent shall be fully authorized, in its sole discretion to terminate the Debtors' use of the DIP Collateral (including without limitation Cash Collateral) pursuant to this Interim Order and the Approved Budget, and/or (iii) the DIP Agent shall be fully authorized, in its sole discretion to terminate the DIP Credit Facility, accelerate the obligations under the DIP Facility, and demand repayment of the DIP Credit Facility obligations then outstanding; in each of cases (i) through (iii), which termination shall become effective five (5) days after delivery of the Default Notice, <u>provided however</u> that the DIP Agent consents to the scheduling of an expedited hearing to consider further access to the DIP Credit Facility, DIP Collateral usage, and/or or Cash Collateral usage by the Debtors.

20.     Further, upon the occurrence of an Event of Default and transmission of a Default Notice or upon the Commitment Termination Date:

A.      the DIP Agent shall have the right, free of the restrictions of sections 362 or under any other section of the Bankruptcy Code or applicable law or rule (including, without limitation, Bankruptcy Rule 4001(a)), to take immediate reasonable action to protect the DIP Collateral from harm, theft and/or dissipation;

B.      with respect to an Event of Default as to which a Default Notice has been given, the Debtors, the Statutory Committee (if any), and the U.S. Trustee shall have five (5) business days from the date of the Default Notice (the "Remedy Notice Period") to obtain an order of the Court on notice to the DIP Agent (a) enjoining or restraining the DIP Secured Parties from taking action or exercising rights and remedies (other than any rights and remedies that may be exercised immediately upon the satisfaction of the conditions set forth set forth in Paragraph 19 herein) based upon the Event of Default specified in the Default Notice; or (b) challenging whether an Event of Default in the Default Notice has occurred or is continuing without cure (a "Restraint on Remedies").  During the Remedy Notice Period, the DIP Agent shall refrain from exercising its rights and remedies (other than those that may be exercised immediately as set forth in Paragraph 19). Immediately upon expiration of the Remedy Notice Period unless a Restraint on Remedies has timely been obtained from the Court, or with respect to and upon the maturity date for the DIP Credit Facility, immediately:

(1)     the DIP Agent shall have the right, free of the restrictions of section 362 or under any other section of the Bankruptcy Code or Bankruptcy Rules (including, without limitation, Bankruptcy Rule 4001(a)), but subject to the

provisions hereof relating to the Carve-Out, to exercise contractual, legal and equitable rights and remedies as to all or such part of the DIP Collateral as it shall elect, and to apply the Proceeds (as such term is defined below) of the DIP Collateral to the repayment of the DIP Credit Facility obligations and Prepetition CIT Obligations; and

(2)     the DIP Agent, should it so elect in its sole and absolute discretion as exercised by the filing of an appropriate statement with the Court, shall be deemed to have been granted "peaceful possession" of, and right of access to, all or any portion of the DIP Collateral, by the Debtors.

21.     The Debtors shall provide the DIP Agent with (i) all financial statements, certificates, and reports required by any DIP Credit Facility Document in the manner specified therein (including, without limitation, a weekly Approved Budget Variance Report) and (ii) such additional information as the DIP Agent shall reasonably request from the Debtors.  The DIP Agent and its representatives shall have reasonable access to the Debtors' business premises and to the DIP Collateral in order to review and evaluate the physical condition of any of the DIP Collateral and/or to inspect the financial records and other records of the Debtors concerning the operation of the Debtors' business.

22.     For purposes of this Interim Order, (a) "Proceeds" shall mean both (i) proceeds (as defined in the Uniform Commercial Code for the State of New York) and (ii) any and all payments, proceeds or other consideration realized upon the sale, liquidation, realization, collection or other manner of disposition of the DIP Collateral, whether in the ordinary course of the Debtors' business (including without limitation accounts, receivables, and other proceeds arising from the Debtors' sales of goods and/or performance of services) or other than in the ordinary course of the

Debtors' business, and (b) "Disposition" shall mean any sale, liquidation, realization, collection or other manner of disposition of DIP Collateral other than in the ordinary course of the Debtors' business, including without limitation any sale conducted pursuant to Section 363 of the Bankruptcy Code.

23.     The Debtors shall maintain in full force and effect the deposit, clearing, dominion, lockbox, and similar accounts maintained by or on behalf of the Debtors pursuant to Prepetition CIT Loan Documents for the collection of Proceeds obtained in the ordinary course of the Debtors' business (the "Collection Accounts"), and the cash management systems, treasury management systems, and payment procedures under which such accounts and systems are administered (the "Collection Procedures").  In furtherance of the foregoing, the DIP Agent shall be deemed to have control of all of the Debtors' bank accounts, and any financial institutions in which such accounts of the Debtors are located are hereby authorized to act in accordance with any request of the DIP Agent concerning such accounts, including, without limitation, requests to turnover funds therein without offset or deduction of any kind.

24.     The Debtors and any successors to the Debtors, including without limitation any successor trustee or trustees, shall assign or direct to the DIP Agent any and all Proceeds realized in any Disposition of any DIP Collateral, and immediately deliver any and all such Proceeds which come into their possession to the DIP Agent in the form received; provided, however, that the foregoing shall be subject in all respects to (a) payment of the Carve-Out and (b) the priorities of the DIP Credit Lien granted by this Interim Order.  The foregoing is without prejudice to the rights of (a) the DIP Agent, the Statutory Committee (if any), or any other party to object to any proposed Disposition, (b) any third party with respect to the allocated Proceeds of any Disposition of Collateral encumbered by a Senior Third Party Lien, or (c) the rights of third parties set forth below

with respect to a Challenge Action and the remedies that may result from a successful Challenge Action.  All Proceeds received by the DIP Agent shall be applied to the repayment of the Prepetition CIT Obligations and DIP Credit Facility obligations, in the manner set forth (a) prior to entry into the DIP Credit Agreement, on Exhibit C, and (b) after entry into the DIP Credit Agreement, in the manner set forth in Section 5.6.2 of the DIP Credit Agreement, until such obligations are paid in full; provided, however, that the foregoing shall be subject in all respects to the terms and the priorities of liens under this Interim Order. Such applications of Proceeds shall be free and clear of any claim, charge, assessment or other liability.

25.    Subject to Paragraph 28 of this Order, the DIP Agent and Prepetition CIT Agent are hereby authorized to credit-bid all or any of the obligations under the DIP Credit Facility and Prepetition CIT Loan Documents at any Disposition of any Prepetition Collateral and/or DIP Collateral, including, without limitation, any sale conducted pursuant to Section 363 of the Bankruptcy Code.

26.    Subject to the right to bring a Challenge Action as set forth in Paragraph 28 below, upon entry of this Interim Order:

A.    the Stipulations shall be binding upon the Debtors and all other persons, entities, and/or parties in all circumstances;

B.    the validity, extent, priority, perfection, enforceability and non-avoidability of the Prepetition CIT Secured Parties' validly perfected prepetition claims and liens against the Debtors and the Prepetition Collateral shall not be subject to challenge by the Debtors or any other person, entity, or party; and

C.    neither the Debtors, nor any other person, entity, or party shall seek to avoid or challenge (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) any

transfer made by or on behalf of the Debtors to or for the benefit of any of the Prepetition CIT Secured Parties prior to the Petition Date.

27.     In consideration of and as a condition to, among other things, the DIP Secured Parties making the Interim DIP Advances and providing credit and other financial accommodations to the Debtors, the Prepetition CIT Secured Parties consenting to, among other things, the use of Cash Collateral, and subordination by the DIP Secured Parties and Prepetition CIT Secured Parties of their Liens to the Carve-Out pursuant to the terms of this Interim Order and the DIP Credit Facility Documents, each of the Debtors, on behalf of themselves, their estates, and their affiliated obligors under the Prepeittion CIT Loan Documents (each a "<u>Releasor</u>" and collectively, the "<u>Releasors</u>"), subject to Paragraph 28 herein, absolutely releases, forever discharges and acquits each of the Prepetition CIT Secured Parties and their respective successors and assigns, affiliates, officers, directors, employees, attorneys and other representatives (the "<u>Releasees</u>") of and from any and all claims, demands causes of action, damages, choses in action, and all other claims, counterclaims, defenses, setoff rights, and other liabilities whatsoever (the "<u>Prepetition Released Claims</u>") of every kind, name, nature, and description, whether known or unknown, both at law and equity (including, without limitation, any "lender liability" claims) that any Releasor may now or hereafter own, hold, have or claim against each and every of the Releasees arising at any time prior to the entry of this Interim Order (including, without limitation, claims relating to the Debtors, the Prepetition CIT Loan Documents, and other documents executed in connection therewith, and the obligations thereunder); <u>provided, however</u>, that such release shall not be effective with respect to the Debtors until entry of the Final Order, and with respect to the Debtors' bankruptcy estates, until the expiration of the Challenge Period.  In addition, upon the indefeasible payment, in full, in cash, of all DIP Credit Facility obligations owed to the DIP

Secured Parties arising under this Interim Order and the DIP Credit Facility Documents, the DIP Secured Parties shall be released from any and all obligations, actions, duties, responsibilities, and causes of action arising or occurring in connection with or related to the DIP Credit Facility Documents.

28.     Notwithstanding any other provisions of this Interim Order, any interested party with requisite standing (other than the Debtors or their Professionals) in these cases (including, without limitation, the Statutory Committee (if any)) shall have until the date that is seventy-five (75) days after entry of this Order (such period, the "Challenge Period"), to commence an adversary proceeding against the Prepetition CIT Secured Parties (as applicable) for the purpose (collectively, a "Challenge Action") of:

A.     challenging any of the Stipulations;

B.     challenging the validity, extent, priority, perfection, enforceability and non-avoidability the Prepetition CIT Secured Parties' Liens (as applicable) against the Debtors;

C.     contesting the amount of the Prepetition CIT Secured Parties' asserted claims;

D.     seeking to avoid or challenge (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtors to or for the benefit of any of the Prepetition CIT Secured Parties, or any of their predecessors in interest under the Prepetition CIT Loan Documents (as applicable) prior to the Petition Date;

E.     seeking damages or equitable relief against any of the Prepetition CIT Secured Parties (as applicable) arising from or related to prepetition business and lending relationships of the Prepetition CIT Secured Parties or any of their predecessors in interest

under the Prepetition CIT Loan Documents with the Debtors, including without limitation equitable subordination, recharacterization, lender liability and deepening insolvency claims and causes of action; or

      F.      challenging the Roll-Up in Paragraph L of this Order and any other matter to be waived or released pursuant to this Interim Order (including, without limitation, pursuant to Paragraphs 26 and 27).

Provided, however, that any Chapter 7 trustee subsequently appointed in these cases shall have until the later of (x) the expiration of the Challenge Period; or (y) 20 days after such trustee is appointed; in order to commence a Challenge Action.

29.      All parties in interest, including without limitation the Statutory Committee (if any), that fail to act in accordance with the time periods set forth in the preceding paragraph shall be, and hereby are, barred forever from commencing a Challenge Action and shall be bound by the waivers, Stipulations, and terms set forth in this Interim Order (including Paragraphs 26, 27, and 28 of this Interim Order).  Any Challenge Action filed shall prohibit application of this paragraph only to the extent of the specific matters set forth in such Challenge Action on the date of filing unless otherwise ordered.  For the avoidance of doubt, if any Challenge Action is timely filed and a final, non-appealable order is entered in favor of the plaintiff sustaining any such Challenge Action, the Debtors' Stipulations in this Interim Order shall nonetheless remain binding and preclusive on any Statutory Committee and any other person or entity, except to the extent that such stipulations and admissions were raised (subject to Bankruptcy Rule 7015) in an adversary proceeding or contested matter prior to the expiration of the Challenge Period and sustained by the final, non-appealable order. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Statutory Committee (if appointed) or

any non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, and all rights to object to such standing are expressly reserved.

30.    The respective legal and equitable claims, counterclaims, defenses and/or rights of offset and setoff of the Prepetition CIT Secured Parties in response to any such Challenge Action are reserved, and the ability of a party to commence a Challenge Action shall in no event revive, renew or reinstate any applicable statute of limitations which may have expired prior to the date of commencement of such Challenge Action.  Despite the commencement of a Challenge Action, the prepetition claims and Liens of the Prepetition CIT Secured Parties shall be deemed valid, binding, properly perfected, enforceable, non-avoidable, not subject to disallowance under section 502(d) of the Bankruptcy Code and not subject to subordination under section 510 of the Bankruptcy Code until such time as, and only to the extent that, a final and non-appealable judgment and order is entered sustaining such Challenge Action in favor of the plaintiffs therein. Notwithstanding anything to the contrary contained in this Interim Order, the Court expressly reserves the right to order other appropriate relief against the Prepetition CIT Secured Parties in the event there is a timely and successful Challenge Action by any party in interest to the validity, enforceability, extent, perfection or priority of the Prepetition CIT Liens or the amount, validity, or enforceability of the Prepetition CIT Obligations.

31.    In making decisions to advance any extensions of credit to the Debtors pursuant to the DIP Credit Facility or in taking any other actions reasonably related to this Interim Order or the DIP Credit Facility Documents (including, without limitation, the exercise of its approval rights with respect to any budget), the DIP Agent, Prepetition CIT Agent, DIP Secured Parties, and Prepetition CIT Secured Parties shall have no liability to any third party and shall not be deemed

to be in control of the operations of the Debtors or to be acting as a "control person", "responsible person" or other "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response Compensation and Liability Act, as amended, or any similar Federal or state statute), and the DIP Agent, Prepetition CIT Agent, DIP Secured Parties, and Prepetition CIT Secured Parties' relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the DIP Secured Parties or Prepetition CIT Secured Parties, respectively, and the Debtors.

32.     This Interim Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Secured Parties, the Prepetition CIT Secured Parties, the Debtors, and their respective successors and assigns, including, without limitation, any trustee, responsible officer, examiner, estate administrator or representative, or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code.  Except as set forth herein with respect to a Challenge Action and the Carve-Out, no rights are created under this Interim Order for the benefit of any creditor of the Debtors, any other party in interest in the Debtors' bankruptcy cases, or any other persons or entities, or any direct, indirect or incidental beneficiaries thereof.

33.     To the extent that any of the provisions of this Interim Order shall conflict with any provisions of the DIP Credit Agreement, the DIP Term Sheet, or with any order of the Court authorizing the Debtors to continue the use of prepetition bank accounts, cash management systems, treasury management systems, or business forms, or any similar orders, this Interim Order is deemed to control and supersede the conflicting provisions therein.  The DIP Term Sheet provides that the Debtors are required to enter into the DIP Credit Agreement prior to entry of the Final Order.  The Debtors shall file a copy of the proposed DIP Credit Agreement in connection

with their entry into such agreement, which shall be filed at least three (3) days prior to the Final Hearing. Such agreement shall remain binding upon the Debtors upon their execution of the agreement, subject to the ability of the Court to examine and rule upon the propriety of any such provisions at the hearing to consider entry of the Final Order.

34. The terms and conditions of this Interim Order shall be effective and immediately enforceable upon its entry by the Clerk of the Court notwithstanding any potential application of Fed. R. Bankr. P. 6004(h) or otherwise. Furthermore, to the extent applicable, the notice requirements and/or stays imposed by Fed R. Bankr. P. 4001(a)(3), 6003(b), and 6004(a) are hereby waived for good and sufficient cause.

35. Nothing in this Interim Order shall preclude the Court from entering a Final Order containing provisions inconsistent with or contrary to the provisions of this Interim Order, provided, however, that the DIP Secured Parties and Prepetition CIT Secured Parties shall be entitled to the benefits and protections of this Interim Order, including (a) the adequate protection afforded to the Prepetition CIT Secured Parties set forth in this Interim Order, and (b) the protections afforded pursuant to section 364(e), with respect to all loans, advances, and other financial, accommodations made by them pursuant to this Interim Order. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the Prepetition CIT Secured Parties shall continue in the Chapter 11 Cases, in any Successor Cases,

or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until all of the Prepetition CIT Obligations and CIT Adequate Protection Claims pursuant to the Prepetition CIT Loan Documents and this Interim Order have been indefeasibly paid in full in cash.  Except as provided herein, no Proceeds, Cash Collateral or Carve-Out may be used by any party in interest seeking to modify any of the rights granted to DIP Secured Parties or Prepetition CIT Secured Parties hereunder or in the DIP Credit Facility Documents.

36.    The Debtors and the DIP Agent may implement non-material modifications of the DIP Credit Facility Documents without the need for notice or further approval of the Court, <u>provided, however</u>, that copies of such amendments will be provided to the U.S. Trustee and the Statutory Committee (if any).  The Debtors and the DIP Agent may implement material modifications of the DIP Credit Facility Documents on at least seven (7) calendar days prior notice to the Statutory Committee (if any) and the U.S. Trustee, and any proposed material modification that is objected to within such period shall only be implemented to the extent approved by the Court.

37.    The Debtors are authorized to do and perform all acts, to make, execute and deliver all instruments and documents, and to pay all fees and expenses that may be required or necessary for the Debtors' performance under this Interim Order or the DIP Credit Facility Documents, including, without limitation, (a) the execution of the DIP Credit Facility Documents, (b) the payment of the fees and other expenses described herein or in the DIP Credit Facility Documents as such become due, including, without limitation, agent fees, commitment fees, letter of credit fees, and facility fees. The automatic stay under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including,

without limitation, to: (a) permit the Debtors to grant the CIT Adequate Protection Liens and CIT Adequate Protection Claims; (b) permit the Debtors to perform such acts as the Prepetition CIT Agent may request in their reasonable discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the Prepetition CIT Secured Parties under the terms of this Interim Order; and (d) authorize the Debtors to pay, and the Prepetition CIT Secured Parties to retain and apply, any payments made in accordance with the terms of this Interim Order.

38.     The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on terms and conditions to which the Debtors and DIP Agent have agreed.  Thus, each of the terms and conditions constitutes a part of the authorization under sections 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in section 364(e) of the Bankruptcy Code.

39.     Notwithstanding any provision in this Interim Order to the contrary, any delay or failure by the Prepetition CIT Secured Parties or DIP Secured Parties to exercise their rights and remedies under this Interim Order, the Prepetition CIT Loan Documents, DIP Credit Facility Documents, or applicable law, as applicable, shall not constitute a waiver of any of the Prepetition CIT Secured Parties or DIP Secured Parties' rights hereunder, thereunder or otherwise, and no such waiver shall be deemed to have occurred unless such waiver is made pursuant to a written instrument executed in accordance with the term of the applicable document.

40.     A final hearing with respect to the Motion is scheduled for [_____], 2023 at [_____].m. (ET) (the "Final Hearing") before the Honorable [_____], United States Bankruptcy Judge.  The Debtors shall promptly mail copies of this Interim Order (which shall

constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing and to any other party that has filed a Rule 2002 request for service.  Any party in interest objecting to the relief sought at the Final Hearing shall file written objections, and serve them on (i) the Debtors' proposed counsel, Willkie Farr & Gallagher LLP, attn:  Brian Lennon, Debra Sinclair, and Weston Eguchi, 787 Seventh Avenue, New York, NY 10019 and Young Conaway Stargatt & Taylor LLP, attn: Edmon L. Morton and Matthew B. Lunn, 1000 North King Street, Wilmington, DE 19801; (ii) the DIP Secured Parties' counsel, Holland & Knight LLP, attn: Robert Jones and Brian Smith, 1722 Routh Street, Suite 1500, Dallas, TX 75201 and Erin Fay, Wilson Sonsini, 222 Delaware Avenue, Suite 800, Wilmington, DE 19801; and (iii) the U.S. Trustee, attn: Richard Schepacarter, Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, on or before [_____] .m. (ET) on [_____], 2023.

41.     This Court hereby retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

**<u>Exhibit A</u>**

**Interim Approved Budget**

(See Attached)

**Unconditional Love dba Hello Bello**
*Forecast DIP Cash Forecast (in 000s)*
*Week Ending*

| | WK 1 10/28/23 | WK 2 11/4/23 | WK 3 11/11/23 | WK 4 11/18/23 | WK 5 11/25/23 | WK 6 12/2/23 | WK 7 (Sale Close) 12/9/23 | Forecast 7 Week Total | Winndown 6 Week Total |
|---|---|---|---|---|---|---|---|---|---|
| **I. Receipts** | | | | | | | | | |
| **Total Cash Receipts** | $2,331 | $2,392 | $2,646 | $2,565 | $2,547 | $2,605 | $2,717 | $17,802 | - |
| **II. Disbursements** | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | |
| Raw Materials | $647 | $647 | $647 | $647 | $647 | $647 | $462 | $4,347 | - |
| Manufacturing | $537 | $537 | $537 | $537 | $537 | $537 | $384 | $3,607 | - |
| Shipping | $281 | $281 | $250 | $250 | $250 | $250 | $178 | $1,740 | - |
| Employee Related | $65 | $945 | $65 | $945 | $65 | $945 | $65 | $3,095 | $783 |
| Corporate & IT | $118 | $118 | $118 | $118 | $118 | $118 | $85 | $795 | - |
| Marketing | $228 | $228 | $228 | $228 | $228 | $228 | $163 | $1,532 | $0 |
| Rent & Equipment Related | $52 | $1,560 | $52 | $243 | $52 | $1,344 | $37 | $3,340 | $574 |
| Tax Related | $180 | $0 | $0 | $290 | $0 | $0 | $0 | $470 | $825 |
| **Total Operating Disbursements** | **$2,109** | **$4,317** | **$1,898** | **$3,259** | **$1,898** | **$4,070** | **$1,374** | **$18,925** | **$2,181** |
| Debtor Professional Fees[1] | 345 | 345 | 445 | 345 | 345 | 371 | 345 | $2,541 | $1,360 |
| Creditor Committee Prof. Fees | - | 25 | 50 | 50 | 50 | 50 | 50 | $275 | $250 |
| Lender Legal Fees | 40 | 40 | 40 | 40 | 40 | 40 | 40 | $280 | $0 |
| UST Fees | - | - | - | - | $65 | - | - | $65 | $176 |
| Other Non-Operating | - | 321 | 233 | 233 | - | 25 | - | $813 | 2,238 |
| **Total Non-Operating Disbursements** | **$385** | **$731** | **$768** | **$668** | **$500** | **$486** | **$435** | **$3,974** | **$4,024** |
| **Total Disbursements** | **$2,494** | **$5,048** | **$2,666** | **$3,927** | **$2,398** | **$4,556** | **$1,809** | **$22,899** | **$6,205** |
| **III. Liquidity** | | | | | | | | | |
| **Beginning Cash** | $815 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | | |
| Net Cash Flow | ($164) | ($2,656) | ($21) | ($1,362) | $149 | ($1,951) | $908 | **($5,097)** | **(6,205)** |
| DIP Draw / (Repayments) | $2,879 | $5,459 | $2,667 | $28,924 | (150) | $2,393 | 4,318 | | |
| Prepetition ABL Paydowns | ($2,331) | ($2,392) | ($2,646) | ($27,562) | - | - | - | | |
| Financing Payments | ($200) | ($411) | - | - | - | ($442) | ($2) | | |
| **Ending Cash** | **$1,000** | **$1,000** | **$1,000** | **$1,000** | **$1,000** | **$1,000** | **$6,223** | | |
| **IV. Debt Summary** | | | | | | | | | |
| **Prepetition ABL** | $32,599 | $30,207 | $27,562 | - | - | - | - | | |
| DIP Facility | $2,879 | $8,338 | $11,005 | $39,929 | $39,779 | $42,172 | $46,490 | | |
| Total Debt Outstanding | $35,478 | $38,545 | $38,567 | $39,929 | $39,779 | $42,172 | $46,490 | | |
| Net Debt Outstanding | $34,479 | $37,546 | $37,566 | $38,929 | $38,779 | $41,172 | $46,472 | | |
| Borrowing Base Availability | $43,640 | $43,640 | $43,640 | $43,640 | $43,640 | $43,640 | $46,490 | | |
| **Remaining Availability** | **$8,162** | **$5,095** | **$5,073** | **$3,711** | **$3,861** | **$1,468** | - | | |

Note:

(1) The Professional Fee line item does not include any transaction or sale fee payable to Jefferies; those fees are assumed to be paid out of the sale proceeds

**Exhibit B**

**363 Sale Milestones**

The Debtors shall be required to comply with the following (the "**Milestones**") (provided that if any deadline set forth below shall be due on a day that is not a Business Day, such deadline shall be extended to the next succeeding Business Day).  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the applicable DIP Financing Documents.

a.      On the Petition Date, the Debtor shall have entered into an asset purchase agreement with the Stalking Horse Bidder, in form and substance satisfactory to the DIP Agent, providing for the Stalking Horse Bidder's purchase of substantially all of the Debtors' assets (subject to the Auction and process contemplated in the Sale Procedure Order)

b.      On or before one business day after the Petition Date, or such later date to which the DIP Agent consents in writing in its sole discretion, the Debtors shall file a motion, in form and substance acceptable to the DIP Agent, requesting entry of the Sale Procedure Order (as defined below) authorizing procedures for the sale of substantially all of the Debtors' assets to the Stalking Horse Bidder (or, if an Auction is held, to the Winning Bidder).

c.      On or before 30 days after Petition Date, or such later date to which the DIP Agent consents in writing in its sole discretion, the Bankruptcy Court shall have entered the Sale Procedure Order; and

d.      On or before the date that is 72 days after the Petition Date, the Debtors shall have conducted an auction for the sale of substantially all of their assets (if necessary) and selected the successful bidder for the substantially all of their assets;

e.      On or before the date that is 75 days after the Petition Date, or such later date to which the DIP Agent consents in writing in its sole discretion, the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale; and

f.      On or before the date that is 77 days after the Petition Date, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which the DIP Agent consents in writing in its sole discretion, the Sale shall be closed.

Notwithstanding anything to the contrary herein, the Bankruptcy Court may set dates with respect to the Milestones beyond the outer dates specified above to accommodate its own schedule and to the extent the Bankruptcy Court makes such an extension, the Milestones hereunder shall be automatically extended by the same period as the Bankruptcy Court's extension.

**Exhibit C**

**Proceeds Application Waterfall**

(see attached)

1.  First, all Proceeds shall be applied to obligations owed under the Pre-Petition Credit Agreement and other Pre-Petition Credit Documents


2.  Second, all remaining Proceeds shall be applied to DIP Facility obligations arising under the DIP Credit Facility Documents.

**Exhibit D**

**DIP Term Sheet**

(see attached)

**Unconditional Love Inc.,** *et al.*
**Terms and Conditions of**
**Proposed Senior Secured, Super-Priority**
**Debtor-in-Possession Credit Facility**

*The terms outlined below in this Terms and Conditions (this "**DIP Term Sheet**") are the terms and conditions for a senior secured, super-priority debtor-in-possession credit facility (hereinafter referred to as the "**DIP Facility**") to be made available to the Debtors (as defined below). This DIP Term Sheet, the Interim Order (as defined below), the Final Order (as defined below), and such other documents as may be designated by the DIP Agent (including, without limitation, a potential DIP Credit Agreement) shall collectively constitute the exclusive and definitive documentation and agreement among the parties for the DIP Facility (the "**DIP Financing Documents**"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in that certain Loan, Security and Guarantee Agreement, dated as of April 12, 2022, by and among CIT Northbridge Credit LLC, as Agent, the lenders party thereto from time to time, Unconditional Love Inc., a Delaware corporation, The Best Training Pants in the World Inc., a Delaware corporation, and Unconditional Love Canada, Inc., a corporation organized under the laws of the Province of Ontario, Canada (as such agreement may be modified, amended, or restated from time to time, the "**Pre-Petition Credit Agreement**"). If the date for payment of any obligation of the Debtors or any Milestone (as defined below) date in this DIP Term Sheet is not a business day, such date shall be extended to the next business day.*

| | |
|---|---|
| **Borrowers:** | (i)      Unconditional Love Inc. <br> (ii)     The Best Training Pants in the World Inc. <br> (iii)    Unconditional Love Canada, Inc. <br><br> Each of the borrowers listed above shall be referred to collectively herein as the "**Debtors**" and each individually, a "**Debtor**". |
| **Amount and Type of Facility:** | The DIP Facility will consist of a consolidated, revolving credit facility in the aggregate, maximum principal amount of forty-seven million dollars ($47,000,000) (such amount, the "**Maximum DIP Facility Amount**"), consisting of new revolving availability of up to twelve million seventy thousand six hundred sixty seven dollars and forty six cents ($12,070,667.46) (the "**Maximum DIP Funding Amount**"), and a conversion of thirty-four million, nine hundred twenty nine thousand three hundred thirty two dollars and fifty four cents ($34,929,332.54) of obligations under the Pre-Petition Credit Agreement into postpetition DIP Facility obligations; *provided*, however, that until entry of the Final Order, the amount of DIP Facility advances shall be limited to an amount that would not cause DIP Facility Usage to exceed the Opening Pre-Petition Loan Balance by more than five million five hundred thousand dollars ($5,500,000). |
| **Agent:** | CIT Northbridge Credit LLC (the "**DIP Agent**"). |
| **DIP Lender:** | CIT Northbridge Funding I LLC (the "**DIP Lender**" and collectively, with the DIP Agent, the "**DIP Secured Parties**"). |

**Borrowing Availability:**       All new advances under the DIP Facility shall be limited by DIP Availability, and the other terms of this DIP Term Sheet.  From and after the entry of the Interim Order, the Debtors may request, and the DIP Lenders shall fund, revolving DIP Facility revolving advances subject to the existence of DIP Availability.

In the event that DIP Availability at the time of a borrowing request (or after advancing the amounts in the borrowing request) would be less than or equal $0.00, but the Approved Budget contemplates additional borrowings for such week and the Debtors would otherwise be entitled to receive a revolving DIP Facility advance in the event that DIP Availability were greater than $0.00, the Debtors shall be entitled to request, and the DIP Lenders shall fund, a limited DIP Facility overadvance, so long as the aggregate amount of such overadvances, together with any DIP facility protective advances extended by the DIP Agent or DIP Lenders, does not exceed the Approved Limited DIP Overadvance Amount (as defined below). Any such DIP Facility overadvances shall not be outstanding for more than sixty (60) consecutive days and shall be repaid within sixty (60) days after the incurrence of such DIP Facility overadvance.  In no event shall a DIP facility overadvance cause the aggregate amount of DIP Facility obligations to exceed (a) prior to entry of the Final Order, the Maximum DIP Funding Amount, less the Carve-Out Trigger Reserve, or (b) after entry of the Final Order, the Maximum DIP Facility Amount, less the Carve-Out Trigger Reserve.  In addition to any permitted DIP Facility overadvances, the DIP Agent and DIP Lenders shall be permitted to make protective advances (which protective advances shall also constitute DIP facility obligations), in the manner set forth in the DIP Facility credit agreement.

As used herein, the "**Approved Limited DIP Overadvance Amount**" shall mean (a) at any time prior to entry of the Sale Order, the lesser of (i) 10% of the amount by which DIP Facility Usage exceeds the Opening Pre-Petition Loan Balance (based on the projected ending balance of the DIP Facility for such week set forth in the Approved Budget), or (ii) $1,150,000; or (b) from and after the entry of the Sale Order, the lesser of (i) $1,150,000 plus the amount set in the Approved Budget as the last draw to be made immediately preceding the 363 Sale closing and (ii) the amount that, after giving effect to such overadvance, would not cause the aggregate amount of DIP Facility obligations to exceed the Maximum DIP Facility Amount, less the Carve-Out Trigger Reserve.

The Borrowing Base may be reduced from time to time by an Availability Reserve (defined in substantially the same manner as in the Pre-Petition Credit Agreement, but with the addition of a reserve, in an amount not to exceed $510,000, to cover any Carve-Out amounts that may be incurred or payable after the Carve-Out

2

Trigger Date (such reserve, a "**Carve-Out Trigger Reserve**"))
established by the DIP Agent at its sole discretion in  a manner
consistent with past practice and in good faith to reflect, among
other things, contingencies or risks that may materially impact the
DIP Collateral, the liens of the DIP Agent and the DIP Lender upon
the DIP Collateral, or the business and operations of the Debtors.
The Borrowing Base for the DIP Facility shall not include the
Availability Block (as that term is defined in the Pre-Petition Credit
Agreement), but shall include the Carve-Out Trigger Reserve.
Other than the Carve-Out Trigger Reserve, the DIP Agent shall
provide the Borrowers with at least three (3) business days' notice
before imposing any reserves that were not in effect immediately
prior to the Petition Date.

Unless the Debtors shall have obtained the written consent of the
DIP Agent for additional, DIP Facility advances, the Debtors shall
not be authorized to receive a DIP Facility advance more frequently
than once per calendar day.

**Budget and Variances:**      Subject to the Approved Budget Variances (as defined below)
(i) the Debtors' aggregate cash receipts budget line item (the
"Total Cash Receipts" line item) and (ii) the Debtors' aggregate
cash operating disbursement line item (the "Total Operating
Disbursements" line item) (which Total Operating
Disbursements Line item shall not include line items for fees and
expenses of third party professionals engaged by or for the
benefit of the Debtor or the Statutory Committee (if any)) shall
be adhered to on a weekly basis (for the Total Operating
Disbursements line item) and a cumulative basis (for the Total
Cash Receipts line item and Total Operating disbursements line
item) for the Approved Budget (as defined below) period then
ending as described below, provided, however, that amounts not
disbursed  under the Approved Budget shall be deemed to roll
over to subsequent weeks

The Debtors' disbursements for fees and expenses of third party
professionals engaged by or for the benefit of the Debtors or the
Statutory Committee (if any), including success or transaction
fees (collectively, "**Professional Fees**") shall be reported within
the Approved Budget in a manner so that Professional Fees for
each retained professional are reflected on its own line item.  The
Approved Budget line items for Professional Fees shall not be
tested for purposes of compliance with the Approved Budget or
calculation of any Approved Budget Variances; provided,
however, that Carve-Out for the respective Chapter 11
Professionals retained by the Debtors or Statutory Committee
shall nevertheless be governed by the amounts of Professional
Fees budgeted for each group's professionals within the
Approved Budget).

Any fees payable to professionals retained by the DIP Secured

3

Parties set forth in the Approved Budget shall not be limited by the amounts set forth in the Approved Budget and shall not be tested for purposes of compliance with the Approved Budget or calculation of any Approved Budget Variances.

Actual amounts for the Total Cash Receipts line item will be tested weekly beginning with the first full calendar week following the Petition Date and may not be less than the applicable Approved Budget on a cumulative basis for that portion of the Approved Budget period then ending by more than (a) fifteen percent (15.0%) for such line item for the first two testing periods, and (b) ten percent (10.0%) for such line item for each testing period thereafter.  Actual amounts for the Total Operating Disbursements line item (which shall not and does not include any Professional Fee line items) will be tested weekly beginning with the first full calendar week following the Petition Date and may not exceed the applicable Approved Budget (including any amounts deemed to roll over from a previous week due to not being spent) by more than ten percent (10.0%) for such line item on a weekly basis or more than ten percent (10.0%) for such line item on a cumulative basis for that portion of the Approved Budget period then ending (collectively, the "**Approved Budget Variances**").

On or before Thursday of each week, commencing with the first full week following the Petition Date, the Debtors shall deliver to the DIP Agent an Approved Budget Variance Report.

The Approved Budget may be modified only with the subsequent written agreement of the Debtors and DIP Agent (at the DIP Agent's sole discretion).

| | |
|---|---|
| **Fees:** | In addition to the costs and expenses of the DIP Secured Parties as set forth in the Section titled "Agent Fees and Expenses" below, the Debtors agree to pay the following fees (the "DIP Fees"): |

(a) An unused line fee equal to 50 basis points per annum

(b) a collateral management fee of $7,000 per month, fully earned and payable in advance on the first business day of each month

(c) an upfront fee of $200,000, payable on the date of the first DIP Facility draw.

| | |
|---|---|
| **Termination Date:** | The earliest to occur of: (a) the Maturity Date (as defined below); (b) thirty (30) days after the Petition Date (as defined below), if the Final Order has not been entered on or before that date; (c) acceleration of the obligations under the DIP Facility; (d) the effective date of a confirmed plan of reorganization or liquidation; |

4

or (e) the date which is the closing date of any sale of all or substantially all of any Debtor's assets. The date on which the earliest of clauses (a) through (e) above occurs and the DIP Agent provides written notice thereof to the Debtors being referred to hereinafter as the "**Termination Date**." On the Termination Date, the DIP Facility shall be deemed terminated, and the DIP Secured Parties shall have no further obligation to provide financing pursuant to the DIP Facility or DIP Financing Documents.

**Non-Default Interest Rate and Payment Terms:**

Interest on all outstanding advances under the DIP Facility shall accrue from and after the Petition Date at a per annum rate equal to Adjusted Term SOFR + 8.00% (the "**Non-Default Interest Rate**"). The Adjusted Term SOFR rate shall have a floor of 1.50%.

Interest on DIP Facility obligations shall be payable monthly, in arrears, on the first day of each calendar month.

Interest with respect to any outstanding obligations under the Pre-Petition Credit Agreement shall, to the extent permitted by applicable bankruptcy law, accrue from and after the Petition Date at the rate of interest set forth in the Pre-Petition Credit Agreement. For purposes of computing interest on DIP Facility obligations, any DIP Collateral proceeds applied by the DIP Agent shall be deemed applied on the third (3rd) Business Day after receipt.

**Default Interest Rate:**

Effective immediately upon the occurrence of an Event of Default unless waived in writing by the DIP Agent, interest on the outstanding loans under the DIP Facility shall accrue at a rate that is 3% per annum in excess of the Non-Default Interest Rate.

**Loan Payments:**

Each of the Debtors, jointly and severally, promises and agrees to pay to the DIP Agent and the DIP Lender all DIP Facility advances, together with interest thereon accruing pursuant to the DIP Financing Documents, in full, in cash, at the times set forth in the DIP Financing Documents, but no later than the Termination Date. All daily collections in respect of DIP Collateral shall be repaid to the DIP Agent, on a daily basis.

All unpaid principal, interest, fees, costs and expenses in respect of the DIP Facility shall be due and payable in full by the Debtors on the Termination Date, whether at maturity, upon acceleration or otherwise and if such amounts are not paid in full in cash, interest, fees, costs, and expenses in respect of the DIP Facility shall continue to accrue until paid in full.

In the event that the DIP Availability on any given date of determination would be less than $0.00, then the Debtors shall promptly (and in any event, no later than one business day after

such occurrence) repay the DIP Facility, in cash, in an amount required to ensure that DIP Availability (after giving effect to such cash payment) is not less than $0.00; provided, however, that any permitted overadvances (described in the Borrowing Availability) section, shall be repaid within 60 days after the incurrence of such permitted overadvance. The DIP Agent and DIP Lender are authorized to exercise any offset rights with respect to any of the Debtors' deposit accounts in the event that such repayment does not occur within one business day as required herein.

**Use Of Proceeds:** Proceeds of the DIP Facility shall be used solely for the following purposes (and to the extent identified in the Approved Budget): (a) to fund postpetition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to pay interest, fees and expenses to the DIP Secured Parties in accordance with this DIP Term Sheet (whether or not such amounts are reflected in the Approved Budget); (c) to fund fees and expenses incurred in connection with the 363 Sale (as defined below); (d) to pay Professional Fees; and (e) to pay certain other costs and expenses of administration of the Chapter 11 Cases.

Proceeds of the DIP Facility or cash collateral shall not be used (a) to permit any Debtor, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of the DIP Agent, the Pre-Petition Agent, the Pre-Petition Lenders or the DIP Lender or (ii) the enforceability of the obligations of any Debtor or any guarantor under the Pre-Petition Credit Agreement, any other Pre-Petition Loan Documents, or the DIP Facility, (b) to investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against the DIP Agent, the Pre-Petition Agent, the Pre-Petition Lenders, or the DIP Lender and their agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the obligations of any Debtor or any guarantor under Pre-Petition Credit Agreement, any other Pre-Petition Loan Documents or the DIP Financing Documents, (d) to fund acquisitions, capital expenditures, capital leases, or any other expenditure not specifically set forth in the Approved Budget and approved by the DIP Agent, or (e) for any other purpose for which the Carve Out may not be used, provided that a Statutory Committee (if any) and its professionals shall be permitted to investigate the liens of the Pre-Petition Agent and Pre-Petition Lenders in connection with the

|  | Pre-Petition Credit Agreement, with such investigation fees not to exceed $25,000. |
|---|---|
| **Cash Management Collections and Remittances:** | The Debtors shall use a cash management system that is the same as or substantially similar to their pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to the DIP Agent in its sole discretion. The Interim Order and Final Order shall provide the DIP Agent and the DIP Lender with a valid and enforceable lien and security interest on the cash held in the Debtors' bank accounts. |
| **Pre-Petition Obligations:** | All collections and proceeds of DIP Collateral shall be applied to reduce, on a dollar for dollar basis, the obligations under the Pre-Petition Credit Agreement and Pre-Petition Loan Documents.  Upon entry of the Final Order, all obligations under the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents shall be deemed and become postpetition obligations under the DIP Facility. |
| **Super-Priority Administrative Claim:** | Amounts owed by Debtors to the DIP Secured Parties pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code, subject to payment of the Carve Out (such claim, the "**DIP Superpriority Claim**"). |
| **Collateral Security:** | Subject and subordinate only to: (i) any valid, properly perfected, enforceable, non-avoidable prior liens and security interests existing as of the Petition Date (including any Liens that are perfected after the Petition Date that are afforded priority due to the express relation back of the perfection of such lien to a date prior to the Petition Date as permitted by Bankruptcy Code section 546(b)) that are senior to the liens and security interests in favor of the Pre-Petition Agent and/or the Pre-Petition Lenders (the "**Permitted Senior Liens**"), and (ii) the Carve Out, the DIP Facility (including accrued interest, fees, costs and expenses) shall be secured by first priority senior and priming liens and security interests (the "**DIP Liens**") in all of the Debtors' property, including, without limitation, all of Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, including accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of each Debtor, excluding only Avoidance Actions, but including, subject to |

entry of the Final Order, Avoidance Proceeds (collectively, the "**DIP Collateral**").

|                              |                                                                                                                                                                                                                                                                                                            |
| ---------------------------- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| **Lien Validation and Perfection:** | All liens authorized and granted pursuant to the Interim Order or the Final Order entered by the Bankruptcy Court approving the DIP Facility or with respect to adequate protection shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection. |

The Debtors shall stipulate in the Interim Order and Final Order that (i) the liens of the Pre-Petition Agent and the other Pre-Petition Lenders securing the Pre-Petition Credit Facility are valid, perfected, encumber all assets of the Debtors, and have first priority, and (ii) the Debtors possess no claims, offsets or any other type cause of action against the Pre-Petition Agent or any of the Pre-Petition Lenders that would impair, in any manner, the liens of the Pre-Petition Agent or any of the Pre-Petition Lenders against the Debtors' assets or the obligations of the Debtors to the Pre-Petition Agent and Pre-Petition Lenders under the Pre-Petition Credit Facility. The Debtors' stipulations shall be binding upon all parties in interest in the Chapter 11 Cases, including any Statutory Committee that is appointed, unless (i) an adversary proceeding is filed by any party-in-interest (including any Statutory Committee appointed in the Chapter 11 Cases) prior to the expiration of seventy-five (75) days after entry of the Interim Order (the "**Review Period**") against the Pre-Petition Agent or the Pre-Petition Lenders (as applicable) challenging the Pre-Petition Agent or the Pre-Petition Lender's liens (as applicable) or otherwise asserting estate claims against the Pre-Petition Agent or the Pre-Petition Lenders (as applicable), and (ii) a final, non-appealable judgment is entered against the Pre-Petition Agent or the Pre-Petition Lenders (as applicable) in such adversary proceeding. Any party-in-interest that fails to file an adversary proceeding within the Review Period shall be forever barred from asserting any claims against the Pre-Petition Agent or the Pre-Petition Lenders on behalf of any Debtor's estate, or challenging in any manner the liens and claims of the Pre-Petition Agent or the Pre-Petition Lenders against any of the Debtors.

|                       |                                                                                                                                                                                                                                                                                                                                      |
| --------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------ |
| **Release of Claims** | In consideration of the furnishing of the DIP Facility, each of the Debtors party hereto, subject to the rights of another party to bring a Challenge Action (as such term is defined in the Interim Order or the Final Order approving the DIP Facility) during the Review Period, and upon entry of the Final Order, hereby absolutely releases and forever discharges each of the Pre-Petition Agent and Pre-Petition Lenders and their affiliates, officers, directors, employees, attorneys, and other representatives from any and all claims and causes of action of every kind and nature that any of the Debtors may hold against |

such released parties.

| | |
|---|---|
| **506(c) Surcharge/Equities of Case** | Upon entry of the Final Order, each of the Debtors hereby waive any right to surcharge the prepetition collateral securing the Pre-Petition Credit Agreement, Pre-Petition Loan Documents, or DIP Collateral, whether pursuant to Bankruptcy Code sections 506(c) or 105(a) or under any other applicable law. |

Upon entry of the Final Order, the DIP Agent, the DIP Lender, the Pre-Petition Agent and the Pre-Petition Lenders shall not be subject to the "equities-of-the case" exception of Bankruptcy Code section 552(b), or to the equitable doctrines of "marshaling" or any similar claim or doctrine with respect to any DIP Collateral or collateral securing the Pre-Petition Credit Agreement or Pre-Petition Loan Documents.

**Adequate Protection – Pre-Petition Lenders:**

As adequate protection and in consideration for being primed by the DIP Lender's claims and liens, the Pre-Petition Agent and Pre-Petition Lenders shall receive, to the extent of diminution in value of the interests of the Pre-Petition Agent and Pre-Petition Lenders in the Debtors' collateral securing the amounts due under the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents following the Petition Date, (a) a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to payment of the Carve Out and subject to the super-priority administrative claims of the DIP Agent and the DIP Lender under the DIP Facility (such claim, the "**Pre-Petition Adequate Protection Superpriority Claim**"); and (b) valid, binding, enforceable and perfected replacement liens in all DIP Collateral, subject to payment of the Carve Out, Permitted Senior Liens (if any), and the DIP Liens (the "**Pre-Petition Adequate Protection Liens**").

The Pre-Petition Adequate Protection Liens granted herein in favor of the Pre-Petition Agent and Pre-Petition Lenders shall not encumber Avoidance Actions, but, subject to entry of the Final Order, shall encumber Avoidance Proceeds.

**Agent Fees and Expenses:**

The Debtors shall promptly pay or reimburse the DIP Agent when requested for all reasonable and documented costs and expenses of counsel (including, without limitation, local counsel) and financial advisors for the DIP Secured Parties relating to the DIP Facility and the administration and interpretation of, and the enforcement of remedies under, the DIP Facility, regardless of whether such amounts were incurred prior to or after the Petition Date, including but not limited to, due-diligence, duplication or printing costs, consultation, travel, and attendance at court hearings, regardless of whether the DIP Facility is consummated. The DIP Agent shall have the right to charge the DIP Facility for any such fees and costs. Failure to pay such fees and expenses within ten (10) days of delivery of the applicable fee

reimbursement request shall be an Event of Default under the DIP Facility if such failure continues unremedied for more than two (2) business days after written notice of such failure to the Debtors, provided that the DIP Agent shall concurrently provide copies of any fee reimbursement request to the U.S. Trustee and the Statutory Committee (if any) and allow such parties and the Debtors ten (10) days to review and object to any fees or expenses requested therein. If any objection is asserted, the Bankruptcy Court shall decide the issue and the Debtors shall not be required to pay any disputed portion of such fees or expenses until the matter is resolved.

**Carve-Out:**

The "**Carve-Out**" shall be an amount equal to the sum of:

(a)      unpaid, postpetition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) in such amount, with respect to the U.S. Trustee, as agreed to by the U.S. Trustee or as determined by the Court (collectively, the "**Statutory Fees**");

(b)      the unpaid postpetition fees and expenses of the professionals retained by the Debtors and by the Statutory Committee (if any), whose retentions are approved pursuant to final orders of the Court under sections 327, 328, 363 or 1103(a) of the Bankruptcy Code (the "**Chapter 11 Professionals**"), but only to the extent that such fees and expenses are (i) incurred prior to delivery of a Carve-Out Trigger Notice (the date of delivery of such notice the "**Carve-Out Trigger Date**"), (ii) within the amounts set forth in the Approved Budget approved by the DIP Agent for the respective Chapter 11 Professionals of the Debtors and Statutory Committee as of the Carve-Out Trigger Date, and (iii) subsequently allowed (whether prior or subsequent to the Carve-Out Trigger Date) by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code; and

(c)      after the Carve-Out Trigger Date: (i) postpetition fees and expenses of the Chapter 11 Professionals incurred in an aggregate amount not to exceed $500,000, to the extent such fees and expenses are subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code; and (ii) fees and expenses of a chapter 7 trustee in an amount not to exceed $10,000.

Provided, however, that (a) the Carve-Out shall only be available to pay fees and expenses set forth herein to the extent that unencumbered funds are not otherwise available; and (b) in no event shall (i) the aggregate pre-Carve-Out Trigger Date amount provided in clause (b) above for all the Chapter 11 Professionals retained by the Debtors exceed the aggregate amount budgeted for such professionals within the Approved Budget and (ii) the

aggregate pre-Carve-Out Trigger Date amount provided in clause (b) above for all the Chapter 11 Professionals retained by the Statutory Committee exceed the aggregate amount budgeted for such professionals within the Approved Budget.

Provided, further, however, that the Carve-Out for Chapter 11 Professional fees shall be first paid from any retainers or any professional expense escrow account established by the Debtor.

The Carve-Out shall not include payment for any fees and expenses, if any, of the Chapter 11 Professionals incurred directly or indirectly, in respect of, arising from or relating to:

(i) the initiation, joinder, support, or prosecution of any action contesting the indebtedness owed to the DIP Agent, the DIP Lender, the Pre-Petition Agent, or the Pre-Petition Lenders, or the validity of any liens granted to the DIP Agent, the DIP Lender, the Pre-Petition Agent, or the Pre-Petition Lenders;

(ii) preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by the DIP Agent or the Pre-Petition Agent of any of its rights and remedies under the Interim Order, Final Order, or documents comprising the DIP Facility, DIP Financing Documents, Pre-Petition Credit Agreements, or other Pre-Petition Loan Documents, including, without limitation, any attempt to prevent, hinder or delay (or supporting any other person or entity in preventing, hindering or delaying) the submission of any credit bid by the DIP Agent, DIP Lender, Pre-Petition Agent, or Pre-Petition Lenders;

(iii) the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Agent, the DIP Lender, the Pre-Petition Agent, the Pre-Petition Lenders or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the DIP Agent, the DIP Lender, the Pre-Petition Agent, or the Pre-Petition Lenders;

(iv) any request to borrow money other than pursuant to the terms of the Interim Order, the Final Order, or the DIP Financing Documents;

(v) with respect to any Debtor, any of the Debtors' Chapter 11 Professionals, or any of their successors or assigns (including, without limitation, any trustee, responsible officer, examiner, estate administrator or representative or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to

any matter released or to be released, waived, or to be waived, or specified as not subject to challenge by the Debtors pursuant to the Interim Order or Final Order; or

(vi) for any other purpose for which proceeds of the DIP Facility may not be used pursuant to this DIP Term Sheet.

"**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Statutory Committee (if any), which notice is identified as a Carve-Out Trigger Notice and is delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility.

The Debtors shall establish and fund a segregated account not subject to the control of the DIP Agent (such account, the "**Carve-Out Account**") for purposes of funding the Carve-Out. So long as a Carve-Out Trigger Date shall not have occurred, the Debtor shall transfer to the Carve-Out Account on a weekly basis, the amounts that the Chapter 11 Professionals may be paid pursuant to the Approved Budget for such week. Such funds shall be held for the benefit of the Chapter 11 Professionals, to be applied to the fees and expenses of such Chapter 11 Professionals that are approved for payment pursuant to one or more orders of the Bankruptcy Court. Any fees and expenses payable to Chapter 11 Professionals shall be paid first out of the Carve-Out Account, and all amounts deposited in the Carve-Out Account shall reduce, on a dollar for dollar basis, the Carve-Out.

Upon the occurrence of the Carve-Out Trigger Date, the Debtors shall be required to deposit in the Carve-Out Account an amount equal to (a) the unpaid amount (if any) of Chapter 11 Professional fees contemplated in the Approved Budget for such week that should have been paid into the Carve-Out Account during the Approved Budget week in which the Carve-Out Trigger Date occurs (to the extent such amount has not already been paid into the Carve-Out Account during such Approved Budget week); and (b) the $510,000 Carve-Out Trigger Reserve. To the extent that the cash of the Debtors is not sufficient to fund the amounts set forth in the preceding items (a) or (b), the DIP Lenders shall make advances under the DIP Facility sufficient to deposit such amounts into the Carve-Out Account.

To the extent that the fees and expenses of the Professionals performed prior to a Carve-Out Trigger Date and allowed pursuant to one or more orders of the Bankruptcy Court are less than the amounts funded into the Carve-Out Account, the excess amounts in the Carve-Out Account shall be remitted to the DIP Agent to reduce the obligations under the DIP Facility.     The

DIP Agent shall not foreclose or sweep amounts in the Carve-Out Account unless and until the final, allowed amounts payable to Chapter 11 Professionals have been disbursed to the Chapter 11 Professionals from the Carve-Out Account, and, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash of the Debtors that would be required to fund the Carve-Out Account after the occurrence of the Carve-Out Trigger Date in the manner set forth in the paragraph above. The DIP Agent and DIP Lenders reserve all of their rights to challenge or otherwise object to the allowance of any fees or expenses sought to be paid to any Chapter 11 Professionals.

For the avoidance of doubt, and notwithstanding anything to the contrary in the Interim Order, Final Order, or the DIP Facility Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, the DIP Liens, the DIP Superiority Claims, and any and all other forms of liens or claims securing the obligations under the DIP Facility.

| | |
|---|---|
| **Conditions Precedent to Initial DIP Facility Advance:** | The closing of the DIP Facility shall be subject to (a) approval of the Approved Budget by the DIP Agent, together with all financial information and projections regarding the Debtors requested by the DIP Agent, all in form and substance satisfactory to the DIP Agent in its sole discretion, (b) entry of an Interim Order approving the DIP Facility, the DIP Liens, and the DIP Superiority Claim, and containing such other orders and findings as the DIP Agent may require, including modification of the automatic stay after a specified notice period following the occurrence of an Event of Default enabling the DIP Agent to exercise certain rights and remedies against the DIP Collateral, which Interim Order or Final Order, as applicable, shall not have been modified or amended without approval of the DIP Agent, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to the DIP Agent in its sole discretion, (c) the DIP Agent's approval (not to be unreasonably withheld, conditioned, or delayed) of all material first day motions and orders filed in the Chapter 11 Cases relating to the 363 Sale or requiring the expenditure of cash amounts greater than $25,000 in the aggregate, (d) continuation of Debtors' present cash management system, (e) the form and substance of this DIP Term Sheet shall be satisfactory to the DIP Agent in its sole discretion, and (f) the Debtors' delivery to the DIP Agent of an executed asset purchase agreement, prior to the Petition Date, between the Debtors and the Stalking Horse Bidder, in form and substance satisfactory to the DIP Agent at its sole discretion, providing for the Stalking Horse Bidder's purchase of substantially all of the Debtors' assets; and (g) no material adverse change in the Debtors' operations (financial, environmental, or otherwise), performance, or properties (other than as a result of (i) the commencement of the Chapter 11 Cases or (ii) events or circumstances disclosed to the DIP Agent prior to |

13

the Petition Date), has occurred since the Petition Date.

**Additional Conditions to Each Borrowing Under the DIP Facility:**

The funding of each DIP Facility advance shall be subject to the following conditions precedent:  (a) There shall exist no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) under any of the DIP Financing Documents, and the representations and warranties therein shall be true and correct in all material respects; (b) compliance with Bankruptcy Rule 4001 and any applicable Local Bankruptcy Rules, the entry of the Interim Order and the Final Order (as applicable), together with any other order requested by the DIP Agent authorizing and approving the DIP Facility in form, substance and amount acceptable to the DIP Agent in its sole discretion; (c) payment of all fees and expenses owing to the DIP Agent in connection with the DIP Facility (which payment may be made from the proceeds of such borrowing); (d) satisfaction of all other borrowing conditions set forth in the DIP Credit Agreement (which shall be substantially the same as in the Pre-Petition Credit Agreement, including, the absence of any Material Adverse Effect since the Petition Date), and (e) the DIP Financing Documents and the Interim and Final Orders shall include such waivers, indemnities, and other provisions as are acceptable to the DIP Agent in its sole discretion.

**Affirmative and Negative Covenants:**

The Debtors shall comply with the following affirmative and negative covenants: (a) compliance with Approved Budget covenants consistent with the section titled "Budget and Variances," (b) the Debtors shall, from and after the Petition Date, satisfy the Milestones; (c) other customary DIP Facility covenants, including covenants substantially the same as in the Pre-Petition Credit Agreement (subject to revisions necessary or appropriate for DIP Facility financings).

**Reporting Matters**

On the fifteenth (15th) day of each calendar month the Debtors shall deliver to the DIP Agent a report, in the form substantially similar to the form utilized for the Pre-Petition Credit Agreement, showing the computation of the Borrowing Base as of the end of the immediately preceding calendar month (such report a "**Borrowing Base Report**"). The Borrowing Base Report shall include a detailed report of all Accounts that are not Eligible Accounts and all Credit Card Receivables that are not Eligible Credit Card Receivables.   All information (including a calculation of DIP Availability) in a Borrowing Base Report shall be certified by the Debtors' chief executive officer, chief financial officer, chief restructuring officer, Christina Keady (senior manager, finance), or Brad Self (director, finance). DIP Agent may from time to time adjust such report (x) to reflect DIP Agent's reasonable estimate of declines in value of DIP Collateral, due to collections received; (y) to adjust advance rates to reflect changes in dilution, quality, mix and other factors affecting DIP Collateral; and (z) to the extent any information or

calculation does not comply with the DIP Facility requirements.

On or before Thursday of each week, the Debtors shall deliver to the DIP Agent a rollforward of sales, accounts receivable, and collections, in form and substance reasonably satisfactory to the DIP Agent.

On or before the fifteenth (15th) day of each calendar month, the Debtors shall deliver to the DIP Agent both (a) an accounts receivable aging, accounts payable aging, sales/invoice registers and collection journals as of the end of the prior month, and (b) a schedule of business locations and inventory locations, which has been updated as of the end of the immediately preceding month, in form and substance satisfactory to DIP Agent in its discretion.

**Application of 363 Sale Proceeds:**    The DIP Facility obligations shall be fully satisfied upon the closing of the 363 Sale (whether via repayment in cash or assumption of such obligations by the 363 Sale purchaser in a manner satisfactory to the DIP Agent at its sole discretion) and 363 Sale cash proceeds required to satisfy the DIP Facility shall be paid to the DIP Agent at the closing of the 363 Sale.

**Bankruptcy Court Filings:**    As soon as reasonably practicable in advance of filing with the Bankruptcy Court, the Debtors shall furnish to the DIP Agent the drafts of forms of the following (which shall not have been modified or amended upon filing in any material respect without approval of the DIP Agent) (i) any motions, proposed orders, and pleadings related to the approval of the DIP Facility, which motion and orders shall be in form and substance satisfactory to the DIP Agent in its sole discretion, (ii) the motions seeking approval of the Sale Procedure Order and the 363 Sale, and the proposed forms of the orders related thereto, which shall be in form and substance reasonably satisfactory to the DIP Agent, (iii) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), which shall be in form and substance reasonably satisfactory to the DIP Agent, (iv) any motion seeking approval of any sale of the Debtors' assets and any proposed form of a related bidding procedures order and sale order (other than those with respect to the bidding procedures and the 363 Sale), and (v) any other motion filed seeking approval of any matter requiring material expenditures of DIP Collateral (each of which must be in form and substance reasonably satisfactory to the DIP Agent).

**Sale Process:**    The Debtors shall conduct a sale process for the sale of substantially all of the assets of the Debtors to the Stalking Horse Bidder (or, if an Auction is held, to the Winning Bidder) in accordance with the Milestones defined below.

15

The Debtors' current management, together with Investment Banker, the Debtors' counsel, and the Debtors' other professionals, shall oversee the sale process on behalf of the Debtors, including all activities of any advisors retained by the Debtors in connection with the sale process. Current management shall at all times be entitled to take any action necessary or appropriate to conduct the sale process, and shall not interfere with, and shall use its commercially reasonable best efforts to provide DIP Agent with access to all potential bidders, lessors, and other interested parties requested by DIP Agent, and, so long as no DIP Agent, DIP Lender, Pre-Petition Agent, or Pre-Petition Lender has provided written notice of its intent to submit a bid at the Auction, any materials, term sheets, bids, or financial information provided in writing to the Debtors by such parties.

The Debtors shall provide or cause to be provided to DIP Agent a written report from current management bi-weekly (or more frequently as reasonably requested by the DIP Agent) in form and substance satisfactory to, and addressing such items as are requested by DIP Agent, including addressing the status of the marketing and sale process of the Debtors. The Debtors shall also cause current management and the Investment Banker to be made available to provide periodic telephonic updates of such reports to DIP Agent from time to time (but not less than bi-weekly), as requested by DIP Agent.

<u>Milestones</u>. The Debtors shall be required to comply with the following, (the "**Milestones**"):

(a)　　On the Petition Date, the Debtor shall have entered into an asset purchase agreement with the Stalking Horse Bidder, in form and substance satisfactory to the Agent, providing for the Stalking Horse Bidder's purchase of substantially all of the Debtors' assets (subject to the Auction and process contemplated in the Sale Procedure Order)

(b)　　On or before one business day after the Petition Date, or such later date to which the DIP Agent consents in writing in its sole discretion, the Debtors shall file a motion, in form and substance acceptable to the DIP Agent, requesting entry of the Sale Procedure Order (as defined below) authorizing procedures for the sale of substantially all of the Debtors' assets to the Stalking Horse Bidder (or, if an Auction is held, to the Winning Bidder).

(c)　　On or before 30 days after Petition Date, or such later date to which the DIP Agent consents in writing in its sole discretion, the Bankruptcy Court shall have entered the Sale Procedure Order; and

(d)    On or before the date that is 72 days after the Petition Date, the Debtors shall have conducted an auction for the sale of substantially all of their assets (if necessary) and selected the successful bidder for the substantially all of their assets;

(e)    On or before the date that is 75 days after the Petition Date, or such later date to which the DIP Agent consents in writing in its sole discretion, the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale; and

(f)    On or before the date that is 77 days after the Petition Date, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which the DIP Agent consents in writing in its sole discretion, the Sale shall be closed.

Notwithstanding anything to the contrary herein, the Bankruptcy Court may set dates with respect to the Milestones beyond the outer dates specified above to accommodate its own schedule and to the extent the Bankruptcy Court makes such an extension, the Milestones hereunder shall be automatically extended by the same period as the Bankruptcy Court's extension.

The DIP Agent, DIP Lender, Pre-Petition Agent, and Pre-Petition Lenders shall have the right to "credit bid" any secured obligations owed to them in any sale of the Debtors' assets.

**Representations and Warranties:** The representations and warranties of the Debtors set forth in the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents, except (i) as otherwise disclosed to the DIP Agent in writing, or (ii) with acceptable qualifications for the commencement of the Chapter 11 Cases and other matters contemplated herein, are hereby incorporated in all material respects into this DIP Term Sheet as if made on the date hereof (except to the extent such representations and warranties expressly relate to an earlier date, in which case they are true and correct in all material respects as of such earlier date)

**Remedies:** Following the Termination Date or the occurrence of an Event of Default, unless such Event of Default has been waived by the DIP Agent in writing in its sole discretion, subject to the terms of the Interim Order or the Final Order (as applicable), the DIP Agent shall be entitled to exercise: (i) any remedies with respect to the DIP Facility that would be available to the Pre-Petition Agent as a result of an event of default under the Pre-Petition Credit Agreement, as well as all other remedies set forth in this DIP Term Sheet, the Interim Order, or the Final Order, including, without limitation, the ability to accelerate the entire DIP Facility and the right to terminate the Debtors' use of cash collateral; and (ii) any customary remedies that would have been available under the Pre-Petition Loan

17

Documents, including, without limitation, the right to realize on all DIP Collateral and the right to exercise any remedy available under applicable law, without the necessity of obtaining any further relief or order from the Bankruptcy Court. Consistent with the foregoing sentence, section 362 relief from the stay in favor of the DIP Agent, as provided herein, shall be embodied in any order approving the DIP Facility and the use of cash collateral.

**Events of Default:**            Defaults and Events of Default shall mean the occurrence of any of the following:

- The Debtors shall cease to employ a chief executive officer or chief restructuring officer who is reasonably acceptable to the DIP Agent (it being understood that Erica Buxton and John Madden shall be acceptable to the DIP Agent).

- Any of the Chapter 11 Cases shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed.

- Filing or support of a proposed plan of reorganization by any Debtor that does not provide for the indefeasible payment in full and in cash of Debtors' obligations outstanding under the DIP Facility, unless otherwise agreed in writing by the DIP Agent in its sole discretion.

- The filing by the Debtor of, or the filing of motion or pleading requesting confirmation of, a plan of reorganization that does not require the indefeasible repayment in full, in cash of the DIP Facility as of the effective date of the plan, unless otherwise agreed in writing by the DIP Agent in its sole discretion.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of the DIP Agent, or the failure of the Debtors to oppose prior to the applicable objection deadline (as such deadline may be extended from time to time) any motion or other pleading requesting such relief.

- Appointment of an examiner with expanded or enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of the DIP Agent, or the failure of the Debtors to oppose prior to the applicable objection deadline (as such deadline may be extended from time to time) any motion or other pleading requesting such relief.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order or Final Order approving the DIP Facility, without the prior written consent of the DIP Agent or the failure of the Debtors to oppose prior to the

applicable objection deadline (as such deadline may be extended from time to time) any motion or other pleading requesting such relief.

- Any Debtor commences an adversary proceeding or files a motion to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the claims of the DIP Agent, DIP Lender, Pre-Petition Agent, or Pre-Petition Lenders, or to subject any of the collateral of the DIP Agent or Pre-Petition Agent to a surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- Any Debtor shall request approval of any postpetition financing, other than the DIP Facility, that would not immediately repay all DIP Facility obligations, in full, in cash, on the date of the closing of such postpetition financing.

- Any Debtor shall apply for an order substituting any assets for all or any portion of the DIP Collateral.

- Subject to the Carve Out and the Permitted Senior Liens, entry of an order granting liens or claims that are senior or *pari passu* to the liens granted in favor of the DIP Agent and/or the DIP Lender under the DIP Financing Documents.

- Any Debtor shall assert in any pleading that any of the DIP Liens are invalid, or any DIP Liens granted to the DIP Agent or DIP Lender shall be determined by the Bankruptcy Court to be invalid.

- Any payment on, or application for authority to pay any pre-petition claim owing to terminated employees or lease rejection damages without prior written consent of the DIP Agent or as otherwise set forth in the Approved Budget.

- If at any time prior to the conclusion of the sale process, either (i) the Debtors announce or state in writing that the sales process has been terminated or suspended, and such termination or suspension continues for more than seven (7) days without the DIP Agent's consent; or (ii) the DIP Agent has filed a notice with the Bankruptcy Court, at least two (2) business days before the effective date of any declared default, of its intent to declare an event of default as a result of the sales process being terminated or suspended for more than seven (7) days (with the Debtors reserving all rights to seek further order of the Bankruptcy Court concerning whether such alleged suspension is an actionable default).

- A final order is entered granting any creditor relief from the automatic stay that would permit the foreclosure of any assets of the Debtors with a value in excess of $500,000 in

the aggregate.

- Failure to make any payment of (i) principal, interest, or DIP Fees under the DIP Facility when due or (ii) any other amount (other than principal, interest, or DIP fees) where such payment default has continued for five (5) days.

- Failure to pay by the applicable due dates (after giving effect to applicable grace periods) any material indebtedness in excess of $500,000 incurred after the Petition Date, which payment is not otherwise stayed.

- Breach of any Milestones.

- Breach of any other covenant set forth in any DIP Financing Document and such breach shall continue for five (5) Business Days after notice by the DIP Agent to the Debtors.

- Any material representation or warranty by any Debtor is incorrect or misleading in any material respect when made.

- Exclusivity shall have been terminated or any Debtor shall have agreed to any such termination.

- After entry thereof, either of the Sale Procedure Order or the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal or shall have been modified or amended without the prior written consent of the DIP Agent (not to be unreasonably withheld, conditioned, or delayed).

- Unless the Stalking Horse Bidder fails to be the Winning Bidder, or a back-up-bidder, following the conclusion of an Auction, the Stalking Horse Bidder designated in the motion seeking approval of the Sale Procedures Order shall drop out of the sale process or otherwise indicate that it is unable to close the sale process within ninety (90) days of the Petition Date.

- Any Debtor shall file a motion to seek (or support any other Person in seeking) an order to restrict or prohibit the DIP Agent, DIP Lender, Pre-Petition Agent, or Pre-Petition Lender from submitting a "credit bid" for any DIP Collateral.

- Any Debtor commences any Challenge Action (as such term is defined in the interim or final order approving the DIP Facility) against the Pre-Petition Agent or any Pre-Petition Lender.

- The Debtors fail to enter into a Pre-Petition Credit Agreement, in form and substance satisfactory to the DIP Agent, on or before three (3) days prior to the hearing to consider entry of the Final Order.

**Indemnification:**       The Debtors shall, jointly and severally, indemnify and hold the

DIP Agent, the DIP Lender, and their officers, directors, employees and agents (including all of their attorneys and other professionals) (each an "**Indemnified Party**") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and disbursements in respect of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Financing Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, fraud, or willful misconduct.  The indemnification terms and conditions of the Pre-Petition Credit Agreements are hereby incorporated in this DIP Term Sheet and applied to the DIP Facility.

**Governing Law:**          All documentation in connection with the DIP Facility shall be governed by the laws of the state of New York, subject to applicable federal bankruptcy laws.

**Other Definitions:**       The definition of the "Borrowing Base" and other definitions related to the computation of the Borrowing Base, are set forth on <u>Annex I</u> hereto.

**"363 Sale"** means the sale of all or substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code.

**"Adjusted Term SOFR"** means (a) Term SOFR <u>plus</u> (b) the Term SOFR Adjustment.  In no event shall Adjusted Term SOFR be less than 1.50%.

**"Approved Budget"** means the 13-week budget of the Debtors relative to the operations of the Debtors in the Chapter 11 Cases for any fiscal period, as delivered to the DIP Agent in form and substance satisfactory to the DIP Agent at its sole discretion. The Approved Budget shall include the Debtors' projected cash receipts and disbursements, and  projected ending cash balance, for each Approved Budget week.  The Approved Budget may be amended from time to time as may be agreed to by the DIP Agent, in writing, in its sole discretion.

**"Approved Budget Variance Report"** means a current report, in form and substance satisfactory to the DIP Agent, that: (i) details the actual amount of cash receipts and disbursements for the prior week for each line item included in the Approved Budget (on a weekly and cumulative basis), (ii) compares such actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each such line item set forth in the Approved Budget for such period, and (iii) provides a reasonable explanation for all variances between budgeted and actual amounts.    Each Approved Budget Variance Report will be certified as true and correct by the Debtors' chief financial officer, chief executive officer, chief restructuring officer, Christina Keady (senior manager, finance), or Brad Self (director, finance).

**"Auction"** means an auction held in connection with the 363 Sale and in accordance with the provisions set forth in the Sale Procedure Order.

**"Avoidance Actions"** means any causes of action that could be brought pursuant to section 544, 545, 547, or 548 of the Bankruptcy Code, or any applicable state fraudulent transfer statutes.

**"Avoidance Proceeds"** means the proceeds received from, or property recovered in respect of, Avoidance Actions.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware presiding over the Chapter 11 Cases.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to close under the Laws of either New York or the state where Agent is located, and, if such day relates to Term SOFR, means any such day meeting the above requirements that is also a U.S. Government Securities Business Day.

"**Chapter 11 Cases**" means the voluntary Chapter 11 cases commenced by the Debtors in the Bankruptcy Court.

"**DIP Availability**" means the lesser of (a) (i) prior to entry of the Final Order, the Maximum DIP Funding Amount, and (ii) after entry of the Final Order, the Maximum DIP Facility Amount; (b) the maximum amount of DIP Facility obligations contemplated in the Approved Budget as of any particular date and (c) the Borrowing Base (as defined in Annex I) minus the DIP Facility Usage.

"**DIP Facility Usage**" means the sum of (a) the total principal amount of obligations under the DIP Facility (prior to giving effect to a proposed DIP Facility revolving advance); plus (b) the total balance of obligations under the Pre-Petition Loan Documents.

"**Final Order**" means a final, non-appealable order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, on terms satisfactory to the DIP Agent in its sole discretion.

"**Governmental Authority**" means any federal, state, provincial, territorial, local, foreign or other agency, authority, body, commission, court, instrumentality, political subdivision, central bank, or other entity or officer exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions for any governmental, judicial, investigative, regulatory or self-regulatory authority (including the Financial Conduct Authority, the Prudential Regulation Authority and any supra-national bodies such as the European Union or European Central Bank).

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing Debtors, among other things, to obtain interim financing and incur postpetition indebtedness on terms satisfactory to the DIP Agent in its sole discretion.

"**Investment Banker**" means Jefferies LLC

"**Material Adverse Effect**" means (a) a material adverse change in, or a material adverse effect upon, the operations,

23

business, assets, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Debtors; (b) a material impairment of the rights and remedies of any of the DIP Agent, DIP Lender, Pre-Petition Agent, or Pre-Petition Lenders under any of the DIP Financing Documents, Pre-Petition Credit Agreement, or other Pre-Petition Loan Documents, (c) a material impairment of the Debtors' ability to perform any of their obligations under the DIP Financing Documents, Pre-Petition Credit Agreement, or other Pre-Petition Loan Documents, or (d) a material adverse effect upon the legality, validity, binding effect, or enforceability against any Debtor of any of the DIP Financing Documents, Pre-Petition Credit Agreement, or other Pre-Petition Loan Documents, in each of the foregoing cases, other than as a result of (i) the commencement of the Chapter 11 Cases or (ii) events or circumstances disclosed to the DIP Agent prior to the Petition Date.

"**Maturity Date**" means the date that is seventy seven (77) days after the Petition Date, or such later date to which the DIP Agent consents in writing.

"**Monthly Period**" means a period that commences on the first day of any calendar month (or in the case of a calendar month in which the first DIP Facility advance occurs, such period shall commence on the date of the first advance) and ends on (and includes) the last day of such calendar month.

"**Opening Pre-Petition Loan Balance**" means $34,929,332.54.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, trust, unincorporated organization, Governmental Authority, or other entity.

"**Petition Date**" means the date on which the Chapter 11 Cases for the Debtors were commenced.

"**Pre-Petition Agent**" means CIT Northbridge Credit LLC, in its role as Agent for the Pre-Petition Lenders under the Pre-Petition Credit Agreement.

"**Pre-Petition Credit Agreement**" has the meaning ascribed to it in the preamble to this term sheet.

"**Pre-Petition Credit Facility**" means the facility furnished by the Pre-Petition Agent and Pre-Petition Lenders pursuant to the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents.

"**Pre-Petition Lenders**" means the lenders party to the Pre-

24

Petition Credit Agreement.

"**Pre-Petition Loan Documents**" means, collectively, the Pre-Petition Credit Agreement, and each other document relating to, and executed in connection with, the credit facility governed by the Pre-Petition Credit Agreement.

"**Sale**" means a sale of all or substantially all of the Debtors' assets.

"**Sale Order**" means the order entered by the Bankruptcy Court in form and substance reasonably satisfactory to the DIP Agent that, among other things, approves the 363 Sale, the results of the Auction (if applicable) and the Winning Bidder's bid.

"**Sale Procedure Order**" means an order in form and substance satisfactory to the DIP Agent approving the bidding procedures to be applicable to the 363 Sale for the sale to the Stalking Horse Bidder or, if an Auction is held, to the Winning Bidder.

"**SOFR**" means a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**Stalking Horse Bidder**" means shall mean Bucky Acquisition Holdco, LLC.

"**Statutory Committee**" means any statutory committee appointed in the Chapter 11 Cases.

"**Term SOFR**" means the rate determined by agent to be the Term SOFR Reference Rate for a tenor comparable to the applicable Monthly Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Monthly Period, as such rate is published by the Term SOFR Administrator and obtained by DIP Agent through the Bloomberg Data License service or a comparable service acceptable to DIP Agent; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published

by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"**Term SOFR Adjustment**" means 0.11448%

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by DIP Agent at its reasonable discretion).

"**Term SOFR Reference Rate**" means the rate per annum determined by DIP Agent as the forward-looking term rate based on SOFR.

"**Termination Event**" means the occurrence of the earlier of:

(i) an Event of Default under the DIP Facility; or

(ii) the Debtors' failure to comply with the terms of the DIP Financing Documents (including, without limitation, their failure to comply with the Approved Budget, subject to any approved variances).

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities and is otherwise a Business Day.

"**Winning Bidder**" means the bidder that agrees (at the Auction if applicable) to purchase all or substantially all of the assets of the Debtors.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

<u>**DEBTORS**</u>**:**

**UNCONDITIONAL LOVE INC.**

By: _____
Name:
Title:

**THE BEST TRAINING PANTS IN THE WORLD INC.**

By: _____
Name:
Title:

**UNCONDITIONAL LOVE CANADA, INC.**

By: _____
Name:
Title:

**DIP AGENT**:

**CIT NORTHBRIDGE CREDIT LLC**


By: _____
Name:
Title:



**DIP LENDER**:

**CIT NORTHBRIDGE FUNDING I LLC**


By: _____
Name:
Title:

**Annex I**

**Calculation of the Borrowing Base**

The Borrowing Base shall be substantially the same as under the Pre-Petition Credit Agreement, with the following exceptions:  (a) the Availability Block shall be $0.00; (b) the Availability Reserve will include provision for all Carve-Out amounts payable after the Carve-Out Trigger Date, and (c) the Special Advance Amount shall be computed as set forth below.

SPECIAL ADVANCE FORMULA:    Up to the lesser of a) $13,900,000 and b) the sum of (x) Up to 10% of the U.S. Formula Amount, plus the Canadian Formula Amount, minus the Availability Reserve and (y) $11,700,000.

The existing Special Advance Formula (in effect under the Pre-Petition Credit Agreement) provides availability of $6.9 million. The revised Special Advance Formula above, combined with the lifting of the $5 million Availability Block, will produce incremental DIP Facility availability of $12,000,000 (prior to giving effect to the post-termination Carve-Out reserve).

SPECIAL ADVANCE AMORT:    No amortization of the Special Advance Formula Amount during the DIP period.