IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UNCONDITIONAL LOVE INC., *et al.*,[1] | Case No. 23-11759 (MFW) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ROBERT WHITE
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY
OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTORS TO OBTAIN POSTPETITION FINANCING, GRANTING SENIOR
POSTPETITION SECURITY INTERESTS AND ACCORDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS PURSUANT TO SECTIONS 364(C)
AND 364(D) OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE
OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION, (IV)
MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

I, Robert J. White, hereby declare, under penalty of perjury, as follows:

1. I am a Managing Director at Jefferies LLC ("Jefferies"), a global investment banking and financial advisory firm with a principal office located at 520 Madison Avenue, New York, NY 10022, as well as other locations worldwide. Jefferies is the proposed investment banker to the debtors and debtors in possession (the "Debtors") in the above-captioned cases (the "Chapter 11 Cases").

2. I submit this declaration (the "Declaration) on behalf of the Debtors in support of the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, Granting Senior Postpetition Security Interests and According Superpriority Administrative Expense Status Pursuant to Section 364(c) and 364(d) of the*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Unconditional Love Inc. d/b/a Hello Bello (5895), Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc. (9369). The Debtors' headquarters is located at 17383 Sunset Blvd, Suite B200, Pacific Palisades, CA 90272.

*Bankruptcy Code, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, filed contemporaneously herewith (the "Motion").[2]

3. Unless otherwise indicated, all facts set forth in the Declaration are based upon (a) my personal knowledge of the Debtors' current operations and financial performance, (b) my attendance and oversight of the Debtors' sale and DIP marketing process; (c) information learned from my review of relevant documents and information concerning the Debtors' operations and financial affairs; (d) information I received from members of the Debtors' management or advisors, including members of Jefferies working directly with me and under my supervision, direction, or control; and/or (e) my views based on my experience and knowledge.

4. I am over the age of 18 and am duly authorized to submit the Declaration on behalf of the Debtors and in support of the Motion. I am not being specifically compensated for this testimony other than through payments received by Jefferies as a proposed professional to be retained by the Debtors. If called upon to testify, I could and would testify as to the facts set forth herein.

## QUALIFICATIONS

5. As a global investment banking and financing firm, Jefferies provides a broad range of corporate advisory services to its clients including, without limitation, services relating to: (i) general financial advice; (ii) mergers, acquisitions, and divestitures; (iii) special committee assignments; (iv) capital raising; and (v) corporate restructurings. Jefferies and its senior professionals have extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 proceedings. Jefferies has advised debtors,

---

[2] Capitalized terms used but not defined herein have the meanings given to them in the Motion.

creditors, equity constituencies, and purchasers in connection with many reorganizations. Since 2007, Jefferies has been involved in over 250 restructurings, representing over $800 billion in restructured liabilities

6. Jefferies' restructuring professionals have extensive experience working with and advising financially troubled companies, debtors, and other constituencies in chapter 11 cases and have served as financial advisors to debtors and creditors in various restructurings, including, but not limited to:  In re Lordstown Motors Corp., Case No. 23-10831 (MFW) (Bankr. D. Del. July 25, 2023); AeroCision Parent, LLC, Case No. 23-11032 (KBO) (Bankr. D. Del. July 31, 2023); In re Pipeline Health System, LLC, Case No. 22-90291 (MI) (Bankr. S.D. Tex. Oct. 2, 2022); In re Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.), Case No. 22-90273 (MI) (Bankr. S.D. Tex. Sep. 22, 2022); In re SAS AB, Case No. 22-10925 (MEW) (Bankr. S.D.N.Y. Sept. 19, 2022); In re Vewd Software USA, LLC, Case No. 21-12065 (MEW) (Bankr. S.D.N.Y. Dec. 15, 2021); In re Limetree Bay Services, LLC, Case No. 21-32351 (DRJ) (Bankr. S.D. Tex. Sep. 10, 2021); In re Rosehill Resources Inc., Case No. 20-33695 (DRJ) (Bankr. S.D. Tex. July 26, 2020), In re Hospitality Investors Trust, Case No. 21-10831 (CTG) (Bankr. D. Del. May 20, 2021); In re CarbonLite Holdings LLC, Case No. 21-10527 (JTD) (Bankr. D. Del. Apr. 7, 2021); In re Gulfport Energy Corporation, Case No. 20-35562 (DRJ) (Bankr. S.D. Tex. Jan. 21, 2021); In re Mallinckrodt PLC, Case No. 20-12522 (JTD) (Bankr. D. Del. Jan. 13, 2021); In re Bouchard Transportation Co., Inc., Case No. 20-34682 (DRJ) (Bankr. S.D. Tex. Jan. 14, 2021); In re Valaris PLC, Case No. 20-34114 (MI) (Bankr. S.D. Tex. Nov. 04, 2020); In re APC Automotive Technologies Intermediate Holdings, LLC, Case No. 20-11466 (CSS) (Bankr. D. Del. June 3, 2020); In re Foresight Energy LP, Case No. 20-41308-659 (KSS) (Bankr. E.D. Mo. Apr. 7. 2020);

In re Melinta Therapeutics, Inc., Case No. 19-12748 (LSS) (Bankr. D. Del. Feb. 7, 2020); In re EP Energy Corp., Case No. 19-35654 (MI) (Bankr. S.D. Tex. Jan. 8, 2020).

7. I have been employed by Jefferies since 2009, initially as a Senior Vice President in the Debt Advisory and Restructuring Group and was promoted to the position of Managing Director in 2013. Prior to working at Jefferies, I was a Senior Distressed Debt Analyst at Fintech Advisory, Inc., a private investment firm with $4 billion of assets under management, as well as a Director with Barclays Capital's Distressed Debt trading desk. At Fintech and Barclays, I analyzed, invested, and traded in the securities of distressed companies. Prior to that time, I was a Senior Vice President specializing in restructuring advisory services at Chanin Capital Partners, Inc., a boutique investment bank. I hold an MBA from Boston University and a Bachelor's Degree with Honors from Allegheny College. I also hold FINRA Series 7 and Series 63 licenses.

8. I have approximately 25 years of investment banking and restructuring experience, assisting companies on a wide range of strategic matters. I have experience handling complex financial and other restructuring matters for a variety of companies (distressed or otherwise and both in- and out-of-court) across a wide spectrum of industries. My areas of expertise include, among other things, (a) advising on financial restructuring strategies, (b) sizing, structuring, raising, and executing all aspects of financing transactions, including rescue/bridge, debtor-in-possession, and exit financings, and (c) conducting sale processes both in- and out-of-court for companies undergoing financial distress. My experience has included involvement in many section 363 sale processes in chapter 11 cases or similar situations in a variety of roles of the following companies, among others: Arch Coal, Blackjewel LLC, Brookstone, Inc., Blockbuster Inc., Claire's Stores Inc., Cineworld Plc., the Diocese of Rockville Center, Eastman Kodak, Extended Stay Hotels, Forbes Energy, The Great Atlantic & Pacific Tea Co., Hospitality Investors

Trust, JC Penney Inc., McClatchy Company, Momentive Performance Materials, Southland Royalty Co., Rex Energy, and Real Industry, among others. Additionally, my merger and acquisition experience includes troubled company buy-side and sell-side assignments as well as special committee representations and traditional M&A transactions.

9. I, and the Jefferies engagement team working under my direction, have been working closely with the Debtors' senior management team and their other advisors over the past ten months. I am familiar with the Debtors' day-to-day operations, books and records, and restructuring efforts. As part of this engagement, I have developed an understanding as to the liquidity needs of the Debtors.

## THE DIP FINANCING MARKETING PROCESS

10. As set forth in the Motion and First Day Declaration, in the months leading up to the Petition Date, the Debtors faced significant economic and operational challenges that strained their liquidity and, in turn, their ability to raise additional capital or seek strategic partnerships. In addition to working closely with Jefferies to continue exploring potential out-of-court sale transactions, the Debtors retained Willkie Farr & Gallagher LLP, as counsel, and Emerald Capital Partners, as financial advisor, to assist the Debtors in pursuing various strategic alternatives. Over the weeks leading up to the filing of these Chapter 11 Cases, advisors at Jefferies, at the direction of the Debtors, reviewed and analyzed the Debtors' projected cash requirements as well as considered actionable alternatives, including additional debt or equity financing, or an acquisition of the Company. Given the Debtors' dwindling liquidity profile, the Debtors ultimately determined that the most value-maximizing approach was to file for chapter 11 protection and proceed with a sale of their assets under section 363 of the Bankruptcy Code.

11.     In the weeks leading up to the Petition Date, in consultation with their advisors, the Debtors conducted a comprehensive liquidity analysis to determine how much liquidity would be required to operate their business in the ordinary course, while funding all administrative expenses associated with pursuing and consummating the Sale Process in chapter 11.  This analysis demonstrated that the Debtors would be unable to meeting their postpetition liquidity needs through the use of Cash Collateral alone.  As a result, the Debtors, alongside their advisors, engaged in discussions with the Prepetition CIT Secured Parties concerning the imminent financial issues facing the Debtors.

12.     With respect to debtor-in-possession financing, the Prepetition CIT Secured Parties agreed to provide postpetition financing to the Debtors, as well as consent to the consensual use of their Cash Collateral, as long as the Debtors secured a stalking horse bidder and entered into an asset purchase agreement prior to filing for bankruptcy and implementing a sale pursuant to section 363 through an auction process while in chapter 11.  The Prepetition CIT Secured Parties were clear that they would not fund a debtor-in-possession financing in the context of a "free fall" chapter 11 without a stalking horse bid in hand.  While the Debtors were vigorously pursuing a potential stalking horse bidder in hopes of negotiating and entering into an asset purchase agreement prior to filing for chapter 11, the Debtors, along with their advisors, began evaluating whether they would be able to obtain debtor-in-possession financing from third parties in case negotiations with prospective buyers stalled.

13.     Nevertheless, I, and the Jefferies engagement team working under my direction, commenced a marketing process to obtain postpetition financing for the Debtors.  Beginning in late-August, 2023, Jefferies contacted 86 potential parties active in the debtor-in-possession financing market, comprised of a mix of ABL lenders and term loan lenders, and potential stalking

horse investors. Of these parties, 26 signed nondisclosure agreements and were granted access to additional due diligence which primarily focused on the use of proceeds, collateral coverage, timing of the financing and chapter 11 process, and the stalking horse sale process. Jefferies received two preliminary indications of interest, but ultimately none of these potential lenders expressed a willingness to provide debtor-in-possession financing of this size and on an accelerated timeline that was either (a) secured by liens junior to the liens of the Prepetition CIT Secured Parties or (b) secured by priming liens without the consent of the Prepetition CIT Secured Parties given the attendant cost and delay of a likely priming dispute.

14. In parallel with marketing to third party sources, the Debtors also continued negotiations with the Prepetition CIT Secured Parties on the terms of a debtor-in-possession term sheet. The Debtors determined that the DIP Lender provided the most beneficial and cost-effective debtor-in-possession terms. The resulting DIP Credit Facility is a consolidated, revolving credit facility in the aggregate maximum principal amount of approximately $47 million, and will provide up to approximately $12 million in new money commitments to the Debtors, approximately $5.5 million of which will be available during the interim period. The terms of the DIP Credit Facility are the result of extensive, arms' length good faith negotiations that took place over the course of several weeks, and I believe are the best available to the Debtors under the circumstances.

15. I believe the DIP Credit Facility is necessary to among other things, (a) fund the Debtors' working capital and capital expenditure needs during the course of these Chapter 11 Cases and ensure payments to employees, third-party vendors, utilities, and taxing authorities, among others, who provide essential services needed to operate, maintain, and insure the Debtors' assets; (b) ensure the timely payment of chapter 11 administrative expenses; (c) provide the

Debtors with continued access to the use of Cash Collateral; and (d) provide a positive message to the market that the Chapter 11 Cases are sufficiently funded, which, in my experience, is critical to ensure confidence in the Debtors from their customers, employees, and vendors and to the success of the Sales Process. I also believe that the Debtors would face a material risk of substantial, irreparable harm that could drive the Debtors into liquidation. I believe that access to the liquidity provided under the DIP Credit Facility to fund these Chapter 11 Cases should ensure that the Debtors have sufficient funds to preserve and maximize the value of their estates and avoid such an outcome.

### THE TERMS OF THE DIP CREDIT FACILITY ARE REASONABLE AND SHOULD BE APPROVED

16. Based on my experience and negotiations resulting in the proposed DIP Credit Facility, I believe the economic terms are reasonable when considering the size of the financing, the Debtors' existing collateral package, and the accelerated timeline.

17. I understand that in accordance with, and subject to, the terms of the DIP Credit Facility, the DIP Credit Facility provides the Debtors with approximately $12 million in new money commitments, including an initial draw of up to approximately $5.5 million. The DIP Credit Facility contemplates an upfront fee of $200,000 and annual interest rate of Adjusted Term SOFR + 8.00% with a default interest rate of an additional 3.00%. The DIP Credit Facility also includes a roll up of approximately $35 million of obligations outstanding under the Pre-Petition Credit Agreement into postpetition DIP Credit Facility obligations. I believe that the terms and conditions of the DIP Credit Facility are generally consistent with market terms for debtor-in-possession financing, and I understand that the Lenders would not provide financing without the proposed fees and expenses, or the proposed roll-up of the obligations under the Pre-Petition Credit

Agreement.  I believe that the fees and expenses associated with the DIP Credit Facility are appropriate and representing the best terms currently available to the Debtors.

18. I believe that, taken as a whole, the terms of the DIP Credit Facility are fair and reasonable under the circumstances, especially in light of the Debtors' need for postpetition financing and their capital structure.  I also believe that the DIP Credit Facility is crucial to avoid immediate and irreparable harm to the Debtors' estates, employees, customers, and creditors.

[*Remainder of Page Left Intentionally Blank*]

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 23 day of October, 2023.

<u>/s/ Robert J. White</u>　　　　　　<br>
Robert J. White<br>
Managing Director<br>
Jefferies LLC

10