**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| UNCONDITIONAL LOVE INC., *et al.*,[1] | Case No. 23-11759 (MFW) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR
ENTRY OF ORDERS (I) (A) APPROVING
BIDDING PROCEDURES FOR THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS, (B) AUTHORIZING THE DEBTORS TO
ENTER INTO THE STALKING HORSE APA AND TO
PROVIDE THE STALKING HORSE BID PROTECTIONS
THEREUNDER, (C) SCHEDULING AN AUCTION AND A SALE
HEARING AND APPROVINGTHE FORM AND MANNER OF NOTICE
THEREOF, (D) APPROVING ASSUMPTION PROCEDURES, AND
(E) GRANTING RELATED RELIEF; AND (II) (A) APPROVING THE SALE
OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS, AND ENCUMBRANCES, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (the "Debtors") hereby file this motion (the "Motion") for the entry of (a) an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order") (i) approving bidding procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), to be used in connection with the sale (the "Sale") of substantially all of the Debtors' assets (collectively, the "Assets"), (ii) authorizing the Debtors to enter into the Stalking Horse APA (as defined herein) and to reimburse the Stalking Horse Bidder for reasonable and

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, are Unconditional Love Inc. d/b/a/ Hello Bello (5895), Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc. (9369).  The Debtors' headquarters is located at 17383 Sunset Blvd, Suite B200, Pacific Palisades, CA 90272.

documented expenses in connection with the Stalking Horse Bid, not to exceed $649,000 (the "Expense Reimbursement") and a breakup fee in an amount equal to 3.0% of the Purchase Price (the "Breakup Fee," and together with the Expense Reimbursement, the "Bid Protections"), (iii) scheduling an auction for the Assets (the "Auction"), if necessary, and scheduling a hearing to approve the Sale (the "Sale Hearing"), and approving the form and manner of notice of the proposed Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Sale Notice"), (iv) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "Contracts") in connection with the Sale (the "Assumption Procedures"), and approving the form and manner of notice to each relevant non-debtor counterparty to a Contract of (A) the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract (the "Cure Costs") and (B) certain other information regarding the potential assumption and assignment of Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Assumption and Assignment Notice"), and (v) granting related relief; and (b) an order of the Court (the "Sale Order")[2] (i) authorizing the sale of the Debtors' Assets free and clear of all liens, claims, interests, and encumbrances, except as provided in the Sale Order, (ii) authorizing the assumption and assignment of certain Contracts in connection with the sale(s), and (iii) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Erica Buxton in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[3] filed contemporaneously herewith, and the declaration of Robert White of Jefferies LLC in support of the Motion, filed contemporaneously

---

[2]    A copy of the Sale Order will be filed in advance of the applicable Sale Hearing.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

herewith (the "White Declaration").  In further support of this Motion, the Debtors respectfully

represent as follows:

## JURISDICTION AND VENUE

1.　　The United States Bankruptcy Court for the District of Delaware (the "Court") has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

*Order of Reference* from the United States District Court for the District of Delaware, dated

February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant

to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the

entry of a final order by the Court in connection with this Motion to the extent that it is later

determined that the Court, absent the consent of the parties, cannot enter final orders or judgments

in connection herewith consistent with Article III of the United States Constitution.

2.　　Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.　　The statutory and legal predicates for the relief requested herein are sections 363,

365, 503, 507, and 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the

"Bankruptcy Code"), Rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, and 9006-1.

## BACKGROUND

**I.　　General.**

4.　　On the date hereof (the "Petition Date"), each of the Debtors filed voluntary

petitions under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court.  The

Debtors are authorized to operate their businesses and manage their properties as debtors and

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official

committee has been appointed in these Chapter 11 Cases, and no request has been made for the

appointment of a trustee or an examiner.  Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

## II.    Events Leading to the Sale.

5.      As set forth in greater detail in the First Day Declaration, the Debtors, who operate in the competitive consumer goods industry, were an immediate success in the years after their founding, and enjoyed steady growth and market expansion.  Following the COVID-19 pandemic, however, the Debtors have faced higher shipping costs, inflation of prices for raw materials, and increased costs of manufacturing.  Although the Debtors have continued successful operations, and have enhanced their revenues by implementing cost-cutting measures, they have faced gradually tightening liquidity under the circumstances.

6.      In light of these continued industry headwinds, the Debtors retained Jefferies LLC in November 2022 as their investment banker.  Since their engagement, Jefferies has assisted the Debtors in pursuing a range of strategic alternatives, including additional debt financing, new equity financing, or an acquisition of the company.  The Debtors' initial market outreach formally began in December 2022. As part of this process, the Debtors, with the assistance of Jefferies, identified a robust universe of potential investors and contacted approximately 155 parties.  These included 135 financial and/or equity investors and twenty (20) strategic buyers, eighty (80) of which executed nondisclosure agreements and were given preliminary financial and operational diligence materials.

7.      The Debtors' market outreach yielded a variety of proposals and interest from bidders and investors – none of which proved actionable or sufficient on a standalone basis to adequately capitalize the Debtors.  Specifically, Jefferies received four indications of interest in mid-February 2023 and invited each potential bidder to continue with additional due diligence, but

all four of these parties ultimately elected not to move forward in the process.  Among other reasons, these parties cited concerns regarding the Company's capital structure and tightening liquidity.  Jefferies and the Debtors continued to market a broad range of transaction opportunities, both reaching out to newly identified parties and following up with previously contacted parties. Over the course of spring and early summer 2023, Jefferies continued engaging with a range of strategic and financial parties, which included the Stalking Horse Bidder.  At this time, the Debtors received two indications of interest for potential transactions, one of which resulted in the Debtors entering briefly into a non-binding, non-exclusive letter of intent in April 2023.  However, both parties also declined to move forward after conducting further due diligence.  These entities were also concerned with the Company's outstanding debt structure and liquidity profile.

8.      As summer 2023 approached, Jefferies and the Debtors continued to market a broad range of transaction opportunities, both to new and previously contacted parties.  In July 2023, the Stalking Horse Bidder approached Jefferies with renewed interest in purchasing the Debtors' Assets.  Through July 2023, the Debtors and their advisors facilitated the Stalking Horse Bidder's due diligence while continuing discussions with other potential interested parties.  On July 28, 2023, the Debtors and the Stalking Horse Bidder entered into a letter of intent, which memorialized the preliminary terms under which the Stalking Horse Bidder was willing to pursue a transaction, including requiring an in-court sale pursuant to section 363 of the Bankruptcy Code.

9.      The Debtors and their advisors continued negotiating with the Stalking Horse Bidder through mid-October. These good faith, arm's-length negotiations resulted in significant improvements to the terms of the Stalking Horse Bidder's proposed transaction and ultimately the proposed transaction garnered the support of the Debtors' prepetition secured lenders as well as two of the Debtors' key equipment lessors, NFS Leasing Inc. ("NFS") and 36th Street Capital

Partners, LLC ("36th Street"), who have agreed to material modifications to their lease agreements with the Stalking Horse Bidder, pursuant to the terms of a Transaction Support Agreement dated October 23, 2023, by and among the Debtors, the Stalking Horse Bidder, NFS, and 36th Street (the "Transaction Support Agreement"). Therefore, on October 23, 2023, the Debtors announced their intention to enter into that certain Asset Purchase Agreement, dated October 23, 2023, annexed to the Bidding Procedures Order as Exhibit 4 (together with the scheduled and related documents thereto, and as may be amended, supplemented, or otherwise modified from time to time, the "Stalking Horse APA") to sell the Assets (as defined in the Stalking Horse APA) to Bucky Acquisition Holdco, LLC (the "Stalking Horse Bidder") in a transaction worth a total aggregate consideration as set forth in the Stalking Horse APA (the "Stalking Horse Bid"), free and clear of all claims or encumbrances (other than Assumed Liabilities and Permitted Liens, as defined in the Stalking Horse APA).

10.     The Stalking Horse Bid represents the highest and best executable bid the Debtors received through the prepetition marketing process. The Stalking Horse Bid benefits the Debtors by establishing a floor for the purchase of substantially all of the Debtors' Assets. Any offer that tops the Stalking Horse Bid will inure to the benefit of the Debtors' creditors and other stakeholders. The Debtors understand that their prepetition and postpetition secured lender supports entry into the Stalking Horse APA and culmination of a value-maximizing marketing and sale process.

**III.    Need for an Expedited Process.**

11.     The Bidding Procedures balance the Debtors' need to efficiently consummate a sale of their business while providing adequate notice to parties in interest to conduct a postpetition marketing process to seek bids in excess of the Stalking Horse Bid. Under the proposed Bidding Procedures, in the event the Debtors receive a Qualified Bid (as defined below), they will conduct

the Auction to yield a value-maximizing sale of the Debtors' Assets.  If they do not receive any competing bids, they will immediately seek approval of the Stalking Horse Bid.  This process, while expeditious, is more than sufficient when viewed in the context of the Debtors' extensive and robust prepetition marketing process.  The Debtors marketed their Assets for over ten months to a wide range of potential strategic buyers and financial investors, and a substantial amount of information regarding the Debtors' business has been available to potential bidders throughout the prepetition marketing process.  While the Bidding Procedures enable bidders to submit binding bids, a lengthy in-court process is simply not necessary or the most effective use of the Debtors' increasingly limited resources as the Bidding Procedures are the culmination of a very long and thorough prepetition process.

12.    Time is of the essence for the Debtors. Although the Debtors continue to manufacture and sell profitable products, they are no longer able to generate sufficient revenue to meet their immediate liquidity and working capital needs.  Prior to the filing, the Debtors had been operating for months with extremely tight liquidity driven by declining cash receipts, as well as diminishing receivables and inventory resulting in a severely constrained borrowing base under its Prepetition First Lien Credit Agreement.  The Debtors forecast that their liquidity will remain constrained throughout the pendency of the Chapter 11 Cases.  The Debtors simply cannot afford a longer process than contemplated by these Bidding Procedures. The $12 million debtor-in-possession financing facility can only support this abbreviated sale process as the Debtors will run out of money by early December 2023.  Also, while the DIP Credit Facility provides $12 million of liquidity, it is structured as an over advance against the Prepetition CIT Secured Parties' collateral, and as a result, there is no headroom to support additional liquidity beyond the current DIP Credit Facility.  Any delay in consummation of a sale jeopardizes the Debtors' ability to

conduct these Chapter 11 Cases and operate their businesses in an efficient manner for the benefit of all creditors, particularly because the Debtors have limited access to postpetition financing that will fund an expeditious sale process as the current debtor-in-possession facility is the only facility available to the Debtors.

13.    Accordingly, the Debtors have determined that the Bidding Procedures are in the best interests of their estates, as they will enable the Debtors to market test the Stalking Horse Bid, establish a uniform process in which interested bidders can participate in a competitive auction, and facilitate one or more value-maximizing sales of the Debtors' Assets on a timeline that balances the need for a swift transaction with the need to provide all potential bidders sufficient opportunity to participate.

## IV.    The Stalking Horse Bid and Material Terms of the Stalking Horse APA.

14.    The Stalking Horse Bidder is seeking to acquire substantially all of the Debtors' Assets in exchange for a purchase price valued at approximately $64.9 million.  The Debtors are now seeking approval of the Stalking Horse APA, which will be consummated absent higher or better bids at the Auction, and will be subject to the closing conditions under the Stalking Horse APA being satisfied.  The Stalking Horse APA is conditioned on the transfer of the Assets free and clear of any Liabilities and Encumbrances (each as defined in the Stalking Horse APA) against the Debtors.  The Stalking Horse APA is not conditioned on financing or the completion of due diligence.

15.    The following chart summarizes the terms and conditions of the Stalking Horse
APA and discloses certain information required pursuant to Local Rule 6004-1:[4]

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Stalking Horse APA Parties**<br><br>**See Preamble** | Unconditional Love Inc. and The Best Training Pants in the World Inc., and Bucky Acquisition Holdco, LLC. |
| **Purchase Price**<br><br>**Local Bankr. R. 6004-1(b)(iv)(N)**<br>**See § 2.1** | $64,900,000. |
| **Breakup Fee and Expense Reimbursement**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(2)**<br>**See § 7.3** | Expense Reimbursement: $649,000.<br><br>Breakup Fee: Three percent (3%) of the Purchase Price, provided that the Break-Up Fee and Expense reimbursement, in the aggregate, shall not exceed an amount equal to four percent (4%) of the Purchase Price. |
| **Assets**<br>**See § 1.1** | Substantially all of the properties and assets of Debtors used in the Business (other than the Excluded Assets), including but not limited to the Accounts Receivables, the Assumed Contracts, the Assumed Purchase Orders, the Assumed Real Property, the Products and the Assumed Equipment Leases (collectively, the "Purchased Assets"). |
| **Assumed Liabilities**<br>**See § 1.3** | Any and all Liabilities of each Debtor arising under the Stalking Horse Bidder Assumed Agreements and the Assumed Purchase Orders in each case solely to the extent arising from performance that first comes due after the Closing; the Cure Costs; and any Taxes (other than Income Taxes attributable to taxable periods (or portions thereof) ending on or prior to the Closing Date) arising out of the conduct of the Business, ownership of the Purchased Assets or associated with the Transferred Employees. |
| **Excluded Assets**<br>**See § 1.2** | All assets expressly excluded from the Purchased Assets. |
| **Excluded Liabilities**<br>**See § 1.4** | All liabilities of the Debtors other than the Assumed Liabilities. |

---

[4]    This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse APA, the Stalking Horse APA shall govern in all respects. All references to schedules or sections in the following summary shall refer to schedules or sections of the Stalking Horse APA.

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Bankruptcy Court Approval** <br> See § 5.6 | The sale of the Purchased Assets pursuant to the Stalking Horse APA is subject to approval by the Bankruptcy Court. |
| **Sale to Insider** <br> **Local Bankr. R. 6004-1(b)(iv)(A)** | Not applicable. |
| **Agreements with Management** <br> **Local Bankr. R. 6004-1(b)(iv)(B)** | Not applicable. |
| **Releases** <br> **Local Bankr. R. 6004-1(b)(iv)(C)** | Not applicable. |
| **Private Sale/No Competitive Bidding** <br> **Local Bankr. R. 6004-1(b)(iv)(D)** <br> See § 5.6(b) | From the date of the Stalking Horse APA (and any prior time) until the completion of the Auction, the Debtors and their Affiliates are permitted to, and are permitted to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Stalking Horse Bidder) in connection with an Alternative Bid, including to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase any or all of the Purchased Assets. |
| **Closing and Other Deadlines** <br> **Local Bankr. R. 6004-1(b)(iv)(E)** <br> See §§ 2.5, 6.1 | Closing of the sale will be subject to, among other customary conditions, (a) no injunction by any court or other tribunal of competent jurisdiction shall have been entered and shall continue to be in effect and no Law shall have been adopted that remains in effect or be effective, in each case, that prevents, enjoins, prohibits or makes illegal the consummation of the Asset Purchase; (b) all material consents, licenses, registrations, or declarations of, or filings with, any Governmental Entities in any such jurisdictions required under any Laws for the Asset Purchase to be completed have been obtained or made on a basis reasonably acceptable to Debtors and Stalking Horse Bidder; (c) entry of the Sale Order, and such Sale Order being a Final Order, (d) the Stalking Horse Bidder shall have consummated the Debt Financing and received the proceeds thereof in an amount sufficient to satisfy the DIP Payment Obligation of the Purchase Price, (e) (i) the Stalking Horse Bidder's representations and warranties in the Stalking Horse APA being true and correct in all respects except where breaches would not have or reasonably be expected to have a material adverse effect on the Stalking Horse Bidder's ability to consummate the Asset Purchase and (ii) the Stalking Horse Bidder having performed and complied in all material respects with all covenants required by the Stalking Horse APA, (f) (i) the Debtors' representations and warranties in the Stalking Horse APA being true and correct in all material respects or true and correct in all respects except where breaches would not constitute a Material Adverse Effect and (ii) Debtors having performed and complied in all material respects with all covenants required by the Stalking Horse APA, (g) Stalking Horse Bidder being prepared to deliver to Debtors or perform, or cause to be delivered to Debtors or performed, the items set |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | forth in Section 2.5 of the Stalking Horse APA; (h) Debtors being prepared to deliver to Stalking Horse Bidder or perform, or cause to be delivered to Stalking Horse Bidder or performed, the items set forth in Section 2.6 of the Stalking Horse APA; (i) each Transaction Support Agreement being in full force and effect and (j) Debtors having performed and complied with the conditions set forth on Section 6.3(g) of the Disclosure Schedule of the Stalking Horse APA. |
| **Good Faith Deposit**<br><br>**Local Bankr. R. 6004-1(b)(iv)(F)**<br>See § 2.8 | $3,000,000 |
| **Interim Arrangements with Stalking Horse Bidder**<br><br>**Local Bankr. R. 6004-1(b)(iv)(G)** | Not applicable. |
| **Use of Proceeds**<br><br>**Local Bankr. R. 6004-1(b)(iv)(H)** | Not applicable. |
| **Tax Exemption**<br><br>**Local Bankr. R. 6004-1(b)(iv)(I)** | Not applicable. |
| **Record Retention**<br><br>**Local Bankr. R. 6004-1(b)(iv)(J)**<br>See § 1.1(h) | Included in the Purchased Assets, are all Books and Records, except (i) those relating solely to any Excluded Asset, Excluded Liability or Unconditional Canada, (ii) those relating solely to employees of a Debtor or Unconditional Canada who are not Transferred Employees; or (iii) those which a Debtor is required by Law to retain, including all Tax Returns and related workpapers, financial statements and accounting Books and Records, Organizational Documents of the Debtors and corporate or other entity filings (but copies of such Books and Records shall be retained by Debtors and made available to Stalking Horse Bidder upon Stalking Horse Bidder's reasonable request and at Stalking Horse Bidder's expense). |
| **Sale of Avoidance Actions**<br><br>**Local Bankr. R. 6004-1(b)(iv)(K)**<br>See § 1.1(s) | The Purchased Assets shall include all claims and causes of action arising under Sections 544 through 553 of the Bankruptcy Code or any analogous state law, but only to the extent such actions are against (i) any of the Debtors' vendors, suppliers, customers, or trade creditors in regards or related to the Purchased Assets or the Assumed Liabilities and (ii) any counterparties to any Stalking Horse Bidder Assumed Agreement. |
| **Requested Findings as to Successor Liability**<br><br>**Local Bankr. R. 6004-1(b)(iv)(L)**<br>See § 5.6(d) | The Debtors will seek entry of a Sale Order, which, with respect to the Stalking Horse APA, will be in form and substance reasonably acceptable to the Stalking Horse Bidder. |

11

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Sale of Unexpired Leases Free and Clear**<br><br>**Local Bankr. R. 6004-1(b)(iv)(M)**<br>Sees § 1.1 | The Purchased Assets includes the Assumed Real Property Leases and Assumed Equipment which shall be transferred to the Stalking Horse Bidder free and clear of all Liabilities and Liens (other than Liens created by the Bidder and Permitted Liens). |
| **Credit Bid**<br><br>**Local Bankr. R. 6004-1(b)(iv)(N)** | Not applicable. |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>**Local Bankr. R. 6004-1(b)(iv)(O)**<br>See ¶ 62 | Not applicable. |

## THE BIDDING PROCEDURES

### I.    Overview.

16.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures.  The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Debtors' Assets, consistent with the timeline of these Chapter 11 Cases.  The Bidding Procedures will enable the Debtors to confirm that the Stalking Horse Bid is the best offer for the Assets, or promptly identify the alternative bid that is higher or otherwise better.  The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward, bring finality to the Debtors' sale process, and create a path towards consummation of a Sale that provides the highest or otherwise best available recoveries to the Debtors'

stakeholders.  Pursuant to Local Rule 6004, certain of the key terms of the Bidding Procedures

(which are attached to the Bidding Procedures Order) are highlighted in the chart presented below:[5]

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND BIDDING PROCEDURES ORDER | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids** Local Rule 6004-1(c)(i)(A)-(B) | **Qualified Bid and Qualified Bidder Requirements are set forth in Sections III.A and IV of the Bidding Procedures.** <br><br> Requirements to Participate and Obtain Due Diligence <br><br> To be considered an Acceptable Bidder (as such term is defined in the Bidding Procedures), a party must submit (a) an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"); and (b) proof of financial capacity to close the proposed Sale, which may include audited financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors and their advisors. <br><br> Qualified Bids <br><br> Any binding proposal, solicitation, or offer will be considered a qualified bid only if it is submitted in writing by an Acceptable Bidder by the Bid Deadline (as such term is defined in the Bidding Procedures) and deemed to comply with all of the following in the Debtors' business judgment (a "Qualified Bid"): <br><br> 1. **Identity**. The bid must fully disclose the identity of each person or entity that (a) is bidding for all or any portion of the Assets; (b) is sponsoring or financing the bid (including through the issuance of debt in connection with such bid); (c) is participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such bid) the Auction in connection with such bid and the complete terms of any such participation; and/or (d) will directly or indirectly own and/or control any amount of equity and/or voting securities of the Qualified Bidder; in each case, including its full legal name, jurisdiction of incorporation or formation, and its location in the Qualified Bidder's corporate structure.  The bid must also disclose any past or present connection or agreement with any Debtor, any other prospective bidder for all or any portion of the Assets, or any officer, director, or equity security holder of any Debtor. <br> 2. **Purpose; Assets and Liabilities.** Each Bid must be an irrevocable and binding offer and state which Assets and Liabilities are purchased and assumed. <br> 3. **Purchase Price**. The Bid must clearly state the cash purchase price, assumed Liabilities, and any other non-cash consideration (with the form of such consideration specified), to be paid for the Assets to be purchased; provided that the proposed purchase price shall be equal to or greater than the Purchase Price (as such term is defined in the Stalking Horse APA), plus (a) cash consideration in an amount equal to or greater than the Bid Protections and (b) $500,000. <br> 4. **Deposit**. Each Bid must be accompanied by a good faith deposit in an amount equal to ten percent (10%) of the maximum cash component of the purchase price. |

---

[5]    This summary is qualified in its entirety by the provisions of the Bidding Procedures.  To the extent that there is any inconsistency between the terms of the Bidding Procedures and this summary, the terms of the Bidding Procedures shall control.  Capitalized terms used but not defined prior to or in this summary shall have the respective meanings given to them later in the Motion or in the Bidding Procedures, as applicable.

| MATERIAL TERMS OF THE BIDDING PROCEDURES<br>AND BIDDING PROCEDURES ORDER |
| --- |

5. **Minimum Bid**. The Debtors shall determine, in their sole discretion, the highest or otherwise best Qualified Bid for purposes of constituting the opening bid at the Auction. The Minimum Bid must be greater or equal to the sum of the purchase price under the Stalking Horse APA, plus (a) the amount of the Bid Protections and (b) $500,000.

6. **Marked Agreement**. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated.

7. **Committed Financing**. Each Bid must include evidence of (a) the Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand or (b) committed financing documented to the satisfaction of the Debtors.

8. **Contingencies; No Financing or Diligence Outs**. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

9. **Irrevocable**. An Acceptable Bidder's Bid must be irrevocable and binding.

10. **Backup Bidder**. Each Bid must contain an agreement for the Acceptable Bidder to be a Backup Bidder.

11. **As-Is, Where-Is**. The Bid must include the following representations and warranties:
    a. (a) expressly state that the Bidder has had an opportunity to conduct any and all due diligence; and
    b. (b) include a statement that the Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets.

12. **Authorization**. The Bid must include evidence that the Bidder has obtained authorization or approval from its board of directors or comparable governing body.

13. **Disclaimer of Fees**. Each Bid (other than any Stalking Horse Bid) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, "topping" or termination fee, or any other similar form of compensation.

14. **Time Frame for Closing**. The Bid must be reasonably likely to be consummated, if selected as the Successful Bid, within a time frame reasonably acceptable to the Debtors, and no later than December 9, 2023.

15. **Employees**. Each Bid must include a statement regarding whether the Acceptable Bidder intends to offer future employment to any of the Debtors' employees (and, if so, specifically identify such employees).

16. **Adherence to Bid Procedures**. Each Bid must include a statement that:
    a. (a) the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code; and
    b. (b) that the Bid constitutes a bona fide offer to consummate the proposed Sale embodied therein, and agrees to be bound by these Bidding Procedures.

17. **Cooperation**. The Bidder must provide a covenant to cooperate with the Debtors to provide factual information regarding such Bidder's operations upon the Debtors' request to analyze issues arising with respect to any applicable laws or regulatory requirements.

18. **No Collusion**. The Bidder must acknowledge in writing that:
    a. it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code, specifying that it did not agree with any other Bidders to control prices; and
    b. it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

19. **Other Information**. The Bid contains such other information as may be reasonably requested by the Debtors.

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND BIDDING PROCEDURES ORDER | |
|---|---|
| **Provisions Providing Bid Protections to Stalking Horse Bidder** Local Rule 6004-1(c)(i)(C) | As set forth in Section I.B of the Bidding Procedures, the Debtors have agreed to provide the Stalking Horse Bidder with the Breakup Fee and Expense Reimbursement on the terms set forth in the Stalking Horse APA. |
| **Modification of Bidding Procedures** Local Rule 6004-1(c)(i)(D) | Section VII.B of the Bidding Procedures sets forth the Debtors' reservation of rights to (a) announce, at the Auction, modified or additional procedures for conducting the Auction, and (b) otherwise modify these Bidding Procedures.  All such modifications and additional rules will be communicated to each of the Consultation Parties, Acceptable Bidders, and Qualified Bidders in advance to the extent reasonably practicable; provided that, to the extent such modifications occur at the Auction, disclosure of such modifications shall be limited to those in attendance at the Auction. |
| **Closing with Alternative Back-up Bidders** Local Rule 6004-1(c)(i)(E) | Section VIII of the Bidding Procedures sets forth the primary requirements with respect to Backup Bids.  If an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid as compared to the Successful Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a Backup Bidder, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.  The Stalking Horse Bidder agrees to serve as a Backup Bidder. <br><br> The identity of the Backup Bidder(s) and the amount and material terms of the Qualified Bid of the Backup Bidder(s) shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. <br><br> The Backup Bid(s) shall remain binding on the Backup Bidder(s) until the earlier of (a) the closing of a Sale for the Assets pursuant to the Successful Bid or (b) 90 days after the date of the Sale Hearing, unless otherwise decided.  If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. <br><br> The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of a Backup Bidder without further order of the Court or notice to any party. |
| **Provisions Governing the Auction** Local Rule 6004-1(c)(ii) | Section VII of the Bidding Procedures sets forth the procedures governing the Auction. <br><br> If the Debtors receive no bid other than the Stalking Horse Bid with regard to the Assets, (a) the Debtors shall not hold an Auction with respect to such Assets; (b) the Stalking Horse Bid will be deemed the Successful Bid with respect to such Assets; and (c) the Stalking Horse Bidder will be named the Successful Bidder with respect to such assets.  If the Debtors receive more than one Qualified Bid for the Assets, the Debtors shall conduct the Auction to determine the Successful Bidder(s) with respect to the Assets. <br><br> No later than twenty-four (24) hours prior to the commencement of the Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid for the Assets, as determined in the Debtors' reasonable business judgment (the "Baseline Bid"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders.  The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid |

| MATERIAL TERMS OF THE BIDDING PROCEDURES<br>AND BIDDING PROCEDURES ORDER |
|---|

constitutes the Successful Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates.

The date and time of the Auction, if required, will take place at **November 28, at 10:00 a.m. (ET)** (i) via a virtual meeting, (ii) at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, or (iii) on such later date, time, and location as designated by the Debtors, after providing notice to the Notice Parties (as such term is defined in the Bidding Procedures).

1. Participation. Only Qualified Bidders that have submitted Qualified Bids by the Bid Deadline (including, for avoidance of doubt, the Stalking Horse Bidder) are eligible to participate in the Auction. Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (i) it has not engaged in any collusion with respect to the submission of any Bid or the Auction and (ii) each Qualified Bid it submits at the Auction is a binding, good faith and bona fide offer to purchase the Assets identified in such bid.

2. Proceedings. The Auction proceedings will be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment:

    a) Baseline Bids. Bidding shall commence at the amount of the Baseline Bid.

    b) Minimum Overbid. Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid for the Assets (each such bid, an "Overbid"). Any Qualified Bidder's initial Overbid shall be made in increments of at least $500,000 in cash, cash equivalents, or such other consideration that the Debtors deem equivalent. The Debtors may, in their reasonable business judgment, announce increases or reductions to initial or subsequent minimum incremental bids at any time during the Auction.

    c) Highest or Best Offer. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe in their reasonable business judgment to be the highest or otherwise best offer for the Assets (the "Leading Bid") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid. To the extent not previously provided (as determined by the Debtors), a Qualified Bidder submitting a subsequent bid must submit, as part of its subsequent bid, written evidence (in the form of financial disclosure or credit quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction at the Purchase Price contemplated by such subsequent bid.

    d) Incremental Deposit. Upon the declaration by a Qualified Bidder of its Bid at the Auction, it must commit on the record to pay promptly following the Auction, if such Bid were to be the Successful Bid or the Backup Bid, the incremental amount of its Deposit calculated based on the increased purchase price of such bid, if applicable.

    e) Rejection of Bids. The Debtors may, in their reasonable business judgment, reject any bid that the Debtors determine is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND BIDDING PROCEDURES ORDER | |
|---|---|
| | Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders. For the avoidance of doubt, the Debtors may not reject the Stalking Horse Bid on any such grounds. |
| | f) No Round-Skipping. Round-skipping is explicitly prohibited. To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Assets without the consent of the Debtors. |
| | g) Additional Information. The Debtors shall have the right to request any additional financial information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any bid made by a Qualified Bidder during the Auction. |
| | h) Modification of Procedures. The Debtors may, in consultation with the Agent if the Agent notifies the Debtors that it will not exercise its Credit Bid Right, (a) announce, at the Auction, modified or additional procedures for conducting the Auction, and (b) otherwise modify these Bidding Procedures; provided that, for the avoidance of doubt, the Debtors may not modify (i) the Bid Protections afforded to the Stalking Horse Bidder, unless the Stalking Horse Bidder agrees to such modification in writing in its sole discretion, or (ii) the rules, procedures, or deadlines set forth herein, or adopt new rules, procedures, or deadlines that would impair in any material respect the Stalking Horse Bidder's right to payment of the Break-Up Fee or the Expense Reimbursement or the Stalking Horse Bidder's right to receive a credit for its Bid Protections as set forth in the Bidding Procedures without the express written consent of the Stalking Horse Bidder in its sole discretion. All such modifications and additional rules will be communicated to each of the Acceptable Bidders and Qualified Bidders in advance to the extent reasonably practicable; provided that, to the extent such modifications occur at the Auction, disclosure of such modifications shall be limited to those in attendance at the Auction. |

17.     Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals. The Bidding Procedures preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

**II.      Key Dates and Deadlines.**

18.      Pursuant to the Bidding Procedures, the Debtors will solicit any higher or otherwise better proposals according to the following proposed schedule, subject to Court approval and availability, which the Debtors believe is appropriate in light of the circumstances of these Chapter 11 Cases.

| Deadline | Event |
|---|---|
| **November 15, 2023** | Entry of Bidding Procedures Order |
| **Two Business Days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Sale Hearing Notice |
| **Two Business Days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Assumption and Assignment Notice |
| **As soon as practicable after the entry of the Bidding Procedures Order** | Deadline for Debtors to publish Sale Hearing Notice |
| **Fourteen (14) days after service of the Sale Notice and Assumption and Assignment Notice at 4:00 p.m. (ET)** | Sale Objection Deadline (including objections to Assumption and Assignment of Contracts) |
| **November 22, 2023 at 4:00 p.m. (ET)** | Bid Deadline |
| **No later than 24 hours prior to Auction, if applicable** | Deadline to Designate Qualified Bidders |
| **November 27, 2023 at 10:00 a.m. (ET)** | Auction, solely in the event the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Bid |
| **As soon as practicable after the Auction, if applicable** | Deadline for Debtors to file and serve Notice of Winning Bidder |
| **November 28, 2023 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline[6] |

---

[6]      Solely for objections to (i) conduct at Auction and (ii) adequate assurance of future performance under Assigned Contracts if Successful Bidder is not the Stalking Horse Bidder.

| Deadline | Event |
|---|---|
| **December 1, 2023 at 12:00 p.m. (ET)** | Deadline to Reply to Sale Objections |
| **December 4, 2023 at 10:00 a.m. (ET), subject to the availability of the Court** | Sale Hearing |

### III.    Sale Noticing and Objection Procedures.

19.    The Debtors seek approval of the following sale noticing and objection procedures, which the Debtors respectfully submit are reasonably calculated to provide interested parties with notice of the Sale and Sale Hearing and an opportunity to respond accordingly.

| **Service of Sale Hearing Notice** | Within two (2) business days after entry of the Bidding Procedures Order, the Debtors will cause the notice of the Auction and Sale, substantially in the form attached to the Bidding Procedures Order as Exhibit A, to be served on the following parties or their respective counsel, if known: (a) the Notice Parties (as defined in the Bidding Procedures); (b) all parties to executory contracts and leases to be assumed, assigned, or rejected as part of the proposed Sale; (c) all parties who have expressed a written interest in some or all of the Debtors' Assets; (d) all known holders of liens, encumbrances, and other claims secured by the Debtors' Assets; (e) the Internal Revenue Service; (f) all applicable state and local taxing authorities; (g) the Food and Drug Administration; (h) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002. |
|---|---|
| **Publication of Sale Hearing Notice** | In addition, as soon as reasonably practicable after the entry of the Bidding Procedures Order, the Debtors will provide notice of the Sale Hearing through the publication of the Sale Hearing Notice, with any modifications necessary for ease of publication, in *The New York Times* (national edition) and on the website of the Debtors' proposed noticing and claims agent to be retained in these Chapter 11 Cases, Stretto, Inc., at https://cases.stretto.com/hellobello. |

### IV.    Assumption Procedures.

20.    The Debtors seek approval of the Assumption Procedures to facilitate the fair and orderly assumption and assignment of the Assigned Contracts (as defined below) in connection with the Sale.

| **Assumption and Assignment Notice** | Within two (2) business days after the entry of the Bidding Procedures Order, the Debtors shall serve a notice of contract assumption, substantially in the form attached to the Bidding Procedures Order as Exhibit A, by first-class mail, |
|---|---|

| | |
|---|---|
| | overnight mail, or email on each counterparty to the Assigned Contracts to be assumed and assigned as part of the proposed Sale (the "<u>Assigned Contracts</u>") (or their respective counsel, if known).<br><br>The Assumption and Assignment Notice shall inform each recipient of (i) the timing and procedures relating to such assumption and assignment, (ii) the title (or an appropriate description) and date of the Assigned Contract (if available), (iii) the name of the non-Debtor counterparty to the Assigned Contract, (iv) the Debtors' good faith estimates of the Cure Costs (if any) required in connection with the Assigned Contract, (v) the identity of the Stalking Horse Bidder to whom the Assigned Contract is to be assigned, and (vi) the Cure Objection Deadline,; <u>provided</u>, <u>however</u>, that service of an Assumption and Assignment Notice does not constitute an admission that such contract is an executory contract or that any stated Cure Cost constitutes a claim against the Debtors or a right against any Stalking Horse Bidder or other Successful Bidder, and all rights with respect thereto are expressly reserved.<br><br>The inclusion of a contract on the Assumption and Assignment Notice is not a guarantee that such contract will ultimately be assumed and assigned.  Any determination of whether such contract is an executory contract or can be rejected will be made in accordance with the Bankruptcy Code, the Bankruptcy Rules, and all applicable orders of the Court. |
| **Cure Costs** | The payment of the applicable Cure Costs by the Stalking Horse Bidder or any Successful Bidder, as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the Assigned Contracts by the Debtors and the assignment of the Assigned Contracts to any Stalking Horse Bidder or other Successful Bidder, constitute adequate assurance of future performance thereof.<br><br>In the event the Successful Bidder is not the Stalking Horse Bidder, objections to adequate assurance of future performance of the Assigned Contracts by the Successful Bidder must be filed with the Court and served on the Objection Notice Parties no later than November 28, 2023. |
| **Supplemental Contract Assumption Notice** | To the extent the Debtors, at any time after the Assumption and Assignment Service Deadline (i) identify additional Assigned Contracts to be assumed and assigned to the Stalking Horse Bidder or Successful Bidder (the "<u>Additional Assigned Contracts</u>"), (ii) remove Assigned Contracts from the list of executory contracts and leases proposed to be assumed and assigned in connection with the Sale, which removal must be consistent with the Transaction Support Agreement, and/or (iii) modify the previously stated Cure Cost associated with any Assigned Contracts, the Debtors will promptly file with this Court and serve by first-class mail, overnight mail, or email a supplemental notice of contract assumption (a "<u>Supplemental Assumption Notice</u>") on each of the counterparties to such Assigned Contracts and their counsel of record, if any. Each Supplemental Assumption Notice will include the same information with respect to listed Assigned Contracts as was included in the Contract Assumption Notice.  Subject to the Transaction Support Agreement, the Stalking Horse Bidder may designate Additional Assigned Contracts to be assumed and assigned at any time prior to the Sale Hearing, and may remove Assigned Contracts from the list of Assigned Contracts at any time prior to the Sale Hearing. |

| | |
|---|---|
| | Counterparties to Additional Assigned Contracts or that otherwise receive a Supplemental Assumption Notice shall have until 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) days after the filing and service of the Supplemental Assumption Notice by the Debtors to the Counterparty. |
| **Objections** | Objections, if any, to the proposed assumption and assignment or the Cure Cost proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon the Objection Notice Parties so as actually to be received on or before the Sale Objection Deadline or deadline set forth in the Supplemental Assumption Notice, as applicable. |
| **Dispute Resolution** | In the event that the Debtors and the non-Debtor counterparty cannot resolve any objection to the Cure Cost, the Assigned Contract may be assumed by the Debtors and assigned to the Stalking Horse Bidder or Successful Bidder, as applicable; <u>provided</u> that the Debtors shall segregate the Cure Cost that the counterparty asserts is required to be paid, pending a resolution of the dispute by the Court or mutual agreement by the parties.  Any objection to the proposed assumption and assignment of a contract or related Cure Cost proposed in connection with the Sale that remains unresolved as of the Sale Hearing shall be heard at the Sale Hearing (or at a later date as fixed by the Court). |
| **Contract Assumption** | No Assigned Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming and assigning such Assigned Contracts or (ii) the date the Sale has closed; <u>provided</u> that the Stalking Horse Bidder shall comply with the Transaction Support Agreement. |

## **<u>RELIEF REQUESTED</u>**

21.     The Debtors seek entry of the Bidding Procedures Order, substantially in the form

attached hereto as <u>Exhibit A</u>:

> (a)     authorizing and approving the Bidding Procedures;

> (b)     authorizing the Debtors to enter into the Stalking Horse APA, and to designate the Stalking Horse Bidder as the stalking horse for the Assets (as such term is defined in the Stalking Horse APA);

> (c)     scheduling (A) one or more Auction(s) of the Assets and (B) one or more sale hearing(s) to consider approval of the proposed Sale(s), and approving the Sale Hearing Notice;

> (d)     approving the Assumption Procedures and approving the Assumption and Assignment Notice; and

(e)    granting related relief.

## BASIS FOR RELIEF

**V.    The Bidding Procedures are in the Best Interests of the Debtors and Their Stakeholders.**

22.    The Bidding Procedures were formulated with the goal of maximizing the value of the Debtors' estates for the benefit of their creditors.  Courts have made clear that a debtor has a "fiduciary duty to maximize the value of the estate at hand."  In re Food Barn Stores, Inc., 107 F.3d 558, 564–65 (8th Cir. 1997) (citing In re Midway Airlines, Inc., 6 F.3d 492, 494 (7th Cir. 1993)); see In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets").  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by a debtor's estate.  See, e.g., In re Integrated Res., Inc., 147 B.R. 650, 659 (S.D.N.Y. 1990) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); In re Dura Auto. Sys., No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *253 (Bankr. D. Del. Aug. 15, 2007) ("Bidding procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets.").

23.    The Bidding Procedures provide for an appropriately competitive process that will promote active bidding and will elicit the highest or otherwise best offers available for the Debtors' Assets.  The Bidding Procedures will establish a controlled, fair, and open sale process that encourages consummation of a Sale in a timely manner.  Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding

parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.  They provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale.  This is particularly true in these Chapter 11 Cases, where entering into the Stalking Horse APA ensures that the Debtors obtain fair market value by setting a minimum purchase price for their Assets.

24.     Accordingly, the Bidding Procedures should be approved.  Not only do they appropriately encourage competitive bidding under the standards governing auction proceedings and bidding incentives in bankruptcy cases, but they also are aligned with the circumstances of these Chapter 11 Cases and will result in a sale on fair and reasonable terms for at or above market value.  The Bidding Procedures are otherwise reasonable and in the best interests of the Debtors, their estates, and all parties in interest.

### A.     The Proposed Bid Protections are Necessary, Reasonable, and Appropriate.

25.     As noted above, the Bidding Procedures provide for appropriate and fair Bid Protections for the Stalking Horse Bidder, which include (a) a Break-up Fee in the amount of 3% of the Purchase Price and (b) an Expense Reimbursement not to exceed $649,000. The Bid Protections are necessary for the Stalking Horse Bidder to enter into the Stalking Horse APA, and the presence of the Stalking Horse Bidder sets a floor for the sale of the Assets.  The presence of the Stalking Horse Bidder will attract other potential buyers to bid for the Assets, thereby maximizing the realizable value of the Debtors' Assets for the benefit of the Debtors' estates, their creditors, and all other parties in interest.

26.     Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have identified at least two instances in which bid protections may benefit the estate.  First, a breakup fee may be necessary

to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537. Second, "if the availability of a breakup fee [was] to induce a bidder to research the value of the debtor and convert [the] value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.; see also In re Reliant Energy Channelview LP, 594 F.3d 200, 206–08 (3d Cir. 2010) (reasoning that a breakup fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

27. In O'Brien, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a breakup fee:

(a)   the presence of self-dealing or manipulation in negotiating the breakup fee;

(b)   whether the fee hampers, rather than encourages, bidding;

(c)   the reasonableness of the breakup fee relative to the purchase price;

(d)   whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

(e)   the ability of the request for a breakup fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

(f)   the correlation of the fee to a maximum value of the debtor's estate;

(g)   the support of the principal secured creditors and creditors' committees of the breakup fee;

(h)   the benefits of the safeguards to the debtor's estate; and

(i)   the substantial adverse impact of the breakup fee on unsecured creditors, where such creditors are in opposition to the breakup fee.

O'Brien, 181 F.3d at 536.

28.     While none of the factors are dispositive, several of the factors support approval of the Bid Protections here.  In particular, the Bid Protections are necessary to preserve the value of the Debtors' estates because they enable the Debtors to secure an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than the Stalking Horse APA—a clear benefit to the Debtors' estates.  Further, the Stalking Horse Bidder would not agree to act as a "stalking horse" without the Bid Protections, given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction.  Without the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose any downside protection that would be afforded by the existence of the Stalking Horse Bidder.  The bid of the Stalking Horse Bidder sends a message to all potential bidders that the Assets are worth at least as much as the Stalking Horse Bid.  Therefore, without the benefit of the bid of the Stalking Horse Bidder, the bids received at auction for the Assets could be substantially lower than any bid offered by the Stalking Horse Bidder.

29.     "The usual rule is that if breakup fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable."  In re Integrated Res., Inc., 147 B.R. at 659.  The Debtors do not believe that the Bid Protections will stifle bidding.  To the contrary, the Debtors believe that such bid protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders."  Id. at 662.

30.     Here, the bid of the Stalking Horse Bidder would serve all three functions.  First, such bidders might not enter into the Stalking Horse APA without the Bid Protections.  Second, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must

submit an offer that is higher or otherwise better than the bid of the Stalking Horse Bidder.  Third,

the bid of the Stalking Horse Bidder could attract additional bidders because, among other things,

subsequent bidders would be able to save considerable time and expense by relying on

documentation negotiated by the Stalking Horse Bidder.  In sum, if the Assets are sold to a

Successful Bidder other than the Stalking Horse Bidder, the Sale likely will be the result of the

Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and

establishing a minimum acceptable price and offer against which other parties can bid for such

Assets.

      31.    In addition, "[a] breakup fee should constitute a fair and reasonable percentage of

the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of

the prospective purchaser.  'When reasonable in relation to the bidder's efforts and to the

magnitude of the transaction, breakup fees are generally permissible.'"  Id. (citation omitted).

      32.    Here, the Bid Protections are appropriate under the circumstances.  As an initial

matter, the Stalking Horse Bidder required the Bid Protections as a condition to entering into the

Stalking Horse APA.  Further, the Stalking Horse APA provides a commitment to purchase the

Assets in a transaction valued at $64.9 million, the best value available following the Debtors'

robust prepetition marketing efforts, while providing for an opportunity to improve on that value

through a postpetition auction process.  Further, the Bid Protections are reasonable.  The Breakup

Fee and Expense Reimbursement represent 3% and 1%, respectively, of the Purchase Price.  This

amount is consistent with the range of bid protections typically paid in sale transactions that have

been recently approved by this Court.  See, e.g., In re Williams Industrial Services Group Inc.,

Case No. 23-10961 (BLS) (Bankr. D. Del. Aug. 19, 2023) [Docket No. 196] (authorizing potential

stalking horse agreements to include expense reimbursements and breakup fees not exceeding

4.7% of the qualified bid); In re Plastiq Inc., Case No. 23-10671 (BLS) (Bankr. D. Del. June 21, 2023) [Docket. No. 127] (authorizing potential stalking horse agreements to include expense reimbursements and breakup fees not exceeding 5% of the qualified bid); In re Nova Wildcat Shur-Line Holdings, Inc., Case No. 23-10114 (CTG) (Bankr. D. Del. Mar. 3, 2023) [Docket No. 142] (authorizing potential stalking horse agreements to include expense reimbursements and breakup fees not exceeding 4% of the qualified bid); In re Pancakes & Pies, LLC, Case No. 19-11743 (KG) (Bankr. D. Del. Aug. 23, 2019) [Docket No. 141] (authorizing potential stalking horse agreements to include expense reimbursements and breakup fees not exceeding 3% of the qualified bid); In re GUE Liquidation, Inc., Case No. 19-11240 (LSS) [Docket No. 201] (same); In re Hospital Acquisition LLC, No. 19-10998 (BLS) (Bankr. D. Del. June 27, 2019) [Docket No. 298] (authorizing potential stalking horse agreements to include breakup fees not exceeding 3% of the qualified bid and expense reimbursements not exceeding $250,000); In re The Weinstein Co. Holdings LLC, No. 18-10601 (MFW) (Bankr. D. Del. Apr. 6, 2018) [Docket No. 190] (approving breakup fee and expense reimbursement equal to 5% of the purchase price).

## VI.    The Form and Manner of the Sale Hearing Notice Should Be Approved.

33.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

34.    As noted above, within three (3) business days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Hearing Notice upon the following parties or their respective counsel, if known: (a) the Notice Parties (as defined in the Bidding Procedures); (b) all parties to executory contracts and leases to be assumed, assigned, or rejected as part of the proposed Sale; (c) all parties who have expressed a written interest in some or all of the Debtors' Assets; (d) all

known holders of liens, encumbrances, and other claims secured by the Debtors' Assets; (e) the Internal Revenue Service; (f) all applicable state and local taxing authorities; (g) the Food and Drug Administration; (h) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

35.     In addition, as soon as reasonably practicable thereafter, the Debtors will provide notice of the Sale Hearing through the publication of the Sale Hearing Notice in *The New York Times* (national edition) and on the website of the Debtors' proposed noticing and claims agent to be retained in these Chapter 11 Cases, Stretto, Inc., at https://cases.stretto.com/hellobello.

36.     The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Hearing Notice, the contract notice, and the Assumption and Assignment Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and in satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Hearing Notice.

**VII.    The Sale Should Be Approved as an Exercise of Sound Business Judgment.**

37.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. See, e.g., In re Martin, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . ."); see also In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (same); Comm. Of Equity Sec. Holders v. Lionel

Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Telesphere Commc's, Inc., 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

38. Once a debtor articulates a valid business justification, "[t]he business judgment rule is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." In re S.N.A. Nut Co., 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); In re Filene's Basement, LLC, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); Integrated Res., 147 B.R. at 656; In re Johns-Manville Corp., 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

## A. A Sound Business Purpose Exists for the Sale.

39. As set forth above, the Debtors have a sound business justification for selling the Assets to the Stalking Horse Bidder. First, the Debtors believe the Sale will maximize asset value by allowing a party to bid on the Debtors' Assets, while such Assets would have substantially less value on a stand-alone basis. Moreover, because the Stalking Horse APA contemplates the assumption of certain contracts and other obligations in connection with the acquisition of the Assets, it will result in payment in full for a number of creditors.

40. Second, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the ultimately successful bid, after being subject to an overbid process in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practically

available alternative. <u>See</u>, <u>e.g.</u>, <u>In re Trans World Airlines, Inc.</u>, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

41.     As such, the Debtors' determination to sell their Assets through one or more Auction processes and subsequently to enter into one or more purchase agreements with any Successful Bidder(s) will be a valid and sound exercise of the Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

**B.     Adequate and Reasonable Notice of the Sale Will Be Provided.**

42.     The Sale Hearing Notice: (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the sale or the assumption and assignment of Assigned Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Hearing Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

**C.     The Sale and Purchase Price Reflects a Fair Value Transaction.**

43.     It is well settled that where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  <u>See</u> <u>Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434, 457 (1999); <u>see also</u> <u>In re Trans World Airlines, Inc.</u>, No. 01-00056, 2001 WL 1820326, at *4  (while a "section 363(b) sale transaction does not require an auction procedure,"

"the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").

44.     Moreover, as described herein, even as the Debtors move forward with the Stalking Horse APA, Jefferies will continue to market the Debtors' business and solicit other offers for the Assets, consistent with the Bidding Procedures.  The marketing process will include, for example, contacting previously solicited parties, continuing to provide acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive Auction process for the Debtors' Assets will be maximized, or, if no Auction is held because no Auction is necessary, the purchase price in the Stalking Horse APA will, conclusively, be fair value.

**D.     The Sale Has Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder and/or Successful Bidder Is a "Good-Faith Purchaser."**

45.     The Debtors request that the Court find the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

46.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11. U.S.C. § 363(m).

47.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. See, e.g., In re Abbotts Dairies of Pa., Inc. ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); In the Matter of Andy Frain Servs., Inc., 798 F.2d 1113 (7th Cir. 1986) (same); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

48.     The Debtors submit that the Stalking Horse Bidder or any other Successful Bidder arising from the Auction, is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse APA or any respective marked versions thereof, are or would be good-faith agreements entitled to the protections of section 363(m) of the Bankruptcy Code.[7] First, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the Stalking Horse APA is substantial, fair, and reasonable. Second, the parties entered into the Stalking Horse APA in good faith and after extensive arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted

---

[7]     The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction. Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. In addition, the Debtors will not choose as a Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

on an arm's-length, good faith basis.  Third, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  Cumberland Farms Dairy, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn., Inc.), 788 F.2d 143, 147 (3d. Cir. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)); see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997).  The Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.

49.    Finally, the Debtors evaluated and approved the Stalking Horse Bidder's offer in consultation with their advisors, and any other bids that the Debtors ultimately determine to be a successful bid will have been evaluated in a similar fashion.  Accordingly, the Debtors believe that the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, as well as the Stalking Horse APA (or marked version(s) thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

**E.    The Sale of the Assets Should be Approved "Free and Clear" Under Section 363(f).**

50.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  See 11 U.S.C. § 363(f).

51.    Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and clear of all interests (i.e., all liens, claims, rights, interests, charges, or

encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement.  See In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

52.     The Debtors submit that any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Stalking Horse Bidder or other Successful Bidder arising from an Auction of non-Assets, if any, free and clear of all liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

**VIII.   The Assumption and Assignment of the Assigned Contracts Should Be Approved.**

   **A.      The Assumption and Assignment of the Assigned Contracts Reflects the Debtors' Reasonable Business Judgment.**

53.     To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign or transfer executory contracts to the Stalking Horse Bidder or other Successful Bidder arising from any Auction, to the extent required by such bidders.  In connection with this process, the Debtors believe it is necessary to establish the Assumption Procedures by which: (a) the Debtors and contract counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of the Assigned Contracts and/or related cure amounts.

54.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the

defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. See, e.g., Grp. of Inst'l Invrs. v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); In re Network Access Sols., Corp., 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard.").

55.    Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment:  First, the Assigned Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets.  Second, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction.  Third, the Stalking Horse APA provides that the assumption and assignment of the Assigned Contracts is integral to, and inextricably integrated in, the Sale.  Finally, the Assigned Contracts will be assumed and assigned through the

process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these Chapter 11 Cases.

56.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any contract be deemed to consent to the assumption and assignment of the applicable contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the contract notice. See, e.g., In re Tabone, Inc., 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

57.     The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts and leases, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

**B.     Defaults Under the Assigned Contracts Will Be Cured Through the Sale.**

58.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the

benefit of the debtor's bargain." In re Fleming Cos., 499 F.3d 300, 306 (3d Cir. 2007) (citation omitted).

59.     The Debtors' assumption and assignment of any Contracts will be contingent upon payment of cure costs and effective only upon the closing of the Sale.  As set forth above, subject to the Court's approval, the Debtors will file with the Court and serve on each counterparty an Assumption and Assignment Notice setting forth the Debtors' good-faith calculation of relevant cure costs for each contract that could be assumed in connection with the Sale.  Counterparties will have an opportunity to raise any assignment and cure objection in advance of the Sale Hearing. Because the Assumption Procedures (once approved) provide a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cures will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### C.     Non-Debtor Parties Will Be Adequately Assured of Future Performance.

60.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." In re U.L. Radio Corp., 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective

assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

61.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts will be satisfied whether their Assets are sold to the Stalking Horse Bidder or other Successful Bidders arising from the Auction, as the Bidding Procedures require all bidders to provide adequate assurance of their ability to perform under any assigned contract.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (e.g., financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assigned Contracts assigned to the Stalking Horse Bidder or any Successful Bidder arising from the Auction.  Further, the Assumption Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or any Successful Bidder arising from the Auction to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the Stalking Horse APA.

**D.      Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

62.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." The

Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

63.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bankruptcy ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

64.     To maximize the value received for the Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**NOTICE**

65.     Notice of this Motion has been or will be provided to: (i) the U.S. Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Food & Drug Administration; (v) counsel to the Prepetition CIT Secured Parties; (vi) counsel to the Stalking Horse Bidder; (vii) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates; and (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors will serve copies of this Motion and an order entered in respect of this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice

is necessary.  No previous motion for the relief sought herein has been made to this Court or any other court.

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order, attached hereto as <u>Exhibit A</u> and such other and further relief to the Debtors as the Court may deem proper.

*[Remainder of Page Left Intentionally Blank]*

Dated: October 23, 2023
       Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Edmon L. Morton*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Heather P. Smillie (Del. No. 6923)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

**WILLKIE FARR & GALLAGHER LLP**
Brian S. Lennon (*pro hac vice* pending)
Debra M. Sinclair (*pro hac vice* pending)
Erin C. Ryan (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
blennon@willkie.com
dsinclair@willkie.com
eryan@willkie.com

*Proposed Counsel to the Debtors and Debtors in Possession*