# **EXHIBIT A**

**Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| UNCONDITIONAL LOVE, INC., *et al.*,[1] | Case No. 23-11759 (MFW) |
| Debtors. | (Jointly Administered) |

**ORDER (I) (A) APPROVING
BIDDING PROCEDURES FOR THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS,
(B) AUTHORIZING THE DEBTORS TO
ENTER INTO THE STALKING HORSE APA AND TO
PROVIDE THE STALKING HORSE BID PROTECTIONS
THEREUNDER, (C) SCHEDULING AN AUCTION AND A SALE
HEARING AND APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (D) APPROVING ASSUMPTION PROCEDURES, AND
(E) GRANTING RELATED RELIEF; AND (II) (A) APPROVING THE SALE
OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES, (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"), (I) (a) authorizing and approving

the bidding procedures attached hereto as Exhibit 1 (the "Bidding Procedures") for the sale of

substantially all of the Debtors' Assets, (b) authorizing the Debtors to enter into the Stalking Horse

APA for the Purchased Assets (as such term is defined in the Stalking Horse APA), attached hereto

as Exhibit 4, and to provide the Bid Protections; (c) scheduling an Auction and a Sale Hearing and

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, are Unconditional Love Inc. d/b/a Hello Bello (5895), Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc. (9369).  The Debtors' headquarters is located at 17383 Sunset Blvd, Suite B200, Pacific Palisades, CA 90272.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

approving the form and manner of notice of the Auction, the Sale, and the Sale Hearing, (d) establishing procedures for the assumption and assignment of Contracts and approving the form and manner of notice to each relevant non-debtor counterparty to a Contract of (i) the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract (the "Cure Costs") and (ii) certain other information regarding the potential assumption and assignment of Contracts in connection with the Sale, and (e) granting related relief, and (II) (a) approving the sale of the Debtors' assets free and clear of liens, claims, interests, and encumbrances, (b) approving the assumption and assignment of executory contracts and unexpired leases, and (c) granting related relief; and upon the *Declaration of Erica Buxton in Support of Chapter 11 Petitions and First Day Pleadings*; and upon the *Declaration of Robert White* in further support of the Motion; and upon the record of the hearing of the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been adequate and appropriate under the circumstances; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor, **THE COURT FINDS THAT:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      Good and sufficient notice of the Motion, the Bidding Procedures, and the relief sought in the Motion has been given under the circumstances, and no other or further notice is required except as set forth herein.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

C.      The bases for the relief requested in the Motion are: (i) sections 105, 363, 365, 503, and 507 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014; and (iii) Local Rule 6004-1.

D.      The Debtors have articulated good and sufficient reasons for this Court to: (i) approve the Bidding Procedures; (ii) approve the Stalking Horse APA and the Bid Protections; (iii)  schedule the Auction and Sale Hearing (to consider granting the other relief requested in the Motion); (iv) approve the forms and manner of notice of the Auction, Sale, and Sale Hearing; and (v) approve the procedures for the assumption and assignment of the Contracts, including notice of proposed Cure Costs.  The best interests of the Debtors, their estates, creditors, and other parties in interests will be served by such approval and authorization.

E.      The Bidding Procedures, the Stalking Horse APA, and the Bid Protections were negotiated by the parties at arm's length and in good faith by the Debtors and the Stalking Horse Bidder.  The Bid Protections to be paid in accordance with the Stalking Horse APA are: (i) an actual and necessary cost of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code; (b) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) reasonable and appropriate in light of the size and nature of the proposed Sale embodied in the Stalking Horse APA and comparable transactions, the commitments that have been made by the Stalking Horse Bidder for the benefit of the Debtors' estates, the condition of the Purchased Assets, and the efforts that have been and

will be expended by the Stalking Horse Bidder; and a condition to and necessary to induce the Stalking Horse Bidder to continue to pursue the Sale and to continue to be bound by the Stalking Horse APA.

F.     The Stalking Horse Bid represents the highest and best offer the Debtors have received to date to purchase the Purchased Assets.  The Stalking Horse APA provides the Debtors the opportunity to sell the Purchased Assets in a manner designed to preserve and maximize their value and provide a floor for a further marketing and auction process, to the benefit of the Debtors' estates, their creditors, and all other parties in interest.  Designation of the Stalking Horse Bidder as a "stalking horse bidder" and the Stalking Horse APA as a "stalking horse agreement" is in the best interests of the Debtors' estates and their creditors and reflects a sound exercise of their business judgment.  The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Purchased Assets will be realized.

G.     The Bid Protections to be paid in accordance with the Stalking Horse APA are: (i) an actual and necessary cost of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code; (b) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) reasonable and appropriate in light of the size and nature of the proposed Sale embodied in the Stalking Horse APA and comparable transactions, the commitments that have been made by the Stalking Horse Bidder for the benefit of the Debtors' estates, the condition of the Purchased Assets, and the efforts that have been and will be expended by the Stalking Horse Bidder; and a condition to and necessary to induce the Stalking Horse Bidder to continue to pursue the Sale and to continue to be bound by the Stalking Horse APA.

H.     The Bid Protections are an essential inducement and condition of the Stalking Horse Bidder's entry into, and continuing obligations under, the Stalking Horse APA.  Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate the Sale or otherwise be bound under the Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or otherwise better offers).  The Bid Protections induced the Stalking Horse Bidder to submit a bid that will serve as a minimum floor bid for the Purchased Assets on which the Debtors, their creditors and other bidders can rely, and which encourages and facilitates the Auction process.  The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Purchased Assets will be realized. Accordingly, the Bid Protections are reasonable and appropriate and represent the best method for maximizing the value of the Purchased Assets.

I.     The Debtors and their advisors engaged in a robust and extensive marketing and sale process prior to the commencement of these Chapter 11 Cases.  The Bidding Procedures are designed to continue that robust and extensive marketing and sale process following entry of this Order in order to solicit the highest or otherwise best value for the Assets.  The Bidding Procedures are fair, appropriate, and reasonably designed to enable the Debtors to receive bids for the Assets, and they represent the best method for maximizing the realizable value of the Assets for the benefit of the Debtors' estates.

J.     The Sale Notice, substantially in the form attached hereto as Exhibit 2, is reasonably calculated to provide interested parties with timely and proper notice of the proposed Sale, including, without limitation: (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures; (iii) the deadline for filing objections to the Sale and entry of the Sale Order,

and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the Assets to be sold; (v) instructions for obtaining copies of the Stalking Horse APA; and (vi) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests (except as set forth in the Stalking Horse APA or another Successful Bidder's purchase agreement, if any), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds. No other or further notice of the Sale shall be required.

K.     The Assumption and Assignment Notice, substantially in the form attached hereto as <u>Exhibit 3</u>, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse APA (or to another Successful Bidder arising from the Auction, if any), including with respect to Cure Costs.

L.     The Assumption and Assignment Procedures set forth herein are fair, reasonable, appropriate, and comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

M.     The Motion and this Order are reasonable and appropriate, and the Bidding Procedures comply with the requirements set forth by Local Rule 6004-(1)(c).

N.     The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Order is in the best interests of the Debtors and their estates, creditors, interest holders, and all other parties in interest.

**IT IS HEREBY ORDERED THAT:**

1.     The Motion is granted as set forth herein.

2.     All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are hereby overruled.

## I.      Important Dates and Deadlines.

3.      The Debtors are authorized to proceed with the Sale in accordance with the Bid Procedures and are authorized to take any and all actions necessary or appropriate to implement the Bid Procedures (subject to the terms thereof) in accordance with the following timeline:

| Deadline[3] | Event |
|---|---|
| November 15, 2023 | Entry of Bidding Procedures Order |
| Two Business Days after the entry of the Bidding Procedures Order | Deadline for Debtors to file and serve Sale Hearing Notice |
| Two Business Days after the entry of the Bidding Procedures Order | Deadline for Debtors to file and serve Assumption and Assignment Notice |
| As soon as practicable after the entry of the Bidding Procedures Order | Deadline for Debtors to publish Sale Hearing Notice |
| Fourteen (14) days after service of the Sale Notice and Assumption and Assignment Notice at 4:00 p.m. (ET) | Sale Objection Deadline (including objections to Assumption and Assignment of Contracts) |
| November 22, 2023 at 5:00 p.m. (ET) | Bid Deadline |
| No later than 24 hours prior to Auction, if applicable | Deadline to Designate Qualified Bidders |
| November 27, 2023 at 10:00 a.m. (ET) | Auction, solely in the event the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Bid |
| As soon as practicable after the Auction, if applicable | Deadline for Debtors to file and serve Notice of Winning Bidder |

---

[3] All deadlines and milestones may only be extended (a) in consultation with the Agent or (b) upon Court order.  As used herein, the term "Agent" shall mean: (a) at all times prior to the Court's entry of the order authorizing the Debtors to obtain debtor in possession financing, CIT Northbridge Credit LLC, in its role as agent for the Prepetition CIT Secured Parties (the "Prepetition CIT Agent") under that certain Loan, Security, and Guarantee Agreement, dated as of April 12, 2022 (as such agreement may be modified, amended, or restated from time to time, the "Prepetition First Lien Credit Agreement"), and (b) at all times subsequent to entry of the order authorizing the Debtors to obtain debtor in possession financing (the "DIP Order"), the DIP Agent (as defined in the DIP Order).

| Deadline[3] | Event |
|---|---|
| **November 28, 2023 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline (if applicable)[4] |
| **December 1, 2023 at 12:00 p.m. (ET)** | Deadline to Reply to Sale Objections |
| **December 4, 2023 at 10:00 a.m. (ET), subject to the availability of the Court** | Sale Hearing |

## II.    Bidding Procedures, Bid Protections, and Related Relief

4.      The Bidding Procedures, substantially in the form attached hereto as **<u>Exhibit 1</u>**, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to the proposed sale of the Assets.  Any party desiring to bid on the Assets (other than the Stalking Horse Bidder, who shall automatically be deemed a Qualified Bidder under the Bidding Procedures) or a portion thereof shall comply with the Bidding Procedures and this Order in all respects.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures (subject in all respects to the terms thereof). The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures.

5.      The Debtors are authorized to enter into the Stalking Horse APA, subject to higher and better offers at the Auction in accordance with the Bidding Procedures.  The Debtors are authorized to perform all obligations of the Debtors set forth in the Stalking Horse APA that are intended to be performed prior to the Sale Hearing and prior to entry of the Sale Order, subject to

---

[4]    Solely for objections to (i) conduct at Auction and (ii) adequate assurance of future performance under Assigned Contracts if Successful Bidder is not the Stalking Horse Bidder.

the terms of the Bidding Procedures.  The Stalking Horse Bidder is deemed a Qualified Bidder, and the Stalking Horse Bid as set forth in the Stalking Horse APA is deemed a Qualified Bid.

6.    In connection with any Sale and notwithstanding anything to the contrary, until the conclusion of the Auction (regardless of whether the Agent participated in prior rounds at the Auction), the Prepetition Agent and the DIP Agent may, as determined by the Agent, credit bid any portion and up to the entire amount of the Prepetition CIT Obligations (as defined in the operative Financing Order)[5] and/or the DIP Obligations (as defined in the operative Financing Order), as applicable, on any individual Asset, portion of the Assets, or all Assets, in each case constituting Prepetition Collateral (as defined in the operative Financing Order) or the DIP Collateral (as defined in the operative Financing Order), as applicable (the "Credit Bid Right" and such bid, the "Credit Bid"); *provided however, that* to the extent there are no other Qualified Bids other than the Stalking Horse Bid or the Stalking Horse Bidder continues to submit Overbids (as defined in the Bidding Procedures) as against Bids submitted by other Qualified Bidders (other than the Agent), the Agent shall not exercise its Credit Bid Rights unless and until another Qualified Bidder (other than the Agent) has outbid the Stalking Horse Bidder and the Stalking Horse Bidder has indicated that it will not submit any further Overbids.

7.    In the event the Agent exercises the Credit Bid Right, the Agent shall be deemed a Qualified Bidder (as defined herein) in all respects, and the Credit Bid shall be deemed a Qualified Bid (as defined herein) in all respects. For the avoidance of doubt, notwithstanding anything to the contrary, the Credit Bid must contain a cash component sufficient to pay the Break-Up Fees and/or Expense Reimbursements required to be paid by the Debtors to the Stalking Horse Bidder pursuant

---

[5] "Financing Order" shall mean the order then in effect authorizing the use of cash collateral and/or approving DIP financing.

to the Stalking Horse APA, which cash component shall be used solely to pay such Break-Up Fees and Expense Reimbursements subject to the terms provided in the Stalking Horse APA.

8.      Upon exercise of the Credit Bid Right, neither the Prepetition CIT Agent nor the DIP Agent shall be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal equitable, or otherwise), any individual Asset, portion of the Assets, or all of the Assets, and the Prepetition CIT Agent and the DIP Agent shall each have the right to designate any person or entity that shall take title to the individual Asset, portion of the Assets, or all of the Assets that are subject to the Credit Bid Right. No other person may credit bid on the prepetition Collateral or the DIP Collateral unless the entire amount of the Prepetition CIT Obligations and the DIP Obligations will be paid in full in cash on the closing of the proposed Sale; *provided further* that Stalking Horse Bidder shall receive a credit in connection with such Overbid equal to the value of the Bid Protections granted to it pursuant to the terms of the Stalking Horse APA (as set forth in Section VII.B.2. of the Bidding Procedures).

9.      The deadline by which all Bids for all or any portion of the Debtors' Assets must be *actually received* by the parties specified in the Bidding Procedures is 4:00 p.m. (prevailing Eastern Time), on **November 22, 2023** (the "Bid Deadline").

10.     The Bid Protections are approved as follows: a Break-Up Fee in the amount of 3% of the Purchase Price (as defined in the Stalking Horse APA) of the Stalking Horse Bid and Expense Reimbursement not to exceed $649,000; *provided* that the Bid Protections shall not exceed 4% of the Purchase Price.  The Bid Protections shall survive any termination of the Stalking Horse APA, and shall be binding and enforceable against each Debtor and its respective estates, any trustee, examiner or other representative of the Debtors' estates and any successors thereto.

The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Bid Protections solely on the terms set forth in the Stalking Horse APA. The Bid Protections for the Stalking Horse Bidder shall be payable solely from the proceeds from the Sale of the Purchased Assets at the Closing of such Sale, in accordance with the terms of the Stalking Horse APA, free and clear of all liens, claims, encumbrances and other interests, without further order of this Court. Nothing in this Order shall be construed as authorizing and directing the payment of the Bid Protections to the Stalking Horse Bidder in the event that it is the Successful Bidder with respect to the Purchased Assets.

11. No person or entity other than the Stalking Horse Bidder shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise; *provided*, that the Debtors reserve all rights to seek further relief from the Court if necessary (to the extent not inconsistent with the Bid Protections and other rights granted to the Stalking Horse Bidder pursuant to the terms of the Stalking Horse APA) to designate additional stalking horse bidders and provide additional bid protections, subject to approval by the Court.

**III.    Auction.**

12. If the Debtors receive one or more Qualified Bids (other than the Stalking Horse Bid), the Auction will take place on **November 27, 2023 at 10:00 a.m.** (prevailing Eastern Time), or such later time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids. No later than 24 hours prior to the commencement of the Auction, the Debtors shall notify each Acceptable Bidder whether such party is a Qualified Bidder. Such Auction will be held (i) via a virtual meeting, (ii) at the offices of proposed co-counsel to the Debtors, Willkie Farr &

Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, or (iii) at such other later date, time, and location as designated by the Debtors. The Auction shall be transcribed by a court reporter. As soon as practicable after the Auction, the Debtors shall file a notice identifying the Successful Bidder and Backup Bidder (if selected) as soon as reasonably practicable after closing the Auction, if any, and in any event not more than 24 hours following closing the Auction.

13.     If the Debtors do not receive any Qualified Bids other than the Stalking Horse Bid by the Bid Deadline, the Debtors shall not hold an Auction, and the Stalking Horse Bidder shall be named the Successful Bidder immediately following the Bid Deadline.

14.     Pursuant to Local Rule 6004-1(c)(ii): (a) each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale, as set forth in the Bidding Procedures; (b) the Auction shall be conducted openly and all creditors will be permitted to attend; and (c) the Auction shall be transcribed or videotaped.

15.     The Debtors may, in their business judgment (in consultation with the Agent if the Agent has notified the Debtors that it will not exercise the Credit Bid Right), (a) determine which Potential Bidders are Qualified Bidders (other than the Stalking Horse Bidder, who shall automatically be deemed a Qualified Bidder); (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best offer, the "Successful Bid," and which is the next highest or otherwise best proposal, the "Backup Bid" in each case according to bid assessment criteria; (d) reject, at any time before entry of an Order of the Bankruptcy Court approving the Successful Bid, any Bid (other than the Stalking Horse Bid) that, in the discretion of the Debtors, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders; (e) at or

before the conclusion of the Auction, may impose additional terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these Chapter 11 Cases; and (f) with the consent of the Agent not to be unreasonably withheld if the Agent notifies the Debtors that it will not exercise its Credit Bid Right, modify the Bid Procedures or withdraw the request to sell the Assets, as applicable, to the Successful Bidder or Backup Bidder, as applicable, at any time with or without prejudice; *provided that*, for the avoidance of doubt, the Debtors may not modify (i) the Bid Protections afforded to the Stalking Horse Bidder, unless the Stalking Horse Bidder agrees to such modification in writing in its sole discretion, or (ii) the rules, procedures, or deadlines set forth herein, or adopt new rules, procedures, or deadlines that would impair in any material respect (x) the Stalking Horse Bidder's right to payment of the Break-Up Fee or the Expense Reimbursement or the Stalking Horse Bidder's right to receive a credit for its Bid Protections as set forth in the Bidding Procedures without the express written consent of the Stalking Horse Bidder in its sole discretion.

**IV.     The Sale Hearing.**

16.     The Debtors shall file a reply to any Sale Objections and/or Cure Objections (each as defined herein) by no later than 12:00 p.m. (prevailing Eastern Time) on December 1, 2024, and the Sale Hearing shall take place on December 4, 2023 at 10:00 a.m. (prevailing Eastern Time).

17.     The form of the Sale Notice attached to this Order as Exhibit 2 is approved.  Within two (2) Business Days after entry of this Order, the Debtors shall serve the Sale Hearing Notice on the following parties (or their respective counsel, if known) by first class mail or email: (a) the Notice Parties; (b) all parties to the Assigned Contracts to be assumed and assigned as part of the proposed Sale; (c) all parties who have expressed a written interest to the Debtors or their legal or financial advisors in some or all of the Debtors' Assets; (d) all known holders of liens, encumbrances, and other claims secured by the Debtors' Assets; (e) the Internal Revenue Service;

(f) the Food and Drug Administration; (g) all applicable state and local taxing authorities; (h) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

18.     As soon as reasonably practicable after entry of this Order, the Debtors shall publish the Sale Notice in *The New York Times* (national edition) and on the website of the Debtors' proposed noticing and claims agent to be retained in these Chapter 11 Cases, Stretto, Inc. at https://cases.stretto.com/hellobello.

19.     Objections, if any, to the Sale, including on the basis of the identity of the Stalking Horse Bidder (each, a "Sale Objection") must be made no later than 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) days after service of the Sale Notice and Assumption and Assignment Notice (the "Sale Objection Deadline").   Objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received*** no later than the Sale Objection Deadline by the following parties (the "Objection Notice Parties"):

| Counsel to the Debtors | Co-Counsel to the Debtors |
|---|---|
| Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>Attn.: Brian S. Lennon<br>Debra M. Sinclair<br>Erin C. Ryan | Young Conaway Stargatt & Taylor, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>Attn.: Edmon L. Morton<br>Matthew B. Lunn<br>Heather P. Smillie |
| **Counsel to the Committee (if any)** | **The United States Trustee** |
| [●] | Office of the United States Trustee<br>for the District of Delaware |

| | 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 Attn.: Richard L. Schepacarter, Esq |
|---|---|
| **Counsel to the Stalking Horse Bidder** | **Counsel to the DIP Lenders** |
| Lowenstein Sandler LLP 1251 Avenue of the Americas New York, NY 10020 Attn.: Andrew Behlmann Philip J. Gross Sam E. Khan Mitchell V. McDonald | Holland & Knight LLP 1722 Routh St., #1500 Dallas, TX 75201 Attn.: Robert W. Jones Brian Smith |

20.     All parties-in-interest shall have an opportunity to object to the conduct of the Auction and the adequate assurance of future performance under Assigned Contracts if the Successful Bidder is not the Stalking Horse Bidder (each such objection, a "Supplemental Sale Objection"). Any Supplemental Objection must (i) be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (ii) be filed with the Court by no later than 4:00 p.m. on November 28, 2023 (the "Supplemental Sale Objection Deadline"); and (iii) served on the Objection Notice Parties.

21.     Any party failing to timely file a Sale Objection shall be forever barred from objecting and shall be deemed to have consented to each Sale, including the transfer of the Debtors' right, title and interest in, to and under the Purchased Assets free and clear of any and all liens, claims, interests, and encumbrances in accordance with the Stalking Horse APA or Successful Bidder's purchase agreement.

22.     The Sale Hearing may be adjourned by the Debtors, in consultation with the Agent, from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

### V.    Assumption and Assignment Procedures.

23.    The procedures set forth below regarding the assumption and assignment of the Contracts (each, an "Assigned Contract," and collectively, the "Assigned Contracts") proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder or other Successful Bidder, if any, pursuant to section 365(f) of the Bankruptcy Code in connection with the Sale (the "Assumption Procedures") are hereby approved to the extent set forth herein and shall govern the assumption and assignment of all of the Debtors' Assigned Contracts to be assumed and assigned in connection with the Sale, subject to the payment of any amounts necessary to cure any defaults arising under any Assigned Contract (the "Cure Costs"):

(a)    **Assumption and Assignment Notice**.  The form of the Assumption and Assignment Notice attached to this Order as Exhibit 3 is approved.  Within two (2) Business Days after entry of this Order (the "Assumption and Assignment Service Deadline"), the Debtors shall serve the Assumption and Assignment Notice by first class mail or email on each counterparty to the Assigned Contracts to be assumed and assigned as part of the proposed Sale (or their respective counsel, if known).  The Assumption and Assignment Notice shall inform each recipient of (i) the timing and procedures relating to such assumption and assignment, (ii) the title (or an appropriate description) and date of the Assigned Contract (if available), (iii) the name of the non-Debtor counterparty to the Assigned Contract, (iv) the Debtors' good faith estimates of the Cure Costs (if any) required in connection with the Assigned Contract, (v) the identity of the Stalking Horse Bidder to whom the Assigned Contract is to be assigned, and (vi) the Cure Objection Deadline;  provided,  however,  that service of an Assumption and Assignment Notice does not constitute an admission that such contract is an executory contract or that any stated Cure Cost constitutes a claim against the Debtors or a right against any Stalking Horse Bidder or other Successful Bidder, and all rights with respect thereto are expressly reserved.  Subject to the terms of the Transaction Support Agreement, further, the inclusion of a contract on the Assumption and Assignment Notice is not a guarantee that such contract will ultimately be assumed and assigned.  Any determination of whether such contract is an executory contract or can be rejected will be made in accordance with the Bankruptcy Code, the Bankruptcy Rules, and all applicable orders of this Court.

(b)     **Cure Costs**. The payment of the applicable Cure Costs by the Stalking Horse Bidder and/or Successful Bidder, as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the Assigned Contracts by the Debtors and the assignment of the Assigned Contracts to the Stalking Horse Bidder or other Successful Bidder, constitute adequate assurance of future performance thereof.  In the event the Successful Bidder is not the Stalking Horse Bidder, objections to adequate assurance of future performance of the Assigned Contracts by the Successful Bidder must be filed with the Court and served on the Objection Notice Parties no later than November 28, 2023.

(c)     **Supplemental Contract Assumption Notice**. To the extent the Debtors, at any time after the Assumption and Assignment Service Deadline (i) identify additional Assigned Contracts to be assumed and assigned to the Stalking Horse Bidder or Successful Bidder (the "Additional Assigned Contracts"), (ii) remove Assigned Contracts from the list of executory contracts and leases proposed to be assumed and assigned in connection with a Sale, which removal must be consistent with the Transaction Support Agreement dated October 23, 2023, by and among the Debtors, Stalking Horse Bidder, NFS Leasing, Inc., and 36th Street Capital Partners, LLC (the "Transaction Support Agreement"), (iii) and/or modify the previously stated Cure Cost associated with any Assigned Contracts, the Debtors will promptly file with this Court and serve by first-class mail or email a supplemental notice of contract assumption (a "Supplemental Assumption Notice") on each of the counterparties to such Assigned Contracts and their counsel of record, if any.  Each Supplemental Assumption Notice will include the same information with respect to listed Assigned Contracts as was included in the Contract Assumption Notice.   Subject to the Transaction Support Agreement, the Stalking Horse Bidder may designate Additional Assigned Contracts to be assumed and assigned at any time prior to the Sale Hearing, and may remove Assigned Contracts from the list of Assigned Contracts at any time prior to the Sale Hearing.  Counterparties to Additional Assigned Contracts or that otherwise receive a Supplemental Assumption Notice shall have until 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) days after the filing and service of the Supplemental Assumption Notice by the Debtors to the Counterparty.

(d)     **Objections**. Objections, if any, to the proposed assumption and assignment or the Cure Cost proposed with respect thereto (each, a "Cure Objection"), must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon the Objection Notice Parties, so as actually to be received on or before the Sale Objection Deadline or

deadline set forth in the Supplemental Assumption Notice, as applicable (each, a "Cure Objection Deadline").

(e) **Dispute Resolution**. In the event that the Debtors and a non-Debtor counterparty cannot resolve any objection to the Cure Cost, the Assigned Contract may be assumed by the Debtors and assigned to the Stalking Horse Bidder or Successful Bidder, as applicable, *provided* that the Debtors shall segregate the Cure Cost that the counterparty asserts is required to be paid, pending a resolution of the dispute by the Court or mutual agreement by the parties. Any objection to the proposed assumption and assignment of a contract or related Cure Cost proposed in connection with the Sale that remains unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at a later date as fixed by the Court).

(f) **Contract Assumption**. No Assigned Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming and assigning such Assigned Contracts or (ii) the date the Sale has closed; provided, that the Stalking Horse Bidder shall comply with the Transaction Support Agreement.

24. Any party failing to timely file an objection to the Cure Cost or the proposed assumption and assignment of an Assigned Contract or additional Assigned Contract listed on the Assumption and Assignment Notice or any Supplemental Assumption Notice is deemed to have consented to (a) such Cure Cost, (b) the assumption and assignment of such Assigned Contract or additional Assigned Contract, (c) the related relief requested in the Motion, and (d) the Sale. Such party shall be forever barred and estopped from objecting to the Cure Costs, the assumption and assignment of the Assigned Contract, or additional Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Debtors and the Stalking Horse Bidder or Successful Bidder, as applicable, with respect to such party's Assigned Contract or additional Assigned Contract.

25.     The Assumption Procedures are appropriate and fair to all counterparties and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  The Contract Assumption Notice is: (a) reasonably calculated to (i) provide sufficient, effective notice to all counterparties and any other affected parties of the Debtors' intent to assume and assign to any Successful Bidder some or all of the Assumed Contracts and (ii) afford the counterparties the opportunity to exercise any rights affected by the Motion and the relief granted by this Order pursuant to Bankruptcy Rules 2002(a)(2), 6004, and 6006; and (b) hereby approved.

## V.     Miscellaneous.

26.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

27.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

28.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

29.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

## <u>EXHIBIT 1</u>

**Bidding Procedures**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UNCONDITIONAL LOVE INC., *et al.*,[1] | Case No. 23-11759 (MFW) |
| Debtors. | (Joint Administration Requested) |

## BIDDING PROCEDURES

On October 23, 2023, Unconditional Love Inc. and its affiliated debtors and debtors in possession (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

On [●], 2023, the Court entered an order [Docket No. [●]] (the "Bidding Procedures Order"),[2] authorizing the Debtors to solicit bids for a sale or disposition (the "Sale") of all or substantially all of the Debtors' assets (collectively, the "Assets"), free and clear of all liens, claims, encumbrances, and other interests and in accordance with the following procedures (the "Bidding Procedures") and to conduct a related auction if needed (the "Auction").

These Bidding Procedures set forth the process through which a person or entity interested in all or substantially all of the Assets (each, a "Potential Bidder") may submit a binding proposal or offer (each, a "Bid") pursuant to which the Potential Bidder proposes to, among other things, purchase, acquire, and take assignment and delivery of the Assets and assume certain liabilities (the "Liabilities") of the Debtors. This process is intended to obtain a sale proposal that is in the best interests of the Debtors, their creditors, and their equity holders.

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, are Unconditional Love Inc. d/b/a Hello Bello (5895), Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc. (9369). The Debtors' headquarters is located at 17383 Sunset Blvd, Suite B200, Pacific Palisades, CA 90272.

[2]    Terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Motion of the Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter Into the Stalking Horse APA and to Provide the Stalking Horse Bid Protections Thereunder, (C) Scheduling an Auction and a Sale Hearing and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, and (E) Granting Related Relief; and (II) (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* (the "Motion") or the Bidding Procedures Order, as applicable.

**ANY PARTY INTERESTED IN BIDDING ON ALL OR ANY PORTION OF THE DEBTORS' ASSETS SHOULD CONTACT THE DEBTORS' PROPOSED ADVISORS, AS FOLLOWS:**

Jefferies Group LLC
520 Madison Avenue, 6th Floor
New York, NY 10022
Attn: Robert White
(rwhite@jefferies.com);
Nicholas Barnes
(nbarnes@jefferies.com).

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn: Brian S. Lennon
(blennon@willkie.com);
Debra M. Sinclair
(dsinclair@willkie.com);
Erin C. Ryan
(eryan@willkie.com);
Jessica D. Graber
(jgraber@willkie.com).

Young Conaway Stargatt &
Taylor, LLP
1000 North King Street
Wilmington, Delaware 19801
Attn:  Edmon L. Morton
(emorton@ycst.com);
Matthew B. Lunn
(mlunn@ycst.com);
Heather Smillie
(hsmillie@ycst.com).

## I.    DESCRIPTION OF THE ASSETS AND STALKING HORSE BID.

### A.    The Assets.

The Debtors intend to sell all or substantially all of the Assets.

Any Potential Bidder may bid on the Assets, subject to the conditions set forth herein.

The ability to undertake and consummate a sale of the Assets shall be subject to competitive bidding, as set forth herein, and approval by the Court.

### B.    The Stalking Horse Agreement.

On October 23, 2023, the Debtors entered into that certain Asset Purchase Agreement (the "Stalking Horse APA") with Bucky Acquisition Holdco, LLC (the "Stalking Horse Bidder", and such bid, the "Stalking Horse Bid").  Subject to court approval, pursuant to the Stalking Horse APA, the Stalking Horse Bidder has committed to pay a Purchase Price worth a total aggregate consideration as set forth in the Stalking Horse APA, free and clear of all claims or encumbrances (other than Assumed Liabilities and Permitted Liens, as defined in the Stalking Horse APA).  In the event that the Stalking Horse APA is terminated, pursuant to the conditions thereunder, or in the event that the purchase of the Assets is ultimately consummated by any person other than the Stalking Horse Bidder, the Debtors will pay the Stalking Horse Bidder a break-up fee in the amount equal to three (3) percent of the Purchase Price (the "Break-Up Fee") and reimburse the Stalking Horse Bidder for its reasonable and documented expenses in conjunction with the Stalking Horse Bid up to a maximum amount of $649,000 (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections"); provided, however, that the Break-Up Fee and Expense Reimbursement, in the aggregate, shall not exceed an amount equal to four percent (4%) of the Purchase Price.

## II.    KEY DATES AND DEADLINES.

| Deadline[3] | Event |
|---|---|
| **November 15, 2023** | Entry of Bidding Procedures Order |
| **Two Business Days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Sale Hearing Notice |
| **Two Business Days after the entry of the Bidding Procedures Order** | Deadline for Debtors to file and serve Assumption and Assignment Notice |
| **As soon as practicable after the entry of the Bidding Procedures Order** | Deadline for Debtors to publish Sale Hearing Notice |
| **Fourteen (14) days after service of the Sale Notice and Assumption and Assignment Notice at 4:00 p.m. (ET)** | Sale Objection Deadline (including objections to Assumption and Assignment of Contracts) |
| **November 22, 2023 at 5:00 p.m. (ET)** | Bid Deadline |
| **No later than 24 hours prior to Auction, if applicable** | Deadline to Designate Qualified Bidders |
| **November 27, 2023 at 10:00 a.m. (ET)** | Auction, solely in the event the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Bid |
| **As soon as practicable after the Auction, if applicable** | Deadline for Debtors to file and serve Notice of Winning Bidder |
| **November 28, 2023 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline[4] |
| **December 1, 2023 at 12:00 p.m. (ET)** | Deadline to Reply to Sale Objections |

---

[3] All deadlines and milestones may only be extended (a) in consultation with the Agent in its sole discretion or (b) upon Court order.  As used herein, the term "Agent" shall mean: (a) at all times prior to the Court's entry of the order authorizing the Debtors to obtain debtor in possession financing, CIT Northbridge Credit LLC, in its role as agent for the Prepetition CIT Secured Parties (the "Prepetition CIT Agent") under that certain Loan, Security, and Guarantee Agreement, dated as of April 12, 2022 (as such agreement may be modified, amended, or restated from time to time, the "Prepetition First Lien Credit Agreement"), and (b) at all times subsequent to entry of the order authorizing the Debtors to obtain debtor in possession financing (the "DIP Order"), the DIP Agent (as defined in the DIP Order).

[4] Solely for objections to (i) conduct at Auction and (ii) adequate assurance of future performance under Assigned Contracts if Successful Bidder is not the Stalking Horse Bidder.

| Deadline[3] | Event |
|---|---|
| **December 4, 2023 at 10:00 a.m. (ET), subject to the availability of the Court** | Sale Hearing |

## III.    PARTICIPATION REQUIREMENTS.

### A.    Potential Bidders.

To participate in the bidding process, a Potential Bidder must deliver to each of the Debtors' advisors the following documents and information:

1.    an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"); and

2.    proof by the Potential Bidder of its financial capacity to close the proposed Sale, which may include audited financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors and their advisors in consultation with the Agent.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors and their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction; provided that the Consultation Parties (as defined herein) and their respective advisors shall be permitted to submit reasonable requests for information from Potential Bidders only through the Debtors and their advisors and, for the avoidance of doubt, shall not be permitted to directly contact any Potential Bidder and/or its respective advisor(s) prior to the Auction regarding the Sale.

### B.    Obtaining Due Diligence.

Only Potential Bidders that have executed confidentiality agreements and have provided evidence satisfactory to the Debtors (in the Debtors' discretion) of their financial capacity to close the proposed Sale (such Potential Bidders, an "Acceptable Bidder") shall be eligible to receive due diligence information, access to the Debtors' electronic data room, and any additional non-public information regarding the Debtors and the Assets.

The Debtors and their advisors shall coordinate responses to all reasonable requests from Acceptable Bidders for additional information and due diligence access; provided that (i) the Debtors shall have the right to limit the information and due diligence provided to competitors and (ii) the Debtors may decline to provide such information to any Acceptable Bidder (other than the Agent with respect to the Credit Bid Right) who, at such time and in the Debtors' reasonable business judgment, has not established, or who has raised doubt, that such Acceptable Bidder intends in good faith to consummate the proposed Sale.

4

The due diligence period will end on the Bid Deadline and, subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information. Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed appropriate by the Debtors in consultation with the Agent. The Debtors and their representatives and advisors are not responsible for, and will bear no liability with respect to, any information obtained by any Acceptable Bidder in connection with the Sale.

### C.      Right to Credit Bid.

In connection with any Sale and notwithstanding anything to the contrary, until the conclusion of the Auction (regardless of whether the Agent participated in prior rounds at the Auction), the Prepetition Agent and the DIP Agent may, as determined by the Agent, credit bid any portion and up to the entire amount of the Prepetition CIT Obligations (as defined in the operative Financing Order)[5] and/or the DIP Obligations (as defined in the operative Financing Order), as applicable, on any individual Asset, portion of the Assets, or all Assets, in each case constituting Prepetition Collateral (as defined in the operative Financing Order) or the DIP Collateral (as defined in the operative Financing Order), as applicable (the "Credit Bid Right" and such bid, the "Credit Bid"); *provided, however* that to the extent there are no other Qualified Bids other than the Stalking Horse Bid or the Stalking Horse Bidder continues to submit Overbids (as defined in the Bidding Procedures) as against Bids submitted by other Qualified Bidders (other than the Agent), the Agent shall not exercise its Credit Bid Rights unless and until another Qualified Bidder (other than the Agent) has outbid the Stalking Horse Bidder and the Stalking Horse Bidder has indicated that it will not submit any further Overbids.

In the event the Agent exercises the Credit Bid Right, the Agent shall be deemed a Qualified Bidder (as defined herein) in all respects, and the Credit Bid shall be deemed a Qualified Bid (as defined herein) in all respects. For the avoidance of doubt, notwithstanding anything to the contrary, the Credit Bid must contain a cash component sufficient to pay the Break-Up Fees and/or Expense Reimbursements required to be paid by the Debtors to the Stalking Horse Bidder pursuant to the Stalking Horse APA, which cash component shall be used solely to pay such Break-Up Fees and Expense Reimbursements subject to the terms provided in the Stalking Horse Agreement. In the event that the Agent exercises the Credit Bid Right, the Agent agrees to serve as a Backup Bidder.

Upon exercise of the Credit Bid Right, neither the Prepetition Agent nor the DIP Agent shall be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), any individual Asset, portion of the Assets, or all of the Assets, and the Prepetition Agent and the DIP Agent shall each have the right to designate any person or entity that shall take title to the individual Asset, portion of the Assets, or all of the Assets that are subject to the Credit Bid Right. No other person may credit bid on the Prepetition Collateral or the DIP Collateral unless the entire amount of the Prepetition CIT Obligations and the DIP Credit Agreement Obligations will be paid in full in cash on the closing of the proposed Sale; *provided* that the Stalking Horse Bidder shall receive a credit

---

[5] "Financing Order" shall mean the order then in effect authorizing the use of cash collateral and/or approving DIP financing.

in connection with such Overbid equal to the value of the Bid Protections granted to it pursuant to the terms of the Stalking Horse Agreement (as set forth in Section VII.B.2 of these Bidding Procedures).  Further, upon exercise of the Credit Bid Right, the Agent shall not be entitled to any consultation rights contained herein or in the Order, and shall no longer be deemed a Consultation Party.

## IV.    REQUIREMENTS FOR QUALIFIED BIDS.

Any Bid will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder by the Bid Deadline and is determined to comply with all of the following in the Debtors' business judgment (such bid, a "Qualified Bid," and such bidder, a "Qualified Bidder"):

1.    ***Identity***.  The bid must fully disclose the identity of each person or entity that (a) is bidding for all or any portion of the Assets; (b) is sponsoring or financing the bid (including through the issuance of debt in connection with such bid); (c) is participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such bid) the Auction in connection with such bid and the complete terms of any such participation; and/or (d) will directly or indirectly own and/or control any amount of equity and/or voting securities of the Qualified Bidder; in each case, including its full legal name, jurisdiction of incorporation or formation, and its location in the Qualified Bidder's corporate structure.  The bid must also disclose any past or present connection or agreement with any Debtor, any other prospective bidder for all or any portion of the Assets, or any officer, director, or equity security holder of any Debtor.

2.    ***Purpose; Assets and Liabilities***.  Each Qualified Bidder must state that the Bid includes an irrevocable and binding offer by the Qualified Bidder to purchase some or all of the Assets (identified with specificity).  The Bid must clearly identify the following: (a) the Assets, or the portion thereof, to be purchased; and (b) the Liabilities and obligations to be assumed, including any indebtedness and applicable Cure Costs to be assumed, if any.

3.    ***Purchase Price***.  The Bid must clearly set forth the cash purchase price, assumed Liabilities, and any other non-cash consideration (with the form of such consideration specified), to be paid for the Assets to be purchased; provided that the proposed purchase price shall be equal to or greater than the Purchase Price (as such term is defined in the Stalking Horse APA), plus (a) cash consideration in an amount equal to or greater than the Bid Protections and (b) $500,000.

4.    ***Deposit***.  Each Bid must be accompanied by a good faith deposit in the form of cash (or other form acceptable to the Debtors in their sole discretion) in an amount equal to ten percent (10%) of the maximum cash component of the purchase price of the Bid (the "Deposit") to be held in an escrow account

to be established by the Debtors until no later than five (5) Business Days after the conclusion of the Auction and thereafter returned to the respective Qualified Bidders (except for the Deposit of any bidder who is selected at the Auction as a Successful Bidder or as a Backup Bidder (as defined below)).

5. ***Minimum Bid***.  If at least one Qualified Bid (in addition to the (i) Stalking Horse Bid; and (ii) the Agent's Credit Bid Right) is received by the Bid Deadline with regard to the Assets, the Debtors will conduct an Auction with respect to such Assets and shall determine, in their reasonable discretion (in consultation with the Agent if the Agent has notified the Debtors that it will not exercise the Credit Bid Right), which Qualified Bid is the highest or otherwise best Qualified Bid for purposes of constituting the opening bid at the Auction (the "<u>Minimum Bid</u>").  The Minimum Bid must have a value to the Debtors, as determined by the Debtors, that is greater than or equal to the sum of the Purchase Price under the Stalking Horse APA, plus (a) the amount of the Bid Protections and (b) $500,000.

6. ***Marked Agreement***.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "<u>Bid Documents</u>").  The Bid Documents shall include a schedule of Assigned Contracts and a clearly marked version of (a) the form Sale Order provided by the Debtors to the Acceptable Bidder, in each case, showing all changes requested by the Acceptable Bidder, and (b) the Stalking Horse APA, as well as all other material documents integral to such Bid.

7. ***Committed Financing***.  Each Bid must include evidence of (a) the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand or (b) committed financing documented to the satisfaction of the Debtors that demonstrates that the Acceptable Bidder has received sufficient unconditional debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid, including providing adequate assurance of future performance under all contracts proposed to be Assigned Contracts by such Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

8. ***Contingencies; No Financing or Diligence Outs***.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

9. ***Governmental, Licensing, and Regulatory Approvals***.  Each Bid must describe all governmental, licensing, regulatory, or other approvals or consents that are required to consummate the proposed transaction

(including any antitrust approval related to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended), together with evidence satisfactory to the Debtors, of the ability to obtain such approvals or consents as soon as reasonably practicable, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents.

10.     ***Irrevocable***.  Each Bid must be irrevocable and binding; <u>provided</u> that if the Bid is not selected as the Successful Bid or Backup Bid, the Bid may be revoked after the Auction if such Acceptable Bidder's Bid is not selected as the Successful Bid or Backup Bid.

11.     ***Backup Bidder***.  Each Bid (including, for the avoidance of doubt, the Stalking Horse Bid) must contain an agreement for the Acceptable Bidder to be a Backup Bidder if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid.

12.     ***As-Is, Where-Is***.  The Bid must include the following representations and warranties: (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' business and the Assets such Acceptable Bidder proposes to acquire prior to submitting its Bid; and (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets such Acceptable Bidder proposes to acquire in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets such Acceptable Bidder proposes to acquire or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Acceptable Bidder's proposed purchase agreement ultimately accepted and executed by the Debtors.

13.     ***Authorization***.  The Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid and Bid Documents, participation in the Auction, and closing of the proposed Sale contemplated in such Bid.  The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.

14.     ***Disclaimer of Fees***.  Each Bid (other than the Stalking Horse Bid, subject to the terms of the Bidding Procedures Order) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement,

"topping" or termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor will be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and, by submitting its Bid, the Qualified Bidder is deemed to have agreed to waive any request for any such fee, costs, or reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

15. ***Time Frame for Closing***.  A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations in the Debtors' business judgment, in consultation with the Agent if the Agent notifies the Debtors that it will not exercise the Credit Bid Right) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame acceptable to the Debtors.  The Acceptable Bidder must commit to closing the proposed Sale contemplated by the Bid as soon as practicable, and in no event later than December 9, 2023, and must expressly set forth any potential regulatory issues or approvals that might arise in connection with such Acceptable Bidder's acquisition of the Assets, including such Acceptable Bidder's anticipated timing and proposed approach for resolving any such regulatory issues and obtaining any potential regulatory approvals.

16. ***Employees***.  Each Bid must include a statement regarding whether the Acceptable Bidder intends to offer future employment to any of the Debtors' employees (and, if so, specifically identify such employees).

17. ***Adherence to Bidding Procedures***.  Each Bid must include a statement that (a) the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code; and (b) the Bid constitutes a *bona fide* offer to consummate the proposed Sale embodied therein, and the Acceptable Bidder agrees to be bound by these Bidding Procedures.

18. ***Cooperation***.  The Acceptable Bidder must covenant to cooperate with the Debtors to provide factual information regarding such Bidder's operations upon the Debtors' request to analyze issues arising with respect to any applicable laws or regulatory or licensing requirements.

19. ***No Collusion***.  The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Potential Bidders, Acceptable Bidders, or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

20. ***Other Information.*** The Bid contains such other information as may be reasonably requested by the Debtors and the Consultation Parties (with such requests made through the Debtors).

## V.    BID DEADLINE.

An Acceptable Bidder that desires to make a bid must transmit via email (in .pdf or similar format) or deliver written copies of its bid to the following parties so as to be received not later than **5:00 p.m. (prevailing Eastern Time) on November 22, 2023** (the "Bid Deadline"): (i) proposed counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Brian S. Lennon, email: blennon@willkie.com, Debra M. Sinclair, email: dsinclair@willkie.com, and Erin C. Ryan, email: eryan@willkie.com; (ii) proposed Delaware counsel to the Debtors, Young Conaway Stargatt and Taylor, LLP, 1000 North King Street, Wilmington, DE, 19801, Attn: Edmon L. Morton, email: emorton@ycst.com; Matthew B. Lunn, email: mlunn@ycst.com; and Heather Smillie, email: hsmillie@ycst.com; and (iii) the Debtors' proposed investment banker, Jefferies Group LLC, 520 Madison Avenue, New York, NY 10022, Attn: Robert White, email: rwhite@jefferies.com; Nicholas Barnes, email: nbarnes@jefferies.com.

## VI.    QUALIFIED BIDDERS.

No later than twenty-four (24) hours prior to the commencement of the Auction, the Debtors shall notify each Acceptable Bidder whether such party is a Qualified Bidder and file a notice with the Court identifying each Qualified Bidder. If any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit on or before the date that is five (5) Business Days after the Bid Deadline. On the same date that the Debtors determine that a Bid is a Qualified Bid, the Debtors shall provide notice of such determination to the Stalking Horse Bidder.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Each Qualified Bidder (other than the Stalking Horse Bidder) shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of such Qualified Bidder to consummate its contemplated transaction. Failure by a Qualified Bidder (other than the Stalking Horse Bidder) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is no longer a Qualified Bidder or that a bid made by such bidder is not a Qualified Bid.

For the avoidance of doubt, the Stalking Horse Bidder will be deemed a Qualified Bidder and any Stalking Horse Bid will be deemed to be a Qualified Bid, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a bidder (other than the Stalking Horse Bidder) must satisfy to be a Qualified Bidder.

## VII.    THE AUCTION.

Within two (2) Business Days after entry of the Bidding Procedures Order, the Debtors shall serve a notice of the Auction and Sale (the "Sale Hearing Notice") on: (a) the Notice Parties; (b) all parties to executory contracts and leases to be assumed, assigned, or rejected as part of the proposed Sale; (c) all parties who have expressed a written interest in some or all of the Debtors' Assets; (d) all known holders of liens, encumbrances, and other claims secured by the Debtors' Assets; (e) the Internal Revenue Service; (f) all applicable state and local taxing authorities; (g) the Food and Drug Administration; (h) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall publish the Sale Hearing Notice, with any modifications necessary for ease of publication, in *The New York Times* (national edition) to provide notice to any other potentially interested parties.  If the Debtors receive no bid other than the Stalking Horse Bid (and the Agent notifies the Debtors that it will not exercise the Credit Bid Right) with regard to the Assets, (a) the Debtors shall not hold an Auction with respect to such Assets; (b) the Stalking Horse Bid will be deemed the Successful Bid with respect to such Assets; and (c) the Stalking Horse Bidder will be named the Successful Bidder with respect to such Assets.  If the Debtors receive more than one Qualified Bid (other than the Agent's Credit Bid Right) for the Assets, the Debtors shall conduct the Auction to determine the Successful Bidder(s) with respect to the Assets.

No later than twenty-four (24) hours prior to the commencement of the Auction, the Debtors will notify all Qualified Bidders and Agent of the highest or otherwise best Qualified Bid for the Assets, as determined in the Debtors' reasonable business judgment (the "Baseline Bid"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the number, type, and nature of any changes to the Stalking Horse APA requested by the Qualified Bidder, including the Assets sought and Assumed Liabilities to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close the proposed Sale, the conditions thereto, and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transactions contemplated by the Bid Documents; and (e) the tax consequences of such Qualified Bid.

The Auction shall take place at **10:00 a.m. (prevailing Eastern Time) on November 27, 2023**, (i) via a virtual meeting, (ii) at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, or (iii) at such later date, time, and location as designated by the Debtors, after providing notice to the Notice Parties.  The Debtors shall have the right to conduct

any number of Auctions on that date, if the Debtors determine, in their reasonable business judgment, that conducting such Auctions would be in the best interests of the Debtors' estates.

## A.    Participants and Attendees.

The Debtors and their advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.  All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (as defined below).

Only Qualified Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder) that have submitted Qualified Bids by the Bid Deadline are eligible to participate in the Auction. Qualified Bidders participating in the Auction must appear in person (or through a duly authorized representative), telephonically, or through a video teleconference, as determined by the Debtors. The Auction will be conducted openly and all creditors may be permitted to attend; provided that the Debtors may establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder or creditor at the Auction.  Any creditor and its advisors wishing to attend the Auction must contact the Debtors' advisors no later than three (3) Business Days prior to the start of the Auction; provided that the Prepetition CIT Secured Parties and the Stalking Horse Bidder, and their respective advisors, shall be permitted to attend the Auction without any prior notice to the Debtors' advisors.

Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (i) it has not engaged in any collusion with respect to the submission of any Bid or the Auction and (ii) each Qualified Bid it submits at the Auction is a binding, good faith, and *bona fide* offer to purchase the Assets identified in such bid.

## B.    Auction Procedures.

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment (provided that, for the avoidance of doubt, the Debtors may not modify the Bid Protections afforded to the Stalking Horse Bidder, unless the Stalking Horse Bidder agrees to such modification in writing in its sole discretion. For the avoidance of doubt, the Debtors may not modify the rules, procedures, or deadlines set forth herein, or adopt new rules, procedures, or deadlines that would impair in any material respect the Stalking Horse Bidder's right to payment of the Break-Up Fee or the Expense Reimbursement or the Stalking Horse Bidder's right to receive a credit for its Bid Protections as set forth in paragraph B.2, immediately below without the express written consent of the Stalking Horse Bidder in its sole discretion):

1.    ***Baseline Bid***.  Bidding shall commence at the amount of the Baseline Bid.

2.    ***Minimum Overbid***.  Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid for the Assets (each such bid, an "Overbid").  Any Qualified Bidder's initial Overbid shall be made in increments of at least $500,000 in cash, cash

equivalents, the Credit Bid Right, or such other consideration that the Debtors deem equivalent; provided that no bid may qualify as an Overbid unless such bid provides for cash consideration (or Credit Bid Right) in an amount equal to or greater than the Bid Protections granted to the Stalking Horse Bidder. The Debtors may, in their reasonable business judgment, announce increases or reductions to initial or subsequent minimum incremental bids at any time during the Auction. If the Stalking Horse Bidder submits an Overbid, it will receive a credit equal to the value of the Bid Protections granted to it when bidding during the Auction.

3.    *Highest or Best Offer*. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe in their reasonable business judgment to be the highest or otherwise best offer for the Assets (the "Leading Bid") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid. To the extent not previously provided (as determined by the Debtors), a Qualified Bidder submitting a subsequent bid must submit, as part of its subsequent bid, written evidence (in the form of financial disclosure or credit quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction at the Purchase Price contemplated by such subsequent bid.

4.    *Incremental Deposit*. Upon the declaration by a Qualified Bidder of its Bid at the Auction, it must commit on the record to pay promptly following the Auction, if such Bid were to be the Successful Bid or the Backup Bid, the incremental amount of its Deposit calculated based on the increased purchase price of such bid, if applicable (the "Incremental Deposit Amount").

5.    *Rejection of Bids*. The Debtors may, in their reasonable business judgment, at any time before entry of an order of the Court approving a Qualified Bid, reject any bid that the Debtors determine is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders. For the avoidance of doubt, the Debtors may not reject the Stalking Horse Bid on any such grounds.

6.    *No Late Bids*. The Debtors shall not consider any bids submitted after the conclusion of the Auction, and any and all such bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

7.    *No Round-Skipping*. Round-skipping, as described herein, is explicitly prohibited. To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid before the end of

such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Assets without the consent of the Debtors.

8.   ***Additional Information***.  The Debtors shall have the right to request any additional financial information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's (other than the Agent's) financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any bid made by a Qualified Bidder during the Auction.

9.   ***Modification of Procedures***.  The Debtors may, in consultation with the Agent if the Agent notifies the Debtors that it will not exercise its Credit Bid Right, (a) announce, at the Auction, modified or additional procedures for conducting the Auction, and (b) otherwise modify these Bidding Procedures; *provided that*, for the avoidance of doubt, the Debtors may not modify (i) the Bid Protections afforded to the Stalking Horse Bidder, unless the Stalking Horse Bidder agrees to such modification in writing in its sole discretion, or (ii) the rules, procedures, or deadlines set forth herein, or adopt new rules, procedures, or deadlines that would impair in any material respect the Stalking Horse Bidder's right to payment of the Break-Up Fee or the Expense Reimbursement or the Stalking Horse Bidder's right to receive a credit for its Bid Protections as set forth in paragraph B.2, immediately above without the express written consent of the Stalking Horse Bidder in its sole discretion.  All such modifications and additional rules will be communicated to each of the Acceptable Bidders and Qualified Bidders in advance to the extent reasonably practicable; <u>provided</u> that, to the extent such modifications occur at the Auction, disclosure of such modifications shall be limited to those in attendance at the Auction.

The Auction shall include open bidding in the presence of all other Qualified Bidders.  All Qualified Bidders shall have the right to submit additional bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their bids; <u>provided</u> that any Overbid made by a Qualified Bidder (including with respect to any Backup Bid (as defined below) must remain open and binding on the Qualified Bidder until the earlier of (a) the closing of a Sale for the Assets pursuant to the Successful Bid and (b) 90 days after the date of the Sale Hearing, unless otherwise decided.  The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.

**C.** **Adjournment of the Auction.**

The Debtors reserve the right, in their reasonable discretion (in consultation with the Agent (if the Agent has notified the Debtors that it will not exercise its Credit Bid Right) and the Stalking Horse Bidder), to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale at the prevailing bid amount.

**D.** **Successful Bidder.**

Immediately prior to the conclusion of the Auction, the Debtors shall (a) determine (in consultation with the Agent if the Agent has notified the Debtors that it will not exercise the Credit Bid Right) consistent with these Bidding Procedures, which Bid constitutes the highest or otherwise best Bid for the applicable Assets (each such Bid, a "Successful Bid"); and (b) notify all Qualified Bidders at the Auction for the applicable Assets of the identity of the bidder that submitted the Successful Bid (such bidder, the "Successful Bidder") and the amount of the purchase price and other material terms of the Successful Bid (the "Notice of Winning Bidder"). As a condition to remaining the Successful Bidder, any Successful Bidder (other than the Stalking Horse Bidder) shall be required to wire to the Debtors in immediately available funds the Incremental Deposit Amount, if applicable, calculated based on the purchase price of the Successful Bid, no later than one (1) Business Day following the date on which the Notice of Winning Bidder is served.

The Debtors shall file a notice identifying the Successful Bidder and Backup Bidder (if selected) as soon as reasonably practicable after closing the Auction, if any, and in any event not more than twenty-four (24) hours following closing the Auction.

**VIII.** **BACKUP BIDDER.**

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid as compared to the Successful Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated. For the avoidance of doubt, the Stalking Horse Bidder agrees to serve as a Backup Bidder and, in the event the Agent exercises the Credit Bid Right (consistent with Section III.C. above), the Agent shall agree to serve as a Backup Bidder. As a condition to remaining the Backup Bidder, any Backup Bidder (other than the Stalking Horse Bidder) shall wire to the Debtors, in immediately available funds, the incremental amount of its Deposit, if applicable, calculated based on the increased Purchase Price of the Backup Bid, no later than one (1) Business Day following the date on which the Notice of Winning Bidder is served.

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.

The Backup Bid(s) shall remain binding on the Backup Bidder until the earlier of (a) the closing of a Sale for the Assets pursuant to the Successful Bid and (b) 90 days after the date of the Sale Hearing, unless otherwise decided.  If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.

The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of a Backup Bidder without further order of the Court or notice to any party.

## IX.    ACCEPTANCE OF SUCCESSFUL BID.

The Debtors' presentation of a particular Qualified Bid to the Court for approval does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale Hearing (as defined below).  The Debtors shall seek approval by the Court to consummate a Backup Bid solely in the event the applicable Successful Bidder fails to close the transaction as provided in the Successful Bid and with all rights reserved against the Successful Bidder.

## X.    FREE AND CLEAR OF ANY AND ALL ENCUMBRANCES.

All rights, title, and interest in and to the Assets or any portion thereof shall be sold free and clear of all liens, claims, interests, and encumbrances (if any) (collectively, the "Encumbrances"), subject only to the Assumed Liabilities and Permitted Liens (each as defined in the Successful Bidder's purchase agreement), if any, in accordance with Bankruptcy Code section 363(f), with such Encumbrances to attach to the net proceeds (if any) received by the Debtors from the Sale of the Assets in accordance with the Bankruptcy Code, applicable non-bankruptcy law, and any prior orders of the Court.

## XI.    ASSUMPTION AND ASSIGNMENT PROCEDURES.

The procedures for assuming and assigning Assigned Contracts to the Successful Bidder are set forth in the Bidding Procedures Order.

## XII.    NOTICE PARTIES.

The term "Notice Parties" as used in these Bidding Procedures shall mean (i) the Prepetition CIT Secured Parties and their counsel; (ii) the Stalking Horse Bidder; (iii) the U.S. Trustee for the District of Delaware; and (iv) counsel to any official committee appointed in these Chapter 11 Cases.

## XIII.   CONSULTATION BY THE DEBTORS.

The Debtors shall consult with the Consultation Parties as explicitly provided for in these Bidding Procedures.  Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith.  The following parties will constitute the "<u>Consultation Parties</u>": (a) the Prepetition CIT Secured Parties and their counsel; and (b) counsel to any official committee appointed in these Chapter 11 Cases.  Notwithstanding anything to the contrary herein, during any period in which a Consultation Party has submitted a Qualified Bid and has become a Qualified Bidder hereunder, such Consultation Party shall no longer be considered a Consultation Party for purposes of these Bidding Procedures and shall only receive the same diligence, information, and notice as all other Qualified Bidders, unless and until such party unequivocally revokes its Bid and waives its right to continue in the Auction process.

## XIV.   RESERVATION OF RIGHTS.

**The Debtors reserve the right, in their reasonable business judgment (in consultation with the Agent), to modify these Bidding Procedures in good faith (*provided that*, for the avoidance of doubt, the Debtors may not modify (i) the Bid Protections afforded to the Stalking Horse Bidder, unless the Stalking Horse Bidder agrees to such modification in writing in its sole discretion, or (ii) the rules, procedures, or deadlines set forth herein, or adopt new rules, procedures, or deadlines that would impair in any material respect the Stalking Horse Bidder's right to payment of the Break-Up Fee or the Expense Reimbursement or the Stalking Horse Bidder's right to receive a credit for its Bid Protections as set forth in paragraph B.2, immediately above without the express written consent of the Stalking Horse Bidder in its sole discretion), to further the goal of attaining the highest or otherwise best offer for the Assets, or impose, at or prior to selection of the Successful Bidder(s), additional customary terms and conditions on the Sale of the Assets, including, without limitation: (a) extending the dates and deadlines set forth in these Bidding Procedures (including, but not limited to, those set forth in Section II hereof); (b) adjourning the Auction (if held) without further notice; (c) adding or modifying procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction, and/or adjourning the Sale Hearing (as defined below) in open court (if held); (d) cancelling the Auction or electing not to hold an Auction; (e) rejecting any or all Bids or Qualified Bids; (f) adjusting the applicable minimum Overbid increment; and (g) selecting a draft purchase agreement agreed to by a Qualified Bidder in connection with a Qualified Bid to serve as the purchase agreement that will be executed by the Successful Bidder or Successful Bidders, as applicable and with any necessary adjustments for the Assets and Liabilities being purchased and assumed, upon conclusion of the Auction, if held.  The Debtors shall provide reasonable notice of any such modification to all Qualified Bidders, including the Stalking Horse Bidder and the Agent.**

## XV.   CONSENT TO JURISDICTION.

All Potential Bidders, Acceptable Bidders, and Qualified Bidders (other than the Agent) shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right

to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XVI.   SALE HEARING.

A hearing to consider approval of the sale of the Debtors' Assets (or any portion thereof) to the Successful Bidder(s) or Backup Bidder(s) (if applicable) (the "Sale Hearing") is currently scheduled to take place on November  27, 2023, at 10:00 a.m., (prevailing Eastern Time), if no other Qualified Bids are received, or December 4, 2023 at 10:00 a.m. (prevailing Eastern Time), before the Honorable Mary F. Walrath, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom No. 4, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors (in consultation with the Agent) by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

At the Sale Hearing, the Successful Bidder and the Backup Bidder must acknowledge on the record at the start of the hearing that in connection with submitting their Bids, they did not engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale, specifying that they did not agree with any Potential Bidders, Acceptable Bidders, or Qualified Bidders to control the price or any other terms of the Sale.

Objections to (i) the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code to the Successful Bidder(s) and/or Backup Bidder(s), as applicable, (ii) any of the relief requested in the Motion, and (iii) entry of any order approving the sale (the "Sale Order"), must (w) be in writing and specify the nature of such objection; (x) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all orders of the Court; (y) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (z) be filed with the Court and served on the Objection Notice Parties (as such term is defined in the Bidding Procedures Order) so as to be actually received no later 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) days after service of the Sale Notice and Assumption and Assignment Notice.

## XVIII.  FIDUCIARY OUT.

Nothing in these Bidding Procedures will require the board of directors, board of managers, or such similar governing body of a Debtor or any non-Debtor affiliate to take any action, or to refrain from taking any action (including, but not limited to, with respect to the Bidding Procedures or the Sale), to the extent such board of directors, board of managers, or such similar governing body determines in good faith that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

**XVIII. RETURN OF DEPOSIT.**

The Deposit of each Successful Bidder shall be applied to the purchase price of the applicable transaction(s) at closing.  The Deposits for each Qualified Bidder (other than the Stalking Horse Bidder) shall be held in one or more escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned on or before the date that is five (5) Business Days after the Auction (other than with respect to the Successful Bidder and the Backup Bidder).  The Stalking Horse Bidder's Deposit shall be held and returned in accordance with the terms of the Stalking Horse APA.  Any Backup Bidder's Deposit shall be held in escrow until the closing of the Sale with the Successful Bidder.  In the event the applicable Successful Bidder fails to close and the Debtors opt to close on the Sale set forth in the applicable Backup Bid, the Backup Bidder's Deposit shall be applied to the purchase price of such transaction at closing.  In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Backup Bidder, as applicable, the defaulting Successful Bidder's Deposit or Backup Bidder's Deposit, as applicable, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder or Backup Bidder, as applicable, subject to the terms of the Stalking Horse APA, the Successful Bidder's purchase agreement, or the Backup Bidder's purchase agreement, as applicable.

\*       \*       \*       \*

## EXHIBIT 2

**Sale Hearing Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| UNCONDITIONAL LOVE INC., *et al.*,[1] | Case No. 23-11759 (MFW) |
| Debtors. | (Jointly Administered) |

## NOTICE OF PROPOSED SALE OF ASSETS,
## BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on October 23, 2023 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are seeking to sell (the "Sale") all or substantially all of their assets (the "Assets"), free and clear of all liens, claims, interests, and encumbrances, except as may be provided in any applicable Sale Order.[2]

**PLEASE TAKE FURTHER NOTICE** that, by order dated [●], 2023 [Docket No. ●] (the "Bidding Procedures Order"), the Bankruptcy Court approved certain relief requested in the related motion [Docket No. ●] (the "Bidding Procedures Motion") and certain "Bidding Procedures" that govern the Sale. All interested parties should carefully read the Bidding Procedures Order and the Bidding Procedures. Copies of the Bidding Procedures Motion, the Bidding Procedures Order, and the Bidding Procedures (which are attached to the Bidding Procedures Order as Exhibit 1) are available upon request to the Debtors' claims and noticing agent, Stretto, Inc., via telephone at (855) 316-4223 or via email at TeamHelloBello@stretto.com, and are available for download at https://cases.stretto.com/hellobello. A separate notice will be provided to counterparties to executory contracts and unexpired leases with the Debtors that may be assumed and assigned in connection with the Sale. **Any interested bidder should contact [Rob White (rwhite@jefferies.com) and Nicholas Barnes (nbarnes@jefferies.com)] at Jefferies LLC, the Debtors' investment banking advisor**.

- The deadline for the submission of Qualified Bids is **November 22, 2023 at 5:00 p.m. (ET)**.

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, are Unconditional Love Inc. d/b/a Hello Bello (5895), Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc. (9369). The Debtors' headquarters is located at 17383 Sunset Blvd, Suite B200, Pacific Palisades, CA 90272.

[2]  Capitalized terms used but not defined herein shall have the meanings given to them in the Bidding Procedures Order (as defined below).

- Any objections to the Sale or the relief requested in connection with the Sale (a "Sale Objection"), other than a Cure Objection, which shall be governed by the Assumption Procedures, must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801 **on or before 4:00 p.m. (ET) on [●], 2023** (the "Sale Objection Deadline"), and proof of service of such Sale Objection upon the Objection Notice Parties (as defined below) shall be filed with the Court as and when required by the Local Rules; and (e) be served upon the Objection Notice Parties.  The "Objection Notice Parties" are as follows: (i) proposed counsel to the Debtors, (a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Debra M. Sinclair, Esq. (dsinclair@willkie.com) and Erin C. Ryan, Esq. (eryan@willkie.com), and (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Attn:  Edmon L. Morton, Esq. (emorton@ycst.com), Matthew B. Lunn, Esq. (mlunn@ycst.com), and Heather P. Smillie (hsmillie@ycst.com); (ii) counsel to any Stalking Horse Bidder; (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Room 2207, Wilmington, DE 19801, Attn: Richard L. Schepacarter, Esq. (Richard.Schepacarter@usdoj.gov); and (iv) counsel to any official committee appointed in these Chapter 11 Cases.

- Any counterparty that wishes to obtain adequate assurance information regarding bidders that will or may participate at the Auction (defined below) must notify the proposed counsel to the Debtors in writing, (a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Debra M. Sinclair, Esq. (dsinclair@willkie.com) and Erin C. Ryan, Esq. (eryan@willkie.com), and (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Attn:  Edmon L. Morton, Esq. (emorton@ycst.com), Matthew B. Lunn, Esq. (mlunn@ycst.com), and Heather P. Smillie (hsmillie@ycst.com) (the "Request for Adequate Assurance").  The Request for Adequate Assurance must include an e-mail or address to which a response to such information request can be sent.

- An auction for the Assets, unless cancelled or adjourned in accordance with the Bidding Procedures Order, will be held on **November 27, 2023 at 10:00 a.m. (ET)** (the "Auction"), at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, or such later date, time and location as designated by the Debtors, after providing notice to the Notice Parties. In the event that the Auction cannot be held at a physical location, the Auction will be conducted via a virtual meeting.

- If the Auction is held, the Debtors shall file a reply to any Sale Objections and/or Cure Objections by November 28, 2023 at 4:00 p.m. (ET), and the Sale Hearing shall take place on December 4, 2023 at 10:00 a.m. (ET) subject to availability of the Court.

**PLEASE TAKE FURTHER NOTICE THAT IF A SALE OBJECTION IS NOT FILED AND SERVED ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO THE SALE AND BEING HEARD**

**AT THE SALE HEARING, AND THE BANKRUPTCY COURT MAY ENTER THE SALE ORDER WITHOUT FURTHER NOTICE TO SUCH PARTY.**

[*Remainder of Page Intentionally Left Blank*]

Dated: October [●], 2023
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ DRAFT*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Heather P. Smillie (Del. No. 6923)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
hsmillie@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Brian S. Lennon (*pro hac vice* pending)
Debra M. Sinclair (*pro hac vice* pending)
Erin C. Ryan (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
blennon@willkie.com
dsinclair@willkie.com
eryan@willkie.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **EXHIBIT 3**

**Assumption and Assignment Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| UNCONDITIONAL LOVE INC., *et al.*,[1] | Case No. 23-11759 (MFW) |
| Debtors. | (Jointly Administered) |

**NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT
AND CURE AMOUNTS WITH RESPECT TO EXECUTORY
CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS**

**PLEASE TAKE NOTICE THAT:**

The above-captioned debtors and debtors-in-possession (the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on October 23, 2023, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are seeking to assume and assign certain of their executory contracts and unexpired leases (the "Contracts") in connection with the sale (the "Sale") of all or substantially all of their assets (the "Assets"), free and clear of all liens, claims, interests, and encumbrances, except as may be provided in any applicable Sale Order.[2]

By order dated [●], 2023 [Docket No. ●] (the "Bidding Procedures Order"), the Bankruptcy Court approved certain relief requested in the related motion [Docket No. ●] (the "Bidding Procedures Motion"), certain "Assumption Procedures" that govern the Debtors' assumption and assignment of their executory contracts and unexpired leases in connection with the Sale, and certain "Bidding Procedures" that govern the sale of the Assets to the highest or otherwise best bidders. Copies of the Bidding Procedures Motion, the Bidding Procedures Order, and the Bidding Procedures are available for download at https://cases.stretto.com/hellobello (the "Case Website") or from the Debtors' claims and noticing agent, Stretto, Inc., via telephone at (855) 316-4223 or via email at TeamHelloBello@stretto.com.

**You are receiving this Notice because you may be a party to an unexpired lease or an executory contract that *may* be assumed and assigned (collectively, the "Contracts") in connection with such Sale. A list of the Contracts is attached hereto as Exhibit A.**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, are Unconditional Love Inc. d/b/a Hello Bello (5895), Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc. (9369). The Debtors' headquarters is located at 17383 Sunset Blvd, Suite B200, Pacific Palisades, CA 90272.

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the Bidding Procedures Order (as defined below).

The Debtors have determined the cure amounts owing (the "Cure Amounts") under each Contract, and have listed the applicable Cure Amounts on Exhibit A attached hereto. The Cure Amounts are the only amounts proposed to be paid upon any assumption and assignment of the Contracts, in full satisfaction of all amounts outstanding under the Contracts.

**To the extent that a counterparty to a Contract objects to (i) the assumption and assignment of such party's Contract, (ii) the applicable Cure Amount, or (iii) the provision of adequate assurance of future performance, the counterparty must file and serve an objection (a "Cure Objection"). Any Cure Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801 on or before 4:00 p.m. (ET) on [●], 2023 (the "Cure Objection Deadline"), and proof of service of such Cure Objection upon the Objection Notice Parties (as defined below) shall be filed with the Court as and when required by the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.**

**\*Any objections to adequate assurance of future performance by a Successful Bidder (as defined in the Bidding Procedures Order) that is not the Stalking Horse Bidder shall be filed not later than November 28, 2023 at 4:00 p.m. (ET).\***

The "Objection Notice Parties" are as follows: (i) proposed counsel to the Debtors, (a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Debra M. Sinclair, Esq. (dsinclair@willkie.com) and Erin C. Ryan, Esq. (eryan@willkie.com), and (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Attn: Edmon L. Morton, Esq. (emorton@ycst.com), Matthew B. Lunn, Esq. (mlunn@ycst.com), and Heather P. Smillie (hsmillie@ycst.com); (ii) counsel to any Stalking Horse Bidder; (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Room 2207, Wilmington, DE 19801, Attn: Richard L. Schepacarter, Esq. (Richard.Schepacarter@usdoj.gov); and (iv) counsel to any official committee appointed in these Chapter 11 Cases.

**If no Cure Objection is timely received with respect to an Assigned Contract (as defined below): (i) the counterparty to such Assigned Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder, of the Assigned Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Assigned Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Assigned Contract shall be controlling, notwithstanding anything to the contrary in such Assigned Contract, or any other related document, and the counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Assigned Contract against the**

Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

If no timely objection is received as to adequate assurance of future performance with respect to a Contract, the non-Debtor party to such Contract shall be deemed to have consented to the assumption, assignment, and/or transfer of the applicable Contract to the proposed assignee, and shall be forever barred and estopped from asserting or claiming that any conditions to such assumption, assignment, and/or transfer must be satisfied under such applicable Contract or that any related right or benefit under such applicable Contract cannot or will not be available to the proposed assignee.

Subject to the terms of the Bidding Procedures Order, an auction (the "Auction") for the Assets, including the Contracts, will be conducted on **November 27, 2023 at 10:00 a.m. (ET)** (the "Auction"), (i) via a virtual meeting, (ii) at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, or (iii) such later date, time, and location as designated by the Debtors, after providing notice to the Notice Parties (as defined in the Bidding Procedures Order). After the Auction, the Debtors will file and serve a notice that identifies the Successful Bidder for the Assets, including any Contracts.

The Debtors will seek to assume and assign the Contracts that have been selected by the Successful Bidder (which, for the avoidance of doubt, may be the Stalking Horse Bidder) (collectively, the "Assigned Contracts") at a hearing before the Honorable Mary F. Walrath, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, DE 19801, Fifth (5th) Floor, Courtroom #4, (a "Sale Hearing") on [●], 2023 at [●] (ET), or such other date as determined by the Debtors, in consultation with the Successful Bidder, in accordance with the terms of the Bidding Procedures Order. To the extent that the parties are unable to consensually resolve any Cure Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the Cure Amount (any such dispute, a "Cure Dispute"), such Cure Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court; *provided, however*, that if the Cure Objection relates solely to a Cure Dispute, the Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder, *provided* that the cure amount that the counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the counterparty) is deposited in a segregated account by the Debtors or the Successful Bidder, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

Dated: October [●], 2023
       Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ DRAFT*_____
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Heather P. Smillie (Del. No. 6923)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
hsmillie@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Brian S. Lennon (*pro hac vice* pending)
Debra M. Sinclair (*pro hac vice* pending)
Erin C. Ryan (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
blennon@willkie.com
dsinclair@willkie.com
eryan@willkie.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

# **EXHIBIT 4**

**Stalking Horse APA**

*Execution Version*
*Strictly Confidential*

---

ASSET PURCHASE AGREEMENT

by and among

UNCONDITIONAL LOVE INC.,

and

THE BEST TRAINING PANTS IN THE WORLD INC.

as Sellers,

and

BUCKY ACQUISITION HOLDCO, LLC

as Buyer

and,

solely with respect to its role as Good Faith Deposit Escrow Holder and Article VIII,

Lowenstein Sandler LLP

as Good Faith Deposit Escrow Holder

Dated as of October 23, 2023

---

**TABLE OF CONTENTS**

**PAGES**

ARTICLE I PURCHASE AND SALE                                                                                     1

1.1    Purchased Assets                                                                                          1

1.2    Excluded Assets                                                                                           4

1.3    Assumed Liabilities                                                                                       5

1.4    Excluded Liabilities                                                                                      5

1.5    Assignments; Cure Amounts                                                                                 7

1.6    Further Assurances                                                                                        8

1.7    Bulk Sales Laws                                                                                           9

ARTICLE II PURCHASE PRICE                                                                                        9

2.1    Purchase Price                                                                                            9

2.2    Closing Date Payment                                                                                     10

2.3    Allocation of Purchase Price                                                                            10

2.4    Closing Date                                                                                             10

2.5    Deliveries and Actions of Buyer                                                                         10

2.6    Deliveries and Actions of Sellers                                                                       11

2.7    Withholding Rights                                                                                       11

2.8    Good Faith Deposit                                                                                       12

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS                                                           12

3.1    Organization                                                                                             13

3.2    Corporate Authority Relative to this Agreement; Consents and Approvals; No Violation                    13

3.3    Financial Statements                                                                                     14

3.4    Compliance with Law; Permits                                                                             14

3.5    Environmental Matters                                                                                    15

3.6    Employee Benefit Plans                                                                                   15

3.7    Litigation                                                                                               16

3.8    Tax Matters                                                                                              16

3.9    Cares Act Matters                                                                                        18

3.10   Employment and Labor Matters                                                                             18

3.11   Real Property                                                                                            19

3.12   Intellectual Property                                                                                    19

3.13   Material Contracts                                                                                       21

3.14   Key Business Relationships                                                                               22

3.15   FDA and Healthcare Regulatory Matters                                                                    23

3.16   Insurance                                                                                                23

3.17    Finders or Brokers                                                                           24

3.18    Inventory                                                                                    24

3.19    Title to Assets; Sufficiency of Assets; Condition of Assets                                  24

3.20    Arrangements with Related Parties                                                            25

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER                                                  25

4.1    Organization.                                                                                 25

4.2    Corporate Authority Relative to this Agreement; Consents and Approvals; No Violation          25

4.3    Litigation                                                                                    26

4.4    Finders or Brokers                                                                            26

4.5    Solvency                                                                                      26

ARTICLE V COVENANTS AND AGREEMENTS                                                                  26

5.1    Conduct of Business                                                                           26

5.2    Access                                                                                        27

5.3    Employees and Employee Benefit Plans                                                          28

5.4    Efforts                                                                                       29

5.5    Adequate Assurances regarding the Buyer Assumed Agreements                                    29

5.6    Bankruptcy Court Approval; Alternative Transaction                                            29

5.7    Taxes                                                                                         30

5.8    R&W Policy                                                                                    30

5.9    Public Announcements                                                                          31

5.10    Consents; Notices                                                                            31

5.11    Cooperation with Financing                                                                   31

5.12    Restrictive Covenants                                                                        32

5.13    Acknowledgment by Buyer                                                                       32

5.14    Transaction Support Agreements                                                               33

5.15    Equipment Lessor Amendments                                                                  33

5.16    New CIT Facility                                                                             33

5.17    Equity Capitalization                                                                        33

ARTICLE VI CONDITIONS TO THE PURCHASE AND SALE                                                      33

6.1    Conditions to Each Party's Obligation to Close                                                33

6.2    Conditions to Obligation of Sellers to Close                                                  34

6.3    Conditions to Obligation of Buyer to Close                                                    34

ARTICLE VII TERMINATION                                                                             35

7.1    Termination                                                                                   35

7.2    Effect of Termination                                                                         37

7.3    Break-Up Fee; Expense Reimbursement                                                           37

7.4     Good Faith Deposit                                          37

ARTICLE VIII MISCELLANEOUS                                          37

8.1     No Survival                                                 37

8.2     Expenses                                                    38

8.3     Counterparts; Effectiveness                                 38

8.4     Governing Law; Jurisdiction                                 38

8.5     Remedies                                                    38

8.6     WAIVER OF JURY TRIAL                                        39

8.7     Notices                                                     39

8.8     Assignment; Binding Effect                                  40

8.9     Severability                                                41

8.10    Entire Agreement                                            41

8.11    Amendments; Waivers                                         41

8.12    Construction                                                41

8.13    No Third-Party Beneficiaries                                41

8.14    Interpretation                                              41

8.15    Definitions                                                 42

8.16    Disclosure Schedule                                         51

8.17    Good Faith Deposit Escrow Holder                            52

8.18    No Right of Set-Off                                         53

8.19    Fiduciary Obligations                                       53

## **SCHEDULES**

Schedule 1.1(b)      Assumed Contracts
Schedule 1.1(c)      Assumed Real Property Leases
Schedule 1.1(j)      Assumed Equipment Leases

Disclosure Schedule

## **EXHIBITS**

EXHIBIT A:    Form of Assignment and Assumption Agreement
EXHIBIT B:    Form of Bidding Procedures
EXHIBIT C:    Form of Bidding Procedures Order
EXHIBIT D:    Form of Bill of Sale
EXHIBIT E:    [Intentionally Omitted]
EXHIBIT F:    New CIT Facility Term Sheet
EXHIBIT G:    NFS Amendment Term Sheet
EXHIBIT H:    36th Amendment Term Sheet
EXHIBIT I:    Form of Intellectual Assignment Agreement
EXHIBIT J:    Form of VMG Agreement

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of October 23, 2023 (the "Agreement Date"), is by and among Unconditional Love Inc., a Delaware corporation ("Parent"), The Best Training Pants in the World Inc., a Delaware corporation ("BTPW" and together with Parent, "Sellers" and each a "Seller"), Bucky Acquisition Holdco, LLC, a Delaware limited liability company ("Buyer"), and solely with respect to its role as Good Faith Deposit Escrow Holder and Article VIII, Lowenstein Sandler LLP, counsel to Buyer (the "Good Faith Deposit Escrow Holder").  Capitalized terms used in this Agreement and not otherwise defined above or in the text below have the meanings given to them in Section 8.15.

**WHEREAS**, Sellers are engaged in the business of developing, researching, marketing, selling, distributing, and otherwise commercializing affordable premium baby products, including, for the avoidance of doubt, under the Brand Names (collectively, the "Business");

**WHEREAS**, Sellers intend to file voluntary petitions for relief commencing cases (collectively, the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), on or about October 23, 2023 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, Sellers desire to sell to Buyer all of the Purchased Assets, subject to the assumption by Buyer of the Assumed Liabilities (which Purchased Assets and Assumed Liabilities generally comprise the Business), and Buyer desires to purchase from Sellers the Purchased Assets and assume the Assumed Liabilities, in each case, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Parties intend to effectuate the transactions contemplated hereby, including the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (collectively, the "Asset Purchase"), pursuant to Sections 363 and 365 of the Bankruptcy Code;

**WHEREAS**, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions contemplated hereby are subject, among other things, to the Bidding Procedures, consideration of Alternative Bids (if any), and the entry of the Sale Order pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code;

**WHEREAS**, the Parties desire to consummate the transactions contemplated hereby as promptly as practicable after the Bankruptcy Court enters the Sale Order; and

**WHEREAS**, the Parties desire to make certain representations, warranties, covenants and agreements specified herein.

**NOW**, **THEREFORE**, in consideration of the foregoing and the representations, warranties, covenants and agreements contained herein, and intending to be legally bound hereby, Buyer, Sellers and the Good Faith Deposit Escrow Holder hereby agree as follows:

# ARTICLE I
# PURCHASE AND SALE

1.1     Purchased Assets.  On the terms and subject to the conditions set forth in this Agreement (including entry of the Sale Order and such order not being subject to any stay and remaining in effect), at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase, acquire and accept free and clear of all Liabilities and Liens (other than Liens created by Buyer and

Permitted Liens, if any), the right, title and interest of Sellers in, to and under all of the properties and assets of Sellers used in the Business (other than the Excluded Assets), including, for the avoidance of doubt, the following (herein collectively called the "Purchased Assets"):

(a)     the Accounts Receivable of Sellers outstanding as of the Closing;

(b)     to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, the Contracts listed or described on Schedule 1.1(b) as of the Assumption Deadline, as may be amended by Buyer from time to time as provided herein (the "Assumed Contracts"), and the purchase orders listed or described on Schedule 1.1(b) as of the Assumption Deadline, as may be amended by Buyer from time to time as provided herein (the "Assumed Purchase Orders");

(c)     to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, the Real Property Leases of Sellers, and rights thereunder, listed or described on Schedule 1.1(c), as may be amended by Buyer from time to time as provided herein (the "Assumed Real Property Leases");

(d)     all rights (including goodwill, if any) in and to each product of the Business (the "Products") and all Product registrations and related registration information (including applications that are in the process of being prepared by a Seller for Product registrations);

(e)     all machinery, production equipment, forklifts, furniture, fixtures, structures, improvements, office furnishings, apparatuses, appliances, implements, telephone systems, signage, spare parts, leasehold improvements, tools and dies, molds and parts, capital spares, vehicles, computer hardware and software, and other tangible personal property of every kind and description (including communications equipment, information technology assets, and any attached and associated hardware, routers, devises, panels, cables, manuals, cords, connectors, cards, and vendor documents), and in each case including all warranties, guarantees, claims against third parties in connection with the Assumed Contracts and similar rights to the extent assignable or transferable under applicable Law, owned by each Seller as of the Closing that are located on or at the Acquired Real Property;

(f)     to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code and applicable Law, all Permits and pending applications therefor;

(g)     to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, all Intellectual Property that is owned or licensed by each Seller and held for, or used in, the Business and existing as of the Closing;

(h)     all Books and Records, except (i) those relating solely to any Excluded Asset, Excluded Liability or Unconditional Canada, (ii) those relating solely to employees of a Seller or Unconditional Canada who are not Transferred Employees; or (iii) those which a Seller is required by Law to retain, including all Tax Returns and related workpapers, financial statements and accounting Books and Records, Organizational Documents of the Sellers and corporate or other entity filings (but copies of such Books and Records shall be retained by Sellers and made available to Buyer upon Buyer's reasonable request and at Buyer's expense);

(i)     all telephone and facsimile numbers, email and web addresses, social media accounts and other directory listings used in connection with the Business, to the extent assignable;

(j)     the equipment leases listed or described on Schedule 1.1(j), as may be amended from time to time by Buyer as provided herein (the "Assumed Equipment Leases" and together with the

Assumed Contracts, Assumed Purchase Orders, and Assumed Real Property Leases, the "Buyer Assumed Agreements");

(k)    all rights, claims, credits, refunds, causes of action, choses in action, rights of recovery and rights of setoff (including preference or avoidance claims and causes of action arising under Chapter 5 of the Bankruptcy Code and similar state Law) of each Seller against third parties arising out of, or related to, the Purchased Assets, including any rights in connection with product returns, rebates, credits and related claims and any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to each Seller related to the Purchased Assets;

(l)    all rights of each Seller under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements with the Transferred Employees or any employees of each Seller terminated within two (2) years prior to the Closing Date, or with any agents of each Seller or with third parties, in each case, related to the Business, except (i) to the extent they are solely related to any Excluded Assets or Excluded Liabilities, and (ii) those relating solely to employees of a Seller who are not Transferred Employees;

(m)    all Purchased Deposits;

(n)    all Inventory held by each Seller as of the Closing, but excluding any hand sanitizer Inventory;

(o)    all Prepaid Assets, provided that Schedule 3.3(c) shall be updated prior to the Closing to reflect additional cash deposits, advance payments and other prepaid items of the types specified in the definition of Prepaid Assets and arising in the Ordinary Course after the date hereof so long as such cash deposit, advance payment or other prepaid item is (i) of a type consistent with the Prepaid Assets set forth on Schedule 3.3(c) as of the date hereof and (ii) incurred on commercially reasonable terms and included (either initially or by way of modification as additional items to be included arise pursuant to this Section 1.1(o)) on Schedule 3.3(c) in good faith;

(p)    all rights under insurance policies of each Seller to the extent relating to any Purchased Asset or Assumed Liability;

(q)    all goodwill as of the Closing Date that is associated with the Business and not expressly referenced in Sections 1.1(a) through 1.1(p); and

(r)    all avoidance actions (including any proceeds thereof), including all claims and causes of action arising under Sections 544 through 553 of the Bankruptcy Code or any analogous state law, but only to the extent such actions are against the following parties (collectively, the "Designated Parties"): (i) any of the Sellers' vendors, suppliers, customers, or trade creditors in regards or related to the Purchased Assets or the Assumed Liabilities and (ii) any counterparties to any Buyer Assumed Agreement (collectively, the "Purchased Avoidance Actions").

Buyer shall have the right at any time prior to the Sale Hearing in accordance with the Bidding Procedures and Bidding Procedures Order to amend Schedule 1.1(b), Schedule 1.1(c) and Schedule 1.1(j) so as to exclude any Contract from being a Buyer Assumed Agreement. Schedules of Contracts that may be designated as a Buyer Assumed Agreement, and any Cure Costs relating thereto, shall be filed by Sellers with the Bankruptcy Court and served on the counterparties thereto in accordance with the Bidding Procedures Order, and the deadline for counterparties to object to Sellers' asserted Cure Cost amounts shall be as set forth in the Bidding Procedures Order. Notwithstanding anything to the contrary,

in connection with any change to Schedule 1.1(b), Schedule 1.1(c) or Schedule 1.1(j) described in the preceding sentence, (i) any Purchased Asset attendant to any Contract that is excluded shall become an Excluded Asset to the extent applicable in accordance with Section 1.2, (ii) Sellers shall be permitted to update the Disclosure Schedule as necessary to correct or complete any such disclosure contained therein, (iii) Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to remove any Contract listed on Schedule 1.1(b), Schedule 1.1(c) or Schedule 1.1(j), and (iv) the Cure Cost shall be adjusted, as applicable.

      1.2    Excluded Assets.  Notwithstanding the provisions of Section 1.1, nothing in this Agreement shall be deemed to sell, transfer, assign or convey to Buyer the Excluded Assets. Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  For all purposes of and under this Agreement, the term "Excluded Assets" shall mean the following assets of each Seller:

      (a)    all shares of capital stock or other equity interest of each Seller or Unconditional Canada or any securities convertible into, exchangeable, or exercisable for shares of capital stock or other equity interest of Sellers or Unconditional Canada;

      (b)    all cash and cash equivalents of Sellers;

      (c)    any Contracts other than Assumed Contracts;

      (d)    any leases for Leased Real Property, and rights thereunder, that are not Assumed Real Property Leases (the "Excluded Real Property Leases");

      (e)    any equipment leases other than Assumed Equipment Leases or the Equipment Lessor Amendments (the "Excluded Equipment Leases");

      (f)    all minute books, stock ledgers, corporate seals and stock certificates of each Seller and other Books and Records (1) to the extent they are solely related to any Excluded Assets, Excluded Liabilities or Unconditional Canada, (2) relating solely to employees of a Seller who are not Transferred Employees;  or (3) which a Seller is required by Law to retain, including all Tax Returns and related workpapers, financial statements and accounting Books and Records, Organizational Documents of the Sellers and corporate or other entity filings (but copies of such Books and Records shall be retained by Sellers and made available to Buyer upon Buyer's reasonable request and at Buyer's expense); provided, however, that Sellers may retain copies of any Books and Records included in the Purchased Assets that are related to any Excluded Assets, Excluded Liabilities or Unconditional Canada;

      (g)    all Seller Benefit Plans, and trusts or other assets attributable thereto, including any assets, reserves, credits and service agreements, and all documents created, filed or maintained in connection with such Seller Benefit Plans and any applicable insurance policies related to such Seller Benefit Plans;

      (h)    any rights, claims or causes of action arising under this Agreement or the Ancillary Documents;

      (i)    all receivables, claims or causes of action related solely to any Excluded Asset or Excluded Liability, including any such item to the extent arising under any guarantee, warranty, indemnity or similar right in favor of a Seller in respect of an Excluded Asset or Excluded Liability;

      (j)    all refunds, credits and rebates of Taxes attributable to taxable periods (or portions thereof) ending on or before the Closing Date;

(k)　　　all rights under insurance policies relating to claims for losses pending as of the Closing except to the extent such losses are an Assumed Liability;

(l)　　　all post-petition adequate assurance deposits provided to utilities and any deposits provided to suppliers or service providers to a Seller on a prepetition or post-petition basis;

(m)　　　all derivative financial instruments, including future foreign currency contracts;

(n)　　　all rights, claims, credits, refunds, causes of action, choses in action, rights of recovery and rights of setoff (including but not limited to preference or avoidance claims and causes of action arising under Chapter 5 of the Bankruptcy Code and similar state law) of each Seller (i) against any Seller or Affiliate thereof or any past, present or future director, officer, employee, equityholder or agent of any Seller, (ii) against any Person with respect to any other Excluded Assets, any Excluded Liabilities or Unconditional Canada, and (iii) against CIT Northbridge Credit LLC or any Affiliate thereof;

(o)　　　all deposits and prepaid charges and expenses of, and advance payments made by, a Seller, in each case, other than Purchased Deposits;

(p)　　　(i) all attorney-client work product and other legal privilege of each Seller, (ii) all records and reports prepared or received by Sellers or any of their Affiliates in connection with the sale of the Purchased Assets or any portion thereof, the Bankruptcy Case and the transactions contemplated hereby, and (iii) all confidentiality agreements with prospective purchasers of the Business or the Purchased Assets or any portion thereof, and all bids and expressions of interest received from third parties with respect thereto;

(q)　　　any hand sanitizer Inventory; and

(r)　　　all avoidance actions (including any proceeds thereof), including all claims or causes of action arising under Sections 544 through 553 of the Bankruptcy Code or any analogous state law, other than the Purchased Avoidance Actions.

For the avoidance of doubt, no goodwill or other intangible assets not expressly set forth in this <u>Section 1.2</u> shall constitute "Excluded Assets."

　　　1.3　　　<u>Assumed Liabilities</u>. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall assume only the following Liabilities (without duplication) (collectively the "<u>Assumed Liabilities</u>") and no other Liabilities:

(a)　　　any and all Liabilities of each Seller arising under the Buyer Assumed Agreements and the Assumed Purchase Orders in each case solely to the extent arising from performance that first comes due after the Closing (<u>provided</u>, <u>however</u>, notwithstanding anything to the contrary herein or otherwise, the Assumed Liabilities shall not include any Liability arising out of or relating to a breach (including the occurrence of any event that with the passing of time or the giving of notice would constitute a breach) that occurred or arises from or relates to an event prior to the Closing);

(b)　　　the Cure Costs; and

(c)　　　any Transfer Taxes.

　　　1.4　　　<u>Excluded Liabilities</u>. Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of any Seller, and each Seller shall be solely and exclusively liable with respect to

all Liabilities of such Seller, other than the Assumed Liabilities (collectively, the "Excluded Liabilities"). For the avoidance of doubt, the Excluded Liabilities with respect to each Seller include (i) any claims under Sections 503 and 507 of the Bankruptcy Code and (ii) the following:

(a)     any Liability of such Seller, arising out of, or relating to, this Agreement or the transactions contemplated hereby, whether incurred prior to, at or subsequent to the Closing, including all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of such Seller;

(b)     any Liability incurred by any Sellers' respective directors, officers, managers, stockholders, members, partners, agents or employees (acting in such capacities);

(c)     any Liability of such Seller relating to infringement, dilution, misappropriation, or other violation of Intellectual Property rights;

(d)     all trade accounts payable by any Seller to the extent in respect of periods prior to Closing;

(e)     any Liability of such Seller relating to alleged or actual hazard or defect in design, manufacture, materials, or workmanship based on any theory, including negligence, strict products liability, and any failure to warn or disclose or alleged or actual breach of express or implied warranty or representation, in each case, in respect of periods prior to Closing;

(f)     any Liability of such Seller relating to warranty obligations in respect of periods prior to Closing;

(g)     any Liability relating to human exposure to Regulated Substances in respect of periods prior to Closing;

(h)     any Liability of such Seller relating to the return after the Closing of any Product sold prior to the Closing;

(i)     any Liability to the extent arising out of or relating to any Seller at any time being the occupant of, or the operator of activities conducted at, the Acquired Real Property, prior to Closing;

(j)     any Liability of such Seller to any Person on account of any Proceeding to the extent relating to facts, circumstances or events that existed or occurred before the Closing;

(k)     any Liability to the extent relating to, resulting from, or arising out of the ownership or operation of an Excluded Asset;

(l)     any Liability arising out of or incurred as a result of any actual or alleged violation by any Seller of any Law prior to the Closing, or related to the Business that arises under or relates to a violation of Environmental Laws;

(m)     all checks and drafts that have been written or submitted by such Seller prior to the close of business on the Closing Date but have not yet cleared;

(n)     any Liability of the Business for: (i) deferred income (including any profit sharing arrangements); (ii) accrued payroll (including, for the avoidance of any doubt, both the employee

and employer portions of accrued payroll Taxes, Assumed Plan contributions and premium payments and unemployment contributions); (iii) accrued (to the extent not paid by Sellers) and unused vacation and paid time off ("PTO") to which the employees of the Business are entitled pursuant to the PTO policies of Sellers applicable to such employees immediately prior to the Closing Date; (iv) retention bonus and key employee incentive obligations, severance obligations, enhanced executive severance arrangements and change of control payments; (v) any liabilities in connection with product returns, rebates, credits and related claims and any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to each Seller; (vi) unearned revenue; and (vii) accrued and unpaid property, public utility commission and sales Taxes of Sellers attributable to periods (or portions thereof) ending on or before the Closing Date (as determined in accordance with the past practices of the relevant Seller and reduced (but not below zero) by refunds, credits or other receivables (including VAT receivable) in respect of such Taxes) and (viii) annual bonuses, annual cash incentives, short-term cash bonuses or commissions;

(o)    other than as explicitly included in Assumed Liabilities, any Liability of such Seller for any Indebtedness, including Indebtedness under the Credit Facility, any Indebtedness owed to any stockholder or other Affiliate of any such Seller, and any Contract evidencing any such financing arrangement;

(p)    all Liabilities under the WARN Act (if any);

(q)    all Liabilities or obligations arising out of or otherwise relating to the employment or service, of any person by any Seller or its Affiliates who does not become a Transferred Employee (whether arising prior to, on or after the Closing), and all Liabilities (other than any Assumed Liability) in respect of any Transferred Employee arising prior to the Closing;

(r)    all Seller Benefit Plans and any Liabilities or obligations under Seller Benefit Plans, including liabilities and obligations under COBRA or other similar state or local law;

(s)    any and all Liabilities for (i) Taxes of a Seller, whether arising prior to, on, or after the Closing Date and (ii) Taxes arising out of the conduct of the Business, ownership of the Purchased Assets or associated with the Transferred Employees, in each case, attributable to taxable periods (or portions thereof) ending on or prior to the Closing Date; and

(t)    other than as specifically set forth herein, fees or expenses of such Seller incurred with respect to the transactions contemplated by this Agreement.

For the avoidance of doubt, Buyer is not assuming hereunder and shall have no liability to any Person for any Income Taxes that are attributable to taxable periods (or portions thereof) ending on or prior to the Closing Date.

1.5    Assignments; Cure Amounts.

(a)    Notwithstanding anything to the contrary contained herein, Buyer reserves the right, in consultation with Sellers, to amend or supplement, at any time prior to the Sale Hearing (the "Assumption Deadline"), Schedule 1.1(b), Schedule 1.1(c) and Schedule 1.1(j) to add any Contract, so long as (i) any Contract so added is added to such schedule(s) prior to the entry of any Order of the Bankruptcy Court approving the rejection of such Contract; (ii) the Buyer provides the non-debtor counterparty to such Contract with information evidencing Buyer's adequate assurance of future performance of such Contract; and (iii) the non-Debtor counterparty to such Contract has an opportunity to object within the period of time set forth in the Bidding Procedures to the proposed assignment of such

Contract on any grounds, including that Buyer has not demonstrated adequate assurance of future performance of such Contract pursuant to Section 365 of the Bankruptcy Code. Any Contract so added to Schedule 1.1(b), Schedule 1.1(c) or Schedule 1.1(j) shall be deemed an Assumed Contract, Assumed Purchase Order, Assumed Real Property Lease or Assumed Equipment Lease, respectively. Each Seller shall transfer and assign all Buyer Assumed Agreements to which such Seller is a party to Buyer, and Buyer shall assume all Buyer Assumed Agreements from such Seller that is a party thereto, as of the Closing pursuant to Section 365 of the Bankruptcy Code and the Sale Order.

(b)    In connection with and as a prerequisite to such assignment and assumption, Buyer shall pay in full all costs (as determined by an order of the Bankruptcy Court) to cure all defaults under such Buyer Assumed Agreements to the extent required by Section 365(b) of the Bankruptcy Code (such amounts, the "Cure Costs") and Seller shall have no Liability therefor. For the avoidance of doubt, Buyer shall be fully responsible to pay the amount of Cure Costs for any Buyer Assumed Agreement as determined by the Bankruptcy Court or as otherwise agreed to between Buyer and the applicable counterparty.

(c)    The Sale Order shall provide that as of the Closing, each Seller shall assign to Buyer the Buyer Assumed Agreements to which it is a party, with the name and date of each Buyer Assumed Agreement, as well as its non-debtor counterparty and the address of such party for notice purposes, all included on one or more exhibit(s) attached to either the motion seeking approval of the Sale Order or one or more motion(s) or notice(s) regarding such Seller's intention to have such Buyer Assumed Agreement assumed by the Seller and assigned to the Buyer. Such exhibit(s) shall also set forth the Cure Costs (if any) necessary to cure any defaults under each Buyer Assumed Agreement.

(d)    In the case of licenses, certificates, approvals, authorizations, leases, Contracts and other commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, subject to any approval of the Bankruptcy Court that may be required and the terms set forth in Section 5.4, cooperate with Buyer in endeavoring to obtain such consent (or restructure the acquisition of the underlying asset and unwind any associated agreements to enable the acquisition thereof) and this Agreement shall not operate as an assignment thereof in violation of any such license, certificate, approval, authorization, Real Property Lease, Contract or other commitment.

1.6    Further Assurances.

(a)    At the Closing, and at all times thereafter as may be necessary, Sellers and Buyer shall execute and deliver such other instruments of transfer as shall be reasonably necessary to vest in Buyer title to the Purchased Assets free and clear of all Liens (other than Permitted Liens), and such other instruments as shall be reasonably necessary to evidence the assignment by Sellers and the assumption by Buyer of the Assumed Liabilities, including the Buyer Assumed Agreements. Each of Sellers, on the one hand, and Buyer, on the other hand, shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carry out the transactions contemplated by this Agreement. At the Closing, and at all times thereafter as may be necessary, Buyer shall cooperate with Sellers, to facilitate the procurement, possession and return to Sellers of any Excluded Assets, including any equipment subject to any lease which does not constitute an Assumed Equipment Lease.

(b)    At the Closing, and at all times thereafter as may be necessary, each Party shall, upon reasonable request, execute, deliver, and file, or cause to be executed, delivered, and filed, such other instruments of conveyance and transfer and take such other actions as may reasonably be requested, in order to more effectively consummate the transactions contemplated hereby and to vest in Buyer good and marketable title to the Intellectual Property included in the Purchased Assets, including executing,

filing, and recording, with all appropriate intellectual property registration authorities and other relevant entities, all assignment instruments and other filings that are necessary to correctly record the prior chain of title with respect to ownership of the Intellectual Property included in the Purchased Assets.

(c)     If, following the Closing, any Seller or any of their respective Affiliates receives or becomes aware that it holds any Liability, asset, property or right which constitutes an Assumed Liability or Purchased Asset (including if it receives any payment in respect of any services performed, or products shipped, by Buyer from and after the Closing), then such Seller shall, or cause the applicable Affiliate to, transfer such Liability, asset, property or right to Buyer (including the execution and delivery of all appropriate transfer documents) as promptly as practicable for no additional consideration.

(d)     If, following the Closing, Buyer receives or becomes aware that it holds any Liability, asset, property or right which constitutes an Excluded Liability or an Excluded Asset, then Buyer shall transfer such Liability, asset, property or right to Sellers (including the execution and delivery of all appropriate transfer documents) as promptly as practicable for no additional consideration.

1.7     Bulk Sales Laws.  Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any and all Liens and Liabilities in the Purchased Assets (other than Permitted Liens), including any Liens or claims arising out of any bulk- transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. The Sale Order shall provide either that (i) the party required by applicable law has complied with the requirements of any applicable laws relating to bulk sales or transfers or (ii) compliance with such applicable laws is not necessary or appropriate under the circumstances.

## ARTICLE II
## PURCHASE PRICE

2.1     Purchase Price.  The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be the sum of the following:

(a)     up to Thirty-Five Million Dollars ($35,000,000) as contemplated by the term sheet (the "New CIT Facility Term Sheet") annexed hereto as Exhibit F with respect to the New CIT Facility (as defined below); plus

(b)     Fifteen Million Eight Hundred Nine Thousand Two Hundred Twenty Dollars and Seven Cents ($15,809,220.07), minus the value of all postpetition ordinary course monthly lease payments paid to NFS and 36th prior to the Closing (which shall be paid by Sellers when due), to be paid in accordance with the NFS Amendment Term Sheet and the 36th Amendment Term Sheet; plus

(c)     Fifteen Million Dollars ($15,000,000) in cash which, for the avoidance of doubt, includes the amount of the Good Faith Deposit; plus

(d)     the assumption by Buyer of the Assumed Liabilities.

Notwithstanding the foregoing, the portion of the Purchase Price set forth in Section 2.1(c) shall be reduced on a dollar-for-dollar basis to the extent the fees (including any success or transaction fees) approved by the Bankruptcy Court for Jefferies LLC and its Affiliates are less than three million dollars ($3,000,000).

2.2     <u>Closing Date Payment</u>.  At the Closing, Buyer shall satisfy the Purchase Price as follows:

(a)     The Good Faith Deposit Escrow Holder shall deliver the Good Faith Deposit (and any interest or income accrued thereon), via wire transfer of immediately available funds into the account(s) designated in writing by Parent;

(b)     Buyer shall satisfy the Purchase Price, via (i) release of the Good Faith Deposit, and (ii) wire transfer of immediately available funds of the remaining cash balance of the Purchase Price under <u>Section 2.1(a)</u> and <u>Section 2.1(c)</u> into the account(s) designated in writing by Parent;

(c)     Buyer shall be funded with the Equity Capitalization Amount; and

(d)     Buyer shall assume the Assumed Liabilities; <u>provided</u>, <u>however</u>, that to the extent any such Assumed Liabilities are able to be satisfied at Closing, without preventing the transfer of the Purchased Assets or the assumption of the Assumed Liabilities, Buyer shall satisfy such Assumed Liabilities either at Closing or, in Buyer's sole discretion, in the Ordinary Course.

2.3     <u>Allocation of Purchase Price</u>.  Buyer and Sellers agree that the Purchase Price (and all other capitalized costs), as determined for U.S. federal income Tax purposes, shall be allocated in accordance with Section 1060 of the IRC and the Treasury Regulations promulgated thereunder in accordance with a schedule, among the Purchased Assets (the "Allocation Schedule"). The Allocation Schedule will be prepared in accordance with the applicable provisions of the Code or any other provision of applicable Law. Within sixty (60) days of the Closing, Buyer shall deliver to Parent a draft of the Allocation Schedule. If, within thirty (30) days of Sellers' receipt of Buyer's proposed allocation, Sellers do not deliver Buyer written notice (a "<u>Seller Allocation Objection Notice</u>") of any objections that they have to such allocation, Buyer's proposed allocation shall be the Allocation Schedule. If Sellers timely deliver to Buyer a Seller Allocation Objection Notice, then Buyer and Sellers shall work together in good faith to resolve the disputed items. The parties hereto agree for all Tax reporting purposes to report the transactions contemplated by this Agreement in accordance with the Allocation Schedule (as finally agreed), and to not take any position during the course of any audit or other Proceeding inconsistent with such Allocation Schedule unless required by a final determination of an applicable Governmental Entity.

2.4     <u>Closing Date</u>.  Upon the terms and conditions set forth in this Agreement, the consummation of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020, at 10:00 a.m. local time on the third Business Day following the day on which the last of the conditions set forth in <u>ARTICLE VI</u> are satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions in accordance with this Agreement), or at such other place or time as Buyer and Sellers may agree in writing.  The date on which the Closing actually occurs is referred to as the "<u>Closing Date</u>."

2.5     <u>Deliveries and Actions of Buyer</u>.  At or prior to the Closing, Buyer shall:

(a)     satisfy the Purchase Price in accordance with <u>Section 2.2</u>;

(b)     enter into the New CIT Facility; and

(c)     deliver to Sellers:

(i)    the Assignment and Assumption Agreement, the Assignment of Intellectual Property and each other Ancillary Document to which the Buyer is a party, each dated as of the Closing Date and duly executed by Buyer;

(ii)    a copy of resolutions of the governing body of the Buyer approving and authorizing the Asset Purchase;

(iii)    the officer's certificate required to be delivered pursuant to Section 6.2(c);

(iv)    such resale certificates for sales tax purposes as are reasonably requested by a Seller; and

(v)    a non-solicitation and non-disparagement agreement, in substantially the form attached hereto as Exhibit J (the "VMG Agreement"), duly executed by Buyer.

2.6    Deliveries and Actions of Sellers. At or prior to the Closing, Sellers shall deliver to Buyer the following:

(a)    the Bill of Sale, the Assignment and Assumption Agreement, Assignment of Intellectual Property and each other Ancillary Document to which a Seller is a party, dated as of the Closing Date and duly executed by such Seller;

(b)    a copy of the final Sale Order;

(c)    the officer's certificates required to be delivered pursuant to Section 6.3(d);

(d)    with respect to each Seller, a fully completed and executed Internal Revenue Service Form W-9;

(e)    a copy of resolutions of the governing body of each Seller approving and authorizing the Asset Purchase;

(f)    the VMG Agreement, duly executed by each of VMG Partners IV, L.P., VMG Partners IV Coinvest, L.P., and VMG Partners Mentors Circle IV, L.P.;

(g)    such other bills of sale, deeds, endorsements, assignments and instruments of conveyance and transfer, dated as of the Closing Date and in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Sellers in, to or under any or all of the Purchased Assets;

(h)    the NFS Amendment, duly executed and delivered by NFS;

(i)    the 36th Amendment, duly executed and delivered by 36th; and

(j)    such other instruments and documents as may be reasonably requested by Buyer prior to Closing.

2.7    Withholding Rights. Buyer and any agent or affiliate thereof shall be entitled to deduct and withhold with respect to any payments made pursuant to this Agreement such amounts that are required to be deducted and withheld with respect to any such payments under the Code (or any other provision of applicable Law). Before withholding or deducting any amounts hereunder, the applicable

withholding agent shall notify Sellers of its intent to withhold reasonably in advance before deducting or withholding any such amounts and shall cooperate in good faith to eliminate or reduce such deduction or withholding. To the extent that such amounts are withheld and remitted to the appropriate Taxing Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Persons in respect of which such deduction and withholding was made. Notwithstanding anything to the contrary, any compensatory amounts payable to an employee pursuant to or as contemplated by this Agreement shall be remitted to the applicable payor for payment to the applicable Person through regular payroll procedures, as applicable.

2.8     Good Faith Deposit.

(a)     On or prior to approval of Buyer's stalking horse bid by the Bankruptcy Court, Buyer shall deposit into an escrow account (the "Good Faith Deposit Escrow") maintained by the Good Faith Deposit Escrow Holder, an amount equal to Three Million Dollars ($3,000,000) (the "Good Faith Deposit") in immediately available funds.

(b)     The Good Faith Deposit Escrow Holder shall hold the Good Faith Deposit in trust pursuant to the terms of this Agreement for the benefit of Sellers. Any funds held by the Good Faith Deposit Escrow Holder as Good Faith Deposit Escrow Holder will not be used for any purpose except as expressly provided in this Agreement.

(c)     At the Closing, the Good Faith Deposit (and any interest or income accrued thereon) shall be paid to Sellers by the Good Faith Deposit Escrow Holder in accordance with Section 2.2(a).

(d)     If this Agreement is terminated in accordance with the termination provisions hereof by Sellers pursuant to Section 7.1(d) or in the event of the occurrence of any Good Faith Deposit Payment Trigger, the Good Faith Deposit Escrow Holder shall deliver the Good Faith Deposit (and any interest or income accrued thereon), via wire transfer of immediately available funds, into the account(s) designated in writing by Parent, without prejudice to Sellers' other rights and remedies hereunder. If this Agreement is terminated in accordance with the termination provisions hereof for any reason other than by Sellers pursuant to Section 7.1(d) and there has not occurred any Good Faith Deposit Payment Trigger, the Good Faith Deposit Escrow Holder shall deliver the Good Faith Deposit (and any interest or income accrued thereon), via wire transfer of immediately available funds, into the account(s) designated in writing by Buyer, without prejudice to Buyer's right to receive the Break-Up Fee and Expense Reimbursement, if any, when payable in accordance with Section 7.3.

(e)     The Parties hereto agree that, prior to the earliest of (i) application of the Good Faith Deposit against the payment of the Purchase Price, (ii) the Good Faith Deposit becoming nonrefundable as provided herein before the Closing by reason of Sellers terminating this Agreement pursuant to Section 7.1(d) or the occurrence of any Good Faith Deposit Payment Trigger, or (iii) the return of the Good Faith Deposit to Buyer under the provisions of this Section 2.3, the Good Faith Deposit shall be treated for federal, and applicable state and local, income Tax purposes as owned by Buyer.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, except as disclosed in the disclosure schedule delivered by Sellers to Buyer

concurrently with the execution of this Agreement (the "Disclosure Schedule"), each Seller, jointly and severally, represents and warrants to Buyer as follows:

      3.1    Organization.  Such Seller is a legal entity duly incorporated, validly existing and, except as set forth in Section 3.1 of the Disclosure Schedule, in good standing under the laws of the jurisdiction of its organization.  Subject to the limitations imposed on such Seller as a result of having filed a petition for relief under the Bankruptcy Code, such Seller has full power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted in the Business.

      3.2    Corporate Authority Relative to this Agreement; Consents and Approvals; No Violation.

      (a)    Such Seller has the full corporate power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is a party and, subject to the entry of the Sale Order, perform its obligations under and consummate the transactions contemplated by this Agreement, including the Asset Purchase. The execution, delivery and performance by such Seller of this Agreement and the Ancillary Documents to which it is a party and the consummation of the transactions contemplated by this Agreement, including the Asset Purchase, have been duly and validly authorized by such Seller and no other actions on the part of such Seller, subject to the entry of the Sale Order, are necessary to authorize the execution and delivery by such Seller of this Agreement and the Ancillary Documents to which it is a party or the consummation of the transactions contemplated by this Agreement, including the Asset Purchase. This Agreement has been, and the Ancillary Documents to which it is a party have been (or will be at Closing) duly and validly executed and delivered by such Seller and, assuming this Agreement constitutes the legal, valid and binding agreement of Buyer and the Good Faith Deposit Escrow Holder, this Agreement and the Ancillary Documents to which it is a party constitute (or upon execution at Closing will constitute, as applicable), subject to Alternative Bids (if any), the entry of the Sale Order, the legal, valid and binding agreements of such Seller, enforceable against such Seller in accordance with their terms, except as and to the extent that such validity and enforceability may be limited by equitable principles of general applicability (whether considered in a proceeding at law or in equity) (the "Enforceability Exceptions").

      (b)    Other than in connection with or in compliance with the Sale Order, no authorization, consent, order, license, permit or approval of, or registration, declaration, notice or filing with, any Governmental Entity is required to be made or obtained under applicable Law for the consummation by such Seller of the transactions contemplated hereby. except for such notices that are not required to be made or obtained prior to the consummation of such transactions.

      (c)    Except as set forth in Section 3.2(c) of the Disclosure Schedule (the "Consents"), the execution and delivery by such Seller of this Agreement does not, and (after giving effect to the Sale Order) the consummation of the transactions contemplated hereby and compliance with the provisions hereof will not, (i) require any material consent or approval under, violate, conflict with, result in any breach of or any loss of any benefit under, constitute an impermissible change of control or default under, or result in termination or give to others any right of termination, vesting, amendment, acceleration or cancellation of, or result in the creation of a Lien (other than Permitted Liens) upon any of the respective properties or assets of such Seller pursuant to any Material Contract to which such Seller is a party or by which they or any of their respective properties or assets are bound, (ii) conflict with or result in any violation, in any material respect, of any provision of the Organizational Documents of such Seller or (iii) conflict with or violate, in any material respect, any applicable Laws.

3.3     Financial Statements.

(a)     Sellers have made available to Buyer copies of (a) the audited balance sheet of the Business as of January 31, 2021 (the "Most Recent Balance Sheet"), and the related audited income statement and audited statement of cash flows for the twelve month period then ended, together with the accompanying notes thereto and (b) the unaudited balance sheet of the Business as of August 31, 2023 (the "Interim Balance Sheet"), and (c) the related unaudited income statement and unaudited statement of cash flows for the eight month period then ended (collectively, with the Most Recent Balance Sheet and Interim Balance Sheet, the "Financial Statements"). Each of the Financial Statements has been prepared in all material respects in conformity with U.S. generally accepted accounting principles ("GAAP") applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of the Business as at the dates and for the periods indicated therein.

(b)     All Acquired Receivables (except with respect to a *de minimis* amount) resulted from bona fide sales in the Ordinary Course and represent the genuine, valid, undisputed (to Sellers' Knowledge), and legally enforceable claims of the Business not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the Ordinary Course. Section 3.3(b) of the Disclosure Schedule sets forth a true and complete list of (i) all Accounts Receivable that are more than thirty (30) days past due as of the date hereof and (ii) all Accounts Receivable that have been outstanding for one hundred and twenty (120) days or more as of the date hereof. To the Knowledge of Seller, none of the Acquired Receivables are not collectible in full within ninety (90) days after billing.

(c)     Section 3.3(c) of the Disclosure Schedule accurately lists the amounts of the Prepaid Assets as of the execution of this Agreement.

(d)     Section 3.3(d) of the Disclosure Schedule sets forth a true and complete list of all capital leases secured by any of the Purchased Assets (the "Capital Lease Obligations").

3.4     Compliance with Law; Permits.

(a)     Such Seller is, and for the past three (3) years has been, in compliance in all material respects with all applicable federal, state, local and foreign laws, statutes, ordinances, rules, regulations, judgments, orders, injunctions, decrees or agency requirements of Governmental Entities (collectively, "Laws" and each, a "Law") applicable to the Purchased Assets. Sellers have not received any written notice or, to the Knowledge of Sellers, other communication from any Governmental Entity regarding any actual or alleged failure to comply in all material respects with any Law applicable to the Purchased Assets.

(b)     Subject to the limitations imposed on Sellers as a result of having filed a petition for relief under the Bankruptcy Code, Sellers hold all material authorizations, licenses, permits, certificates, variances, exemptions, approvals, orders, registrations and clearances of any Governmental Entity necessary for Sellers to own, lease and operate the Purchased Assets, and to carry on and operate the Business as currently conducted.

(c)     Neither Sellers, nor, to Knowledge of Sellers, any of their respective directors or officers, has directly or indirectly in respect of the Business, (i) used any funds of the Business for unlawful contributions, unlawful gifts, unlawful entertainment or other unlawful expenses relating to political activity; (ii) made any unlawful payment to foreign or domestic governmental officials or employees or to foreign or domestic political parties or campaigns from funds of the Business; or (iii)

violated or are in violation of applicable Bribery Legislation of any jurisdiction in which the Business operates.

3.5    <u>Environmental Matters</u>.

(a)    Except as set forth on <u>Section 3.5</u> of the Disclosure Schedule, for the past three (3) years there has been no actual, planned, or threatened Release of any Regulated Substance on, upon, into, or from any site or property currently or previously owned, leased, or otherwise operated or used by or for the Business, such Seller or any of its predecessors. Except as set forth on <u>Section 3.5</u> of the Disclosure Schedule, there have been no Regulated Substances used, generated, handled, treated, stored, or transported on, upon, into, from, or to any site or property currently or previously owned, leased, or otherwise operated or used by or for the Business of any Seller or any of its predecessors, except, in each case, with respect to hand sanitizer Inventory.

(b)    In the past three (3) years such Seller (i) has not received any written or to the Knowledge of Seller oral notice, report, claim, order, directive, or other information, and no Proceeding has been filed or commenced in the past three (3) years, is pending, or to the Knowledge of Sellers has been threatened in the past three (3) years regarding any actual or alleged violation of Environmental Law or Release of Regulated Substances; and (ii) has no actual or potential Liability or obligation—concerning personal injury, property damage, assessments, penalties, fines, Remedial Action, investigation or cleanup, natural resource damages, or any other topic—arising under any Environmental Law.

(c)    Neither such Seller nor any of its predecessors have expressly or to the Knowledge of such Seller otherwise assumed responsibility for, agreed to, undertaken, provided any indemnity or hold harmless with respect to, or otherwise become subject to, any Liability (contingent or otherwise) of any other Person relating to Environmental Law(s) or Regulated Substances.

(d)    Neither such Seller nor any of its predecessors have used, designed, manufactured, sold, marketed, installed, repaired, or distributed products or items containing any Regulated Substances so as to give rise to any material Liability (actual, contingent, potential, or otherwise) under Environmental Law.

(e)    Sellers have made available to Buyer complete and correct copies of all material environmental, health, and safety assessments, audits, reports, and any other material environmental, health, and safety documents relating to Sellers, the Business, and/or the current or former facilities, properties, and/or operations of the Company and each of its predecessors.

3.6    <u>Employee Benefit Plans</u>.

(a)    <u>Section 3.6(a)</u> of the Disclosure Schedule sets forth a correct and complete list of each material Seller Benefit Plan. With respect to each material Seller Benefit Plan, to the extent applicable, correct and complete copies of the following have been delivered or made available to Buyer by Sellers: (i) the most recent plan document (which, for the avoidance of doubt, with respect to any Seller Benefit Plan for which a form agreement is used, shall consist of a copy of such form); (ii) the most recent related trust document; (iii) the most recent annual report (Form 5500) filed with the Internal Revenue Service (the "<u>IRS</u>"); (iv) the most recent determination, opinion or advisory letter from the IRS for any Seller Benefit Plan that is intended to qualify under Section 401(a) of the Code; and (v) the most recent summary plan description. No Seller Benefit Plan has terms requiring assumption by Buyer.

(b)    (i) Each U.S. Seller Benefit Plan has been established, operated and administered in material accordance with its terms and the requirements of all applicable Laws, including ERISA and

the Code, and (ii) there are no pending or, to the Knowledge of such Seller, threatened in writing material claims (other than claims for benefits in the Ordinary Course) with respect to any Seller Benefit Plan. To the Knowledge of Sellers, there is no audit or investigation of any Seller Benefit Plan by any Governmental Entity that could affect the transactions contemplated by this Agreement or result in the imposition of a Lien or other claim against any of the Purchased Assets. Sellers have paid and discharged promptly when due all Liabilities arising under ERISA or the Code of a character which if unpaid or unperformed could result in the imposition of a Lien or any other claim against any of the Purchased Assets.

(c)        With respect to each Seller Benefit Plan that is intended to qualify under Section 401(a) of the Code, Sellers have received a currently effective favorable determination, opinion or advisory letter with respect to such Seller Benefit Plan and its related trust that has not been revoked and no circumstances exist and no events have occurred that could reasonably be expected to adversely affect the qualified status of such Seller Benefit Plan or the related trust. Sellers have no obligation to provide retiree health or life insurance benefits except as may be required by Section 4980B of the Code and Section 601 of ERISA, any other applicable Law or at the sole expense of the participant or the participant's beneficiary. No Seller Benefit Plan that provides health insurance or medical coverage is self-funded or self-insured and all premiums that have become due have been paid in full.

(d)        To the extent applicable, each Seller Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code complies and has been operated in all respects in compliance in all material respects with the requirements of Section 409A of the Code and the final regulations and official guidance promulgated thereunder.

(e)        Neither Sellers, nor any of their respective ERISA Affiliates, sponsor, maintain, or contribute to, or has at any time sponsored, maintained, contributed to or been required to sponsor, maintain or contribute to, or has any actual or contingent Liability with respect to any employee benefit plan that is (i) subject to Title IV of ERISA or Section 412 of the Code, (ii) a "multiple employer plan" within the meaning of Sections 4063 or 4064 of ERISA, or (iii) a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

(f)        Neither the execution of this Agreement nor the completion of the transactions contemplated by this Agreement (either alone or in conjunction with any other event) will result in (i) any compensation payment becoming due to any employee of Sellers' (who is or was employed in respect of the Business), (ii) the acceleration of vesting or payment to any employee of Sellers' (who is or was employed in respect of the Business), or (iii) any increase to the compensation or benefits otherwise payable under any Seller Benefit Plan. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will, either alone or in combination with any other event in a result in a payment, economic benefit or other entitlement to any "disqualified individual" which could give rise to any "parachute payment," as defined under Section 280G(b)(2) of the Code and the regulations thereunder.

3.7        <u>Litigation</u>.    Other than the Bankruptcy Case and as set forth on <u>Section 3.7</u> of the Disclosure Schedule, such Seller is not a party to any pending or, to the Knowledge of such Seller, threatened Proceeding relating to the Purchased Assets. Sellers are not subject to any outstanding Order relating to the Purchased Assets (other than any Orders entered or to be entered in connection with any Bankruptcy Case).

3.8        <u>Tax Matters</u>.

(a)      Except as set forth in <u>Section 3.8</u> of the Disclosure Schedule (i) Sellers have timely filed (taking into account any extension of time within which to file) all material Tax Returns required to be filed by any of them and all such material filed Tax Returns are complete and accurate in all material respects; (ii) Sellers have paid all income and other material Taxes that are required to be paid by any of them, except, in each case of <u>clauses (i)</u> and <u>(ii)</u>, with respect to matters contested in good faith; and (iii) there are no pending, or to the Knowledge of Sellers, threatened, audits, examinations, investigations or other administrative or judicial Proceedings in respect of Taxes of a Seller (solely in respect of the Purchased Assets or the Business), other than in respect of matters.

(b)      There are no Liens for Taxes on any of the Purchased Assets other than Permitted Liens.

(c)      No Seller has participated in any "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

(d)      Since the date of the Most Recent Balance Sheet, no Seller has incurred any Liability for Taxes outside the Ordinary Course.

3.9     <u>Cares Act Matters</u>. <u>Section 3.9</u> of the Disclosure Schedule sets forth a true, correct, and complete list of any and all loans applied for or received by any Seller (whether repaid or forgiven), and any and all indebtedness or other obligations otherwise incurred by any Seller (including a description of all Contracts related thereto) in connection with any loan under the CARES Act, including the Small Business Administration's "Paycheck Protection Program" or under any of the "Main Street Loan Programs" established by the Federal Reserve (collectively, the "<u>PPP Loans</u>") and the amount of funds received by such Seller under each program. Such Seller has made available to Buyer true, correct, and complete copies of all (i) applications, forms, and other documents filed or submitted by such Seller relating to any CARES Act programs and (ii) notices, letters, or other correspondence to such Seller from any Governmental Entity in connection with any application related to any CARES Act programs, and all statements and information made by such Seller contained in such applications, forms, and other documents are true, correct, and complete in all respects. With respect to each item set forth on <u>Section 3.9</u> of the Disclosure Schedule, such Seller was eligible to participate in the applicable program pursuant to the rules and regulations applicable to such program. All funds received by such Seller for the PPP Loans (the "<u>CARES Act Funds</u>") have been used by such Seller in compliance in all material respects with all conditions and other applicable statutory, regulatory, and other requirements under the terms of such program(s), including with respect to the application of all proceeds therefrom, and such Seller has maintained accounting and other records relating to the CARES Act Funds and the use thereof which comply with all conditions and other applicable statutory, regulatory, and other requirements under the terms of such program(s) (including records that track the costs and other expenses for which the CARES Act Funds have been used, and all documentation and other information supporting or otherwise documenting such Seller's certification of need for any CARES Act Funds), true, correct, and complete copies of which have been made available to Buyer. The consummation and closing of the transactions contemplated hereby shall not cause or result in an event of default under any PPP Loan. All certifications and representations made by such Seller in all application(s) and any other documents relating to the PPP Loans were made in good faith and are true and correct in all material respects and such Seller qualified in all respects to obtain the PPP Loans under the terms and conditions of the applicable statutory, regulatory, and other requirements of such program(s) and such Seller has complied in all material respects with all agreements and all applicable Laws with respect to the PPP Loans.

3.10    <u>Employment and Labor Matters</u>.

(a)     Sellers are not and have never been a party to any collective bargaining agreement, labor union contract, or trade union agreement (each, a "<u>Collective Bargaining Agreement</u>") covering employees in the United States.

(b)     Sellers, with respect to the Business, have no direct or indirect material Liability with respect to any misclassification of any Person as an independent contractor or temporary worker hired through a temporary worker agency rather than as an employee or with respect to classification under the Fair Labor Standards Act. There has been no "mass layoff" or "plant closing" (as defined by the Worker Adjustment and Retraining Notification Act of 1988, as amended) with respect to the Business in the past three (3) years.

(c)     <u>Section 3.10(c)</u> of the Disclosure Schedule, contains a true, complete and correct list, as of the date hereof, of (i) for each employee of the Business, the name, location, job title, current base salary (or rate of hourly pay), amount of accrued but unused paid-time off, and whether or not any such employee is on leave of absence (and if so the reason for absence and the expected date of return to work), and (ii) the name of each Person who regularly currently provides services to the Business as an individual independent contractor, date of engagement and current rates of compensation or fees.

(d)     Except as set forth on Section 3.10(d) of the Disclosure Schedule and would not be material to Sellers, to the Knowledge of Sellers there have not been (i) any allegations or formal or informal complaints made to or filed with any Seller with respect to the Business related to sexual harassment or sexual misconduct; (ii) any other claims initiated, filed or, to the Knowledge of Sellers, threatened, against any Seller with respect to the Business related to sexual harassment or sexual misconduct; or (iii) any other allegations, formal or informal complaints or any other claims initiated, filed or threatened against any Person other than any Seller related to sexual harassment or sexual misconduct, in each case by or against any employee of the Business.

(e)     (i) There is not currently, nor has there been in the past year, any strike, lockout, slowdown, or work stoppage against any Seller (in respect of the Business),  pending or, to the Knowledge of Sellers, threatened in writing; and (ii) to the Knowledge of Sellers, there is no pending charge or complaint against any Seller (solely in respect of the Business) by the National Labor Relations Board or any comparable Governmental Entity.

3.11    Real Property.

(a)     Sellers do not currently own, and for the past three (3) years have not previously owned, any real property.

(b)     The applicable Seller has a good and valid leasehold interest (free and clear of all Liens (other than Permitted Liens)) in each of the Assumed Real Property Leases on Schedule 1.1(c), which lists the name of the lessor and lessee of each Acquired Real Property, a description of each of the Assumed Real Property Leases and the applicable address of each Acquired Real Property. No Seller has subleased or sublicensed to any Person or otherwise granted to any Person the right to occupy, use or enjoy any Acquired Real Property.

(c)     There are currently in effect such insurance policies for each of the Acquired Real Property as are required by the applicable Assumed Real Property Lease, and all premiums due on such insurance policies have been timely paid by Sellers. Sellers have not received written notice of any defects or inadequacies in any Acquired Real Property, which, if not corrected, would result in any termination or increase in the cost of any insurance policies maintained for such Acquired Real Property.

(d)     Except as set forth on Section 3.11 of the Disclosure Schedule, Sellers have not received written notice of any breach or default under any Assumed Real Property Lease, which default continues on the Agreement Date, and to the Knowledge of Sellers, no event exists which, with the giving of notice or lapse of time or both, would constitute such a breach or default or permit termination or acceleration of rent thereunder or written notice of any defects or inadequacies in any Acquired Real Property, which, if not corrected, would result in any termination or increase in the cost of any insurance policies maintained for such Acquired Real Property.

(e)     Sellers are in sole and exclusive possession of all Acquired Real Property, and to the Knowledge of Sellers, there are no contractual or legal restrictions that preclude or restrict in any material way the ability to use the Acquired Real Property for the purposes for which it is currently being used.

3.12    Intellectual Property.

(a)     Section 3.12(a) of the Disclosure Schedule sets forth a list of all Patents, pending Patent applications, registered Marks, pending applications for registration of marks and registered copyrights owned by Sellers and used or held for use in the Business (the "Registered Intellectual

Property"), including, for each item listed, the relevant jurisdiction, registration or application number and date, as applicable, of such item. All Registered Intellectual Property is valid, enforceable, subsisting, and in full force and effect.

(b)    Sellers own all right, title, and interest to all Registered Intellectual Property. There are no oppositions, cancellations, invalidity proceedings, interferences or re-examination proceedings presently pending with respect to any Registered Intellectual Property. Sellers own or have valid rights to use, all Intellectual Property necessary for the conduct of the Business as currently conducted (the "Seller Intellectual Property"). All Intellectual Property owned by Sellers or exclusively licensed to Sellers and used or held for use in the conduct of the Business as currently conducted ("Seller Owned Intellectual Property") are free and clear of all Liens other than Permitted Liens.

(c)    (i) As of the Agreement Date, the conduct of the Business, including the Seller Intellectual Property, does not infringe, violate or constitute misappropriation of any Intellectual Property of any third Person; (ii) as of the Agreement Date, no third Person is infringing, violating, or misappropriating any Seller Owned Intellectual Property; and (iii) as of the Agreement Date, there is no pending claim asserted in writing against a Seller (including any "cease and desist" letters and invitations to license) asserting that Sellers' conduct of the Business has infringed, violated or misappropriated, or is infringing, violating or misappropriating, any Intellectual Property rights of any third Person.

(d)    Except with respect to any Intellectual Property owned by a Seller by operation of Law, Sellers have entered into binding, valid and enforceable, written contracts with each current and former employee and independent contractor who is or was involved in or has contributed to the invention, creation, or development of any material Intellectual Property included in the Purchased Assets during the course of employment or engagement with Sellers whereby such employee or independent contractor: (i) grants to Sellers a present, irrevocable assignment of any ownership interest such employee or independent contractor may have in or to such Intellectual Property; and (ii) agrees to maintain the confidentiality of confidential information of Sellers. Sellers have taken commercially reasonable steps to protect their rights in the material Trade Secrets of the business conducted by Sellers as of the Agreement Date.

(e)    All Business IT Systems are in good working condition and are sufficient for the operation of the Business as currently conducted.

(f)    Sellers are in compliance in all material respects with (i) any privacy policies or related policies, programs or other notices that concern Sellers' collection, handling, storage, disclosure, transfer or other disposition or use of any Personal Information, and (ii) the requirements of any codes of conduct to which Sellers are a party with respect to Personal Information. Sellers have commercially reasonable security measures and policies in place to protect the Personal Information collected by each Seller from and against unauthorized access, use, modification and/or disclosure.

(g)    There are no claims pending or, to the Knowledge of Sellers, threatened against Sellers alleging a violation of any third Person's privacy or personal information or data rights, a violation of Privacy Laws, applicable privacy policies, or contractual commitments with respect to Personal Information, solely with respect to the operation of the Business.

(h)    Sellers have implemented and maintained adequate policies and procedures to respond to requests from individuals concerning their Personal Information as and to the extent required by applicable Privacy Laws. There have been no data breaches, security incidents, misuse of or unauthorized access to or disclosure of any Personal Information in the possession or control of Sellers or collected, used or processed by or on behalf of Sellers that would require notification of individuals, law

20

enforcement, or any Governmental Entity, or any remedial action under any applicable data protection requirement, and there are no pending, or reasonably expected complaints, actions, fines or other penalties facing Sellers in connection with any such failures, crashes, security breaches, unauthorized access, use or disclosure of Personal Information, or other adverse events or incidents.

(i)    (i) Sellers comply with their internal policies and procedures, to the extent applicable, relating to privacy, data protection, and the collection, retention, protection and use of personal information collected, used, or held for use in the operation of the Business and (ii) there are no claims pending or, to the Knowledge of Sellers, threatened against Sellers alleging a violation of any third Person's privacy or personal information or data rights, solely with respect to the operation of the Business.

3.13    Material Contracts.

(a)    Section 3.13(a) of the Disclosure Schedule, as of the Closing, sets forth each of the following Contracts (other than a Seller Benefit Plan) to which any Seller is a party relating to the Purchased Assets (such Contracts, whether or not scheduled, the "Material Contracts"):

(i)    agreement for the employment of any officer, individual employee or other person on a full-time or consulting basis providing for base compensation in excess of $100,000 per annum that is not terminable without notice or penalty;

(ii)    material license of any material Intellectual Property that involves payments (by or to a Sellers) in excess of $50,000 per annum and is not terminable without notice or penalty (other than licenses of commercially available, off-the-shelf software and other than licenses entered into in the Ordinary Course);

(iii)    agreement or group of related agreements with the Key Customers and Key Vendors (other than purchase orders entered into in the Ordinary Course);

(iv)    any Buyer Assumed Agreement that materially prohibits any of the Sellers from freely engaging in business anywhere in the world, including any Contract containing any (A) exclusivity, (B) most favored nation, (C) non-competition (including limiting the ability of the Business to compete in any line of business or with any Person or in any geographic area or during any period of time), (D) non-solicitation, (E) option, right of first option, or right of first refusal or (F) other similar provisions restricting the Business;

(v)    agreement relating to any acquisition or disposition any of the Sellers of any business (whether by asset or stock purchase or otherwise) or any merger, consolidation or similar business combination transaction, in each case, pursuant to which such Seller has an outstanding obligation to pay any purchase price thereunder or other material obligation;

(vi)    agreement that involves any take-or-pay or requirements arrangement other than in the Ordinary Course;

(vii)    agreement relating to any joint venture or partnership;

(viii)    Contracts that provide for or that are reasonably likely to result in annual payments or expenses by, or annual payments or income to, the Business of $50,000 or more (other than ordinary course purchase and sale orders);

(ix)    other than in the Ordinary Course, Contracts that provide for the indemnification by any Seller of any Person or the assumption of any Tax, environmental, or other Liability of any Person;

(x)    Contracts that provide for severance, retention, change in control, or other similar payments to Transferred Employees; or

(xi)    agreement in writing to enter into any of the foregoing.

(b)    Each Material Contract is a valid and binding obligation of a Seller and, to the Knowledge of Sellers, the other party or parties thereto in accordance with its terms and conditions, except as and to the extent that such validity and enforceability may be limited by (i) bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally, (ii) the Enforceability Exceptions and (iii) the obligation to pay Cure Costs under Section 365 of the Bankruptcy Code and <u>Section 1.3</u>.

(c)    With respect to any Material Contract, no event has occurred or not occurred through such Seller's action or inaction or, to the Knowledge of Sellers, prior to the Agreement Date, through the action or inaction of any third party which, with notice or the lapse of time or both, would constitute a material default or result in the termination of or a right of termination or cancelation under any Material Contract, accelerate the performance or obligations required thereby, or result in the loss of any material benefit under the terms of any Material Contract to which such Seller is a party, except for the obligation to pay Cure Costs.

3.14    <u>Key Business Relationships</u>.

(a)    Except as set forth on <u>Section 3.14(a)</u> of the Disclosure Schedule, all of the top ten (10) customers of the Business based on revenue generated for the period ended August 31, 2023 (each, a "<u>Key Customer</u>", and together, the "<u>Key Customers</u>") are current in their payments due to the Sellers, and such Key Customers have consistently been current, in all material respects, in their payments due to the Sellers for the twelve (12) months prior to the date hereof.

(b)    To the Knowledge of Sellers, (i) no supplier, manufacturer, or distributor of any Seller has failed to comply or is not in compliance, in all material respects, with all Laws relating to labor or employment, including relating to equal employment opportunity, nondiscrimination, anti-harassment and hostile environment, non-retaliation, civil and human rights, whistleblower protections, immigration, wages, hours, overtime, child labor, leaves of absence, benefits, collective bargaining, fair labor practices, the payment of unemployment insurance, social security and similar taxes, contributions and withholdings, occupational safety and health, workplace conditions and standards, plant closings, and mass layoffs and (ii) none of the suppliers, manufacturers, and distributors of any Seller has failed to comply or is in non-compliance with such Laws or the business relationship, dealings, agreements, or transactions with any Seller, in each case, in any material respect.

(c)    <u>Section 3.14(c)</u> of the Disclosure Schedule sets forth a true and complete list of (i) the Key Customers and the amount of such revenue generated with respect to each Key Customer, and (ii) the top ten (10) vendors or suppliers of the Business based on purchases for the period ended August 31, 2023 (each, a "<u>Key Vendor</u>", and together, the "<u>Key Vendors</u>") and the amount of such expenses incurred with respect to each Key Vendor. Since the date of the Most Recent Balance Sheet, (i) no Key Customer has (A) materially decreased or notified any Seller or any of its Affiliates of the foregoing of its intention to decrease its aggregate level of purchases of services from Sellers relative to such Key Customer's purchasing history during the twelve (12) months prior to such change or (B) requested

reduced pricing (whether through increased credits or otherwise) from that in effect under an existing Contract, in each case, other than with respect to commercial negotiations in the Ordinary Course with respect to such Key Customer and not as a result of any other deterioration in the business relationship with such Key Customer and (ii) no Key Vendor has adversely altered or notified any of any Seller or any of its Affiliates of the foregoing of its intention to adversely alter in any material respect the terms (including price) on which it sells goods or services to the Business. Sellers have not received any written notice, or to the Knowledge of Sellers, other notice, that any Key Customers of the Business has ceased, or intends to cease, to use the goods or services of the Business or to otherwise terminate or materially reduce its relationship with the Business. Sellers have not received any written notice, or to the Knowledge of Sellers, other notice, that any of the Key Vendors of the Business has ceased, or intend to cease, to supply goods or services to the Business or to otherwise terminate or materially reduce its relationship with the Business.

3.15    <u>FDA and Healthcare Regulatory Matters</u>.

(a)    <u>General Compliance</u>. The Products constitute all of the products currently tested, manufactured, handled, labeled, packaged, stored, supplied, promoted, distributed, marketed, commercialized, imported, exported, or sold by or on behalf of any Seller.

(b)    <u>Administrative/Enforcement Action</u>. No Seller has received, (i) any written notice or to the Knowledge of such Seller, other communication from the FDA, the Federal Trade Commission, the Consumer Product Safety Commission, or any other Governmental Entity requiring, recommending, or threatening to initiate any Action to terminate or to suspend the sale of any Product, to withdraw a new Product application or approval, or alleging material noncompliance with any Healthcare Laws or (ii) any written or to the Knowledge of such Seller, other Form FDA-483 Inspectional Observations, notice of adverse finding, warning letter, notice of violation, or notice of import detention or refusal from the FDA or similar communications from any Governmental Entity relating to the Products. Neither any Seller nor to the Knowledge of such Seller any director, manager, officer or employee of any Seller solely in his or her capacity as such, has been and in the past three (3) years or is currently subject to any enforcement, regulatory, or administrative proceedings by the FDA or other Governmental Entity, and no such proceedings have been threatened in writing.

(c)    <u>Recalls</u>. The Products have not been voluntarily recalled, suspended, or discontinued by any Seller at the request of the FDA or any other Governmental Entity, nor has any Seller received any written notice from the FDA or any other Governmental Entity that it has commenced, or threatened to initiate, any action to withdraw approval of, place sales or marketing restrictions on, request the recall of, or seize the Products, or that it has commenced or threatened to initiate any action to enjoin or place restrictions on the production of the Products.

(d)    <u>Recordkeeping/Reporting</u>. Sellers have submitted to the FDA and other Governmental Entities in a timely manner all required notices and annual or other reports, including adverse experience reports and annual reports, related to the testing, manufacture, handling, labeling, packaging, storage, supply, promotion, distribution, marketing, commercialization, import, export, and sale of the Products.

(e)    <u>Advertising and Promotion</u>. Each Seller has data and information to substantiate all claims being made by Sellers for each Product.

3.16    <u>Insurance</u>. <u>Section 3.16</u> of the Disclosure Schedule sets forth a true and complete list of all insurance policies maintained by Sellers with respect to the Business or covering the Purchased Assets or the Business (including policies providing property, casualty, liability, and workers' compensation

coverage) (collectively, the "<u>Insurance Policies</u>"). Each Insurance Policy is in full force and effect and all premiums due to date thereunder have been paid in full, or if not yet due have been properly accrued for as payables, and neither Seller nor any of its Affiliates is in material default thereunder.  Neither Seller nor any of its Affiliates, has received notice of cancellation or nonrenewal, in whole or in part, in respect of any Insurance Policy. To the Knowledge of Sellers, Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

3.17    <u>Finders or Brokers</u>.  Except as set forth on <u>Section 3.17</u> of the Disclosure Schedule, no broker, finder or investment banker is entitled to any broker's, finder's or financial advisor's fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers or any of the Seller's board of directors (or similar governing body), and Buyer shall not be liable for, and no Person is entitled to, any brokerage, finder's, financial advisor's or other similar fee or commission or like payment in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Sellers or any of their Affiliates.

3.18    <u>Inventory</u>.

(a)    Each of the Products tested, manufactured, handled, labeled, packaged, stored, supplied, promoted, distributed, marketed, commercialized, imported, exported, or sold by or on behalf of any Seller is, and at all times in the past six (6) years has been, fit for the ordinary purposes for which it is intended to be used. All Inventory, whether or not reflected in the Financial Statements, consists of a quality and quantity usable and salable in the Ordinary Course, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established. The quantities of each item of Inventory (whether raw materials, work in process, or finished goods) are not excessive in light of the Sellers' inventory needs in the Ordinary Course. All Products which are included in Inventory are from the current catalog of products of Sellers. The finished goods forming part of the Inventory (the "<u>Finished Goods</u>") are salable. The raw materials forming part of the Inventory all have a sufficient shelf life in order to be salable upon the incorporation thereof into Finished Goods. The packaging materials forming part of the Inventory are usable for the packing of Finished Goods.

(b)    Each Product manufactured, sold, or delivered by any Seller has been in material compliance with all applicable contractual commitments and all express and implied warranties, and no Seller has any material Liability (i) arising out of an injury to persons or property as a result of ownership, use, or possession of any Products manufactured, sold, or delivered or (ii) for replacement thereof or other damages in connection therewith.

(c)    There are no warranty claims or other uninsured claims pending or threatened in writing against any Seller which would reasonably be expected to involve a monetary Liability except those which are not material in amount. No Product is subject to any guaranty, warranty, or other indemnity provided by any Seller beyond the applicable standard terms and conditions of sale applicable thereto and there have been no recalls or post-sale warnings with respect to any Product conducted by or on behalf of any Seller.

(d)    No Seller has experienced any returns of Products, other than in the Ordinary Course. There are no claims against any Seller to return any Product by reason of alleged over-shipments or defective product, and there is no Product in the hands of customers under an understanding that such merchandise would be returnable, in each case except in the Ordinary Course.

3.19    <u>Title to Assets; Sufficiency of Assets; Condition of Assets</u>.  Sellers have good and valid legal and beneficial title to, or a valid, binding and enforceable leasehold interest in, as applicable, all of

the Purchased Assets, and such Purchased Assets are not subject to any Liens (other than Permitted Liens) that will not be removed at the Closing by the effect of the Sale Order or otherwise satisfied at the Closing, and, subject to the entry of the Sale Order and receipt of any Consents, at the Closing, Buyer will be vested with good and valid title to such Purchased Assets, free and clear of all Claims (as defined in the Bankruptcy Code) and Liens (other than Permitted Liens), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. The Purchased Assets (together with the Excluded Assets and employees of the Sellers and Unconditional Canada) constitute all of the tangible and intangible rights, assets and properties that are owned, used or held for use by Sellers in connection with the Business and necessary for the conduct of the Business in the Ordinary Course and are adequate to conduct the operations of the Business as currently conducted. The Purchased Assets are in good working condition, have been maintained in accordance with normal industry practice, and are suitable for the purposes for which they are used (subject to normal wear and tear) including for Buyer to conduct and operate the Business in the Ordinary Course.

3.20    Arrangements with Related Parties. Except set forth on Section 3.20 of the Disclosure Schedule, for employment relationships and compensation, benefits, travel advances and employee loans in the Ordinary Course, no record or beneficial owner of more than five percent (5%) of any class or series of the equity securities of any Seller or any of its respective Affiliates (other than any other Seller) is a party to any Contract with a Seller and none of the stockholders, members, equityholders, directors, managers, or officers of any Seller or any of its respective Affiliates (other than any other Seller) (collectively, "Related Parties") (i) owns any interest in, directly or indirectly, in whole or in part, any material property, asset, or right which is used in any business of any Seller, (ii) has outstanding indebtedness to any Seller, (iii) owns a material interest in, directly or indirectly, or is a stockholder, member, equityholder, director, manager, officer, employee, contractor, or consultant of any competitor, supplier, customer, distributor, lessor, tenant, creditor, or debtor of any Seller, or (iv) directly or indirectly has an interest in or is a party to any Contract with any Seller.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer represents and warrants to Sellers as follows:

4.1    Organization. Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has all requisite power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.

4.2    Corporate Authority Relative to this Agreement; Consents and Approvals; No Violation.

(a)    Buyer has the requisite power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is a party and to perform the transactions contemplated hereby, including the Asset Purchase. The execution, delivery and performance by Buyer of this Agreement and the Ancillary Documents to which it is a party and the consummation by Buyer of the transactions contemplated hereby, including the Asset Purchase, have been duly and validly authorized by all requisite limited liability company action and, no other action or proceedings on the part of Buyer, are necessary to authorize the execution and delivery by Buyer of this Agreement and the Ancillary Documents to which it is a party and the performance of the transactions contemplated hereby, including the Asset Purchase. This Agreement and the Ancillary Documents to which it is a party have been duly and validly executed and delivered by Buyer and, assuming this Agreement constitutes the legal, valid and binding agreement of Sellers, this Agreement and the Ancillary Documents to which it is a party

constitute the legal, valid and binding agreements of Buyer and are enforceable against Buyer in accordance with their terms, except as such enforcement may be subject to the Enforceability Exceptions.

(b)     Other than in connection with or in compliance with the Sale Order, no authorization, consent, order, license, permit or approval of, or registration, declaration, notice or filing with, any Governmental Entity or other third party, is required to be made or obtained, under applicable Law, for the consummation by Buyer of the transactions contemplated hereby, including the Asset Purchase, except for such authorizations, consents, orders, licenses, permits, approvals, registrations, declarations, notices and filings that are not required to be made or obtained prior to the consummation of such transactions.

(c)     The execution and delivery by Buyer of this Agreement does not, and (assuming compliance with the Sale Order) the consummation of the transactions contemplated hereby, including the Asset Purchase, and compliance with the provisions hereof will not, (i) require the making by Buyer of any declaration, filing or registration with, any Person, other than filings with the Bankruptcy Court, (ii) conflict with or result in any violation of any provision of the Organizational Documents of Buyer or (iii) conflict with or violate any applicable Laws.

4.3     <u>Litigation</u>.    There is no Proceeding to which Buyer is a party pending or, to Buyer's knowledge, threatened, and Buyer is not subject to any outstanding Order, in each case that would reasonably be expected to have, individually or in the aggregate, an adverse effect on the ability of Buyer to perform its obligations under this Agreement and the Ancillary Documents to which it is a party, for Buyer to assume and perform the Assumed Liabilities or for Buyer to consummate on a timely basis the transactions contemplated hereby or thereby.

4.4     <u>Finders or Brokers</u>.    No broker, finder or investment banker is entitled to any broker's, finder's or financial advisor's fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer or Buyer's board of directors (or similar governing body).

4.5     <u>Solvency</u>.    Buyer will have at and as of the Closing (a) sufficient available funds to consummate the Asset Purchase and to promptly make, when due, all payments required to be made in connection with this Agreement, including satisfaction of the CIT Payment Obligation, and assumption of all of the Assumed Liabilities and (b) equity capitalization of an aggregate amount not less than $25,000,000 (the "<u>Equity Capitalization Amount</u>"). Based on the accuracy of the representations and warranties set forth in <u>Article III</u>, immediately after giving effect to the transactions contemplated hereby, Buyer, taken as a whole, (x) will not (i) be insolvent as defined in Section 101 of the Bankruptcy Code, and (ii) have incurred Indebtedness beyond its ability to pay such Indebtedness as it matures or becomes due, and (y) will have adequate capital to carry on its business and all businesses in which Buyer is about to engage.

## ARTICLE V
## COVENANTS AND AGREEMENTS

5.1     <u>Conduct of Business</u>.    During the period from the Agreement Date until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Sellers shall use commercially reasonable efforts to (i) maintain the Purchased Assets and conduct the Business with respect to the Purchased Assets in all material respects in the Ordinary Course, (ii) preserve the business relationships with Key Customers and key business relationships related to the Purchased Assets, (iii) maintain all Registered Intellectual Property free from lapse or abandonment, (iv) maintain its books and records to the extent related to the Purchased Assets, (v) maintain in full force and effect all Permits used or held for

use by Seller in connection with the construction, maintenance, and operation of the Business, (vi) not assign, transfer, convey, lease, or otherwise intentionally dispose of any of the Purchased Assets (except for the sale of inventory at arm's length in the Ordinary Course), (vii) not materially amend, materially modify or terminate any Assumed Contract, comply with applicable Laws in all material respects and comply with any Order of the Bankruptcy Court requiring Seller to perform its obligations under an Assumed Contract in all material respects, and (viii) not exclusively license the right to use any Seller Owned Intellectual Property to any Person, in each case except (a) as may be required by applicable Law and subject to any order of the Bankruptcy Court, including any order approving post-petition debtor-in-possession financing and any budget related thereto, (b) with the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed), (c) with the approval of the Bankruptcy Court, (d) as expressly contemplated or required by this Agreement, or (e) to the extent the effect their being in bankruptcy may have on them and the Business.

      5.2    <u>Access</u>.

      (a)    For purposes of furthering the transactions contemplated hereby, Sellers shall afford Buyer and its Representatives reasonable access during normal business hours upon reasonable advance notice to Sellers, throughout the period from the Agreement Date until the earlier of the termination of this Agreement and the Closing, to Sellers' personnel, properties, Contracts, commitments, Books and Records and such other information concerning the business, properties and personnel of the Business as Buyer may reasonably request. Without limiting the foregoing, throughout the period from the Agreement Date until the earlier of the termination of this Agreement and the Closing, Sellers shall provide to Buyer, within five (5) Business Days following the end of each calendar week (which, for purposes of the foregoing, shall be deemed to end at 11:59 p.m. New York City time on Sunday), details with respect to (i) the gross sales of the Business during such calendar week and an explanation with respect to any deviations from the DIP Facility, (ii) the production of units of Products by the Business during such calendar week, and (iii) any advisement or notice by any major retail customer, whether orally or in writing, that such customer plans to substantially discontinue Sellers' diapers, wipes, or personal care business, including, in each case, all applicable and related key metrics, key performance indicators, rolling 13-week cash flow, weekly production reports, monthly financial reports, and regularly produced management information. All access pursuant to this <u>Section 5.2(a)</u>, shall be conducted in such a manner as not to interfere unreasonably with the normal operations of Sellers.

      (b)    Notwithstanding anything to the contrary contained in this <u>Section 5.2</u>, Sellers shall not be required to provide any access, or make available any document, correspondence or information, if doing so would, (i) jeopardize the attorney-client privilege of a Seller, (ii) conflict with any Law applicable to a Seller or the assets or operation of the Business or the provisions of any agreement to which a Seller is party, (iii) cause significant competitive harm to Sellers if the transactions contemplated by this Agreement and the Ancillary Documents are not consummated, or (iv) would require Sellers to disclose any financial or proprietary information of or regarding the Affiliates of the Sellers or otherwise disclose information regarding the Affiliates of the Sellers that the Sellers deem to be commercially sensitive; <u>provided</u> that in such instances described in the foregoing <u>clauses (i)</u> and <u>(ii)</u>, Sellers shall inform Buyer of the general nature of the information being withheld and, upon Buyer's request, reasonably cooperate with the other party to provide such information, in whole or in part, in a manner that would not result in any of the outcomes described in the foregoing <u>clauses (i)</u> and <u>(ii)</u>.

      (c)    The parties hereto hereby agree that all information provided to them or their respective Representatives in connection with this Agreement and the consummation of the transactions contemplated hereby shall be governed in accordance with the Confidentiality Agreement, dated as of April 17, 2023, between Parent and Hildred Capital Management, LLC (the "<u>Confidentiality Agreement</u>"), which shall continue in full force and effect in accordance with its terms.

(d)    In order to facilitate a Sellers' efforts to (i) administer and close the Bankruptcy Case, including for purposes of administering and closing any insurance claims and any Proceedings to which any Seller is a party (other than in connection with any Proceeding with Buyer) (together, the "Post-Close Proceedings"), and (ii) prepare Tax Returns (together, the "Post-Close Filings"), for a period of five (5) years following the Closing, Buyer shall permit Sellers and Sellers' counsel, accountants and other Representatives (collectively, "Permitted Access Parties") during regular business hours, with reasonable notice, reasonable access to the applicable financial and other Books and Records which comprised part of the Purchased Assets, and to employees, officers, advisors and accountants of Buyer, in each case to the extent required to complete the Post-Close Filings or to administer and Close the Post-Close Proceedings, which access shall include (A) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such reasonably documents and records and (B) Buyer's copying and delivering to the relevant Permitted Access Parties such reasonably requested documents or records as they require, but only to the extent such Permitted Access Parties furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and applicable Permitted Access Party reimburses Buyer for the reasonable costs and expenses thereof; provided, however, that the foregoing rights of access shall not be exercisable in such a manner as to unreasonably interfere with the normal operations of Buyer's business. Notwithstanding anything contained in this Section 5.2 to the contrary, in no event shall a Seller have access to any information that, based on advice of Buyer's counsel, could (i) reasonably be expected to create liability under applicable Law, or waive any legal privilege, (ii) result in the discharge of any trade secrets of Buyer, its affiliates or any third parties or (iii) violate any obligation of Buyer with respect to confidentiality; provided that in such instances described in the foregoing clauses (i) and (iii), Buyer shall inform the relevant Permitted Access Party of the general nature of the information being withheld and, upon such Permitted Access Parties' request, reasonably cooperate with the other party to provide such information, in whole or in part, in a manner that would not result in any of the outcomes described in the foregoing clauses (i) and (iii). Unless otherwise consented to in writing by the Sellers, Buyer will not, for a period of seven (7) years following the Closing (or, if later, the closing of the Bankruptcy Case), destroy, alter or otherwise dispose of any of the books and records relating to the Purchased Assets or the Assumed Liabilities with respect to periods or occurrences prior to the Closing Date without first offering to surrender to the Sellers such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of.

5.3    Employees and Employee Benefit Plans.

(a)    Transferred Employees.    Buyer shall determine which of Sellers' and Unconditional Canada's employees who are employed in respect of the Business and who remain employed by Sellers immediately prior to the Closing (including employees on approved leave of absence) (the "Business Employees"), if any, to offer at-will employment to, in its sole discretion, on the terms and conditions acceptable to Buyer. Those employees who are offered and accept Buyer's offer of employment and commence working for Buyer on the Closing Date (or upon return to work from approved leave of absence) shall hereafter be referred to as "Transferred Employees."

(b)    No Obligation.    Nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit levels or prevent any change in the employee benefits provided to any individual Transferred Employee. No provision of this Agreement shall create any third-party beneficiary rights in any employee or former employee of a Seller or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including in respect of continued employment (or resumed employment) for any specified period. Nothing contained herein, express or implied, shall (i) be construed to establish, amend or modify any Seller Benefit Plan or other benefit plan, program, agreement or arrangement or (ii) alter or limit the ability of Sellers, Buyer or any of their respective Affiliates to amend, modify, or terminate any benefit plan, program, agreement or arrangement at any time assumed,

established, sponsored or maintained by any of them. Nothing in this Section 5.3 is intended to interfere with Buyer's right from and after the Closing to terminate the employment of, or change the compensation and benefits available to, any Transferred Employee.

5.4    Efforts.

(a)    Prior to the Closing, Buyer and Sellers shall, and shall cause their respective Affiliates to, use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under any applicable Laws to consummate the Asset Purchase in accordance with this Agreement as promptly as practicable. The "reasonable best efforts" of a Party will not require a Party or any of their subsidiaries, Affiliates or Representative to expend any money to remedy any breach of any representation or warranty, to commence any Proceeding, to waive or surrender any right, to modify or obtain a waiver or consent under any Contract, to commence or threaten to commence litigation, to agree to any restrictions on the business of such Party or any of its respective Affiliates or to waive or forego any right, remedy or condition hereunder.

(b)    The obligations of the Sellers pursuant to this Agreement, including this Section 5.1(b), shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case) and each Seller's obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Purchased Assets as required by the Bankruptcy Code.

5.5    Adequate Assurances regarding the Buyer Assumed Agreements. With respect to each Buyer Assumed Agreement, Buyer will use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Buyer Assumed Agreement. Buyer and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Buyer Assumed Agreements, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Sellers' and Buyer's employees and representatives available to testify before the Bankruptcy Court.

5.6    Bankruptcy Court Approval; Alternative Transaction.

(a)    Buyer and Sellers acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval and the consideration by Sellers of Alternative Bids (if any). Buyer and Sellers acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including giving notice of the transactions contemplated hereby to creditors and certain other interested parties as ordered by the Bankruptcy Court, and conducting an auction in respect of the Purchased Assets pursuant to the Bidding Procedures Order (the "Auction"), and (ii) Buyer must provide adequate assurance of future performance under the Buyer Assumed Agreements.

(b)    Buyer and Sellers agree that this Agreement and the Asset Purchase are subject to the right of the Sellers and their Affiliates and Representatives to seek, solicit, invite, encourage, consider, discuss and negotiate higher or better Alternative Bids in accordance with the Bidding Procedures and the Bidding Procedures Order. From the date hereof (and any prior time) until the completion of the Auction, the Sellers and their Affiliates are permitted to, and are permitted to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any

inquiries, proposals or offers by, any Person (in addition to Buyer) in connection with an Alternative Bid, including to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase any or all of the Purchased Assets.

(c)     If Buyer is not the prevailing bidder at the Auction, but is the next highest bidder at the Auction, Buyer shall serve as the Back-Up Bidder and keep its bid to consummate the Asset Purchase on the terms and conditions set forth in this Agreement open and irrevocable, and Buyer shall not terminate this Agreement pursuant to Section 7.1(e) or 7.1(j) until the earlier of (i) the End Date and (ii) the date of consummation of an Alternative Transaction. Following the completion of the Auction and prior to the End Date, if the prevailing bidder in the Auction is not the Buyer and fails to consummate an Alternative Transaction, the Buyer (as the Back-Up Bidder) will be deemed to have the new prevailing bid, and the Sellers will be authorized, without further order of the Bankruptcy Court, and Buyer shall, consummate the Asset Purchase on the terms and subject to the conditions set forth in this Agreement (as the same may be improved upon in the Auction by the Buyer).

(d)     As soon as reasonably possible after the Parties execute this Agreement, Sellers shall file a form of the Sale Order, which shall be reasonably acceptable to the Parties, with the Bankruptcy Court, together with required supporting papers and required notices, including but not limited to the Bidding Procedures and Bidding Procedures Order.

5.7     <u>Taxes</u>.

(a)     Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer, real property records recordation fees, documentary or stamp Tax, excise Tax or similar non-income Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order or otherwise under the Bankruptcy Code ("<u>Transfer Taxes</u>") shall be borne by Buyer. Buyer shall, at its own expense, file any necessary Tax Returns relating to Transfer Taxes and other documentation with respect to any Transfer Taxes, and Sellers will provide such cooperation as Buyer shall reasonably request in connection with such filings, provided that Buyer shall reimburse Sellers for any reasonable and out of pocket expenses Buyer incurs in connection with such cooperation. The provisions of this <u>Section 5.7(a)</u> shall expressly survive Closing.

(b)     Sellers and Buyer agree to furnish or cause to be furnished to each other, upon request, as promptly as possible, such information and assistance solely relating to the Business, the Transferred Employees, and the Purchased Assets (including access to books and records and Tax Returns and related working papers dated before the Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Purchased Assets are located; <u>provided</u>, <u>however</u>, that neither Buyer nor any Seller shall be required to disclose the contents of its income Tax Returns to any Person other than the parties.

5.8     <u>R&W Policy</u>. Buyer may obtain customary buyer-side representation and warranty insurance (the "<u>R&W Policy</u>") (payable solely by Buyer) in connection with the transactions contemplated by this Agreement. Any R&W Policy so obtained shall specify that there is no right of, and that the insurer under the R&W Policy expressly waives any claims of, subrogation, contribution, or otherwise against any Seller or any of its Affiliates, employees, or direct or indirect shareholders, members, directors, officers, or partners, except in the case of actual, intentional common law fraud by any Seller in connection with the making of the representations and warranties in <u>Article III</u>. The cost of the R&W Policy (including the premium, underwriting fee, surplus lines taxes, retention and other fees

(including the brokerage fees)) shall be paid by Buyer. From and after the binding of the R&W Policy (which shall include the waivers described above), Buyer shall provide Parent with a true and complete copy thereof and shall not amend, modify, or cancel the R&W Policy if such amendment, modification, or cancellation could reasonably be expected to adversely affect the rights of any Seller thereunder without the prior written consent of such Seller. Sellers shall reasonably cooperate with Buyer in connection with obtaining the R&W Policy, including by making its officers and senior management available to Buyer at reasonable times and for reasonable periods of time; provided that, in no event, shall the issuance of an R&W Policy be a condition to or otherwise affect Buyer's obligation or ability to consummate the transactions set forth herein.

5.9    Public Announcements. Neither Sellers, on the one hand, nor Buyer, on the other hand, shall, without the approval of the other Parties, make any press release or other public announcement concerning the transactions contemplated hereby, except as and to the extent that any such Party shall be so obligated by Law, including as may be required by the Bankruptcy Case, securities laws, or the rules of any stock exchange, in which case, the Parties shall use commercially reasonable efforts consult with each other before issuing such press release or public announcement and shall consider in good faith any comments received from the other Parties. The provisions of this Section 5.9 shall expressly survive Closing or any earlier termination of this Agreement.

5.10    Consents; Notices.    At or prior to the Closing, subject to any approval of the Bankruptcy Court that may be required and the terms set forth in Section 5.4, Sellers shall use commercially reasonable efforts to obtain all Consents and give all notices required for Sellers to assign the Buyer Assumed Agreements to which they are a party to Buyer to the extent not assignable without any such approval, consent, or notice pursuant to Section 363 or Section 365 of the Bankruptcy Code; provided that, for the avoidance of doubt, to extent deemed necessary by Buyer, Buyer shall also be authorized (but not required) to obtain Consents for the Sellers to assign the Buyer Assumed Agreements to Buyer but only to the extent such Buyer Assumed Agreements are not assignable without any such Consent pursuant to Section 363 and Section 365 of the Bankruptcy Code.  If any Consent is not obtained prior to the Closing, then, subject to any approval of the Bankruptcy Court that may be required and the terms set forth in Section 5.4 and to the extent permitted by applicable Law, Sellers shall continue to be required to use commercially reasonable efforts for one hundred eighty (180) days after the Closing to obtain the Consents and will use commercially reasonable efforts to establish an agency type or other similar arrangement reasonably satisfactory to Sellers and Buyer under which Buyer would obtain, to the extent practicable, all rights under the Buyer Assumed Agreements and assume the corresponding Assumed Liabilities for the period of time that the Consents are not obtained and the Buyer Assumed Agreements are not assigned.

5.11    Cooperation with Financing.    Prior to the Closing, Sellers shall use commercially reasonable efforts to provide to Buyer such cooperation as is reasonably requested by Buyer, or as otherwise reasonably necessary, in connection with the arrangement, and consummation of the New CIT Facility (the "Debt Financing"), including (i) assisting with obtaining customary legal opinions, appraisals, surveys, title insurance, insurance certificates and endorsements, waivers, environmental reports, diligence and other customary documentation and items contemplated by the Debt Financing as reasonably requested by Buyer or as required in connection with the Debt Financing; (ii) facilitating the granting of a security interest (and perfection thereof) in collateral, guarantees, mortgages or other certificates or documents as may reasonably be requested by Buyer or required under the Debt Financing, in each case effective on or after the Closing, including obtaining releases of existing liens; and (iii) timely furnishing all documentation and other information required by a Governmental Entity under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act of 2001.

5.12    <u>Restrictive Covenants</u>.

(a)    Sellers understand that Buyer shall be entitled to protect and preserve the going concern value of the Business to the extent permitted by applicable Law and that Buyer would not have entered into this Agreement absent the provisions of this <u>Section 5.12</u> and, therefore, subject to the provisions of this <u>Section 5.12</u>, Sellers agree that for a period of five (5) years from the Closing Date, Sellers shall not directly or indirectly engage in, own, have any financial interest in, finance, manage, or operate anywhere in the world any business, that is competitive with the Business (a "<u>Competitive Activity</u>").

(b)    For a period of five (5) years following the Closing Date, each Seller agrees that it will not, directly or indirectly, (i) encourage any customer, client, supplier, or other Person having a business relationship with the Business to terminate or alter such relationship to the disadvantage of Buyer or any of its Affiliates or (ii) encourage any Person not to enter into a business relationship with Buyer or any of its Affiliates.

(c)    For a period of five (5) years following the Closing Date, each Seller agrees that it will not, without Buyer's prior written consent, directly or indirectly, solicit for employment or hire (whether as an officer, director, employee, consultant, or temporary employee) any Transferred Employee, except that this paragraph shall not preclude any Seller or any other person from entering into discussions with or soliciting any person who has been terminated by Buyer or its Affiliates.

(d)    Other than in connection with any action between the parties, after the Closing Date, each Seller shall not, directly or indirectly, through any Person, make or publish any statement to a third party, whether orally or in writing, regardless of whether such statement is truthful, that criticizes, ridicules, disparages, or is otherwise derogatory to the Business or Buyer or its Affiliates, or which could reasonably be expected to harm the reputation or goodwill of the Business or Buyer or its Affiliates.

(e)    Sellers shall use reasonable best efforts not to take any action to impair any existing rights of Sellers under any non-disparagement, non-solicitation, or non-compete clause in any Contract and shall use reasonable best efforts to include in any Chapter 11 plan of Sellers, or any order dismissing or converting the Bankruptcy Case, as applicable, a provision preserving all such rights, if any, to the greatest extent possible.

(f)    The nature and scope of the provisions of this <u>Section 5.12</u> have been carefully considered by the Parties. Sellers agree and acknowledges that the duration, scope, and geographic areas contemplated by this <u>Section 5.12</u> are fair, reasonable, and necessary and that adequate compensation has been received by Sellers for such obligations. If, however, for any reason any court determines that any such restrictions are not reasonable or that consideration is inadequate, such restrictions shall be interpreted, modified, or rewritten to include as much of the duration, scope, and geographic area identified in this <u>Section 5.12</u> as will render such restrictions valid and enforceable.

(g)    In the event of a breach or threatened breach of this <u>Section 5.12</u>, Buyer and its Affiliates shall be entitled, without the posting of a bond, to an injunction restraining such breach. Nothing herein contained shall be construed as prohibiting Buyer or its Affiliates from pursuing any other remedy available to it for such breach or threatened breach.

5.13    <u>Acknowledgment by Buyer</u>.  Except for the representations and warranties made by Seller in <u>Article III</u> or in any Ancillary Document to be delivered by Sellers pursuant to this Agreement, no Seller nor any other Person makes any express or implied representation or warranty with respect to Sellers or the Business, or the assets, operations, liabilities, condition (financial or otherwise) or prospects

thereof, and Buyer acknowledges that Seller hereby disclaims any such other representations or warranties and that Buyer will acquire the Purchased Assets on a "as-is, where is" basis. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made by Sellers in <u>Article III</u> or in any Ancillary Document to be delivered by Sellers pursuant to this Agreement, no Seller nor any other Person makes or has made any representation or warranty to Buyer or any of its Representatives, (a) with respect to, nor has Buyer or any of its representatives relied on, any financial projection, forecast, estimate, budget or prospective information relating to the Business or any oral or written information furnished or made available to Buyer or any of its representatives in the course of its due diligence investigation of Seller, the Business, the Purchased Assets, the Assumed Liabilities, the negotiation of this Agreement or the consummation of the transactions contemplated by this Agreement, including the accuracy, completeness or currency thereof, and (b) as to the accuracy or completeness of any information regarding any Seller, its Affiliates, the Business or the transactions contemplated hereby not expressly set forth in this Agreement or the other Ancillary Documents, and in each case, no Seller nor any other Person will have any liability to Buyer or any other Person in respect of such information, including any subsequent use of such information. Notwithstanding the foregoing, nothing herein shall be deemed to apply to, or limit in any way, any party's rights and remedies in the case of actual, intentional common law fraud.

5.14    <u>Transaction Support Agreements</u>. On or prior to the Petition Date, Sellers shall have entered into a transaction support agreement with each Equipment Lessor, in form and substance reasonably acceptable to Buyer (each, a "<u>Transaction Support Agreement</u>").

5.15    <u>Equipment Lessor Amendments</u>. Sellers and Buyer shall use reasonable best efforts in good faith to cause Sellers to enter into (a) definitive agreement(s) with NFS Leasing, Inc. ("<u>NFS</u>") with material terms not materially different to the terms set forth in that certain term sheet attached hereto as <u>Exhibit G</u> (the "<u>NFS Amendment Term Sheet</u>") with respect to the Assumed Equipment Lease with NFS (the "<u>NFS Amendment</u>"), and (b) definitive agreement(s) with 36th Street Capital Partners, LLC ("<u>36th</u>" and together with NFS, the "<u>Equipment Lessors</u>") with material terms not materially different to the terms set forth in that certain term sheet attached hereto as <u>Exhibit H</u> (the "<u>36th Amendment Term Sheet</u>") with respect to the Assumed Equipment Lease with 36th (the "<u>36th Amendment</u>" and together with the NFS Amendment, the "<u>Equipment Lessor Amendments</u>").

5.16    <u>New CIT Facility</u>. Buyer shall use reasonable best efforts in good faith to enter into definitive agreement(s) with CIT Northbridge Credit, LLC ("<u>CIT</u>") with material terms which are substantially similar to the terms set forth in the New CIT Facility Term Sheet (the "<u>New CIT Facility</u>").

5.17    <u>Equity Capitalization</u>.  Subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code, unless otherwise agreed by the Parties, at all times prior to Closing, Buyer shall have equity capitalization of an aggregate amount not less than the Equity Capitalization Amount.

**ARTICLE VI**
**CONDITIONS TO THE PURCHASE AND SALE**

6.1    <u>Conditions to Each Party's Obligation to Close</u>.  The respective obligations of each Party to consummate the Closing and effect the Asset Purchase shall be subject to the fulfillment (or waiver in a writing signed by the waiving party, to the extent permissible under applicable Law and provided that such waiver shall only be effective as to the conditions of the waiving party) at or prior to the Closing of the following conditions:

(a)      no injunction by any court or other tribunal of competent jurisdiction shall have been entered and shall continue to be in effect and no Law shall have been adopted that remains in effect or be effective, in each case, that prevents, enjoins, prohibits or makes illegal the consummation of the Asset Purchase;

(b)      all material consents, licenses, registrations, or declarations of, or filings with, any Governmental Entities in any such jurisdictions required under any Laws for the Asset Purchase to be completed have been obtained or made on a basis reasonably acceptable to Sellers and Buyer, such acceptance not to be unreasonably withheld, delayed or conditioned;

(c)      the Sale Order shall have been entered, is not subject to any stay, and is in effect and has become a Final Order; and

(d)      Buyer shall have consummated the Debt Financing and received the proceeds thereof in an amount sufficient to satisfy the CIT Payment Obligation (less the Good Faith Deposit).

6.2      Conditions to Obligation of Sellers to Close.  The obligation of Sellers to consummate the Closing and sell the Purchased Assets at Closing is further subject to the fulfillment (or waiver in a writing signed by Sellers, to the extent permissible under applicable Law) at or prior to the Closing of the following conditions:

(a)      the representations and warranties of Buyer contained in Article IV shall be true and correct as of the Agreement Date and as of the Closing Date as though made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date), interpreted without giving effect to any Material Adverse Effect or materiality qualifications or exceptions contained herein, except where failures of such representations and warranties to be true and correct do not have, or would not be reasonably expected to have, a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby;

(b)      Buyer shall have performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by Buyer prior to Closing;

(c)      Buyer shall have delivered to Sellers a certificate, dated the Closing Date and signed by a duly authorized executive officer (in such officer's capacity as such and not individually) of Buyer, certifying to the effect that the conditions set forth in Section 6.2(a) and Section 6.2(b) have been satisfied;

(d)      Buyer shall have paid the Purchase Price in accordance with Section 2.2; and

(e)      Buyer shall be prepared to deliver to Sellers or perform, or cause to be delivered to Sellers or performed, the items set forth in Section 2.5.

6.3      Conditions to Obligation of Buyer to Close.  The obligation of Buyer to consummate the Closing and purchase the Purchased Assets at Closing is further subject to the fulfillment (or the waiver in a writing signed by Buyer, to the extent permissible under applicable Law) at or prior to the Closing of the following conditions:

(a)      (i) The representations and warranties contained in Section 3.1 (Organization), Section 3.2(a) (Corporate Authority Relative to this Agreement), and Section 3.17 (Finders or Brokers) shall be true and correct as of the Agreement Date and as of the Closing Date as though made on and as of

such date in all material respects (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all material respects as of such earlier date) and (ii) each of the other representations and warranties contained in Article III shall be true and correct as of the Agreement Date and as of the Closing Date as though made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date), interpreted without giving effect to any Material Adverse Effect or materiality qualifications or exceptions contained therein, except, with respect to this clause (ii), where failures of such representations and warranties to be true and correct do not have, or would not reasonably be expected to have, a Material Adverse Effect;

(b)    Sellers shall have performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by them prior to the Closing;

(c)    From the date of this Agreement until the Closing, there shall not have been a Material Adverse Effect;

(d)    Each Seller shall have delivered to Buyer a certificate, dated the Closing Date and signed by a duly authorized executive officer (in such officer's capacity as such and not individually) of such Seller, certifying to the effect that the conditions set forth in Section 6.3(a), Section 6.3(b) and Section 6.3(c) have been satisfied with respect to such Seller;

(e)    Sellers shall be prepared to deliver to Buyer or perform, or cause to be delivered to Buyer or performed, the items set forth in Section 2.6;

(f)    Each Transaction Support Agreement shall be in full force and effect;

(g)    The conditions set forth on Schedule 6.3(g) shall have been satisfied; and

(h)    The Equipment Lessor Amendments shall have been assumed and assigned to Buyer.

## ARTICLE VII
## TERMINATION

7.1    Termination.    Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated, and the transactions contemplated hereby may be abandoned, at any time prior to the Closing, as follows:

(a)    by the mutual written consent of Sellers and Buyer;

(b)    by either Sellers or Buyer, if the transactions contemplated hereby, including the Asset Purchase, shall not have been consummated on or prior to 5:00 p.m. New York City time, on February 28, 2024 (the "End Date"); provided that the right to terminate this Agreement pursuant to this Section 7.1(b) shall not be available to a Party if the failure of the transactions contemplated hereby to be consummated by such date shall be due to the breach by such Party of any material covenant or other material agreement of such Party set forth in this Agreement;

(c)    by either Sellers or Buyer, if an Order by a Governmental Entity of competent jurisdiction shall have been issued permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and such Order shall have become final and

nonappealable; provided that the right to terminate this Agreement pursuant to this Section 7.1(c) shall not be available to a Party if such Order resulted from, or could have been avoided but for, the breach by such Party of any material covenant or other material agreement of such Party set forth in this Agreement;

(d)     by Sellers, if Buyer shall have materially breached or there is a material inaccuracy in any of its representations or warranties, or shall have breached or failed to perform any material covenants or other material agreements contained in this Agreement, which breach, material inaccuracy or failure to perform (i) if it occurred or was continuing to occur on the Closing Date, would result in a failure of a condition set forth in Section 6.2 and (ii) is either not curable or is not cured by the End Date; provided that the Sellers' right to terminate this Agreement pursuant to this Section 7.1(d) shall not be available to Sellers if a Seller shall have materially breached or there is any material inaccuracy in any of its representations or warranties, or shall have breached or failed to perform any of its material covenants or other material agreements contained in this Agreement;

(e)     by Buyer, if Sellers shall have materially breached or there is a material inaccuracy in any of their representations or warranties, or shall have breached or failed to perform any of their material covenants or other material agreements contained in this Agreement, which breach, material inaccuracy or failure to perform (i) if it occurred or was continuing to occur on the Closing Date, would result in a failure of a condition set forth in Section 6.3 and (ii) is either not curable or is not cured by the End Date; provided that the Buyer's right to terminate this Agreement pursuant to this Section 7.1(e) shall not be available to Buyer if Buyer shall have materially breached or there is any material inaccuracy in any of its representations or warranties, or shall have breached or failed to perform any of its material covenants or other material agreements contained in this Agreement;

(f)     by Buyer, if (i) the Bidding Procedures Order has not been entered by the Bankruptcy Court within twenty-three (23) days after the Petition Date, or (ii) subject to Section 7.1(j), the Sale Order has not been entered by the Bankruptcy Court within thirty (30) days after entry of the Bidding Procedures Order;

(g)     by Buyer, if the Bankruptcy Court enters a Final Order providing that the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code for any reason prior to the Closing Date;

(h)     by Buyer, if (i) the Bidding Procedures Order, (ii) the Bidding Procedures, (iii) Break-Up Fee, (iv) Expense Reimbursement or (v) the Sale Order is modified in any material respect without the consent of Buyer and cannot be remedied by the Sellers in a manner acceptable to Buyer (and such action has not been reversed or vacated within ten (10) calendar days after its occurrence);

(i)     by Buyer, if the Bankruptcy Court enters an order pursuant to Section 362 of the Bankruptcy Code lifting or modifying the automatic stay with respect to Purchased Assets of an aggregate value equal to or exceeding a material portion of the Purchased Assets;

(j)     by either Sellers or Buyer, if the Sellers consummate an Alternative Transaction;

(k)     by Buyer, if Sellers shall not have entered into a Transaction Support Agreement with each Equipment Lessor on or prior to the Petition Date or if, following the Petition Date, any Transaction Support Agreement is voided or rescinded such that it is no longer in force or effect; or

(l)     by Sellers if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties.

7.2      Effect of Termination.  In the event of termination of this Agreement pursuant to Section 7.1, this Agreement shall terminate (except that the Confidentiality Agreement, this Section 7.2, Section 7.3, and ARTICLE VIII shall survive any termination), and there shall be no other Liability on the part of Sellers or Buyer to the other Party; provided that nothing herein shall relieve any Party from Liability for a Willful Breach of its covenants or agreements set forth in this Agreement prior to such termination or relieve Buyer from Liability for any Willful Breach of its obligations to consummate the transactions contemplated hereby, in which case, the aggrieved Party shall be entitled to all rights and remedies available at law or in equity.  In the event of termination of this Agreement, and regardless of the reason for the termination, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms and any such termination shall not amend, modify, release, waive or otherwise limit any rights or obligations under the Confidentiality Agreement.

7.3      Break-Up Fee; Expense Reimbursement.  Sellers acknowledge that (i) Buyer has made a substantial investment in time and incurred substantial out-of-pocket expenses in connection with the negotiation and execution of this Agreement, its due diligence with respect to the Purchased Assets, and its efforts to consummate the transactions contemplated hereby, (ii) Buyer would not have entered into this Agreement or invested the time and expense to negotiate and prepare this Agreement without Sellers' agreement to provide the Break-Up Fee, Expense Reimbursement, and other protections contemplated hereunder, and as set forth in the Bidding Procedures and Bidding Procedures Order, and (iii) that Buyer's efforts have substantially benefited Sellers and will benefit Sellers and will benefit the bankruptcy estate of Sellers through the submission of the offer reflected in this Agreement which will serve as a minimum bid on which other potentially interested bidders can rely.  Therefore, as compensation for entering into this Agreement, taking action to attempt to consummate the transactions contemplated hereby and incurring the costs and expenses related thereto and other losses and damages, including foregoing other opportunities, subject to limitations set forth in the Bidding Procedures, Sellers agree, jointly and severally, to pay to Buyer the Expense Reimbursement, plus an amount equal to three percent of the Purchase Price (the "Break-Up Fee") promptly following (a) this Agreement being validly terminated by Buyer or Sellers pursuant to Section 7.1(j) and the closing of the Alternative Transaction or (b) this Agreement being validly terminated by Sellers pursuant to Section 7.1(l), provided, however, that the Break-Up Fee and Expense Reimbursement, in the aggregate, shall not exceed an amount equal to four percent (4%) of the Purchase Price.

7.4      Good Faith Deposit. In the event that this Agreement is validly terminated for any reason, the Good Faith Deposit Escrow Holder shall disburse any amounts held in the Good Faith Deposit Escrow in accordance with Section 2.8 and the Bidding Procedures.

### ARTICLE VIII
### MISCELLANEOUS

8.1      No Survival.   The representations, warranties, covenants and agreements in this Agreement or in any instrument, agreement or document delivered pursuant to this Agreement shall not survive the Closing and shall be extinguished by the Closing and the consummation of the transactions contemplated hereby such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing, except that covenants and agreements that, by their terms, expressly contemplate performance after, or otherwise expressly by their terms survive, the Closing, in each case and to such extent will expressly survive the Closing in accordance with its terms, and nothing in this Section 8.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Buyer and the Sellers acknowledge and agree, on their own behalf and on behalf of the Buyer or the Sellers, as the case may be, that the agreements contained in this Section 8.1, (a) require performance after the Closing to the maximum extent permitted

by applicable Law and will survive the Closing; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 8.1</u>, none of the Parties would enter into this Agreement.

8.2    <u>Expenses</u>.    Except as otherwise provided in this Agreement (including the Expense Reimbursement), whether or not the Asset Purchase is consummated, all costs and expenses incurred in connection with the transactions contemplated hereby, including the Asset Purchase, this Agreement and the transactions contemplated hereby shall be paid by the party hereto incurring or required to incur such expenses.

8.3    <u>Counterparts; Effectiveness</u>.    This Agreement may be executed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties and delivered (by telecopy, electronic delivery or otherwise) to the other Parties.  Signatures to this Agreement transmitted by facsimile transmission, by electronic mail in "portable document format" form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

8.4    <u>Governing Law; Jurisdiction</u>.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and all claims or causes of action (whether at Law, in contract, in tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance hereof, shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(b)    All Proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken, and the Parties irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court or such federal court in any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding, <u>provided</u>, <u>however</u>, that if the Bankruptcy Court declines to exercise jurisdiction over any dispute between the Parties, then solely with respect to such dispute, the Parties irrevocably submit to the jurisdiction of the state and federal courts located in Delaware and irrevocably waive the defense of an inconvenient forum with respect to such dispute. The Parties consent to service of process by mail (in accordance with <u>Section 8.7</u>) or any other manner permitted by law.

8.5    <u>Remedies</u>. The Parties agree and acknowledge that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and accordingly (i) each of the Parties shall be entitled to, and may seek in the alternative, such remedies as are available at law and in equity, and (ii) (A) the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and shall be entitled to specific performance of the terms hereof, in each case, in the Bankruptcy Court (as set forth in <u>Section 8.4(b)</u>), this being in addition to any other remedy to which they are entitled at law or in equity, (B) the Parties waive any requirement for the securing or posting of any bond in connection with the obtaining of any specific performance or injunctive relief, (C) the Parties agree, in any action for specific performance, that there is no adequate remedy at law, and (D) the right of specific performance and other equitable relief is

an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor Buyer would have entered into this Agreement.  In circumstances where Buyer is obligated to consummate the Asset Purchase and the Asset Purchase has not been consummated, Buyer expressly acknowledges and agrees that Sellers shall have suffered irreparable harm, that monetary damages will be inadequate to compensate Sellers, and that Sellers shall be entitled (in addition to any other remedy that may be available to them whether in law or equity, including monetary damages) to enforce specifically Buyer's obligations to consummate the Asset Purchase. Sellers' pursuit of specific performance at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which Sellers may be entitled and will not restrict, impair or otherwise limit any Seller from seeking or collecting applicable damages. In no event shall the Parties be entitled to receive both a grant of specific performance of the consummation of the Asset Purchase pursuant to this <u>Section 8.5</u> and monetary damages to which it is entitled pursuant to this Agreement with respect to termination of this Agreement. For the avoidance of doubt, the Parties shall be entitled to seek the remedies provided herein in the alternative, and not be required to elect their remedies, in any Proceeding brought to seek redress for the failure of Buyer to consummate the Asset Purchase pursuant to this Agreement.  If, prior to the End Date, any party hereto brings any action, in each case in accordance with this Section, to enforce specifically the performance of the terms and provisions hereof by any other party hereto, the End Date will automatically be extended (y) for the period during which such action is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be. In no event will this Section be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty of any Seller made herein.

8.6    <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED ON, ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY HERETO (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY HERETO WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

8.7    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed given (a) upon personal delivery to the party hereto to be notified (with confirmation of transmission); (b) when received when sent by email to the party hereto to be notified (provided that no "bounce back" or similar message of non-delivery is received with respect thereto); or (c) when delivered by a courier (with confirmation of delivery); in each case to the party hereto to be notified at the following address:

To Buyer:

> Bucky Acquisition Holdco, LLC
> c/o of Hildred Capital Management, LLC
> 745 Fifth Avenue, Suite #1701
> New York, NY 10151
> Attention: David Solomon and Andrew Goldman
> Email: dsolomon@hildredcapital.com and agoldman@hildredcapital.com

with a copy (which shall not constitute notice) to:

> Lowenstein Sandler LLP
> 1251 Avenue of the Americas
> 17th Floor
> New York, NY 10020
> Attention: Sam E. Khan, Andrew Behlmann, and Mitchell McDonald
> Email:  skhan@lowenstein.com, abehlmann@lowenstein.com, and
> mmcdonald@lowenstein.com

To Sellers:

> Unconditional Love Inc. d/b/a Hello Bello
> 17383 Sunset Boulevard
> Suite B200
> Pacific Palisades, CA 90272
> Attention: Erica Buxton, Chief Executive Officer
> Email:    CEO@hellobello.com

with a copy (which shall not constitute notice) to:

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, NY 10019
> Attention:  Brian S. Lennon
>                   Debra M. Sinclair
> Email:      blennon@willkie.com
>                   dsinclair@willkie.com

or to such other address as any party hereto shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so delivered, except if email notice is transmitted after 5:00 P.M. Eastern Time, then such notice shall be deemed to have been delivered as of the next day.  Any party hereto may notify any other party hereto of any changes to the address or any of the other details specified in this Section 8.7; provided that such notification shall only be effective on the date specified in such notice or five (5) Business Days after the notice is given, whichever is later.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

        8.8     Assignment; Binding Effect.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by any of the Parties without the prior written consent of the other Parties; provided Buyer acknowledges and agrees that Sellers permitted assigns

include any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case.  Subject to the first sentence of this <u>Section 8.8</u> and the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the Sale Order, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.  Any purported assignment not permitted under this <u>Section 8.8</u> shall be null and void.  Notwithstanding anything in this <u>Section 8.8</u> to the contrary, Buyer may, without any required consent from any other party hereto, assign or transfer this Agreement or any of its rights or obligations hereunder (a) to any of its Affiliates, (b) to any acquirer of all or substantially all of the business or assets of the Business or Buyer after the Closing or (c) as a collateral assignment to its or its Affiliates' lenders in connection with any debt financing arrangements of Buyer or its Affiliates; <u>provided</u>, that no such assignment shall relieve Buyer of any Liability or obligation hereunder until such Liability or obligation has been performed.

8.9     <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

8.10    <u>Entire Agreement</u>.  This Agreement together with the exhibits hereto, schedules hereto, the Ancillary Documents, and the Confidentiality Agreement constitute the entire agreement, and supersede all other prior agreements and understandings, both written and oral, between the Parties, or any of them, with respect to the subject matter hereof and thereof, and this Agreement is not intended to grant standing to any Person other than the Parties.

8.11    <u>Amendments; Waivers</u>.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by Parent and Buyer or, in the case of a waiver, by the party hereto against whom the waiver is to be effective (or, with respect to any Seller, by Parent).  Notwithstanding the foregoing, no failure or delay by any party hereto in exercising any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

8.12    <u>Construction</u>.  Headings of the Articles and Sections of this Agreement are for convenience of the Parties only and shall be given no substantive or interpretive effect whatsoever.  The table of contents to this Agreement is for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.

8.13    <u>No Third-Party Beneficiaries</u>.  Each of Sellers and Buyer agree that (a) its representations, warranties, covenants and agreements set forth herein are solely for the benefit of the other Parties, in accordance with and subject to the terms of this Agreement, and (b) this Agreement is not intended to, and does not, confer upon any Person other than the Parties any rights or remedies hereunder, including the right to rely upon the representations and warranties set forth herein.

8.14    <u>Interpretation</u>.  When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, unless the context otherwise requires.  The word "or" shall not be deemed to be exclusive.  The word "extent" and the phrase "to the extent" when used in this Agreement

shall mean the degree to which a subject or other thing extends, and such word or phrase shall not mean simply "if." All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms. References in this Agreement to specific laws or to specific provisions of laws shall include all rules and regulations promulgated thereunder. Each of the Parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of authorship of any of the provisions of this Agreement.

    8.15   <u>Definitions</u>.

    (a)   <u>Certain Specified Definitions</u>. As used in this Agreement:

"<u>Accounts Receivable</u>" means all third party accounts receivable and other rights to payment of Sellers, and the full benefit of all security for such accounts receivable or rights to payment, including all accounts receivable in respect of goods shipped or products sold or services rendered to customers by Sellers, other miscellaneous accounts receivable of Sellers, and any claim, remedy or other right of Sellers related to any of the foregoing, in each case derived from the operation of the Business.

"<u>Acquired Real Property</u>" means the Leased Real Property subject to Assumed Real Property Lease(s).

"<u>Affiliate</u>" means, as to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise) of such Person.

"<u>Alternative Bid</u>" means a higher or better competing bid, as determined by the board of directors of Parent in its sole discretion, including in consideration of any sale, transfer, liquidation, or disposition of the Business or the Purchased Assets, or of a plan of reorganization or liquidation with respect to the Business or the Purchased Assets.

"<u>Alternative Transaction</u>" means one or more agreements to sell, transfer, liquidate or otherwise dispose of any material portion of the Purchased Assets, other than any plan that does not prevent the consummation of the transactions contemplated hereby in accordance with the terms hereof, either alone or together with any other portion of the Business, in a transaction or series of transactions with one or more Persons, other than Buyer, pursuant to an Alternative Bid that actually closes.

"<u>Ancillary Documents</u>" means the Bill of Sale, the Assignment and Assumption Agreement, the Assignment of Intellectual Property and each other agreement, document or instrument (other than this Agreement) executed and delivered by the Parties in connection with the consummation of the transactions contemplated hereby.

"<u>Assignment and Assumption Agreement</u>" means an assignment and assumption agreement in substantially the form of <u>Exhibit A</u>.

"<u>Assignment of Intellectual Property</u>" means an assignment and assumption agreement in

substantially the form of <u>Exhibit I</u>.

"<u>Back-Up Bidder</u>" has the meaning specified in the Bidding Procedures Order.

"<u>Bidding Procedures</u>" means the bidding procedures in substantially the form attached hereto as <u>Exhibit B</u> or otherwise in form and substance reasonably acceptable to Sellers and Buyer, together with any changes thereto reasonably approved by Buyer, if any, as shall have been directed by the Bankruptcy Court.

"<u>Bidding Procedures Order</u>" means an order of the Bankruptcy Court, in substantially the form attached hereto as <u>Exhibit C</u> or otherwise in form and substance reasonably acceptable to Sellers and Buyer, approving the Bidding Procedures and the amount, timing and terms of payment of the Break-Up Fee and Expense Reimbursement as set forth herein, together with any changes thereto reasonably approved by Buyer.

"<u>Bill of Sale</u>" means a bill of sale in substantially the form attached hereto as <u>Exhibit D</u>.

"<u>Books and Records</u>" means all Tax Returns, books, records, files, invoices, supplier lists, promotional materials, technical documentation, data, and other papers (whether in hard copy or electronic format) held by Seller or related to the Purchased Assets, including financial records and data, engineering drawings of machinery and equipment currently used or held for use in connection with the Purchased Assets; blueprints and other technical papers; user manuals; inventory, maintenance, and asset history records; construction plans and specifications; administrative libraries; environmental records required by law or regulation; and systems documentation and other data processing information and records.

"<u>Brand Names</u>" mean each trade name, brand name, or other business name used by any Seller in connection with the Business, including, for the avoidance of doubt, "Hello Bello".

"<u>Bribery Legislation</u>" means all and any of the following: the Foreign Corrupt Practices Act of 1977, as amended and any applicable anti-bribery or anti-corruption related provisions in criminal and anti-competition laws and/or anti-bribery, anti-corruption and/or anti-money laundering laws of any jurisdiction in which the Business operates.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or any other calendar day on which commercial banks in New York, New York are authorized or required by Law to remain closed.

"<u>Business IT Systems</u>" means all Software, computer hardware, servers, networks, platforms, peripherals, and similar or related items of automated, computerized, or other information technology (IT) networks and systems (including telecommunications networks and systems for voice, data, and video) owned, leased, licensed, or used (including through cloud-based or other third-party service providers) in the conduct of the Business.

"<u>CARES Act</u>" means the Coronavirus Aid, Relief, and Economic Security Act.

"CIT Payment Obligation" means the aggregate amount outstanding under the DIP Facility not to exceed $48,000,000.

"<u>Claim</u>" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations and liabilities of any kind or nature under contract, at Law or in

equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Contract" means any written contract, note, bond, mortgage, indenture, deed of trust, license, lease, agreement, arrangement, commitment or other instrument or obligation that is legally binding.

"Credit Facility" means that certain Loan, Security and Guarantee Agreement, dated as of August 12, 2022 (as it may be amended or modified from time to time), among Sellers, as borrowers, the other loan parties party thereto, the lenders party thereto and CIT Northbridge Credit LLC, as agent, sole lead arranger and sole bookrunner.

"Environmental Law" means any and all federal, state, county, tribal and local statutes, laws, rules, regulations, orders, guidance, policy, and common laws regulating or otherwise relating to (i) pollution or the protection, preservation or restoration of the environment (including air, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or any exposure to or Release of, or the management of (including the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production or disposal of) any Regulated Substances, or (ii) that regulates, imposes liability (including for enforcement, investigatory costs, cleanup, removal or response costs, natural resource damages, contribution, injunctive relief, personal injury or property damage) or establishes standards of care with respect to any of the foregoing, including the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.A. §9601, et seq. ("CERCLA"): the Solid Waste Disposal Act, (including the Resource Conservation and Recovery Act of 1976, as amended), 42 U.S.C.A. §6901, et seq. ("RCRA"); the Clean Water Act, 33 U.S.C.A. §1251, et seq.; the Clean Air Act, 42 U.S.C.A. §7401, et seq.; the Toxic Substances Control Act, 15 U.S.C.A. §2601, et seq.; the Occupational Safety and Health Act, 29 U.S.C.A. §651, et seq. ("OSHA"); the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C.A. §136, et seq.; the Lead Based Paint Exposure Reduction Act, 15 U.S.C.A. §2681, et seq.; the Safe Drinking Water Act, 49 U.S.C. §1801 et. seq.; the Hazardous Waste Materials Transportation Act, 49 U.S.C. 5101, et seq.; and all federal, state, county and local laws and ordinances of a similar nature. The term "Environmental Law" includes any common law or equitable doctrine (including injunctive relief and tort doctrines such as negligence, nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to or threatened as a result of the presence of, exposure to, or ingestion of, any Regulated Substance.

"Environmental Permit" means any permit, certificate, registration, notice, approval, identification number, license or other authorization required under any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code that includes or included the first entity, trade or business.

"Expense Reimbursement" means the reasonable and documented actual out-of-pocket legal, accounting and other third-party advisory or service costs and expenses of Buyer in connection with the transactions contemplated hereby, in an amount not to exceed Six Hundred and Forty-Nine Thousand Dollars ($649,000).

"FDA" means the U.S. Food and Drug Administration or a successor thereto.

"FDCA" means the Federal Food, Drug and Cosmetic Act of 1938, as amended.

"Final Order" means an action taken or Order issued by the applicable Governmental Entity as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Entity and the time for filing any such petition or protest is passed; (iii) the Governmental Entity does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Good Faith Deposit Payment Trigger" means Buyer or Sellers shall have terminated this Agreement pursuant to Section 7.1(b) or Sellers shall have terminated this Agreement pursuant to Section 7.1(d), in each case, as a result of either the non-fulfillment of the condition set forth in Section 6.1(d) or the non-delivery of the deliverables set forth in Section 2.6(h) or Section 2.6(i) and such non-fulfillment or non-delivery, as applicable, was caused by Buyer's material breach of Section 5.15 or Section 5.16, as applicable.

"Governmental Entity" means any federal, state, local or foreign governmental entity, transnational governmental organization or any subdivision, court of competent jurisdiction, judicial authority, court, tribunal, arbitral, self-regulatory organization, agency, authority, department, board, bureau, official or commission or instrumentality, in each case, whether domestic or foreign.

"Income Taxes" means Taxes imposed on, or measured by, income or profits, including franchise taxes imposed in lieu of income tax.

"Indebtedness" means, as to any Person, without duplication, as of the date of determination (i) all obligations of such Person for borrowed money, including accrued and unpaid interest, and any prepayment fees or penalties, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all lease obligations of such Person capitalized on the Books and Records of such Person, (iv) all Indebtedness of others secured by a Lien on property or assets owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (v) all letters of credit or performance bonds issued for the account of such Person, to the extent drawn upon, and (vi) all guarantees of such Person of any Indebtedness of any other Person other than a wholly owned subsidiary of such Person.

"Intellectual Property" means any and all rights existing anywhere in the world arising out of or associated with the following:  (i) patents and patent applications, including continuations, divisionals, continuations-in-part, reissues or reexaminations and patents issuing thereon (collectively, "Patents"), (ii) trademarks, service marks, trade dress, logos, corporate names, trade names and Internet domain names, together with the goodwill exclusively associated with any of the foregoing, and all applications and registrations therefor (collectively, "Marks"), (iii) copyrights (including such rights in software) and registrations and applications therefor, and works of authorship (collectively, "Copyrights"), (iv) designs, databases, and data compilations, (v) computer programs, operating systems, applications, firmware and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof ("Software"), and (vi) trade secrets and other proprietary and confidential information, including know-how, inventions (whether or not patentable), processes, formulations, technical data and designs, in each case, excluding any rights in respect of any of the foregoing that comprise or are protected by Patents (collectively, "Trade Secrets");

in each case, used for the operation of the Business.

"Inventory" means all inventories, materials, raw materials, work in process, finished goods and products, parts (including purchased and spare parts), and merchandise, owned by Sellers and used in connection with the Purchased Assets.

"Knowledge" means (i) with respect to Buyer, the actual knowledge, after due inquiry, of Wael Fayad and Stephen Hallenbeck and (ii) with respect to Sellers, the actual knowledge, after reasonable due inquiry of each such person solely with such person's direct reports, of Erica Buxton, Brad Self and Christina Keady. For the avoidance of doubt, Michael Braun and Peter McLaughlin are direct reports of Erica Buxton.

"Leased Real Property" means real property leased by, subleased, licensed to or otherwise used or occupied (but not owned) by one or more Seller with respect to the Business, together with all buildings, structures, fixtures and improvements erected thereon and all rights, privileges, easements, licenses and other appurtenances relating thereto.

"Liability" means any debt, loss, Claim, damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses relating thereto (including fees, discounts and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

"Lien" means any "Interest" as that term is used in Section 363(f) of the Bankruptcy Code, lien (including any mechanics lien), encumbrance, pledge, mortgage, indenture, deed of trust, security interest, pledge, hypothecation, claim, lease, charge, escrow, option, right of first offer, right of first refusal, preemptive right, easement, servitude, reservation, covenant, encroachment, right of use, right of way, security agreement or other similar agreement, arrangement, Contract, commitment, understanding or obligation (whether written or oral and whether or not relating in any way to credit or the borrowing of money) of any kind with respect to any Person, or any proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance or any other right of a third party in respect of an asset of such Person.

"Material Adverse Effect" means, with respect to Sellers, any change, effect, event, occurrence or development that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, operations or financial condition of Sellers, taken as a whole and in respect of the Business, excluding, however, the impact of (i) the filing or pendency of the Bankruptcy Case or operating in bankruptcy, (ii) any changes or developments in domestic, foreign or global markets or domestic, foreign or global general business or economic conditions generally, including (A) any changes or developments in or affecting the domestic or any foreign securities, equity, credit or financial markets and the industry in which Sellers are engaged, (B) any changes or developments in or affecting domestic or any foreign interest or exchange rates and the industry in which Sellers are engaged or (C) any decline or rise in the price of any commodity, (iii) changes in GAAP or any official interpretation or enforcement thereof, (iv) changes in Law or any changes or developments in the official interpretation or enforcement thereof by Governmental Entities, (v) changes in domestic, foreign or global political conditions (including the outbreak or escalation of war, military actions, cyber attacks or acts of terrorism), including any worsening of such conditions threatened or existing on the Agreement Date, (vi) changes or developments in the business conditions or regulatory conditions affecting the industries in which the Business operates, (vii) the announcement or the existence of, compliance with or performance under, this Agreement or the transactions contemplated hereby (including the impact thereof on the

relationships, contractual or otherwise, of Sellers with employees, labor unions, financing sources, customers, suppliers or partners), (viii) weather conditions or other acts of God (including storms, earthquakes, tornados, floods or other natural disasters, as well as any pandemic or epidemic (including COVID-19) or any change, escalation or worsening thereof), (ix) the failure to meet any projections guidance, budgets, forecasts or estimates (provided that the underlying causes thereof may be considered in determining whether a Material Adverse Effect has occurred if not otherwise excluded hereunder), (x) taken or omitted to be taken by a Seller at the written request of Buyer or that is not prohibited by this Agreement, (xi) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby, or (xii) the identify, nature or ownership of Buyer, including the impact thereof on the relationships, contractual or otherwise of the Sellers; except, with respect to clauses (ii), (iv), (vi), and (viii), to the extent that such impact is disproportionately adverse to Sellers, taken as a whole and in respect of the Business, relative to comparable businesses in the industry or industries in which the Business operates.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Entity.

"Ordinary Course" means the ordinary and usual course of day-to-day operations of the Business (including acts and omissions of a Seller in the ordinary and usual course) through the date hereof, consistent with past practice or operations in or pending a bankruptcy.

"Organizational Documents" means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through (d), and (f) any amendment to or equivalent of any of the foregoing.

"Party" or "Parties" means, individually or collectively, Buyer and each Seller.

"Permits" means all material approvals, permits, certificates, qualifications, authorizations, licenses, franchises, consents, Orders and registrations, together with all modifications, amendments, supplements and extensions thereof, of all United States federal, state and local Governmental Entities and any other Person that are issued to Sellers, or used or held for use by Sellers, in connection with the Purchased Assets.

"Permitted Liens" means (i) any Liens for Taxes not yet due or that are being contested in good faith by appropriate Proceedings and for which adequate reserves have been established in the Most Recent Balance Sheet, in accordance with GAAP or the nonpayment of which is permitted or required under the Bankruptcy Code, (ii) vendors', mechanics', materialmen's, carriers', workers', landlords', repairmen's, warehousemen's, construction and other similar Liens (A) with respect to Liabilities that are not yet due and payable or, if due, are not delinquent or (B) that are being contested in good faith by appropriate Proceedings and for which adequate reserves (based on good faith estimates of management) have been set aside for the payment thereof, (C) arising or incurred in the Ordinary Course and which are not, individually or in the aggregate, material to the operation of the Business and do not materially adversely affect the market value or continued use of the asset encumbered thereby or (D) the nonpayment of which is permitted or required under the Bankruptcy Code, (iii) Liens imposed or promulgated by applicable Law or any Governmental Entity with respect to real property, including zoning, building or similar restrictions but only to the extent that Sellers and their respective assets are materially in compliance with the same, (iv) pledges or deposits in connection with workers'

compensation, unemployment insurance, and other social security legislation, (v) Liens relating to intercompany borrowings among a Person and its wholly owned subsidiaries, (vi) utility easements, minor encroachments, rights of way, imperfections in title, charges, easements, rights of way (whether recorded or unrecorded), restrictions, declarations, covenants, conditions, defects and similar Liens or Claims, but not including any monetary Liens, that are imposed by any Governmental Entity having jurisdiction thereon or otherwise are typical for the applicable property  type and locality as do not individually or in the aggregate materially interfere with the present occupancy under the real property interest, or the use or market value of the real property interest, or materially impair the operation of the Business, (vii) Intellectual Property licenses, (viii) Liens to be released at or prior to Closing, (ix) Liens that do not have and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided that, in each case, enumerated in this definition, such Lien shall only be a Permitted Lien if it cannot be satisfied solely through the payment of money or otherwise removed, discharged, released or transferred, as the case may be, pursuant to Section 363(f) of the Bankruptcy Code or otherwise and (x) liens consented to in writing by Buyer.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Entity or other entity.

"Prepaid Assets" means all cash deposits, advance payments and other prepaid items relating to or arising in connection with the operation of the Business in respect of the Purchased Assets.

"Proceeding" means any action, suit, claim, hearing, arbitration, litigation or other proceeding, in each case, by or before any Governmental Entity.

"Personal Information" means, in addition to any definition for any similar term (*e.g.*, "personally identifiable information" or "PII") provided by applicable Law, or by any Seller in any of its privacy policies, notices or Contracts, all information that identifies or could be used to identify an individual person or device.

"Privacy Laws" means any and all applicable Laws relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security, disposal, destruction, disclosure or transfer of Personal Information.

"Purchased Deposits" means all deposits (including customer deposits and security deposits for rent (including such deposits made by a Seller, as lessee, or to a Seller, as lessor, in connection with the Assumed Real Property Lease(s)) and prepaid charges and expenses of, and advance payments made by a Seller, in each case, in respect of the Purchased Assets and reflected in the Financial Statements.

"Real Property Lease" means the Contracts (including all amendments, modifications, assignments, schedules, exhibits, supplements and guarantees with respect thereto) pursuant to which Sellers have leased, subleased, ground leased or licensed, as applicable, the Leased Real Property.

"Regulated Substances" means any pollutant, contaminant, material, substance, waste, chemical, chemical mixture, toxic chemical, dangerous good, which is regulated, listed, defined, or regulated in relevant form, quantity, or concentration under any Environmental Law(s), or that is toxic, radioactive, ignitable, flammable, explosive, corrosive, reactive, infectious, carcinogenic, mutagenic, or otherwise hazardous to human health or the environment, including any petroleum, waste oil, petroleum derivatives, petroleum constituents, petroleum byproducts, pesticides, repellents, odor, mold, radiation, radon, asbestos, so-called "contaminants of emerging concern" (including, but not limited to, 1,4-dioxane, perchlorate, 1,2,3-trichloropropane, and per- and poly-fluoroalkyl substances), or polychlorinated biphenyls, urea formaldehyde foam insulation.

"Release" means any actual or threatened spilling, emitting, emptying, leaking, dumping, injecting, escaping, pumping, pouring, disposing, depositing, discharging, dispersing, escaping, or leaching into the environment, including movement through, to, in, or from air, soil, surface water, groundwater, sediment, or surface or subsurface strata.

"Remedial Action" means any action required by Environmental Law to assess, investigate, clean up, remove, remediate, correct, respond to, report on, monitor, or post financial assurance for any Release of Regulated Substances.

"Representatives" means, with respect to any Person, any and all directors, managers, officers, employees, contractors, consultants, counsel, financial advisors, accountants, auditors, and other agents or authorized representatives of such Person.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated hereby or a competing transaction.

"Sale Motion" means one or more motions, in form and substance satisfactory to Buyer, filed by Sellers pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code to secure entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court.

"Sale Order" means an Order of the Bankruptcy Court in a form and substance reasonably acceptable to Sellers and Buyer, pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code (i) approving this Agreement and the terms and conditions hereof, (ii) authorizing and approving, *inter alia*, the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein free and clear of all Liabilities and Liens (other than Permitted Liens), the assignment to Buyer of, and the assumption by Buyer of, the Assumed Liabilities, and the assignment to Buyer of, and the assumption by Buyer of, the Buyer Assumed Agreements and (iii) containing certain findings of fact, including a finding that Buyer is a good faith purchaser pursuant to, and thus is entitled to the protection afforded by, Section 363(m) of the Bankruptcy Code.  Sellers and Buyer shall use reasonable best efforts to include in the Sale Order a provision barring creditors of Sellers from disparaging or otherwise interfering with the Business from and after the Closing based upon the Asset Purchase or any facts or circumstances existing or occurring prior to the Closing.

"Seller Benefit Plan" means any "employee benefit plan" (within the meaning of Section 3(3) of ERISA), whether or not subject to ERISA, and any other pension, retirement, profit-sharing, supplemental retirement or deferred compensation, stock option, change in control, retention, equity or equity-based compensation, stock purchase, employee stock ownership, severance pay, employment (including offer letters), consultancy, vacation, bonus or other incentive plans, medical or other welfare, retiree medical, vision, dental or other health plans, or life insurance plan, program, agreement, or arrangement, funded or unfunded, or insured or self-insured, (i) that is maintained, established, sponsored or contributed to by a Seller for the benefit of any current or former employee, officer, director or consultant of Seller (who are or were employed in respect of the Business), or (ii) to which Seller (in respect of the Business) contributes or is obligated to contribute or has any Liability.

"Successful Bidder" means the bidder who shall have submitted the highest or otherwise best bid at the conclusion of the Auction in accordance with the Bidding Procedures and Bidding Procedures Order.

"Tax" or "Taxes" means , without limitation (i) any and all federal, state, local or foreign taxes imposed by any Taxing Authority, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll,

employment, social security, unemployment, excise, severance, environmental, stamp, occupation, premium, property (real or personal), or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any and all interest, penalties, additions to tax or additional amounts imposed by any Governmental Entity responsible for the imposition of any such tax and including any obligations to indemnify or otherwise assume or succeed to the tax Liability of any other Person.

"Tax Return" means any return, declaration, report or similar filing required to be filed with respect to Taxes, including any information return, claim for refund, amended return, or declaration of estimated Taxes (including any attachment thereto or amendment thereof).

"Taxing Authority" means any Governmental Entity responsible for the administration or the imposition of any Tax. "Treasury Regulations" means the U.S. Treasury regulations promulgated under the Code. "WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any other similar statutes or regulations of any jurisdiction relating to any plant closing or mass layoff (or such similar terms used in such statutes or regulations).

"Unconditional Canada" means Unconditional Love Canada, Inc., a corporation incorporated under the laws of Canada.

"VAT" means any value added Tax or similar Tax.

"Willful Breach" means, with respect to any party hereto, means, a breach that is a consequence of an act deliberately undertaken or omitted to be taken by the breaching party for which a reasonable person would reasonably be expected to know that the taking of such act or failure to take such act would, or would reasonably be expected to, cause a breach of any representation, warranty, covenant or other agreement set forth in this Agreement.

(b)     The following terms are defined elsewhere in this Agreement, as indicated below:

| **Defined Term** | | | **Section** |
|---|---|---|---|
| 36th | 5.15 | Business Employees | 5.3(a) |
| 36th Amendment | 5.15 | Buyer | Preamble |
| 36th Amendment Term Sheet | 5.15 | Buyer Assumed Agreements | 1.1(j) |
| Agreement | Preamble | Capital Lease Obligations | 3.3(d) |
| Agreement Date | Preamble | CARES Act Funds | 3.9 |
| Allocation Schedule | 2.3 | cGMP | 3.15(c) |
| Asset Purchase | Recitals | CIT | 5.16 |
| Assumed Contracts | 1.1(b) | Closing | 2.4 |
| Assumed Equipment Leases | 1.1(j) | Closing Date | 2.4 |
| Assumed Liabilities | 1.3 | Collective Bargaining Agreement | 3.9(a) |
| Assumed Purchase Orders | 1.1(b) | Confidentiality Agreement | 5.2(c) |
| Assumed Real Property Lease(s) | 1.1(c) | Consents | 3.2(c) |
| Assumption Deadline | 1.5(a) | Cure Costs | 1.5(a) |
| Auction | 5.6(a) | Designated Parties | 1.1(r) |
| Bankruptcy Case | Recitals | Disclosure Schedule | ARTICLE III |
| Bankruptcy Code | Recitals | End Date | 7.1(b) |
| Bankruptcy Court | Recitals | Enforceability Exceptions | 3.2(a) |
| Break-Up Fee | 7.3 | Equipment Lessor Amendments | 5.15 |
| BTPW | Preamble | Equipment Lessors | 5.15 |
| Business | Recitals | Equity Capitalization Amount | 4.5 |

| | | | |
|---|---|---|---|
| Excluded Assets | 1.2 | NFS Amendment | 5.15 |
| Excluded Equipment Leases | 1.2(e) | NFS Amendment Term Sheet | 5.15 |
| Excluded Liabilities | 1.4 | Parent | Preamble |
| Excluded Real Property Leases | 1.2(d) | Parent Allocation Object Notice | 2.3 |
| Filing | Recitals | Permitted Access Parties | 5.2(c) |
| Financial Statements | 3.3 | Petition Date | Recitals |
| Finished Goods | 3.18(a) | Post-Close Filings | 5.2(d) |
| GAAP | 3.3 | Post-Close Proceedings | 5.2(d) |
| Good Faith Deposit | 2.8 | PPP Loans | 3.9 |
| Good Faith Deposit Escrow | 2.8 | Products | 1.1(d) |
| Good Faith Deposit Escrow Holder | 2.8 | Purchase Price | 2.1 |
| Healthcare Laws | 3.15(a) | Purchased Assets | 1.1 |
| Insurance Policies | 3.16 | Purchased Avoidance Actions | 1.1(r) |
| Interim Balance Sheet | 3.3 | Registered Intellectual Property | 3.12(a) |
| IRS | 3.6(a) | Related Parties | 3.20 |
| Key Customers | 3.14 | R&W Policy | 5.8 |
| Key Vendor | 3.14 | Sellers | Preamble |
| Laws | 3.4(a) | Seller Allocation Objection Notice | 2.3 |
| Material Contracts | 3.13(a) | Transaction Support Agreement | 5.14 |
| Most Recent Balance Sheet | 3.3 | Transfer Taxes | 5.7(a) |
| New CIT Facility | 5.16 | Transferred Employees | 5.3(a) |
| New CIT Facility Term Sheet | 2.1(b) | | |
| NFS | 5.15 | | |

(c)     Other Definitional and Interpretive Matters.   Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. The word "day" shall mean calendar day unless "Business Day" is expressly used.

(ii)     Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(iii)     Exhibits/Schedules.   All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

8.16    Disclosure Schedule.  The Disclosure Schedule is qualified in its entirety by reference to specific provisions of this Agreement and is not intended to constitute, and shall not be construed as broadening the scope of the representations, warranties and covenants of Sellers provided in this Agreement.  Each section or subsection referenced in the Disclosure Schedule corresponds to the section or subsection set forth in this Agreement; provided, however, that any matter set forth in any section or subsection of the Disclosure Schedule shall be deemed to be referred to and incorporated in all other sections or subsections of the Disclosure Schedule to which the relevance of such matter is reasonably apparent on its face to inform Buyer that such information is relevant to such other section or subsection. The inclusion of any information or reference in the Disclosure Schedule shall not be deemed to be an admission, acknowledgment or representation, in and of itself, that such information is required by the

terms hereof to be disclosed, is material, has resulted in a Material Adverse Effect, is outside the Ordinary Course or defines further the meaning of such terms for purposes of this Agreement. Nothing in this Agreement or in the Disclosure Schedule constitutes an admission (i) to any third party of any liability or obligation of Sellers to any third-party or (ii) that any information disclosed, set forth or incorporated by reference in the Disclosure Schedule or in this Agreement is material or has (or may result in) a Material Adverse Effect. Prior to the Closing, Sellers shall update Section 3.10(c) of the Disclosure Schedule to include true, correct, and complete details with respect to most recent annual bonus, commission formula, overtime exemption status, and immigration or visa status with respect to each Transferred Employee, and up until Closing, Sellers may update Section 3.13 of the Disclosure Schedule.

8.17    Good Faith Deposit Escrow Holder.

(a)    The Good Faith Deposit Escrow Holder shall be responsible for performing its obligations under this Agreement. The Good Faith Deposit Escrow Holder shall not be responsible or liable in any manner whatsoever for the performance by Sellers or Buyer for their respective obligations under this Agreement, nor shall the Good Faith Deposit Escrow Holder be responsible or liable in any manner whatsoever for the failure of the other parties to this Agreement or of any third party to honor any of the provisions of this Agreement.

(b)    The Good Faith Deposit Escrow Holder shall be entitled to rely upon and shall be protected in acting in reliance upon any instruction, notice, information, certificate, instrument or other document which is submitted to it in connection with its duties under this Agreement and which the Good Faith Deposit Escrow Holder in good faith reasonably believes to have been signed or presented by the proper party or parties. The Good Faith Deposit Escrow Holder shall have no liability with respect to the form, execution, validity or authenticity thereof.

(c)    The Good Faith Deposit Escrow Holder shall not be liable for any act which the Good Faith Deposit Escrow Holder may do or omit to do hereunder, or for any mistake of fact or law, or for any error of judgment, or for the misconduct of any employee, agent or attorney appointed by it, while acting in good faith, unless caused by or arising from its own willful misconduct.

(d)    The Good Faith Deposit Escrow Holder shall have the right at any time to resign for any reason and be discharged of its duties as Good Faith Deposit Escrow Holder hereunder by giving written notice of its resignation to the parties hereto prior to the date specified for such resignation to take effect. All obligations of the Good Faith Deposit Escrow Holder hereunder shall cease and terminate on the effective date of its resignation and its sole responsibility thereafter shall be to hold the Good Faith Deposit, for a period of no more than sixty (60) calendar days following the effective date of resignation, at which time:

(i)    if a successor holder of the Good Faith Deposit shall have been appointed, by the mutual written consent of Buyer, the Sellers and such successor holder, then the resigning Good Faith Deposit Escrow Holder shall deliver the Good Faith Deposit to such successor holder; or

(ii)    if a successor holder of the Good Faith Deposit shall not have been appointed, for any reason whatsoever, the resigning holder of the Good Faith Deposit shall deliver the Good Faith Deposit to a court of competent jurisdiction in the county in which the Good Faith Deposit is then being held and give written notice of the same to the parties hereto.

(e)    Buyers and Seller, jointly and severally, agree to indemnify and hold the Good Faith Deposit Escrow Holder harmless from and against any and all liabilities, causes of action, claims,

demands, judgments, damages, costs and expenses (including reasonable attorneys' fees and expenses) ("Losses") that may arise out of or in connection with the Good Faith Deposit Escrow Holder's acceptance of or performance of its duties and obligations under this Agreement; provided, however, that the Good Faith Deposit Escrow Holder shall not be entitled to indemnification with respect to Losses that have been finally adjudicated by a court of competent jurisdiction to have been caused by the gross negligence, willful misconduct, bad faith or actual fraud of the Good Faith Deposit Escrow Holder.

(f)    If the Good Faith Deposit Escrow Holder shall be uncertain as to its duties or rights hereunder or shall receive instructions with respect to the Good Faith Deposit which, in its sole discretion, are in conflict either with other instructions received by it or with any provision of this Agreement, the Good Faith Deposit Escrow Holder shall have the absolute right to suspend all further performance under this Agreement (except for the safekeeping of the Good Faith Deposit) until such uncertainty or conflicting instructions have been resolved to the Good Faith Deposit Escrow Holder's sole satisfaction by final judgment of a court of competent jurisdiction, joint written instructions from all of the other parties hereto, or otherwise.

(g)    The parties acknowledge that Lowenstein Sandler LLP, as Good Faith Deposit Escrow Holder, has agreed to serve in such capacity as an accommodation to the parties on the condition that it be allowed to continue to act as legal counsel to Buyer. Sellers acknowledge that Lowenstein Sandler LLP has acted as legal counsel to Buyer in connection with this Agreement, the transactions contemplated hereby and other matters relating thereto and that Lowenstein Sandler LLP shall continue such representation of Buyer, including with respect to Buyer's rights and obligations under this Agreement, and all other matters. Nothing in this Agreement, nor Lowenstein Sandler LLP's serving as Good Faith Deposit Escrow Holder hereunder, is intended to prevent or inhibit Lowenstein Sandler LLP from continuing to serve as legal counsel to Buyer.

8.18    No Right of Set-Off. Buyer, on its own behalf and on behalf its successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Buyer or its successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith.

8.19    Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, the Sellers retain the right to pursue any transaction or restructuring strategy that, in the Sellers' business judgment, will maximize the value of their estates.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed the day and year first above written.

**BUYER:**

BUCKY ACQUISITION HOLDCO, LLC

By: _David Solomon_____
     Name: David Solomon
     Title:   President and Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*

**SELLERS:**

UNCONDITIONAL LOVE INC.

By: _____
Name:  Erica Buxton
Title:
        CEO

THE BEST TRAINING PANTS IN THE WORLD
INC.

By: _____
Name:  Erica Buxton
Title:
        CEO

*[Signature Page to Asset Purchase Agreement]*

**Solely with respect to its role as Good Faith Deposit Escrow Holder and Article VIII:**

### GOOD FAITH DEPOSIT ESCROW HOLDER:

LOWENSTEIN SANDLER LLP

*[Signature Page to Asset Purchase Agreement]*

## TRANSACTION SUPPORT AGREEMENT

This Transaction Support Agreement (together with the exhibits and attachments hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, this "<u>Agreement</u>"), dated as of October 23, 2023, is entered into by and among:

(a)     Unconditional Love, Inc., Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc. (together, the "<u>Company</u>");

(b)     Bucky Acquisition Holdco, LLC ("<u>Buyer</u>");

(c)     NFS Leasing, Inc. ("<u>NFS</u>"); and

(d)     36th Street Capital Partners, LLC ("<u>36th Street</u>").

This Agreement collectively refers to the Company, Buyer, NFS, and 36th Street as the "<u>Parties</u>" and each individually as a "<u>Party</u>."

## RECITALS

WHEREAS, the Company intends to file voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>," and such cases, the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") and seek Bankruptcy Court approval of bid protections for Buyer as a stalking horse bidder and bidding procedures pursuant to which the Company will solicit higher or otherwise better bids for the Company's assets, including holding an auction (the "<u>Auction</u>"), if needed (the "<u>Bidding Procedures</u>"); and

WHEREAS, the Parties have, in good faith and at arm's length, negotiated or been apprised of the terms of the transactions contemplated in the stalking horse asset purchase agreement attached as <u>Exhibit A</u> hereto (together with the exhibits and attachments thereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "<u>Stalking Horse Asset Purchase Agreement</u>") and have agreed to support and pursue the Transactions (as defined herein) in accordance with and subject to the terms and conditions set forth herein; and

WHEREAS, the Stalking Horse Asset Purchase Agreement contains a closing condition requiring that certain Master Lease Agreement No. 106020 and Lease Schedule No. 1, each dated as of February 24, 2023, by and between the Company and NFS (as in effect at the commencement of the Chapter 11 Cases, and together with all exhibits, schedules, and attachments thereto, the "<u>NFS Lease</u>"), to be assumed by the Company and assigned to Buyer upon and subject to the material terms and conditions set forth on <u>Exhibit B,</u> which terms will be incorporated into a new, amended and restated master lease agreement and schedules entered into between the Debtor and NFS immediately prior to the closing of the Stalking Horse Purchase Agreement and assignment of same to Buyer (the "<u>NFS Lease Amendment</u>"); and

67884425.11

WHEREAS, the Stalking Horse Asset Purchase Agreement contains a closing condition requiring that certain Master Lease Agreement, dated as of March 10, 2021, and Amended and Restated Equipment Lease Schedule No. 001, dated as of December 22, 2021, by and between the Company and 36th Street (as in effect at the commencement of the Chapter 11 Cases, and together with all exhibits, schedules, and attachments thereto, the "36th Street Lease"), to be assumed by the Company and assigned to Buyer upon and subject to the material terms and conditions set forth as Exhibit C, which terms will be incorporated into an amendment to the 36th Street Lease, and executed by the Company, immediately prior to the closing of the Stalking Horse Purchase Agreement and assignment of same to Buyer (the "36th Street Lease Amendment," and together with the NFS Lease Amendment, the "Lease Amendments"); and

WHEREAS, the Stalking Horse Asset Purchase Agreement does not presently contemplate the Company's assumption and assignment of its equipment leases with CSC Leasing Company and SCG Capital Corporation (the "Other Equipment Leases"); and

WHEREAS, this Agreement sets forth the agreement among the Parties concerning their respective commitments, subject to the terms and conditions hereof, to support and implement the Stalking Horse Asset Purchase Agreement and the Lease Amendments (collectively, the "Transactions").

NOW, THEREFORE, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

1.     Agreement Effective Date.  This Agreement shall become effective upon the execution of this Agreement by all of the Parties (the "Agreement Effective Date") and shall remain effective until the earlier of (a) for so long as Buyer remains the stalking horse bidder, is an active participant in the Auction (if one is held)), or has otherwise been selected as the successful bidder or backup bidder pursuant to the Bidding Procedures, and (b) the occurrence of a Termination Event (as defined herein) (such period, including through the closing of the Transactions if Buyer is selected as the successful bidder or backup bidder, the "Agreement Effective Period").

2.     Commitments of All Parties.  Subject to the terms and conditions of this Agreement, each of the Parties agrees that it shall (and shall cause each of its direct and indirect subsidiaries to), so long as no Termination Event has occurred, support and take all commercially reasonable actions necessary to facilitate the implementation and consummation of the Transactions, subject to the Bidding Procedures (including the results of any Auction).

3.     Commitment of the Company.

(a)     Notwithstanding anything to the contrary herein, to the extent the Company (i) designates Buyer as the successful bidder or backup bidder in accordance with the Bidding Procedures and (ii) consummates the Transactions with Buyer, the Company shall execute the NFS Lease Amendment and 36th Street Lease Amendment, and shall assume and assign the NFS Lease

2

67884425.11

(as amended by the NFS Lease Amendment) and the 36th Street Lease (as amended by the 36th Street  Lease Amendment) to Buyer on the closing date.

(b)    From the commencement of the Chapter 11 Cases and until the closing of the Transactions or an Alternative Transaction, the Company agrees to, and shall timely make, all scheduled postpetition lease payments due to NFS under the NFS Lease and due to 36th Street under the 36th Street Lease, with all such lease payments constituting ordinary course expenses under Section 503(b) of the Bankruptcy Code.

4.    <u>Commitments of Buyer</u>.

(a)    Notwithstanding anything to the contrary herein, Buyer hereby expressly agrees to the material terms and conditions of the NFS Lease Amendment and the 36th Street Lease Amendment, as set forth on <u>Exhibits B</u> and <u>C</u> hereto, respectively.  Buyer shall support the Company's efforts to assume and assign, and shall accept the assignment of, the NFS Lease (as amended by the NFS Lease Amendment) and the 36th Street Lease (as amended by the 36th Street Lease Amendment) to Buyer on the closing date, subject to Bankruptcy Court approval of Buyer as the successful bidder and satisfaction of all conditions to the closing of the Transactions pursuant to the Stalking Horse Asset Purchase Agreement and any order of the Bankruptcy Court approving the Transactions.

(b)    Notwithstanding anything to the contrary herein, to the extent Buyer seeks the Company's assumption and assignment of any Other Equipment Lease, or otherwise proposes to amend any Other Equipment Lease subsequent to closing the Transactions, on terms and conditions that are more favorable to the applicable lessor than the terms and conditions under the NFS Lease Amendment or the 36th Street Lease Amendment, then Buyer agrees to (i) provide prompt notice to NFS and 36th Street of such proposed more favorable terms, and (ii) at the election by NFS or 36th Street, amend and modify the terms and conditions of the NFS Lease Amendment or the 36th Street Lease Amendment, as applicable, to provide NFS and/or 36th Street equally favorable treatment.

5.    <u>Commitments of NFS</u>.

(a)    During the Agreement Effective Period, NFS shall not sell, transfer, assign, or otherwise dispose of, directly or indirectly, its right, title, or interest with respect to the NFS Lease or any of the equipment subject thereto, in whole or in part, without the express written consent of the Company and Buyer, and any such assignment in violation of this Section 5(a) shall be void *ab initio*.

(b)    Except as provided in this subsection, during the Agreement Effective Period, NFS shall not participate in the Auction as a bidder (whether on its own or as part of a group), and shall not undertake or support any sale, reorganization, merger, consolidation, business combination, or other recapitalization or debt restructuring of the Company (whether through a judicial process or otherwise) other than in connection with the Transactions; <u>provided</u> that, during the Chapter 11 Cases, nothing contained herein shall prevent NFS from negotiating with qualified bidders for the Company's assets other than Buyer (the "<u>Other Bidders</u>") to improve the terms of the NFS Lease and the proposed NFS Lease Amendment, including in connection with the proposed treatment of

67884425.11

the NFS Lease under any such Other Bidder's proposed bid for all or any portion of the Company's assets, provided further that, if terms are agreed upon with any Other Bidder and such bid is the then prevailing bid during the Auction, NFS shall make identical terms available to Buyer in connection with any subsequent bid by Buyer during the Auction. To the extent any Other Bidder participates in the Auction for the Company's assets and seeks to reject the NFS Lease or to otherwise modify the terms of the NFS Lease on less favorable terms than as set forth at Exhibit B hereto, and such bid is the highest or otherwise best bid during the auction, then NFS (on its own or as part of a group) shall be deemed a qualified bidder and may participate in the Auction solely to bid against such Other Bidders for all or any portion of the Company's assets; provided, however, that if Buyer is chosen as the successful bidder, any such bid by NFS shall be null and void and NFS shall remain bound to this Agreement (including, but not limited to, section 5(c) hereof). The obligations set forth in this subsection 5(b) and this Agreement shall supersede any contrary terms embodied in any bid submitted by NFS.

(c)    Notwithstanding anything to the contrary herein or the NFS Lease, and subject to sections 4(b) and 7(b) hereof, to the extent the Company designates Buyer as the successful bidder or backup bidder pursuant to the Bidding Procedures and on the terms set forth in the Stalking Horse Asset Purchase Agreement (as it may be modified as part of the bidding during the Auction), NFS shall be deemed to consent to, and waives any rights it may have to object to, the assignment of the NFS Lease by the Company to Buyer on the terms set forth in the NFS Lease Amendment.

6.    Commitments of 36th Street.

(a)    During the Agreement Effective Period, 36th Street shall not sell, transfer, assign, or otherwise dispose of, directly or indirectly, its right, title, or interest with respect to the 36th Street Lease or any of the equipment subject thereto, in whole or in part, without the express written consent of the Company and Buyer, and any such assignment in violation of this Section 6(a) shall be void ab initio.

(b)    Except as provided for of this subsection, during the Agreement Effective Period, 36th Street shall not participate in the Auction as a bidder (whether on its own or as part of a group), and shall not undertake or support any sale, reorganization, merger, consolidation, business combination, or other recapitalization or debt restructuring of the Company (whether through a judicial process or otherwise) other than in connection with the Transactions; provided that, during the Chapter 11 Cases, nothing contained herein shall prevent 36th Street from negotiating with Other Bidders for the Company's assets to improve the terms of the 36th Street Lease and the proposed 36th Street Lease Amendment, including in connection with the proposed treatment of the 36th Street Lease under any such Other Bidder's proposed bid for all or any portion of the Company's assets, provided further that, if terms are agreed upon with any Other Bidder and such bid is the then prevailing bid during the Auction, 36th Street shall make identical terms available to Buyer in connection with any subsequent bid by Buyer during the Auction. To the extent any Other Bidder participates in the Auction for the Company's assets and seeks to reject the 36th Street Lease or to otherwise modify the terms of the 36th Street Lease on less favorable terms than as set forth at Exhibit C hereto, and such bid is the highest or otherwise best bid during the Auction, then 36th Street (on its own or as part of a group) shall be deemed a qualified bidder and may participate in the Auction solely to bid against such Other Bidders for all or any portion of the Company's assets; provided, however, that if Buyer is chosen as the successful bidder, any such

67884425.11

bid by 36th Street shall be null and void and 36th Street shall remain bound to this Agreement (including, but not limited to, section 6(c) hereof). The obligations set forth in this subsection 6(b) and this Agreement shall supersede any contrary terms embodied in any bid submitted by 36th Street.

(c)     Notwithstanding anything to the contrary herein or the 36th Street Lease, and subject to sections 4(b) and 7(b) hereof, to the extent the Company designates Buyer as the successful bidder or backup bidder pursuant to the Bidding Procedures and on the terms set forth in the Stalking Horse Asset Purchase Agreement (as it may be modified as part of the bidding during the Auction), 36th Street shall be deemed to consent to, and waives any rights it may have to object to, the assignment of the 36th Street Lease by the Company to Buyer on the terms set forth in the 36th Street Lease Amendment.

7.     <u>Termination</u>.

(a)     <u>Mutual Termination</u>. This Agreement may be terminated as to all Parties at any time by mutual written consent of all Parties.

(b)     <u>Automatic Termination</u>. This Agreement will automatically terminate as to all Parties upon the earliest to occur of the following (together with the events described in section 7(a) and 7(b), each, a "<u>Termination Event</u>"):

  (i)   the indefeasible consummation of the Transactions;

  (ii)  the conclusion of the Auction if Buyer is not designated by the Company as the successful bidder or backup bidder;

  (iii) The closing of an asset sale transaction with a party other than Buyer;

  (iv)  the termination of the Stalking Horse Asset Purchase Agreement;

  (v)   notice from the applicable lessor of the Company's breach of its obligations at Section 3(b), which breach shall remain uncured for five (5) business days following such notice;

  (vi)  the dismissal or conversion of the Company's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or

  (vii)     February 28, 2024.

(c)     <u>Termination Date and Survival</u>. The date on which this Agreement is terminated in accordance with this <u>Section 7</u> with respect to a Party shall be referred to as the "<u>Termination Date</u>" with respect to such Party and the provisions of this Agreement shall terminate on the Termination Date; <u>provided</u>, that Sections 4(b), 7(d), and 8 through 20 hereof shall survive the Termination Date.

(d)     <u>Effect of Termination</u>. Upon the Termination Date, this Agreement shall forthwith become null and void and have no further force or effect, each Party shall be released from its

67884425.11

commitments, undertakings and agreements under or related to this Agreement and there shall be no liability or obligation hereunder on the part of any Party; provided that in no event shall any such termination relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder prior to such Termination Date, notwithstanding any termination of this Agreement by any other Party, and (ii) obligations under this Agreement which expressly survive any such termination pursuant to Section 7(d).

8.    Representations and Warranties.

(a)    Each Party (severally and not jointly) represents and warrants to each other Party that:

(i)    such Party is duly organized, validly existing, and in good standing (where such concept is recognized) under the laws of the jurisdiction of its organization and has all requisite corporate, partnership, limited liability company, or other organizational power and authority to enter into this Agreement, carry out the Transactions contemplated herein, and perform its respective obligations under this Agreement;

(ii)    the execution, delivery, and performance of this Agreement by such Party does not and shall not, as applicable, (A) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its organizational documents or those of any of its subsidiaries or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under its organizational documents or any material contractual obligations to which it or any of its subsidiaries is a party;

(iii)    as of the Agreement Effective Date (or such later date that it delivers its signature page hereto to the other Parties), such Party has no actual knowledge of any event that, due to any fiduciary or similar duty to any other Person or entity, would prevent it from taking any action required of it under this Agreement; and

(iv)    this Agreement is a legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles relating to enforceability (regardless of whether enforcement is sought in equity or at law).

9.    Entire Agreement: Prior Negotiations.    This Agreement, including all of the exhibits attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all other prior negotiations, agreements, and understandings, whether written, oral, or implied, among the Parties with respect to the subject matter of this Agreement; provided that any confidentiality agreement or non-disclosure agreement executed by any Party shall survive this Agreement and shall continue in full force and effect, subject to the terms thereof, irrespective of the terms hereof.

10.    Reservation of Rights.    If the Transactions contemplated herein are not consummated, or if this Agreement is terminated in accordance with its terms (except as a result of the occurrence of the Closing Date), nothing shall be construed herein as a waiver by any Party

67884425.11

of any or all of such Party's rights, remedies, or defenses, and the Parties expressly reserve any and all of their respective rights, remedies, or defenses.

11.    <u>FRE 408</u>.  To the extent provided in Federal Rule of Evidence 408 and any other applicable rules of evidence in any applicable jurisdiction, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

12.    <u>Counterparts; Execution</u>.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute one and the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (PDF) or by DocuSign or similar electronic signature.

13.    <u>Amendments and Waivers</u>.  Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented, and no provision of this Agreement may be waived, without the prior written consent of the Parties.  For the avoidance of doubt, notwithstanding anything to the contrary herein, the Stalking Horse Asset Purchase Agreement and Lease Amendments may be amended in accordance with their terms.

14.    <u>Headings</u>.  The headings of the sections, paragraphs, and subsections of this Agreement are included for convenience only and shall not affect the interpretation of the provisions contained herein.

15.    <u>Specific Performance: Damages</u>.  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such actual, alleged, or threatened breach of this Agreement, including, without limitation, a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations in this Agreement.  Notwithstanding anything to the contrary in this Agreement, in no event shall any Party or its representatives be liable to any other Party hereunder for any punitive, incidental, consequential, special, or indirect damages, including the loss of future revenue or income or opportunity, relating to the breach or alleged breach of this Agreement.

16.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to any choice of law provision that would require the application of the laws of another jurisdiction.  By the execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any action, suit, or proceeding against it with respect to any matter arising under or out of or related to this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding may be brought in either a state or federal court of competent jurisdiction in the State and County of New York, Borough of Manhattan; <u>provided</u> that after the Company commences its Chapter 11 Cases, all such actions, suits or proceedings shall be brought solely in the Bankruptcy Court.  By the execution and delivery of this Agreement, each of the Parties hereto agrees not to challenge the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit, or proceeding.  By executing and delivering this Agreement, each of the Parties hereto irrevocably and unconditionally submits to

67884425.11

the personal jurisdiction of each such courts described in this <u>Section 16</u>, as applicable, solely for purposes of any action, suit, or proceeding arising out of or relating to this Agreement or for the recognition or enforcement of any judgment rendered or order entered in any such action, suit, or proceeding.  EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING REFERRED TO ABOVE.

17.    <u>Notices</u>.  All notices (including, without limitation, any notice of termination as provided for herein) and other communications from any Party given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given upon the earliest of the following: (a) upon personal delivery to the Party to be notified; (b) when sent by confirmed electronic mail if sent during the normal business hours of the recipient, and if not so confirmed, on the next Business Day; (c) three (3) Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid; and (d) one (1) Business Day after deposit with a nationally recognized overnight courier, specifying next-day delivery (with an email upon sending to the Party to be notified), with written verification of receipt.  Copies of all notices and other communications sent by any means other than electronic mail shall be sent contemporaneously by electronic mail.  All communications shall be sent:

(a)    If to the Company:

Unconditional Love, Inc. d/b/a Hello Bello
17383 Sunset Boulevard
Suite B200
Pacific Palisades, CA 90272
Attn: Erica Buxton
Email: erica.buxton@hellobello.com

with copies to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attn:   Brian S. Lennon
        Debra M. Sinclair
        Erin C. Ryan
Email: blennon@willkie.com
       dsinclair@willkie.com
       eryan@willkie.com

(b)    If to Buyer:

Bucky Acquisition Holdco, LLC
c/o of Hildred Capital Management, LLC
745 Fifth Avenue, Suite #1701
New York, NY 10151
Attention: David Solomon and Andrew Goldman
Email: dsolomon@hildredcapital.com and agoldman@hildredcapital.com

67884425.11

with a copy (which shall not constitute notice) to:

>Lowenstein Sandler LLP
>1251 Avenue of the Americas
>17th Floor
>New York, NY 10020
>Attention: Sam E. Khan, Andrew Behlmann, and Mitchell McDonald
>Email: skhan@lowenstein.com, abehlmann@lowenstein.com, and
>mmcdonald@lowenstein.com

(c)    If to NFS:

>NFS Leasing, Inc.
> Cummings Center 900
>Suite 226-U
>Beverly, MA 01915
>Attn: Legal
>legal@nfsleasing.com

with a copy (which shall not constitute notice) to:

>Locke Lord LLP
>Huntington Avenue 111
>Boston, MA 02199
>Attn: Adrienne K. Walker
>Telephone: (617) 239-0211
>awalker@lockelord.com

(d)    If to 36th Street:

>36th Street Capital Partners, LLC
>161 Headquarters Plaza – East Tower
>5th Floor
>Morristown, NJ  07960
>Attn: Christopher Szopa
>        Chief Commercial Officer &
>        Corporate Counsel

>Moritt Hock & Hamroff LLP
>400 Garden City Plaza
>Garden City, NY  11530
>Attn:  Theresa A. Driscoll
>Telephone:  (516) 880-7278
>tdriscoll@moritthock.com

18.    <u>Incorporation by Reference</u>.  The exhibits hereto are fully incorporated by reference herein and are made a part of this Agreement as if fully set forth herein, and all references to this Agreement shall include and incorporate all exhibits hereto.

67884425.11

19.     No Third-Party Beneficiaries.   Unless otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other Person shall be a third-party beneficiary hereof.

20.     Successors and Assigns; Severability.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators, and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction.

21.     Email Consent.  Where a written consent, acceptance, approval, notice, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, notice, or waiver shall be deemed given if, by agreement between the Parties (or their counsel) submitting and receiving such consent, acceptance, approval, notice, or waiver, it is conveyed in writing (including electronic mail) between such Parties (or their counsel) without representations or warranties of any kind.

[Signature Pages Follow]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers, all as of the day and year first written above.

UNCONDITIONAL LOVE, INC.

By: _____

Name: Erica Buxton

Title: CEO

BUCKY ACQUISITION HOLDCO, LLC

By: _David Solomon_____

Name: David Solomon
Title:   President and Chief Executive Officer

[Signature Page to Transaction Support Agreement]

BUCKY ACQUISITION HOLDCO, LLC


By: _____
　　　Name:
　　　Title:


NFS LEASING, INC.


By: _____
　　　Name: Dana Calumby
　　　Title: Chief Financial Officer


36th STREET CAPITAL PARTNERS, LLC


By: _____
　　　Name:
　　　Title:


[Signature Page to Transaction Support Agreement]

BUCKY ACQUISITION HOLDCO, LLC


By: _____
    Name:
    Title:


NFS LEASING, INC.


By: _____
    Name:
    Title:


36th STREET CAPITAL PARTNERS, LLC


By: _____
    Name: Matthew Ozanich
    Title: Senior Vice President


[Signature Page to Transaction Support Agreement]

## **Exhibit A**

**STALKING HORSE ASSET PURCHASE AGREEMENT**

## Exhibit B

### MATERIAL TERMS TO NFS AMENDED AND RESTATED LEASE

Upon the closing of the Stalking Horse Purchase Agreement (as may be modified consistent with this Agreement), Buyer and NFS shall enter into the NFS Lease Amendment, which absent written waiver by NFS and Buyer, shall include the following terms:

**A.** **Amended and Restated Master Lease Agreement:**   Buyer agrees to the assignment of an amended and restated master lease agreement, which shall include NFS's standard master lease agreement and equipment lease schedule, a copy of which shall be delivered to Buyer prior to its designation as the stalking horse by the Bankruptcy Court in the chapter 11 case. In addition to the economics set forth in the amended and restated Lease Schedule, the master lease agreement provides that all payments are plus applicable taxes.

**B.** **Lease Schedule:**   Buyer agrees to enter into an amended and restated lease schedule which shall include the following:

- **Equipment Cost**: $8,531,220.07, minus the ordinary course lease payments received by NFS during the Company's chapter 11 case (parties anticipate two (2) lease payments prior to the sale closing)

- **Initial Period (months):** 84, commencing on the first business day of the month immediately subsequent to the assignment to Buyer.

- **Cure Costs:** None

- **Rent:** Lease schedule to provide for the following monthly rent payments, plus applicable taxes:
  - (i)   Months 1-6:  $31,500;
  - (ii)   Months 7-24:  $63,000; and
  - (iii)   Months 25-84: $141,608.65; provided, that such rental payments will be adjusted if the monthly lease payments made by the Company during the chapter 11 case to NFS is fewer or greater than two (2) ordinary course monthly payments.

- **Lease Expiration Option**:

  - (i)   Purchase the Equipment at Fair Market Value at not less than 15% of the Equipment Cost;
  - (ii)   Extend the Monthly Rent on a month-to-month basis or for a fixed term at a mutually agreed to price and term; or
  - (iii)   Return the Equipment to Lessor.

## Exhibit C

## MATERIAL TERMS TO 36th STREET LEASE AMENDMENT

Upon the closing of the Stalking Horse Purchase Agreement (as may be modified consistent with this Agreement), Buyer agrees to the assignment of the 36th Street Lease as amended by the 36th Street Lease Amendment, which amendment shall include the following terms:

**A.** **Acknowledgement of Assignment of the Master Lease Agreement and Lease Schedule 001**:  Prior to closing of the Transactions, Buyer agrees to execute and deliver such assignment documents as may be required by 36th Street pursuant to which Buyer shall acknowledge its obligations as assignee of the 36th Street Master Lease Agreement dated March 10, 2021 and Amended and Restated Equipment Lease Schedule No. 001, as amended pursuant to the 36th Street Lease Amendment on the material terms set forth below.

**B.** **Amendment to Lease Schedule**:  Buyer agrees to an amendment of the 36th Street Lease on the following terms:

- **Equipment Cost**:  $7,278,000.00, minus the ordinary course lease payments received by 36th Street during the Company's chapter 11 case (parties anticipate two (2) lease payments prior to sale closing)

- **Lease Term**:  84 months, commencing on the first business day following the effective date of the Buyer assignment

- **Cure Costs:**  None

- **Rent**:  Lease schedule, as amended, will provide for the following monthly rent payments, plus applicable taxes:

  (i)   Months 1-6:  Six (6) monthly payments of $30,000.00
  (ii)  Months 7-24:  Eighteen (18) monthly payments of $60,000.00
  (iii) Months 25-84:  Sixty (60) monthly payments of $117,920.54; provided, that such rental payments will be adjusted if the monthly lease payments made by the Company during the chapter 11 case to NFS is fewer or greater than two (2) ordinary course monthly payments.

- **Lease Expiration Option**:

  (i)   Purchase the Equipment at Fair Market Value at not less than 15% of the Equipment Cost;

  (ii)  Extend the Rent Payments on a month-to-month basis or for a fixed term at a mutually agreed to price and term; or

   (iii)   Return the Equipment to Lessor.