## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>UNCONDITIONAL LOVE INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11759 (MFW)<br><br>(Joint Administration Requested)<br><br>**Ref. Docket No. 17** |

### DECLARATION OF ROBERT J. WHITE
### IN SUPPORT OF THE MOTION OF THE
### DEBTORS FOR ENTRY OF ORDERS
### (I) (A) APPROVING BIDDING PROCEDURES
### FOR THE SALE OF SUBSTANTIALLY ALL
### OF THE DEBTORS' ASSETS, (B) AUTHORIZING
### THE DEBTORS TO DESIGNATE A STALKING
### HORSE BIDDER AND TO PROVIDE BID PROTECTIONS
### THEREUNDER, (C) SCHEDULING AN AUCTION AND
### A SALE HEARING AND APPROVING THE FORM
### AND MANNER OF NOTICE THEREOF, (D) APPROVING
### ASSUMPTION PROCEDURES, AND (E) GRANTING RELATED
### RELIEF; AND (II) (A) APPROVING THE SALE OF THE
### DEBTORS' ASSET FREE AND CLEAR OF LIENS, CLAIMS,
### INTERESTS AND ENCUMBRANCES, (B) APPROVING THE
### ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF

I, Robert J. White, hereby declare, under penalty of perjury, as follows:

1.      I am a Managing Director at Jefferies LLC ("Jefferies"), a global investment banking and financial advisory firm with a principal office located at 520 Madison Avenue, New York, NY 10022, as well as other locations worldwide. Jefferies is the proposed investment banker

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, to the extent applicable, are Unconditional Love Inc. d/b/a Hello Bello (5895), Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc. (9369). The Debtors' headquarters is located at 17383 Sunset Blvd, Suite B200, Pacific Palisades, CA 90272.

to the debtors and debtors in possession (the "Debtors") in the above-captioned cases (the "Chapter 11 Cases").

2.    I submit this declaration (the "Declaration) on behalf of the Debtors in support of the *Motion of the Debtors for Entry of Orders (I) (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Designate a Stalking Horse Bidder and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and a Sale Hearing, (D) Approving Assumption and Assignment Procedures, and (E) Granting Related Relief; and (II) (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 17] (the "Motion").[2]

3.    Unless otherwise indicated, all facts set forth in the Declaration are based upon (a) my personal knowledge of the Debtors' current operations and financial performance, (b) my attendance and oversight of the sale process; (c) information learned from my review of relevant documents and information concerning the Debtors' operations and financial affairs; (d) information I received from members of the Debtors' management or advisors, including members of Jefferies working directly with me and under my supervision, direction, or control; and/or (e) my views based on my experience and knowledge.

4.    I am over the age of 18 and am duly authorized to submit the Declaration on behalf of the Debtors and in support of the Motion.  I am not being specifically compensated for this testimony other than through payments received by Jefferies as a proposed professional to be

---

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Motion.

retained by the Debtors.  If called upon to testify, I could and would testify as to the facts set forth herein.

<div align="center">**QUALIFICATIONS**</div>

5.      As a global investment banking and financing firm, Jefferies provides a broad range of corporate advisory services to its clients including, without limitation, services relating to: (i) general financial advice; (ii) mergers, acquisitions, and divestitures; (iii) special committee assignments; (iv) capital raising; and (v) corporate restructurings.  Jefferies and its senior professionals have extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 proceedings.  Jefferies has advised debtors, creditors, equity constituencies, and purchasers in connection with many reorganizations.  Since 2007, Jefferies has been involved in over 250 restructurings, representing over $800 billion in restructured liabilities

6.      Jefferies' restructuring professionals have extensive experience working with and advising financially troubled companies, debtors, and other constituencies in chapter 11 cases and have served as financial advisors to debtors and creditors in various restructurings, including, but not limited to: In re Lordstown Motors Corp., Case No. 23-10831 (MFW) (Bankr. D. Del. July 25, 2023); AeroCision Parent, LLC, Case No. 23-11032 (KBO) (Bankr. D. Del. July 31, 2023); In re Pipeline Health System, LLC, Case No. 22-90291 (MI) (Bankr. S.D. Tex. Oct. 2, 2022); In re Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.), Case No. 22-90273 (MI) (Bankr. S.D. Tex. Sep. 22, 2022); In re SAS AB, Case No. 22-10925 (MEW) (Bankr. S.D.N.Y. Sept. 19, 2022); In re Vewd Software USA, LLC, Case No. 21-12065 (MEW) (Bankr. S.D.N.Y. Dec. 15, 2021); In re Limetree Bay Services, LLC, Case No. 21-32351 (DRJ) (Bankr. S.D. Tex. Sep. 10, 2021); In re Rosehill Resources Inc., Case No. 20-33695 (DRJ) (Bankr. S.D.

Tex. July 26, 2020), In re Hospitality Investors Trust, Case No. 21-10831 (CTG) (Bankr. D. Del. May 20, 2021); In re CarbonLite Holdings LLC, Case No. 21-10527 (JTD) (Bankr. D. Del. Apr. 7, 2021); In re Gulfport Energy Corp., Case No. 20-35562 (DRJ) (Bankr. S.D. Tex. Jan. 21, 2021); In re Mallinckrodt PLC, Case No. 20-12522 (JTD) (Bankr. D. Del. Jan. 13, 2021); In re Bouchard Transportation Co., Inc., Case No. 20-34682 (DRJ) (Bankr. S.D. Tex. Jan. 14, 2021); In re Valaris PLC, Case No. 20-34114 (MI) (Bankr. S.D. Tex. Nov. 04, 2020); In re APC Automotive Technologies Intermediate Holdings, LLC, Case No. 20-11466 (CSS) (Bankr. D. Del. June 3, 2020).

7.     I have been employed by Jefferies since 2009, initially as a Senior Vice President in the Debt Advisory and Restructuring Group and was promoted to the position of Managing Director in 2013. Prior to working at Jefferies, I was a Senior Distressed Debt Analyst at Fintech Advisory, Inc., a private investment firm with $4 billion of assets under management, as well as a Director with Barclays Capital's Distressed Debt trading desk. At Fintech and Barclays, I analyzed, invested, and traded in the securities of distressed companies. Prior to that time, I was a Senior Vice President specializing in restructuring advisory services at Chanin Capital Partners, Inc., a boutique investment bank. I hold an MBA from Boston University and a Bachelor's Degree with Honors from Allegheny College. I also hold FINRA Series 7 and Series 63 licenses.

8.     I have approximately 25 years of investment banking and restructuring experience, assisting companies on a wide range of strategic matters. I have experience handling complex financial and other restructuring matters for a variety of companies (distressed or otherwise and both in- and out-of-court) across a wide spectrum of industries. My areas of expertise include, among other things, (a) advising on financial restructuring strategies, (b) sizing, structuring, raising, and executing all aspects of financing transactions, including rescue/bridge, debtor-in-

4

possession, and exit financings, and (c) conducting sale processes both in- and out-of-court for companies undergoing financial distress. While at Jefferies, I have advised significant stakeholders in chapter 11 cases including, among others: Arch Coal, Blackjewel LLC, Brookstone, Inc., Blockbuster Inc., Claire's Stores Inc., Cineworld Plc, The Diocese of Rockville Center, Eastman Kodak, Extended Stay Hotels, Forbes Energy, The Great Atlantic & Pacific Tea Co., Golfsmith, Hospitality Investors Trust, JC Penney Inc., McClatchy Company, Momentive Performance Materials, Southland Royalty Co., Rex Energy, and Real Industry, among others. Additionally, my merger and acquisition experience includes troubled company buy-side and sell-side assignments as well as special committee representations and traditional M&A transactions.

9.      The Jefferies team has worked as investment banker to the Debtors since November 2022. Accordingly, I am familiar with the Debtors' history, operations, and financials.

## PREPETITION MARKETING AND SALE PROCESS

10.      Prior to the Petition Date, the Debtors engaged Jefferies as investment banker to pursue a wide range of strategic alternatives, including additional debt or equity financing and a sale of the Debtors' assets. In December 2022, Jefferies began its formal outreach to a broad universe of potential investors and contacted approximately 155 parties. These included 135 financial and/or equity investors and 20 strategic buyers, 80 of which executed nondisclosure agreements and were provided with initial financial and operational diligence materials. To allow potential bidders and investors to conduct further due diligence and prepare bids, Jefferies worked with the Debtors to establish a virtual data room, which consisted of hundreds of documents, including all information necessary for a potential purchaser to make a proposal. Jefferies received four indications of interest in mid-February 2023, and invited each potential bidder to continue with additional due diligence. However, all four of these parties ultimately elected not to move

forward in the process.  The parties cited concerns regarding the quantum of outstanding debt and other liabilities in combination with go forward capital requirements necessary to solve the operational and working capital needs of the business.  Jefferies and the Debtors continued to market a broad range of transaction opportunities, both reaching out to newly identified parties and following up with previously contacted parties.  Over the course of spring and early summer 2023, dialogue continued with a range of strategic and financial parties.  The Company received two further indications of interest for varying potential transaction structures, one of which resulted in the Company briefly entering into a non-binding, non-exclusive letter of intent in April 2023.  However, after conducting further due diligence, both these parties also declined to move forward in the process.  Key concerns of these parties included the magnitude of debt and overdue accounts payable and the deteriorating status of the Company's liquidity in combination with the new capital investment required to support the business.

11.    In July 2023, a potential stalking horse bidder (the "Stalking Horse Bidder") approached Jefferies with renewed interest in pursuing a sale of the Debtors' Assets.  The Stalking Horse Bidder's contemplated transaction structure would likely require significant compromise from the Company's creditors, but could potentially be executed under an out-of-court recapitalization scenario, subject to the results of preliminary due diligence and structuring work.  Through July 2023, the Company and its advisors facilitated the Stalking Horse Bidder's due diligence, while continuing discussions with other potential interested parties.  On July 28, 2023, the Debtors and the Stalking Horse Bidder entered into that certain letter of intent (the "Letter of Intent"), which set forth the preliminary terms under which the Stalking Horse Bidder was willing to pursue a transaction, including requiring an in-court sale pursuant to section 363 of the Bankruptcy Code.

12.     In the weeks leading to the Petition Date, the Debtors increased engagement with alternative bidders who had expressed interest in their Assets (some of whom identified themselves as interested purchasers days prior to the Petition Date).  Negotiations with the Stalking Horse Bidder continued through mid-October and resulted in significant improvements to the terms of the Stalking Horse Bidder's proposed transaction including a 30% increase in the proposed purchase price, ultimately garnering the support of the Prepetition CIT Secured Parties.  Therefore, on October 22 2023, the Debtors announced their intention to enter into that certain Asset Purchase Agreement, dated October 22, 2023, annexed to the Bidding Procedures Order as <u>Exhibit 4</u> (together with the scheduled and related documents thereto, and as may be amended, supplemented, or otherwise modified from time to time, the "<u>Stalking Horse APA</u>") to sell the Assets (as defined in the Stalking Horse APA) to Bucky Acquisition Holdco, LLC in a transaction valued at approximately $65 million (the "<u>Stalking Horse Bid</u>"), free and clear of all liens, claims, encumbrances (other than Assumed Liabilities and Permitted Liens, as defined in the Stalking Horse APA).

13.     Based on the marketing efforts described above, I believe that the Stalking Horse Bid represents the highest and best executable bid the Debtors received through the prepetition marketing process.  The Stalking Horse Bid establishes a floor for the purchase of substantially all of the Debtors' Assets, and any offer that tops the Stalking Horse Bid will inure to the benefit of the Debtors' creditors and other stakeholders.

<u>**NEED FOR AN EXPEDITIOUS SALE PROCESS**</u>

14.     I believe that the best way to preserve going-concern value of the Debtors' business throughout these Chapter 11 Cases and maximize value in connection with the sale of all or substantially all of the Debtors' Assets is to conduct an efficient and expeditious sale process.

Jefferies and the Debtors are prepared to continue and expand upon their extensive prepetition sale process by conducting a postpetition marketing campaign of the Debtors' Assets and soliciting bids, consistent with the Bidding Procedures, as efficiently as possible.  The Debtors believe, and I agree, that the time periods set forth in Bidding Procedures (as defined below) are reasonable under the circumstances and will provide parties with sufficient time and information to submit a bid for the Debtors' business.

15.     Prior to the filing, the Debtors had been operating for months with extremely tight liquidity driven by declining cash receipts, as well as diminishing receivables and inventory resulting in a severely constrained borrowing base under its pre-petition ABL facility. The Debtors' forecast that their liquidity will remain constrained throughout the pendency of the Chapter 11 case.  Even with the approximate $12 million of new money commitments provided by the DIP Credit Facility, the Debtors project they will run out of liquidity by early December 2023.  Also, while the DIP Credit Facility provides approximately $12 million of liquidity, it is structured as an over-advance against the Prepetition CIT Secured Parties' collateral, as a result there is no headroom to support additional liquidity beyond the current DIP Credit Facility. Therefore, any delay in consummation of a sale jeopardizes the Debtors' ability to conduct these Chapter 11 Cases and operate their businesses in an efficient manner for the benefit of all creditors.

16.     I also believe that a lengthy in-court process is not necessary or the most effective use of the Debtors' increasingly limited resources.  I understand that the Prepetition CIT Secured Parties conditioned their willingness to provide debtor-in-possession financing to the Debtors and consent to the use of cash collateral to fund going concern operations on the designation of a stalking horse bidder prepetition.  As of the Petition Date, the Debtors have limited funds and

received debtor-in-possession financing from the Prepetition CIT Secured Parties to run a six week postpetition sale process.

17.     Further, I believe that an expeditious sale process is appropriate in light of the extensive marketing process that has already occurred.  The Debtors' Assets have been marketed for approximately ten months to a wide range of potential strategic buyers and financial investors, and a substantial amount of information regarding the Debtors' business has been available to potential bidders throughout the prepetition marketing process.  Many of the potential buyers most likely to submit bids on all or substantially all of the Debtors' Assets have been contacted by Jefferies and the Debtors during the prepetition marketing and sale process.  Although already given the opportunity to negotiate with the Debtors and make offers, the process set forth in the Bidding Procedures affords these potential buyers the opportunity to formulate bids based on renewed interest.  As a result, I believe that any potential buyer will have sufficient time to consider a transaction and develop a bid and the Debtors will have time to consider all options to maximize the value of their Assets.

## THE BIDDING PROCEDURES

18.     In support of the Debtors' postpetition marketing and sale process, the Debtors, with the assistance of their advisors, have developed bidding and auction procedures to be used in connection with one or more sales of the Debtors' Assets (as defined in the Motion, the "Bidding Procedures").

19.     The Bidding Procedures are designed to promote a competitive and efficient auction process, and generate maximum interest in a potential acquisition of all or substantially all of the Debtors' Assets.  I believe that the Bidding Procedures provide the Debtors with flexibility to solicit proposals, negotiate transactions, hold an auction, and solicit and identify bids from

potential bidders that constitute the highest or otherwise best offers for the Debtors' Assets in whole or through combination of bids. The Bidding Procedures set forth a timeline that is consistent with the Debtors' proposed milestones to ensure, among other things, that there is a full and fair opportunity to review and consider proposed transactions.

20.    I believe that the milestones and the overall timing of the sale process are fair and reasonable under the circumstances. The milestones set forth in the Bidding Procedures permit the Debtors to conduct the sale and auction consistent with milestones comparable to cases of similar size and complexity. Given the exigencies of the Debtors' business operations and financial condition, it is vital that the Debtors exit chapter 11 in an efficient manner. Furthermore, the procedures for conducting an auction or auctions, if any, are designed to encourage active participation by potential purchasers. I believe that approval of the Bidding Procedures will facilitate an open and fair sale process, which is the best means for demonstrating that the highest or best price is being paid for the Debtors' Assets.

21.    As highlighted above, the Bidding Procedures also provide for a process that allows for adequate time for potential bidders to form and express a view on the value of the Debtors' Assets, while ensuring as expeditious a conclusion of the Debtors' Chapter 11 Cases as possible. Under the proposed Bidding Procedures, in the event the Debtors receive a Qualified Bid, they will conduct the Auction to yield a more value-maximizing sale of the Debtors' Assets. If they do not receive any competing bids, they will immediately seek approval of the Stalking Horse Bid. I believe that the Bidding Procedures balance the Debtors' need to efficiently consummate a sale of their business, while providing adequate notice to parties in interest to conduct a postpetition sale process to seek bids in excess of the Stalking Horse Bid. The Bidding Procedures and time periods set forth therein allow the Debtors to navigate the sale process as efficiently as possible in order to

avoid damage to the business from a prolonged stay in chapter 11 and the associated administrative cash burn, which would be detrimental to the Debtors' stakeholders.

22.    In light of the foregoing, and based on my experience as an investment banker and restructuring professional for 25 years, I believe that the proposed Bidding Procedures have a sound business purpose and will provide interested parties with sufficient opportunity to participate in a sale of the Debtors' Assets.

**THE STALKING HORSE BIDDER AND STALKING HORSE APA**

23.    As set forth in the Motion, the Debtors are seeking approval of the Stalking Horse APA, which will be consummated absent higher or better bids at the Auction and will be subject to the closing conditions under the Stalking Horse APA being satisfied.  Given the Debtors' need to maximize value through a timely and efficient sale process, I believe that their designation of a Stalking Horse Bidder is justified, appropriate, and essential.

24.    I understand that the Stalking Horse APA was negotiated in good faith, at arms-length, and with both parties represented by competent counsel of similar bargaining positions. The Stalking Horse APA was executed only after (a) potential alternatives were evaluated, (b) the transaction was aggressively marketed, and (c) the proposed transaction was presented to the Company's Board, who, in conjunction with advice from experienced professionals, decided to pursue the sale on the terms of the Stalking Horse APA, subject to competitive bidding sanctioned by the Court.  I am not aware of any fraud, collusion between the parties, or any attempt by the Stalking Horse Bidder to take unfair advantage of other bidders.

25.    The Stalking Horse Bid establishes a floor for the Debtors' Assets.  Any offer that tops the Stalking Horse Bid will inure to the benefit of the Debtors' stakeholders.  The Debtors have determined that the Stalking Horse Bid will promote more competitive bidding as a minimum

bid on which other bidders can rely.  I also understand that the Prepetition CIT Secured Parties support the sale process, entry into the Stalking Horse APA, and the Debtors' ongoing efforts to achieve the highest offers possible for their Assets.

### THE BID PROTECTIONS

26.     I believe that the Bid Protections are fair and represent a necessary component of the Stalking Horse APA.  In exchange for the aforementioned value that the Stalking Horse Bidder is providing to the sale process, the Debtors ultimately agreed to grant the Stalking Horse Bidder certain Bid Protections.  The Bid Protections for the Stalking Horse Bidder include (a) a Break-Up Fee of 3% of the Purchase Price and (b) an Expense Reimbursement not to exceed $649,000. The Bid Protections were calculated as a percentage of the proposed Purchase Price under the Stalking Horse Bid.

27.     In my experience, the Break-Up Fee negotiated in these Chapter 11 Cases is within the range of break-up fees that I have seen and negotiated in prior chapter 11 sale transactions, particularly when taking into account the size of this transaction.  I understand that both the Break-Up Fee and Expense Reimbursement, as well as the Bid Protections more generally, were the subject of extensive good faith and arm's-length negotiations between the Debtors and the Stalking Horse Bidder.  .

28.     Moreover, I understand that the Bid Protections were, and remain, a critical component of the Stalking Horse Bidder's commitment and willingness to enter into the Stalking Horse APA.  The Stalking Horse Bidder has expended, and will continue to expend, significant time and resources negotiating, drafting, and performing due diligence activities necessitated by the sale, despite the fact that its bid will be subject not only to Court approval, but also to potential overbidding by third parties at the Auction.  Given the Debtors' need to maximize value through

a timely and efficient sale process, I believe the ability to offer the Bid Protections is justified, appropriate, and essential.

## **CONCLUSION**

29.     As described in the foregoing, it is my belief that the Bidding Procedures set forth an open and fair sale process, which is the best means for demonstrating that the highest and/or best price is being paid for the Assets.   Accordingly, I believe that there is a strong business justification for the proposed Bidding Procedures.

*[Remainder of Page Left Intentionally Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed this 14 day of November, 2023.

<div style="margin-left:40%;">

*/s/ Robert J. White*
Robert J. White
Managing Director
Jefferies LLC

</div>