## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| UNCONDITIONAL LOVE INC., *et al.*,[1] | Case No. 23-11759 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 408** |

### NOTICE OF FILING OF BLACKLINE OF COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF UNCONDITIONAL LOVE INC. AND ITS AFFILIATED DEBTORS

**PLEASE TAKE NOTICE** that, on May 29, 2024, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") filed the solicitation version of the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Unconditional Love Inc. and Its Affiliated Debtors* [Docket No. 408] (together with all exhibits and supplements thereto and as modified or amended from time to time, the "Combined Disclosure Statement and Plan") with the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, subsequent to filing the Combined Disclosure Statement and Plan, the Debtors made certain revisions thereto. For the convenience of the Court and parties in interest, a blackline reflecting the changes made to the Combined Disclosure Statement and Plan is attached hereto as **Exhibit A**. The Debtors reserve their rights to further amend, supplement, or modify the Combined Disclosure Statement and Plan.

**PLEASE TAKE FURTHER NOTICE** that a combined hearing (the "Confirmation Hearing") to consider, among other things, (a) final approval of the Combined Disclosure Statement and Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and (b) confirmation of the Combined Disclosure Statement and Plan will be held before the Honorable Mary F. Walrath, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, on **June 18, 2024 at 10:30 a.m. (prevailing Eastern Time)**. The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Debtors in open court of the adjourned date at the Confirmation Hearing or any continued hearing or as indicated in any notice filed with the Court on the docket in the Chapter 11 Cases.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, are Unconditional Love Inc. d/b/a Hello Bello (5895), Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc. (9369). The Debtors' headquarters is located at 17383 Sunset Blvd, Suite B200, Pacific Palisades, CA 90272.

Dated: June 14, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Carol E. Cox*
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Carol E. Cox (Del. No. 6936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
ccox@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Brian S. Lennon (admitted *pro hac vice*)
Debra M. Sinclair (admitted *pro hac vice*)
Erin C. Ryan (admitted *pro hac vice*)
Jessica D. Graber (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
blennon@willkie.com
dsinclair@willkie.com
eryan@willkie.com
jgraber@willkie.com

*Co-Counsel to the Debtors
and Debtors in Possession*

# Exhibit A

**Blackline of Combined Disclosure Statement and Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| UNCONDITIONAL LOVE INC., *et al.*,[1] | Case No. 23-11759 (MFW) |
| Debtors. | (Jointly Administered) |

**COMBINED DISCLOSURE STATEMENT AND CHAPTER**

**11 PLAN OF UNCONDITIONAL LOVE INC. AND ITS AFFILIATED DEBTORS**

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Edmon L. Morton (Del. No. 3856)
Matthew B. Lunn (Del. No. 4119)
Carol E. Cox (Del. No. 6936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
ccox@ycst.com

*Co-Counsel to the Debtors
and Debtors in Possession*

WILLKIE FARR & GALLAGHER LLP
Brian S. Lennon (admitted *pro hac vice*)
Debra M. Sinclair (admitted *pro hac vice*)
Erin C. Ryan (admitted *pro hac vice*)
Jessica D. Graber (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
blennon@willkie.com
dsinclair@willkie.com
eryan@willkie.com
jgraber@willkie.com

*Co-Counsel to the Debtors
and Debtors in Possession*

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, are Unconditional Love Inc. d/b/a Hello Bello (5895), Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc. (9369).  The Debtors' headquarters is located at 17383 Sunset Blvd, Suite B200, Pacific Palisades, CA 90272.

## TABLE OF CONTENTS

**Page**

ARTICLE  I        DEFINED TERMS AND RULES OF INTERPRETATION .............. 4

ARTICLE  II       CLASSIFICATION OF CLAIMS AND INTERESTS AND
                  ESTIMATED RECOVERIES .......................... 19

    2.1     Classification ........................................ 19

ARTICLE  III      BACKGROUND AND DISCLOSURES ..................... 21

    3.1     General Background .................................. 21
    3.2     Events Leading to Chapter 11 ......................... 25
    3.3     These Chapter 11 Cases .............................. 29

ARTICLE  IV       CONFIRMATION AND VOTING PROCEDURES ........... 34

    4.1     Confirmation Procedure .............................. 34
    4.2     Procedure for Objections ............................. 34
    4.3     Requirements for Confirmation ....................... 34
    4.4     Classification of Claims and Interests ................. 35
    4.5     Unimpaired Claims and Impaired Claims or Interests ... 36
    4.6     Confirmation Without Necessary Acceptances; Cramdown .. 36
    4.7     Feasibility .......................................... 38
    4.8     Best Interests Test and Liquidation Analysis .......... 38
    4.9     Acceptance of the Plan .............................. 39

ARTICLE  V        CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE
                  VOTING ............................................ 39

    5.1     The Plan May Not Be Accepted ...................... 40
    5.2     The Plan May Not Be Confirmed ..................... 40
    5.3     Distributions to Holders of Allowed Claims under the Plan May Be
                  Inconsistent with Projections ........................ 40
    5.4     Objections to Classification of Claims ................ 40
    5.5     Failure to Consummate the Plan ..................... 41
    5.6     Plan Releases May Not Be Approved ................. 41
    5.7     Reductions to Estimated Creditor Recoveries ......... 41
    5.8     Certain Tax Considerations .......................... 42

ARTICLE  VI       TREATMENT OF UNCLASSIFIED CLAIMS ............. 42

    6.1     Administrative Claims ............................... 42
    6.2     DIP Loan Claims ................................... 43
    6.3     Prepetition CIT Loan Claims ........................ 43
    6.4     Priority Tax Claims ................................. 43

ARTICLE  VII    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS................44

    7.1    Class 1:  Priority Non-Tax Claims................44
    7.2    Class 2:  Other Secured Claims................44
    7.3    Class 3:  General Unsecured Claims................44
    7.4    Class 4: Subordinated Claims................44
    7.5    Class 5: Intercompany Claims................44
    7.6    Class 6: Interests................44
    7.7    Reservation of Rights Regarding Claims and Interests................45

ARTICLE  VIII    ACCEPTANCE OR REJECTION OF THE PLAN................45

    8.1    Class Entitled to Vote................45
    8.2    Acceptance by Impaired Classes of Claims or Interests................45
    8.3    Deemed Acceptance by Unimpaired Classes................45
    8.4    Presumed Rejections by Impaired Classes................45
    8.5    Confirmation Pursuant to Bankruptcy Code Section 1129(b)................45
    8.6    Controversy Concerning Impairment................45
    8.7    Elimination of Vacant Classes................46

ARTICLE  IX    IMPLEMENTATION OF THE PLAN AND THE LITIGATION
          TRUST................46

    9.1    Implementation of the Plan................46
    9.2    Substantive Consolidation................46
    9.3    Debtors' Directors and Officers................47
    9.4    Wind-Up and Dissolution of the Debtors................48
    9.5    Plan Settlement................48
    9.6    Creation and Governance of the Litigation Trust................49
    9.7    Provisions with Respect to Retained Causes of Action................50
    9.8    Purpose of the Litigation Trust................50
    9.9    Litigation Trustee and Litigation Trust Agreement................50
    9.10    Compensation and Duties of Litigation Trustee................51
    9.11    United States Federal Income Tax Treatment of the Litigation Trust, the
            Debtors, and Holders of Claims................51
    9.12    Abandonment, Disposal, and Destruction of Records................57
    9.13    Distributions by Litigation Trustee................57
    9.14    Cash Investments................57
    9.15    Dissolution of the Litigation Trust................57
    9.16    Control Provisions................57
    9.17    Limitation of Liability; Indemnification................58
    9.18    Corporate Action................58

ARTICLE  X    PROVISIONS GOVERNING DISTRIBUTIONS................58

    10.1    Distributions for Allowed Claims................58
    10.2    Interest of Claims................59

10.3    Distributions by Litigation Trustee as Disbursement Agent ........... 59
10.4    Means of Cash Payment ........................................................... 59
10.5    Fractional Distributions ........................................................... 59
10.6    De Minimis Distributions ........................................................ 59
10.7    Delivery of Distributions; Unclaimed Distributions ................... 60
10.8    Application of Distribution Record Date .................................... 60
10.9    Withholding, Payment and Reporting Requirements With Respect to
Distributions ........................................................................... 60
10.10  Setoffs ..................................................................................... 61
10.11  No Distribution in Excess of Allowed Amounts ......................... 61
10.12  Allocation of Distributions ....................................................... 61
10.13  Forfeiture of Distributions ........................................................ 61

ARTICLE XI    PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF
CLAIMS .................................................................................. 61

11.1    Claims Administration Responsibility ....................................... 61
11.2    Claims Objections ................................................................... 62
11.3    Estimation of Contingent or Unliquidated Claims ...................... 62
11.4    Distributions on Account of Disputed Claims ............................ 62
11.5    Amendments to Claims ............................................................ 62
11.6    Claims Paid and Payable by Third Parties ................................. 62
11.7    Adjustment to Claims Without Objection ................................... 63

ARTICLE XII    EXECUTORY CONTRACTS ................................................. 63

12.1    Executory Contracts Deemed Rejected ...................................... 63
12.2    Insurance Neutrality ................................................................ 63

ARTICLE XIII    CONFIRMATION AND CONSUMMATION OF THE PLAN ......... 63

13.1    Conditions Precedent to the Effective Date ................................ 63
13.2    Notice of Effective Date ........................................................... 64
13.3    Waiver of Conditions Precedent to the Effective Date ................. 64
13.4    Effect of Non-Occurrence of Effective Date ............................... 64

ARTICLE XIV  EFFECTS OF CONFIRMATION ................................................ 64

14.1    Compromise and Settlement of Claims, Interests, and Controversies ........... 64
14.2    Exculpation, Releases, and Injunctions ..................................... 65
14.3    Term of Bankruptcy Injunction or Stays .................................... 68
14.4    Release of Liens ...................................................................... 68

ARTICLE XV    RETENTION OF JURISDICTION ............................................ 68

15.1    Exclusive Jurisdiction of Bankruptcy Court ............................... 68

ARTICLE XVI MISCELLANEOUS PROVISIONS .......................................................... 70

    16.1   Modification of the Plan ............................................................................ 70
    16.2   Revocation, Withdrawal, or Non-Confirmation of the Plan ..................... 70
    16.3   Binding Effect .......................................................................................... 71
    16.4   Subordination Rights ................................................................................ 71
    16.5   Severability of Plan Provisions ................................................................ 71
    16.6   Payment of Statutory Fees; Filing of Quarterly Reports ......................... 71
    16.7   Dissolution of the Committee .................................................................. 72
    16.8   Exemption from Bankruptcy Code Section 1146 ..................................... 72
    16.9   Closing of Chapter 11 Cases; Caption Change ........................................ 72
    16.10  Filing of Additional Documents ............................................................... 73
    16.11  Insurance .................................................................................................. 73
    16.12  Successors and Assigns ............................................................................ 73
    16.13  Governing Law ......................................................................................... 73
    16.14  Service of Documents ............................................................................... 73
    16.15  Exhibits and Schedules ............................................................................ 75
    16.16  Computation of Time ................................................................................ 75
    16.17  Reservation of Rights ............................................................................... 76

## **DISCLAIMER**

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.  HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.  NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.  ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.  THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAWS.

SEE ARTICLE V HEREIN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## INTRODUCTION[2]

The Debtors hereby propose the following combined Disclosure Statement and Plan for the liquidation of the Debtors' remaining Assets and distribution of the proceeds of the Sale and the remaining Assets to the Holders of Allowed Claims against the Debtors as set forth herein. Each Debtor is a proponent of the Plan within the meaning of Bankruptcy Code section 1129.

This combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, businesses, properties, operations, these Chapter 11 Cases, risk factors, summary and analysis of the Plan, and certain other related matters.

**ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN BANKRUPTCY CODE SECTION 1127, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THE PLAN, OR ANY PART THEREOF, AT ANY TIME, INCLUDING BEFORE ITS SUBSTANTIAL CONSUMMATION.**

**THIS COMBINED DISCLOSURE STATEMENT AND PLAN SUMMARIZES (I) THE DEBTORS' OPERATING AND BUSINESS HISTORY, (II) THE PREPETITION AND POSTPETITION SALES AND MARKETING EFFORTS THE DEBTORS ENGAGED IN AN EFFORT TO MAXIMIZE THE VALUE OF ITS BUSINESS OPERATIONS AND (III) A SETTLEMENT AMONG THE DEBTORS, THE COMMITTEE, VMG, 36TH STREET CAPITAL AND SCG.**

## RECOMMENDATIONS OF THE DEBTORS

**THE DEBTORS BELIEVE THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN.**

## RECOMMENDATIONS OF THE COMMITTEE

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED IN THIS CASE HAS REVIEWED AND NEGOTIATED THE TERMS AND CONDITIONS CONTAINED IN THE PLAN AND RECOMMENDS THAT ALL UNSECURED**

---

[2]   Capitalized terms used but otherwise not defined in this Introduction shall have the meanings ascribed below.

**CREDITORS RECEIVING A BALLOT READ THE FOLLOWING SEVEN PARAGRAPHS AND VOTE IN FAVOR OF THE PLAN.**

At the conclusion of the Debtors' sale and marketing process, and in accordance with the Bidding Procedures, the Debtors designated the Stalking Horse Bidder, Bucky Acquisition Holdco, LLC, as the Successful Bidder for the purchase of the Debtors' business. The sale to the Successful Bidder was approved pursuant to a duly entered Bankruptcy Court Order on December 11, 2023. The Sale closed on December 19, 2023.

The sale price was sufficient to pay the Debtors' Prepetition Senior Secured Debt and the Bankruptcy Court approved DIP Financing in full. The Debtors' junior Secured Creditor, VMG, holds secured Claims of not less than $30 million in principal amount as of the Petition Date, and has asserted a lien on Assets that would otherwise be available for distribution to the Debtors' unsecured Creditors. Through negotiations with the Debtors, the Committee, 36th Street Capital, one of the Debtors' Equipment Lessors, and SCG, another one of the Debtors' Equipment Lessors (both of whom have subordination agreements with VMG) in accordance with the provisions of the 9019 Settlement Agreement and the Prepetition Subordinated Notes Documents as applicable, (i) VMG shall receive (a) $5 million of its Prepetition Subordinated Notes Claims as an Allowed General Unsecured Claim (the "VMG General Unsecured Claim") and (b) on account of the balance of its Prepetition Subordinated Notes Claims an amount it would have received had such Claims been converted into Interests in the Debtors, which will be treated as an Allowed Class 6 Interest in the amount of $30 million; (ii) SCG shall receive on account of its subordination agreement rights any payment or other distribution of any kind or character from the Debtors' Estates in respect of the VMG General Unsecured Claim; (iii) VMG and the Debtors' Current Directors and Officers are released in each case, as provided for in the Plan; and (iv) 36th Street Capital shall receive on account of its subordination agreement (a) an Allowed Administrative Claim equal to 37.5% of the 36th Street Capital Claim and (b) the balance of the 36th Street Capital Claim shall be an Allowed General Unsecured Claim. As a result, the remaining cash and other Assets held by the Estate will be available for distribution to the Debtors' unsecured Creditors. This agreement is memorialized in the 9019 Settlement Agreement incorporated into the Plan and attached hereto as **Exhibit B**.

As reflected in the Liquidation Analysis attached hereto as **Exhibit A** and based on the approval of the 9019 Settlement Agreement, the Debtors anticipate transferring all remaining Assets, including not less than approximately $330,000 in cash and the Retained Causes of Action, to the Litigation Trust on the Effective Date. The Litigation Trustee shall investigate any Retained Causes of Action and determine if any can be brought for the benefit of Holders of General Unsecured Claims, who will be the beneficiaries of the Litigation Trust. Over $375 million in General Unsecured Claims were filed before the Bar Date. However, the Debtors anticipate that, after objections to duplicate and invalid General Unsecured Claims, remaining General Unsecured Claims will be between $70 million and $85 million.

There are a number of significant variables associated with projecting likely distributions to unsecured creditors, both with respect to the value, if any, of the Retained Causes of Action, and the costs and expenses of pursuing such Retained Causes of Action, as well as administering the

Litigation Trust. At this time, there is uncertainty as to the final allowed amount of General Unsecured Claims and the results of any objections to Claims.

However, as reflected in the Liquidation Analysis, without the settlement with VMG, 36th Street Capital and SCG, the Debtors and the Estates would have had to incur substantial professional fees litigating VMG's right and claim to the Debtors' remaining Assets (principally the remaining cash proceeds), as well as VMG's entitlement to an Allowed General Unsecured Claim for the difference between any remaining Assets securing its Lien and the amount of its Prepetition Subordinated Notes Claims. Such litigation would have materially reduced the funds available to transfer to the Litigation Trust for the benefit of unsecured creditors, possibly resulting in insufficient funds to create a Litigation Trust. In addition, unless VMG's Prepetition Subordinated Notes Claims were ordered fully subordinated to General Unsecured Claims through litigation, a General Unsecured Claim from VMG in excess of $35 million would have materially reduced the available funds for distribution to Holders of Allowed General Unsecured Claims (i.e. unsecured creditors). These were important factors in the decision by the Debtors and Official Committee of Unsecured Creditors to negotiate and approve the 9019 Settlement Agreement with VMG.

The 9019 Settlement Agreement and Plan provide that the Debtors and their Estates will release any potential Claims and Causes of Action against the Debtor Released Parties, as defined in the Plan, which includes VMG and its affiliates, as well as the Debtors' Current Directors and Officers. The 9019 Settlement Agreement also requires the Plan provide that Holders of General Unsecured Claims voting on the Plan release their individual Claims against the Debtor Released Parties, unless such Creditor votes to opt-out of such Release, as described below and as contained on the Ballot each Creditor will receive. Creditors will be entitled to vote for or reject the Plan independent of their decision to opt-out of the Release. The decision to opt-out of the Release will not diminish any Creditor's right to receive a pro rata distribution from the Litigation Trust. Each Creditor should consult its own professional advisor(s) with respect to voting on the Plan, as well as whether to opt-out of the proposed Release.

If the currently available cash were to be distributed to Holders of Allowed General Unsecured Claims, as reflected in the Liquidation Analysis, a 0.46% dividend would be provided to Holders of Allowed General Unsecured Claims. That projected distribution may increase if the Litigation Trust obtains additional recoveries based on the transferred Assets and Retained Causes of Action.

## ARTICLE I
### DEFINED TERMS AND RULES OF INTERPRETATION

**Defined Terms**

(1)      ~~1.1~~ **"36th Street Capital Claim"** shall mean the administrative priority tax claim asserted by 36th Street Capital in the amount of $222,332.95.

    **1.1**      ~~1.2~~ **"36th Street Capital"** shall mean 36th Street Capital Partners, LLC.

**1.2**      **1.3** **"503(b)(9) Claims"** shall mean Claims arising under Bankruptcy Code section 503(b)(9).

**1.3**      **1.4** **"9019 Settlement Agreement"** means that certain *Settlement Agreement* between the Debtors, the Committee, VMG, 36th Street Capital, and SCG, attached to this Combined Disclosure Statement and Plan as **Exhibit B**.

**1.4**      **1.5** **"Administrative Claim"** shall mean a Claim for costs and expenses of administration of these Chapter 11 Cases allowed under Bankruptcy Code sections 503(b), 507(a)(2), 507(b), or, if applicable, 1114(e)(2), including, but not limited to: (a) any actual and necessary costs and expenses incurred on or after the Petition Date in preserving the Estates and operating the business of the Debtors (including, but not limited to, wages, salaries, commissions for services, and payments for inventories, leased equipment, and premises) and Claims by Governmental Units for taxes (including Claims related to taxes which accrued after the Petition Date, but excluding Claims related to taxes which accrued on or before the Petition Date); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses allowed by the Bankruptcy Court under Bankruptcy Code sections 328, 330, 331, 363, or 503(b) to the extent incurred on or before the Effective Date; (c) all U.S. Trustee Fees; (d) any 503(b)(9) Claims; and (e) any Claims that have been designated "Administrative Claims" by Final Order of the Bankruptcy Court.

**1.5**      **1.6** **"Administrative Claim Bar Date"** shall mean the date that is thirty (30) days after the date the Effective Date Notice is Filed and served, which date shall be the deadline for filing requests for payment of Administrative Claims (other than as set forth in Section 6.1(a) hereof).

**1.6**      **1.7** **"Affiliate"** shall mean "affiliate" as defined in Bankruptcy Code section 101(2).

**1.7**      **1.8** **"Allowed"** shall mean all or a portion of a Claim against the Debtors or an Interest in the Debtors (a) that has been listed by the Debtors in the Schedules as liquidated in amount and not "disputed" or "contingent," and with respect to which no contrary Proof of Claim or Proof of Interest has been filed, (b) as to which no objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any objection has been settled, waived, withdrawn, or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) pursuant to the terms of the Plan, or (iii) by a Stipulation between the Holder of such Claim or Interest and the Litigation Trustee on or after the Effective Date. For purposes of computing Distributions under the Plan, a Claim or Interest that has been deemed "Allowed" shall not (other than with respect to DIP Loan Claims, Prepetition CIT Loan Claims, and Prepetition Subordinated Notes Claims) include interest, costs, fees, or charges on such Claim or Interest from and after the Petition Date.

**1.8**      **1.9** **"Assets"** shall mean any and all right, title, and interest of the Debtors and the Estates in and to property of whatever type or nature, including their books and records,

whether in physical or electronic form, and any and all rights and benefits under the Purchase Agreement.

**1.9** ~~1.10~~ "**Avoidance Actions**" shall mean any and all actual and potential Claims or causes of action arising under chapter 5 of the Bankruptcy Code, including Bankruptcy Code sections 502(d), 510, 542 through 551, and 553, any equitable subordination or recovery actions or proceedings, or any similar federal, state, or common law causes of action; <u>provided</u>, <u>however</u>, that any avoidance or equitable subordination or recovery actions sold or otherwise transferred in connection with the Sale shall not constitute Avoidance Actions for the purposes hereof.

**1.10** ~~1.11~~ "**Ballot**" shall mean the ballot form distributed to each Holder of an Impaired Claim entitled to vote to accept or reject the Plan.

**1.11** ~~1.12~~ "**Bankruptcy Code**" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101–1532, and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these Chapter 11 Cases.

**1.12** ~~1.13~~ "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Delaware.

**1.13** ~~1.14~~ "**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, or the Local Rules, and as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to these Chapter 11 Cases.

**1.14** ~~1.15~~ "**Bar Date**" shall mean, with respect to any particular Claim, the specific date set by the Bankruptcy Court as the last day for Filing Proofs of Claim against the Debtors in these Chapter 11 Cases for that specific Claim.

**1.15** ~~1.16~~ "**Bar Date Order**" shall mean that certain Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and (B) Approving the Form and Manner of Notice Thereof [D.I. 131].

**1.16** ~~1.17~~ "**Beneficiary**" shall mean a holder of a Litigation Trust Interest, whether individually or as agent on behalf of one or more other Entities. To the extent Holders of Allowed Claims are entitled to a Distribution from the Litigation Trust pursuant to the terms of the combined Disclosure Statement and Plan, such Holders are each a Beneficiary.

**1.17** ~~1.18~~ "**Bidding Procedures Order**" shall mean that certain Order (I) Approving Bidding Procedures in Connection with Sale of the Debtors' Assets and Related Bid Protections; (II) Approving Form and Manner of Notice; (III) Scheduling Auction and Sale Hearing; (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases; and (V) Granting Related Relief [D.I. 153].

**1.18**      ~~1.19~~ **"Business Day"** shall mean any day, other than a Saturday, Sunday, or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

**1.19**      ~~1.20~~ **"Cash"** shall mean money that is legal tender of the United States of America.

**1.20**      ~~1.21~~ **"Causes of Action"** shall mean all Claims, actions, causes of action, choses in action, suits, debts, dues, damages, defenses, judgments, setoff rights, third-party claims, counterclaims, and cross claims that are or may be pending or existing on the Effective Date against any Entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, known or unknown, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order, and including the unknown Causes of Action that have not been released by the Plan, the Settlement Agreement, or any order of the Bankruptcy Court.

**1.21**      ~~1.22~~ **"Chapter 11 Cases"** shall mean the jointly administered cases of the Debtors under chapter 11 of the Bankruptcy Code styled *In re Unconditional Love Inc., et al.*, 23-11579 (MFW).

**1.22**      ~~1.23~~ **"Claim"** shall mean a claim against any Debtor, as such term is defined in Bankruptcy Code section 101(5).

**1.23**      ~~1.24~~ **"Claims Agent"** shall mean the Debtors' claims agent, Stretto, Inc.

**1.24**      ~~1.25~~ **"Claims Objection Deadline"** shall mean one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court; provided, however, that the Litigation Trustee may seek extensions of this date from the Bankruptcy Court at any time.

**1.25**      ~~1.26~~ **"Class"** shall mean each category or group of Holders of Claims or Interests that has been designated as a class in Article II of this combined Disclosure Statement and Plan.

**1.26**      ~~1.27~~ **"Committee"** shall mean the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases [D.I. 76].

**1.27**      ~~1.28~~ **"Confirmation"** shall mean entry of the Confirmation Order by the Bankruptcy Court on the docket of these Chapter 11 Cases.

**1.28**      ~~1.29~~ **"Confirmation Date"** shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of these Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

**1.29**      ~~1.30~~ **"Confirmation Hearing"** shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Plan and final approval of the Disclosure Statement, as such hearing may be adjourned or continued from time to time.

**1.30**    ~~1.31~~ **"Confirmation Notice"** shall mean the notice of the Confirmation Hearing to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f).

**1.31**    ~~1.32~~ **"Confirmation Order"** shall mean the order of the Bankruptcy Court confirming the Plan pursuant to, among others, Bankruptcy Code section 1129, and approving the Disclosure Statement on a final basis in accordance with Bankruptcy Code section 1125.

**1.32**    ~~1.33~~ **"Consummation"** shall mean the occurrence of the Effective Date.

**1.33**    ~~1.34~~ **"Contingent"** shall mean, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

**1.34**    ~~1.35~~ **"Creditor"** shall have the meaning ascribed to such term in Bankruptcy Code section 101(10).

**1.35**    ~~1.36~~ **"Current Directors and Officers"** shall mean Bradley Stewart, McConnell Smith, Philip Mason, and Wayne Wu solely in their capacities as directors of each of the Debtors and Erica Buxton in her capacity as a director and as Chief Executive Officer of each of the Debtors.

**1.36**    ~~1.37~~ **"D&O Policy"** shall mean any insurance policy for, among others, directors, members, trustees, and officers liability (or any equivalents) maintained by the Debtors' Estates, and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage.

**1.37**    ~~1.38~~ **"Debtors"** shall mean, collectively, Unconditional Love Inc. d/b/a Hello Bello, Unconditional Love Canada, Inc., and The Best Training Pants in the World Inc.

**1.38**    ~~1.39~~ **"Debtor Released Parties"** shall mean, each solely in their capacity as such, (a) the Debtors' Current Directors and Officers; (b) the Debtors' Professionals, and other advisors; (c) the Prepetition CIT Secured Parties; (d) the DIP Agent; (e) the DIP Lenders; (g) VMG; and (h) with respect to each of the foregoing, their Related Parties, provided that under no circumstances shall any of the Former Directors or Officers of any of the Debtors shall be a Debtor Released Party.

**1.39**    ~~1.40~~ **"DIP Agent"** shall mean CIT Northbridge Credit LLC, as administrative agent and collateral agent for the DIP Lenders under the DIP Credit Agreement.

**1.40**    ~~1.41~~ **"DIP Lenders"** shall mean the lenders and other financial institutions party to the DIP Credit Agreement or which extend credit thereunder.

**1.41**    ~~1.42~~ **"DIP Credit Agreement"** shall mean that certain Senior Secured, Super-Priority Debtor-in-Possession Loan, Security and Guarantee Agreement, as amended, modified, and/or supplemented.

**1.42**      <del>1.43</del> "**DIP Loan Claims**" shall mean any DIP Superpriority Claim (as defined in the Final DIP Order) or other Claims of the DIP Secured Parties arising under or related to the DIP Credit Agreement, the Final DIP Order, or any other DIP Credit Agreement and which was paid in full in Cash and satisfied in full in connection with the Sale.

**1.43**      <del>1.44</del> "**DIP Secured Parties**" shall mean, collectively, the DIP Lenders and the DIP Agent.

**1.44**      <del>1.45</del> "**Disallowed**" shall mean, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in a Debtor which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn, in whole or in part, by the Holder thereof; (iii) is listed in the Schedules as zero or as Disputed, Contingent, or Unliquidated and in respect of which a proof of Claim or a proof of Interest, as applicable, has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code, or any Final Order or other applicable law; (iv) has been reclassified, expunged, subordinated, or estimated to the extent that such reclassification, expungement, subordination, or estimation results in a reduction in the Filed amount of any proof of Claim or proof of Interest; (v) is evidenced by a proof of Claim or a proof of Interest which has been Filed, or which has been deemed to be Filed under applicable law or order of the Bankruptcy Court or which is required to be Filed by order of the Bankruptcy Court but as to which such proof of Claim or proof of Interest was not timely or properly Filed; (vi) is unenforceable to the extent provided in Bankruptcy Code section 502(b); or (vii) where the Holder of a Claim is an Entity from which property is recoverable under Bankruptcy Code sections 542, 543, 550, or 553 or that is a transferee of a transfer avoidable under Bankruptcy Code sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a), unless such Entity or transferee has paid the amount, or turned over any such Property, for which such Entity or transferee is liable under Bankruptcy Code section 522(i), 542, 543, 550, or 553, and, if required by the Bankruptcy Code, an Objection or adversary proceeding has been Filed.  In each case a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination, or estimation.

**1.45**      <del>1.46</del> "**Disbursing Agent**" shall mean the entity selected to make Distributions at the direction of the Litigation Trustee, which may include Litigation Trustee, the Claims Agent, the Debtors, or other such third party to act as Disbursing Agent selected by the Litigation Trustee.

**1.46**      <del>1.47</del> "**Disclosure Statement**" shall mean this combined Disclosure Statement and chapter 11 Plan, as amended, supplemented, or modified from time to time (including all exhibits and schedules thereto), that is embodied within the combined Disclosure Statement and Plan and distributed in accordance with, among others, Bankruptcy Code sections 1125, 1126(b), and 1145, Bankruptcy Rule 3018, and other applicable law.

**1.47**      <del>1.48</del> "**Disputed**" shall mean any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of the Plan.

**1.48**      <del>1.49</del> "**Disputed Claim Reserve**" shall mean the reserve established and maintained by the Litigation Trustee for payment of Disputed Claims, which reserve shall

be established in an amount equal to the face value of all Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Other Secured Claims, or such other amount as may be ordered by the Bankruptcy Court.

**1.49**    ~~1.50~~ **"Distribution"** shall mean a payment of consideration by the Disbursing Agent to the Holders of Allowed Claims pursuant to the Plan in respect of the Holder's Allowed Claim.

**1.50**    ~~1.51~~ **"Distribution Date"** shall mean the date on which a Distribution is made pursuant to the Plan.

**1.51**    ~~1.52~~ **"Distribution Record Date"** shall mean the date established for determining the Holders of Allowed Claims entitled to Distributions pursuant to the Plan, which shall be the General Bar Date or such other date established by order of the Bankruptcy Court, including the Confirmation Order.

**1.52**    ~~1.53~~ **"Distribution Proceeds"** shall mean all Cash realizable from the Litigation Trust Assets after Payment in Full or satisfaction of the (i) Administrative Claims (including DIP Loan Claims and Professional Fee Claims), Priority Tax Claims, Priority Non-Tax Claims, Prepetition CIT Loan Claims, and Other Secured Claims, and (ii) the payment of, and reservation for, Litigation Trust Expenses in accordance with the Litigation Trust Agreement.

**1.53**    ~~1.54~~ **"Effective Date"** shall mean the first Business Day after the later of the date on which (a) all conditions in Article XIII of the Plan have been satisfied or waived in accordance with that Article and (b) no stay of the Confirmation Order is in effect.

**1.54**    ~~1.55~~ **"Effective Date Notice"** shall mean the notice of the Effective Date.

**1.55**    ~~1.56~~ **"Entity"** shall have the meaning ascribed to such term in Bankruptcy Code section 101(15).

**1.56**    ~~1.57~~ **"Estate"** or **"Estates"** shall mean each of the Debtors' estates, individually or collectively, created by Bankruptcy Code section 541 upon the commencement of these Chapter 11 Cases on the Petition Date.

**1.57**    ~~1.58~~ **"Exculpated Parties"** shall mean each of the following, solely in their capacities as such: (a) the Debtors and their Estates; (b) the Current Directors and Officers; (c) the Professionals retained by the Debtors pursuant to a Final Order of the Bankruptcy Court; (d) the Committee; (e) the present members of the Committee; and (f) the Professionals retained by the Committee pursuant to a Final Order of the Bankruptcy Court; provided, however, that none of the Former Directors or Officers of any of the Debtors shall be an Exculpated Party.

**1.58**    ~~1.59~~ **"Executory Contract"** shall mean a contract or unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.59**    ~~1.60~~ **"File," "Filed,"** or **"Filing"** shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

**1.60**    ~~1.61~~ **"Final Distribution"** shall mean the final Distributions to Holders of Allowed Claims.

**1.61**    ~~1.62~~ **"Final DIP Order"** shall mean the Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, Granting Senior Postpetition Security Interests, and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief [D.I. 154].

**1.62**    ~~1.63~~ **"Final Order"** shall mean an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, that is not subject to stay or appeal, and for which the applicable time within which to take such action has expired, or for which such actions has been adjudicated by the highest court with jurisdiction over the matter.

**1.63**    ~~1.64~~ **"First Day Declaration"** shall mean the Declaration of Erica Buxton in Support of Debtors' Chapter 11 Petitions and First Day Motions [D.I. 12].

**1.64**    ~~1.65~~ **"Former Directors and Officers"** means any Person that has served as a director or officer of any of the Debtors who is not one of the Current Directors and Officers.

**1.65**    ~~1.66~~ **"General Bar Date"** shall mean 5:00 p.m. (prevailing Eastern Time) on December 28, 2023, as established by the Bar Date Order.

**1.66**    ~~1.67~~ **"General Unsecured Claim"** shall mean a Claim against a Debtor, but excluding any Administrative Claims (including Professional Fee Claims), Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, DIP Loan Claims, Prepetition CIT Loan Claims, Intercompany Claims, and Interests.

**1.67**    ~~1.68~~ **"Governing Body"** means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors, as applicable.

**1.68**    ~~1.69~~ **"Governmental Unit"** shall have the meaning ascribed to such term in Bankruptcy Code section 101(27).

**1.69**    ~~1.70~~ **"Holder"** shall mean any Entity holding a Claim or Interest.

**1.70**    ~~1.71~~ **"Impaired"** shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Bankruptcy Code section 1124.

**1.71**    ~~1.72~~ **"Impaired Class"** shall mean a Class of Claims or Interests that is Impaired.

**1.72**      ~~1.73~~ **"Insurance Contract"** shall mean all insurance policies that have been issued at any time to or provide coverage to any of the Debtors and all agreements, documents or instruments relating thereto.

**1.73**      ~~1.74~~ **"Intercompany Claim"** shall mean a Claim held by a Debtor against another Debtor.

**1.74**      ~~1.75~~ **"Interests"** shall mean the legal interests, equitable interests, contractual interests, equity interests, or ownership interests, or other rights of any Entity in the Debtors, including all capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtors, partnership interests in the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests, or other shares of capital stock of the Debtors or obligating the Debtors to issue, transfer, or sell any shares of capital stock whether or not certificated, transferable, voting, or denominated "stock" or a similar security.

**1.75**      ~~1.76~~ **"Investors"** shall mean, collectively, VMG Partners IV Coinvest, L.P., VMG Partners Mentors Circle IV, L.P., and VMG Partners IV, L.P.

**1.76**      ~~1.77~~ **"IRC"** shall mean the Internal Revenue Code of 1986, as amended.

**1.77**      ~~1.78~~ **"IRS"** shall mean the Internal Revenue Service.

**1.78**      ~~1.79~~ **"Lien"** means a lien as defined in Bankruptcy Code section 101(37).

**1.79**      ~~1.80~~ **"Litigation Trust"** shall mean the trust established under the combined Disclosure Statement and Plan and the Litigation Trust Agreement to hold legal and equitable title to the Litigation Trust Assets.

**1.80**      ~~1.81~~ **"Litigation Trust Agreement"** shall mean the trust agreement in the form and substance reasonably satisfactory to the Debtors and the Committee that, together with the terms of the combined Disclosure Statement and Plan, establishes the Litigation Trust and governs the powers, duties, and responsibilities of the Litigation Trustee.  The Litigation Trust Agreement shall be filed as part of the Plan Supplement.

**1.81**      ~~1.82~~ **"Litigation Trust Assets"** shall consist of the following: (i) all remaining Assets of each of the Debtors that have not been sold or abandoned before the Effective Date following payment of (or establishment of appropriate reserves for) all Allowed Priority Non-Tax Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Administrative Claims, Professional Fee Claims, and U.S. Trustee Fees; (ii) all Retained Causes of Action, including the proceeds related thereto; and (iii) the Remaining Professional Budget.

**1.82**    ~~1.83~~ **"Litigation Trust Budget"** shall mean a budget to be prepared by the Litigation Trustee related to estimated fees and expenses to administer the Plan, wind down the Estates, and operate the Litigation Trust, and which may be amended from time to time following the Effective Date in accordance with the Litigation Trust Agreement.

**1.83**    ~~1.84~~ **"Litigation Trustee"** shall mean Jorge Gonzales or Ed Kim of Genesis Credit Partners as designated by the Committee, in consultation with the Debtors, and who will be retained as the trustee to the Litigation Trust, as of the Effective Date, as the fiduciary responsible for administering the Litigation Trust, and any successor subsequently appointed pursuant to the Litigation Trust Agreement. The compensation of the Litigation Trustee shall be disclosed in the Plan Supplement.

**1.84**    ~~1.85~~ **"Litigation Trust Oversight Committee"** shall mean the board that shall oversee the Litigation Trust in accordance with the combined Disclosure Statement and Plan and the Litigation Trust Agreement, the initial composition of which shall consist of three members designated by the Committee. The identities of the initial members of the Litigation Trust Oversight Committee shall be Marc LeBlanc of Irving Consumer Products, Inc., John Strabo of SCG Capital Corporation, and Hal Singley of Fitesa Simpsonville, Inc.

**1.85**    ~~1.86~~ **"Litigation Trust Expenses"** shall mean, subject to the Litigation Trust Budget, all reasonable legal and other fees and expenses incurred by the Litigation Trustee on account of administration of the Litigation Trust, including reasonable attorneys' fees and expenses, insurance costs, taxes, escrow expenses, and all other costs of administering the Litigation Trust in accordance with the combined Disclosure Statement and Plan and the Litigation Trust Agreement.

**1.86**    ~~1.87~~ **"Litigation Trust Interests"** shall mean the non-transferable interests in the Litigation Trust issued to the Beneficiaries pursuant to the combined Disclosure Statement and Plan.

**1.87**    ~~1.88~~ **"Local Rules"** shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

**1.88**    ~~1.89~~ **"OCP Order"** shall mean the Order Authorizing (A) the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business Effective as of the Petition Date and (B) Waiving Certain Information Requirements of Local Rule 2016-2 [D.I. 132].

**1.89**    ~~1.90~~ **"Objection"** shall mean any objection, application, motion, complaint, or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate, or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

**1.90**    ~~1.91~~ **"Other Secured Claim"** shall mean any Secured Claim other than a Prepetition CIT Loan Claim or a DIP Loan Claim or a Prepetition Subordinated Notes Claim.

**1.91** ~~1.92~~ **"Paid in Full," "Payment in Full," or "Pay in Full"** shall mean, with respect to an Allowed Claim, payment in Cash or other consideration in an aggregate amount equal to the Allowed amount thereof.

**1.92** ~~1.93~~ **"Petition Date"** shall mean October 23, 2023, the date on which the Debtors commenced these Chapter 11 Cases in the Bankruptcy Court.

**1.93** ~~1.94~~ **"Plan"** shall mean this combined Disclosure Statement and chapter 11 Plan as it may be altered, amended, modified, or supplemented from time to time, including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

**1.94** ~~1.95~~ **"Plan Settlement"** shall mean the settlement among the Debtors, the Committee, VMG, 36th Street Capital, and SCG as set forth in the 9019 Settlement Agreement.

**1.95** ~~1.96~~ **"Plan Supplement"** shall mean the ancillary documents necessary to the implementation and effectuation of the Plan, including the Litigation Trust Agreement, which shall be in form and substance satisfactory to the Debtors, and the Committee, and Filed on or before the date that is ten (10) days before the Voting Deadline; provided, however, that the Debtors, with the approval of the Committee and VMG (to the extent any such changes affect or impact VMG), with such consents not to be unreasonably withheld, shall have the right to amend documents contained in, and exhibits to, the Plan Supplement.

**1.96** ~~1.97~~ **"Prepetition CIT Agent"** shall mean CIT Northbridge Credit LLC.

**1.97** ~~1.98~~ **"Prepetition CIT Lenders"** shall mean the lenders party to each of the Prepetition CIT Loan Documents.

**1.98** ~~1.99~~ **"Prepetition CIT Loan Claims"** shall mean the secured Claims of the Prepetition CIT Agent or the Prepetition CIT Lenders arising under and related to the Prepetition CIT Loan Documents in the Allowed amount of $35,596,979.95, plus other fees, costs, expenses, and other amounts arising in respect of the Prepetition CIT Loan Document obligations existing immediately before the Petition Date and which was Paid in Full in Cash and satisfied in full in connection with the Sale.

**1.99** ~~1.100~~ **"Prepetition CIT Loan Documents"** shall mean all other documents, instruments, and agreements executed in connection with the Prepetition First Lien Credit Agreement.

**1.100** ~~1.101~~ **"Prepetition CIT Secured Parties"** shall mean the Prepetition CIT Agent and the Prepetition CIT Lenders.

**1.101** ~~1.102~~ **"Prepetition First Lien Credit Agreement"** shall mean that certain *Loan, Security and Guarantee Agreement*, dated as of April 12, 2022 (as amended and existing immediately before the Petition Date) with CIT Northbridge Credit LLC, as agent, and the lenders party thereto.

**1.102** ~~1.103~~ "**Prepetition Note Purchase Agreement**" shall mean that certain Note Purchase Agreement, dated as of November 2, 2022 (as amended and existing immediately before the Petition Date), by and between Unconditional Love Inc. and the Investors.

**1.103** ~~1.104~~ "**Prepetition Subordinated Notes Security Agreement**" shall mean that certain Security Agreement, dated as of November 2, 2022 (as amended and existing immediately before the Petition Date) with VMG Partners IV L.P., as collateral agent, and the holders party thereto.

**1.104** ~~1.105~~ "**Prepetition Subordinated Notes**" shall mean, collectively, those certain secured convertible promissory notes, each dated as of November 2, 2022 (as amended, supplemented, or otherwise modified from time to time), purchased by each Prepetition Subordinated Noteholder from Unconditional Love Inc.

**1.105** ~~1.106~~ "**Prepetition Subordinated Notes Agent**" shall mean VMG Partners IV L.P., as collateral agent.

**1.106** ~~1.107~~ "**Prepetition Subordinated Notes Claims**" shall mean the secured Claims of the Prepetition Subordinated Notes Agent and the Prepetition Subordinated Noteholders arising under and related to the Prepetition Subordinated Notes Documents in the Allowed amount of $30,000,000.00, plus accrued and unpaid interest and other fees, costs, expenses, and other amounts arising in respect of obligations under the Prepetition Subordinated Notes Documents existing immediately before the Petition Date.

**1.107** ~~1.108~~ "**Prepetition Subordinated Notes Documents**" shall mean all other documents, instruments, and agreements executed in connection with the Prepetition Note Purchase Agreement, Prepetition Subordinated Notes and Prepetition Subordinated Notes Security Agreement.

**1.108** ~~1.109~~ "**Prepetition Subordinated Noteholders**" shall mean, collectively, the Investors in their capacity as holders under each of the Prepetition Subordinated Notes.

**1.109** ~~1.110~~ "**Prepetition Subordinated Notes Secured Parties**" shall mean the Prepetition Subordinated Notes Agent and the Prepetition Subordinated Noteholders.

**1.110** ~~1.111~~ "**Priority Non-Tax Claim**" shall mean any and all Claims accorded priority in right of payment under Bankruptcy Code section 507(a), other than Priority Tax Claims and Administrative Claims.

**1.111** ~~1.112~~ "**Priority Tax Claim**" shall mean a Claim or a portion of a Claim for which priority is asserted under Bankruptcy Code section 507(a)(8).

**1.112** ~~1.113~~ "**Professional**" shall mean an Entity (other than Entities retained pursuant to the OCP Order) pursuant to a Final Order in accordance with Bankruptcy Code sections 327, 328, 330, 363, and 1103, and to be compensated for services rendered before the Confirmation Date, pursuant to Bankruptcy Code sections 327, 328, 329, 330, and 331, or

for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 503(b)(4).

**1.113** ~~1.114~~ **"Professional Fee Claims Bar Date"** shall mean the deadline for Filing all applications for Professional Fee Claims, which shall be forty-five (45) days after the Filing and service of the Effective Date Notice; provided, however, for the avoidance of doubt, any Professional retained under Bankruptcy Code section 363 shall not be required to file final fee applications, unless required by a Final Order.

**1.114** ~~1.115~~ **"Professional Fee Claims"** shall mean all fees and expenses (including, but not limited to, transaction fees and success fees) for services rendered by Professionals in connection with these Chapter 11 Cases from the Petition Date through and including the Effective Date.

**1.115** ~~1.116~~ **"Professional Fee Reserve Account"** shall mean the reserve account held by Young Conaway Stargatt & Taylor, LLP and funded by the Debtors in Cash on the Effective Date pursuant to Section 6.1(e) of the Plan, in an amount equal to the Professional Fee Reserve Amount.

**1.116** ~~1.117~~ **"Professional Fee Reserve Amount"** shall mean the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors or the Committee before the Effective Date, which estimates Professionals shall deliver to the Debtors and the Committee as set forth in Section 6.1(e) of the Plan.

**1.117** ~~1.118~~ **"Purchase Agreement"** shall mean that certain *Asset Purchase Agreement*, dated as of November 20, 2023 (together with the schedules and/or exhibits thereto and all related documents, and as may be amended, supplemented, or otherwise modified from time to time), by and among Unconditional Love Inc., and The Best Training Pants in the World Inc, as sellers, and Bucky Acquisition Holdco, LLC, as buyer.

**1.118** ~~1.119~~ **"Related Parties"** shall mean, with respect to any Person or Entity, such Person's or Entity's respective current and former (i) officers, (ii) managers, (iii) directors, (iv) employees, (v) partners, (vi) affiliates and subsidiaries, (vii) professionals, (viii) advisors and advisory board members, (iv) agents, (x) members and shareholders, (xii) owners, (xiii) affiliated investment funds or investment vehicles, (xiii) managed, advised or sub-advised accounts, (xiv) funds or other entities, (xv) investment advisors, sub-advisors or managers, and (xvi) other representatives, including, without limitation, attorneys, accountants, consultants, investment bankers, and financial advisors and the predecessors, successors, assigns, or heirs of such Person or Entity (in each case, in their respective capacities as such); provided that the Former Directors and Officers shall not be Related Parties with respect to any provisions of the Plan.

**1.119** ~~1.120~~ **"Release Opt-Out Election"** shall mean the timely election of any Holders of Claims ~~entitled to vote on the Plan~~ (including Committee members in their individual capacity as individual Creditors) to "opt out" of being a Releasing Party by submitting a Ballot by the Voting Deadline that (i) votes to accept the Plan and selects the option set

forth on the Ballot to not grant the releases set forth in Section 14.2(c) of the Plan, (ii) votes to reject the Plan ~~and elects the option set forth on the Ballot to not grant the releases set forth in Section 14.2(c) of the Plan,~~ or (iii) does not vote on the Plan and selects the option set forth on the Ballot to not grant the releases set forth in Section 14.2(c) of the Plan.  For the avoidance of doubt, regardless of whether Holders Claims submit a Release Opt-Out Election, such Holder will be entitled to a Distribution.

**1.120** ~~1.121~~ **"Releasing Parties"** shall mean (~~a~~i) all Holders of Claims that are deemed to accept the Plan that have not objected to the release on or before the deadline to object to Confirmation, (~~b~~ii) the Committee, including its current members, but solely in their capacity as Committee members and not in their capacity as individual Creditors,[3] (~~e~~iii) the Prepetition CIT Lenders, (~~d~~iv) the Prepetition CIT Agent, (~~e~~v) the DIP Lenders, (~~f~~vi) the DIP Agent, (g) VMG, and (h) all Holders of Claims who vote to accept the Plan and who do not ~~submit~~ a Release Opt-Out Election; provided, however, that (y) Holders of Claims whose Ballots are returned as undeliverable as set forth in the *Voting Declaration*, and (z) Holders of Claims entitled to vote to accept or reject the Plan but do not submit a ballot shall not be deemed to grant, participate in or receive the releases set forth in Section 14.2(c) of the Plan.

**1.121** ~~1.122~~ **"Remaining Professional Budget"** shall mean any savings or amounts remaining, as of the Effective Date, from the amounts budgeted for Professionals in the Final DIP Order.

**1.122** ~~1.123~~ **"Remaining Debtor Budget"** shall mean any savings or amounts remaining, as of the Effective Date, from the Final DIP Order.

**1.123** ~~1.124~~ **"Retained Causes of Action"** shall mean all Causes of Actions, including the rights and Claims described in the schedule filed with the Plan Supplement, but excluding: (i) Claims against counterparties with contracts assigned to a purchaser under the Sale, (ii) Claims, including Avoidance Actions, sold to a purchaser under the Sale, (iii) Claims released or exculpated pursuant to the Plan and the Plan Settlement, including claims against VMG released pursuant to the Plan; and (iv) Claims against the Prepetition CIT Secured Parties and the DIP Secured Parties released pursuant to the Final DIP Order.

**1.124** ~~1.125~~ **"Sale"** shall mean the sale of substantially all of the Debtors' Assets to Bucky Acquisition HoldCo, LLC, pursuant to the Purchase Agreement, and as approved by that certain *Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. 226].

**1.125** ~~1.126~~ **"Sale Cash Consideration"** shall mean the Cash consideration paid or payable by the Successful Bidder pursuant to the Purchase Agreement.

---

[3]  Each Committee member has agreed to not object to the Plan and to vote in favor of confirmation of the Plan.

**1.126**   ~~1.127~~ **"Sale Consideration"** shall mean, in the aggregate, the Sale Cash Consideration and the Sale Non-Cash Consideration.

**1.127**   ~~1.128~~ **"Sale Non-Cash Consideration"** shall mean the non-Cash consideration paid or payable by the Successful Bidder pursuant to the Purchase Agreement.

**1.128**   ~~1.129~~ **"SCG"** means SCG Capital Corporation.

**1.129**   ~~1.130~~ **"Schedules"** shall mean the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to Bankruptcy Code section 521 and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

**1.130**   ~~1.131~~ **"Secured Claim"** shall mean, pursuant to Bankruptcy Code section 506, that portion of a Claim that is (a) secured by a valid, perfected, and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title, or interest of the Debtors in and to property of the Estates, to the extent of the value of the Holder's interest in such property as of the relevant determination date, or (b) Allowed as such pursuant to the terms of the Plan (subject to the Confirmation Order becoming a Final Order).  The defined term Secured Claim includes any Claim that is (i) subject to an offset right under applicable law as of the Petition Date, and (ii) a secured claim against the Debtors pursuant to Bankruptcy Code sections 506(a) and 553.

**1.131**   ~~1.132~~ **"Solicitation Procedures Order"** shall mean that certain Order (I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Solicitation and Tabulation Procedures; (III) Approving the Forms of Ballots and Solicitation Materials; (IV) Establishing the Voting Record Date; (V) Fixing the Date, Time, and Place for the Combined Hearing and the Deadline for Filing Objections Thereto; And (VI) Granting Related Relief [D.I. 407].

**1.132**   ~~1.133~~ **"Stalking Horse Bidder"** shall mean Bucky Acquisition HoldCo, LLC.

**1.133**   ~~1.134~~ **"Successful Bidder"** shall mean Bucky Acquisition HoldCo, LLC.

**1.134**   ~~1.135~~ **"Taxes"** shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, or other similar taxes, estimated import duties, fees, stamp taxes, and customs duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

**1.135**   ~~1.136~~ **"Third-Party Released Parties"** shall mean, each of the following in their capacity as such:  (~~a) the Debtors and the Estates; (b~~i)  the Committee; (~~c~~ii) the Prepetition CIT Secured Parties; (~~d~~iii) the DIP Agent; (~~e~~iv) the DIP Lenders; (~~f~~v) VMG; and (~~g~~vi) with respect to each of the foregoing, their Related Parties, but excluding in all respects all Former Directors and Officers.

**1.136**   ~~1.137~~ **"Unclassified Claims"** shall mean any Administrative Claims, Professional Fee Claims, and Priority Tax Claims.

**1.137**   ~~1.138~~ **"Unimpaired"** shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of Bankruptcy Code section 1124.

**1.138**   ~~1.139~~ **"U.S. Trustee Fees"** shall mean fees payable pursuant to 28 U.S.C. § 1930.

**1.139**   ~~1.140~~ **"VMG"** shall mean, collectively, VMG Partners IV L.P., VMG Partners IV Coinvest, L.P., and VMG Partners Mentors Circle IV, L.P. in all capacities, including as Prepetition Subordinated Notes Secured Parties and holders of equity Interests in the Debtors.

**1.140**   ~~1.141~~ **"VMG Claims"** shall mean VMG's Claims (including the Prepetition Subordinated Notes Claims) and Interests.

**1.141**   ~~1.142~~ **"Voting Deadline"** shall mean **June 8, 2024, at 4:00 p.m. (prevailing Eastern Time)**, the date and time by which ballots to accept or reject the Plan must be received to be counted, as set forth by the Solicitation Procedures Order.

Rules of Interpretation

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, (a) any capitalized term used in the combined Disclosure Statement and Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (b) whenever the context requires, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter shall include the masculine, feminine and the neuter, (c) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (d) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (e) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (f) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Plan, (g) captions and headings to articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions hereof or the interpretation of the Plan, and (h) the rules of construction set forth in Bankruptcy Code section 102 and in the Bankruptcy Rules shall apply.

**ARTICLE  II**
CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

> **THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

    **2.1**   **Classification.**  The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the Claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled before the Effective Date.

All Claims and Interests, except Administrative Claims, Professional Fee Claims, DIP Loan Claims, and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims (including Professional Fee Claims), and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such Unclassified Claims is set forth below in Article VI of the Plan.  The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and distribution pursuant to the Plan and pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

| Class/ Designation | Plan Treatment | Estimated Amount of Total Claims | Status / Voting Rights | Projected Recovery |
|---|---|---|---|---|
| **Class 1**: Priority Non-Tax Claims | Each Holder of an Allowed Priority Non-Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors or the Litigation Trustee, as applicable, and the Holder of such Allowed Priority Non-Tax | $0 | Unimpaired/ Deemed to accept Plan | 100% |

| Class/ Designation | Plan Treatment | Estimated Amount of Total Claims | Status / Voting Rights | Projected Recovery |
|---|---|---|---|---|
| | Claim have agreed upon in writing. | | | |
| **Class 2**: Other Secured Claims | Each Holder of an Allowed Class 2 Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 2 Claim: (A) return of the collateral securing such Allowed Other Secured Claim; or (B) Cash equal to the amount of such Allowed Other Secured Claim; or (C) such other treatment that the Debtors or the Litigation Trustee, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing. | $0 | Unimpaired/ Deemed to accept Plan | 100% |
| **Class 3**: General Unsecured Claims | Unless the Holder agrees to a different treatment, each Holder of a General Unsecured Claim shall receive such Holder's pro rata share of the liquidated value of the Litigation Trust Assets. | $77,500,000.00 | Impaired/ Entitled to vote | 0.46% |
| **Class 4**: Subordinated Claims | Allowed Subordinated Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims. | N/A | Impaired/ Deemed to reject Plan | 0% |
| **Class 5**: Intercompany Claims | Holders of Intercompany Claims shall receive no Distribution on account of their Intercompany Claims. | N/A | Impaired/ Deemed to reject Plan | 0% |
| **Class 6**: Interests | On the Effective Date, all Interests shall be extinguished as of the Effective Date, and owners thereof shall receive no Distribution on account of such Interests. | N/A | Impaired/ Deemed to reject Plan | 0% |

**ARTICLE III**
BACKGROUND AND DISCLOSURES

### 3.1    General Background.[4]

    (a)    *The Debtors' Business.*

Founded in February 2019, Unconditional Love Inc., d/b/a Hello Bello ("Hello Bello"), was a retailer of baby necessities, selling products made with plant based ingredients and organic botanicals across the baby, family, and wellness markets.  At Hello Bello's inception, its products were sold exclusively in Walmart and direct-to-consumer through its website, www.hellobello.com, with thirty core products in diapering, wipes, and personal care.  Hello Bello was an immediate success.  Hello Bello's premier, competitively priced, eco-friendly products resonated with consumers, and its interactive online platform quickly generated a strong direct-to-consumer presence.  Hello Bello also enjoyed a strong relationship with Walmart as its first retail partner, which expanded its customer reach and brand awareness with a prominent in-store presence, both in-aisle and on display.  By 2021, Hello Bello was the largest direct-to-consumer subscription diaper brand in the United States, with approximately 130,000 subscribers and $200 million in annual net sales.

Building on this momentum, funds affiliated with VMG acquired approximately a one-third stake in Hello Bello and began a series of extensive investment initiatives to further grow Hello Bello in July 2020.  Following the acquisition, Hello Bello further expanded its existing key product lines in health and wellness products for babies and parents; diversified its retail channels into grocery, drug, wholesale, and specialty markets; and accelerated its international presence in Canada, Australia, and the United Kingdom.  As of the Petition Date, investment funds advised by VMG held approximately 35% of Hello Bello's equity, with the remaining equity owned by Hello Bello's founders and other third-party investors.

        i.    <u>Current Business Operations.</u>

Headquartered in Los Angeles, California, before the closing of the Sale, Hello Bello manufactured and sold a broad range of products through manufacturing plants located in the United States, Mexico, Canada, and China.  From 2019 to early 2021, Hello Bello produced all of its products through third-party co-manufacturers.  However, in 2021, Hello Bello opened a diaper manufacturing facility in Waco, Texas (the "Texas Manufacturing Facility").  Hello Bello manufactured its own diapers since that time, and, as of the Petition Date, was one of the few privately held, vertically integrated diaper branded businesses in the United States.  As of the Petition Date, Hello Bello relied on eight co-manufacturers throughout Canada, Mexico, and China to produce its vitamins, personal care products, training pants and swim diapers, and baby wipes.

Hello Bello sold its products (i) to a network of wholesale accounts in the United States, Canada and the United Kingdom that included big-box retailers, specialty retailers, and

---

[4] Additional information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in detail in the First Day Declaration.

boutiques, and (ii) directly to consumers, primarily through its e-commerce site, www.hellobello.com. Direct purchasers could subscribe to purchase customizable bundles of products on a monthly basis or choose to purchase individual products through Hello Bello's website. Ninety-five percent of the bundles sold consisted of a combination of diapers and wipes. Customers were also able to incorporate add-ons and extra products from Hello Bello's personal care lines, such as vitamins, shampoo, bug spray, sunscreen, and hand sanitizer, among other products, into their bundle subscription boxes each month. In addition, before closing the Sale, Hello Bello produced private labeled products for Walmart.

The Debtors ordered all raw materials needed to manufacture their products from both domestic and foreign vendors through a worldwide logistics network of common carriers, freight forwarders, customs agents, rail carriers, and truckers. In addition to their Texas Manufacturing Facility, the Debtors maintained their distribution system across two distribution facilities located in Waco, Texas (collectively, the "Texas Distribution Facilities") and a storage facility. The Texas Distribution Facilities were shipping and warehouse facilities in which all direct-to-consumer and store-bound merchandise was received, sorted, and repacked. The Debtors maintained a third facility in Texas that was used solely for the storage of merchandise.

For the fiscal year ending January 31, 2023, Hello Bello generated approximately $179 million in sales and had negative EBITDA of approximately $15 million. Retailer sales accounted for approximately 60% of Hello Bello's total annual sales, while Hello Bello's e-commerce direct-to-consumer business generated approximately 40% in sales.

As of the Petition Date, the Debtors employed approximately 334 full-time employees in the United States and 2 full-time employees in Canada. The workforce was divided among the Debtors' Los Angeles headquarters and the Texas Manufacturing Facility. Certain other employees worked remotely throughout the United States. None of the Debtors' employees were covered by a collective bargaining agreement.

ii.    Product Lines.

Before closing the Sale, Hello Bello sold products in five primary categories: diapers and training pants, baby wipes, personal care products, vitamins, and homecare and other products. As reflected in Hello Bello's organization chart, attached as Schedule 1 to the First Day Declaration, Debtor Unconditional Love Inc. wholly owns (i) Debtor Unconditional Love Canada, Inc., which facilitated payments to a limited set of supply chain logistics providers in Canada, and (ii) Debtor The Best Training Pants in the World Inc., through which Hello Bello operated its private label training pants business.

(A)    Diapers and Training Pants. Through its diapers and training pants segment, Hello Bello manufactured a variety of diapers and training pants. As noted above, Hello Bello manufactured all diapers in-house prepetition, which provided for increased flexibility to quickly change designs at scale. Hello Bello sourced the raw materials from primarily local, U.S.-based providers, and, as of the Petition Date, used four production lines to manufacture the

diapers.  This segment accounted for 67% of Hello Bello's revenue in fiscal year 2022, generating over $137 million in gross revenue.

(B)  <u>Baby Wipes</u>.  Through its baby wipes segment, Hello Bello offered both scented and unscented wipes in 20-, 60-, 180-, and 600-count packages at its e-commerce site and at Walmart, and 540-, 720-, and 1080-count packages that were available through Amazon.  Since Hello Bello's launch, its wipes were available at Walmart, and Hello Bello had significantly expanded its presence internationally.  Hello Bello offered baby wipes as an additional product that may be included with any diaper-bundle subscription purchase.  This segment accounted for 12% of Hello Bello's revenue in fiscal year 2022, generating over $25 million in gross revenue.

(C)  <u>Personal Care</u>.  Through its personal care segment, Hello Bello offered a broad range of products for use by both adults and babies such as hair care, sunscreens, balms, lotions, and baby oil.  In addition to being sold at retailers such as Walmart and Amazon, these products were often sold as an add-on with diaper bundles to increase items per cart.  This segment accounted for 12% of Hello Bello's revenue in fiscal year 2022, generating over $24 million in gross revenue.

(D)  <u>Vitamins</u>.  Through its vitamin segment, Hello Bello offered a variety of naturally flavored, chewable vitamin gummies for both children and adults.  The vitamins addressed a broad range of needs, such as gut health and probiotics, prenatal, stress relief and sleep aids, beauty, immunity, and daily multi-vitamins.  This segment accounted for 7% of Hello Bello's revenue in fiscal year 2022, generating over $14 million in gross revenue.

(E)  <u>Home Care and Other</u>.  Through the homecare and other segment, Hello Bello offered a range of products used around and outside the home, including multi-surface wipes and spray, hand soap, laundry detergent, mosquito repellent, and hand sanitizer gel and spray.  These products leveraged consumer focus on eco-friendly products by offering plant-based, hypoallergenic products in reusable bottles.  This segment accounted for 2% of Hello Bello's revenue in fiscal year 2022, generating over $4 million in gross revenue

24

(b)     ***The Debtors' Capital Structure.***

i.      Prepetition Secured Indebtedness.

The Debtors' prepetition debt structure primarily consisted of (i) the amounts outstanding under the Prepetition CIT Loan Documents, (ii) the amounts outstanding under the Prepetition Subordinated Notes Documents, (iii) the Equipment Leases (as defined below), and (iv) other unsecured obligations, consisting of, among other things, trade debt.  As of the Petition Date, the Debtors had approximately $65 million in outstanding borrowings, consisting of (i) approximately $35 million aggregate principal amount outstanding under the Debtors' Prepetition CIT Loan Documents and (ii) $30 million aggregate principal amount outstanding under the Debtors' Prepetition Subordinated Notes.  Following the consummation of the Sale, the principal amount of the Debtors' prepetition borrowings are set forth below:

| Type of Debt | Maturity | Principal Amount Outstanding |
|---|---|---|
| Prepetition CIT Loan Documents | April 12, 2026 | $0.00 |
| VMG Partners IV Coinvest Subordinated Note | November 2, 2025 | $17,550,000.00 |
| VMG Partners Mentors Circle IV, L.P. Subordinated Note | November 2, 2025 | $314,645.00 |
| VMG Partners IV, L.P. Subordinated Note | November 2, 2025 | $12,135,355.00 |
| **Total** | | **$30,000,000** |

ii.     Prepetition CIT Loan Documents.

The Debtors are party to that certain Prepetition First Lien Credit Agreement, pursuant to which the Debtors received a revolving line of credit in an initial aggregate commitment amount of $65 million.  Pursuant to the Prepetition First Lien Credit Agreement and various other Security Documents (as defined in the Prepetition First Lien Credit Agreement), the obligations under the Prepetition First Lien Credit Agreement are secured by a first priority security interest in substantially all of the assets of the Debtors other than certain excluded assets (the "Prepetition Collateral").  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition CIT Loan Documents was approximately $35 million, plus accrued and unpaid interest thereon.  The amounts owed under the Prepetition CIT Loan Documents were Paid in Full in Cash and satisfied in full in connection with the consummation of the Sale.

iii.    Prepetition Subordinated Notes.

Unconditional Love Inc. is also party to that certain Note Purchase Agreement pursuant to which each Investor purchased from Unconditional Love Inc., and Unconditional Love Inc. sold to each

such Investor, a secured Prepetition Subordinated Note.  As of the Petition Date, there were three Prepetition Subordinated Notes outstanding, issued to (i) VMG Partners IV Coinvest in the principal amount of $17,550,000.00, (ii) VMG Partners Mentors Circle IV, L.P. in the principal amount of $314,645.00, and (iii) VMG Partners IV, L.P. in its capacity as Prepetition Subordinated Noteholder in the principal amount of $12,135,355.00, in each case, plus accrued and unpaid interest thereon.  The Prepetition Subordinated Notes are secured by substantially all of the personal property of Unconditional Love Inc. under that Prepetition Subordinated Notes Security Agreement (the "Subordinated Notes Collateral").

Pursuant to that certain Subordination Agreement, dated as of November 2, 2022, by and among the Investors and the Prepetition CIT Secured Parties, the Junior Liabilities (as defined therein) arising under the Prepetition Subordinated Notes were subordinated to the payment in full of the Senior Liabilities arising under the Prepetition CIT Loan Documents (which occurred in connection with the Sale), and the Liens (as defined therein) securing the Prepetition Subordination Notes are subordinated to the senior Liens securing the Prepetition CIT Loan Documents.

Pursuant to the provisions of the Prepetition Subordinated Notes Documents, including that certain Subordinated Notes  Subordination Agreement, dated as of December 1, 2022, by and among the Prepetition Subordinated Noteholders and SCG and that certain Subordination Agreement, dated as of November 2, 2022, by and among the Prepetition Subordinated Noteholders and 36th Street Capital, (i) the Junior Liabilities (as defined therein) arising under the Prepetition Subordinated Notes are subordinated to the payment in full of the Senior Liabilities (as defined therein), and (ii) each Senior Creditor has agreed that Subordinated Creditor (as defined therein), has the right to elect to receive on account of its Prepetition Subordinated Notes Claims an amount it would have received had such Claim been converted into equity Interests of the Debtors.

iv.    <u>Prepetition Equipment Leases.</u>

Debtor Unconditional Love Inc. is also party to multiple master equipment leases, which include: (i) that certain Master Equipment Lease Agreement No. 2022092, dated as of December 12, 2022, by and between CSC Leasing Co. ("CSC") and Unconditional Love Inc., (ii) that certain Master Equipment Lease Agreement, dated as of March 10, 2021, by and between 36th Street Capital and Unconditional Love Inc., (iii) that certain Master Lease Agreement No. 106020, dated as of February 16, 2023, by and between NFS Leasing, Inc., (assignee to Consultants Group Commercial Funding Corporation (d/b/a Nexseer Capital)) ("NFS") and Unconditional Love Inc., and (iv) that certain Master Lease Agreement, dated as of December 1, 2022, by and between SGC and Unconditional Love Inc. (collectively, as amended, supplemented, or otherwise modified from time to time, the "Prepetition Equipment Leases").  The Prepetition Equipment Leases each relate to individual diaper manufacturing lines and certain other equipment, in each case, as scheduled in each applicable Prepetition Equipment Lease (the "Equipment Lease Collateral").

v.      Other Equipment Arrangements.

Debtor Unconditional Love Inc. has three other outstanding equipment liens, which are evidenced by unterminated UCC-1 filings.  The equipment lessors include Raymond Leasing, Wells Fargo, and De Lage Landen, and the liens relate to "material handling equipment," forklifts, trucks, and other similar equipment.  Both the Wells Fargo and De Lage Landen leases were assumed and assigned to the Buyer under the Purchase Agreement at Sale closing.

vi.      Other Unsecured Obligations.

In addition to the Debtors' funded debt, the Debtors estimate that, as of the Petition Date, they had approximately $52.5 million in unpaid trade and other ordinary course obligations.

### 3.2      Events Leading to Chapter 11.

(a) ***Rising Manufacturing Costs Following the COVID-19 Pandemic.***

As noted above, following its initial launch in 2019, Hello Bello experienced immediate popularity and rapid growth, earning the title of leading direct-to-consumer subscription diaper brand in the United States during its second year on the market.  Further, unlike the vast majority of retail consumer brands during 2020, Hello Bello initially successfully weathered the COVID-19 pandemic as consumers shifted away from in-person retail outlets and towards online shopping.  During the spring and fall of 2020, Hello Bello's direct-to-consumer subscription services and diaper bundle orders experienced significant growth.  Hello Bello was also able to successfully capitalize on such increases in direct-to-consumer traffic by producing and selling other high demand products—such as vitamin gummies and hand sanitizers—to customers as stand-alone products or as additions to their diaper bundle subscription boxes.

However, the ancillary impacts of COVID-19 eventually caught up with Hello Bello and produced drastic effects on its margins.  Global supply chain issues caused higher shipping costs, increased purchase prices and delayed shipment of raw materials needed to manufacture Hello Bello's products.  This, in turn, impacted Hello Bello's ability to fulfill customer orders in a timely manner.  Further, with approximately half of Hello Bello's business comprised of direct-to-consumer customers and a business model committed to ensuring high-quality, low cost products for customers, Hello Bello struggled to meet increased shipping costs and costs of raw materials while maintaining its margins.  Hello Bello's focus on maintaining affordable pricing and low shipping costs for customers made it difficult for Hello Bello to quickly adapt to (or mitigate) the effects of rising supply chain and shipping costs

(b) ***Vertical Integration of Hello Bello's Diaper Manufacturing Process.***

As noted above, Hello Bello initially relied upon one main third-party manufacturer, Irving Consumer Products, Inc. ("Irving"), to produce all of its diapers supply.  The manufacturing contract with Irving set wholesale diaper production prices at a specified rate for a period of

27

time, but, in 2021, Irving began increasing the rates at which diapers were produced to a rate higher than Hello Bello could pass on to retailers. For example, over time, the manufacturer increased diaper production prices by over 18%; however, Hello Bello's main wholesale retailers, such as Walmart and Amazon, would not accept a price increase of more than 10%. Further, even if Hello Bello had managed to offset rising manufacturing costs by raising product prices at in-store wholesalers, Hello Bello would likely have priced itself out of the market with competitors and risked losing its customer base. As a result, Hello Bello was forced to choose between shouldering all rising manufacturing costs at the expense of company growth or severing ties with its sole diaper manufacturer and moving all production in-house.

To minimize the impact of rising shipping costs and regain control of the cost of producing its flagship product, Hello Bello made the strategic choice to vertically integrate its diaper productions and launch its own manufacturing facility in Waco, Texas. Vertical integration also provided Hello Bello with flexibility to quickly and efficiently pivot to new diaper designs, a differentiating factor in the market increasingly sought out by customers.

Despite the significant benefits associated with the decision to integrate, Hello Bello faced several challenges in getting the Texas Manufacturing Facility off the ground that further strained Hello Bello's liquidity profile. First, while the lines were in early development, Hello Bello continued to purchase diapers from Irving to maintain inventory levels and fulfill orders during the transition period. By June 2022, Hello Bello no longer purchased diapers from Irving, but did not realize any cost savings in production in the initial months after integration. Further, although Hello Bello forecasted product sales to keep up with direct-to-consumer and wholesale orders, its manufacturer required Hello Bello to pre-purchase inventory for up to one year in advance. Hello Bello was left with front-loading the costs of producing warehouses full of excess inventory without reaping the benefits of the anticipated, high volume product sales.

Second, Hello Bello encountered several setbacks in its efforts to get the manufacturing plant up and running. To develop the manufacturing lines, Hello Bello first created a diaper design and worked with a development company in Italy to build machines that could make the diapers according to Hello Bello's specifications. Under ordinary circumstances, Hello Bello would send employees to be on-site at the development company to oversee the creation of the machines and ensure the machines met a number of qualification tests and standards. The Italian company would then disassemble the machine, ship it to the Texas Manufacturing Facility, and send its own employees to Texas to supervise the machine's reassembly. Because the manufacturing lines were developed and designed in 2020 during strict COVID-19 lockdowns in Italy, travel restrictions complicated and delayed the ability to develop the lines in a typical timeframe. Neither company's employees were permitted to travel internationally to supervise the development or assembly of the machines. Further, once the manufacturing lines arrived, the Texas Manufacturing Facility was facing its own shortage of personnel due to COVID-19 sick-leave and restrictions. Hello Bello was forced to rely upon United States-based specialists and engineers to reassemble the lines and bring the lines up to code in order to pass another, final round of additional quality testing, which delayed the assembly production time longer than Hello Bello had anticipated. Specifically, the first production line was delivered to Waco, Texas

28

in the summer of 2021, but was not assembled and subsequently approved to begin manufacturing products until six months thereafter.

Third, Hello Bello had to consider certain problems inherent with in-house manufacturing due to the vertical integration.  For example, Hello Bello went through trial and error in sourcing the right raw materials and ensuring no quality issues.  Located in a manufacturing hotspot with a competitive labor force, Hello Bello faced unanticipated difficulties with hiring and retaining employees given the turbulence associated with getting a new manufacturing plant off the ground.  Since Hello Bello was unable to offer consistent hours of employment during the first several months of manufacturing in Waco, Texas, Hello Bello experienced an unanticipated increase in turnover of its workforce.

(c)     <em><strong>Prepetition Marketing Process.</strong></em>

> In an attempt to navigate these adverse economic and operational circumstances and the lack of access to capital markets, in the months leading up to the bankruptcy filing, the Debtors initiated various cost-cutting measures to preserve liquidity.  These efforts included: scaling back their footprint in international markets; requiring more direct-to-consumer customers to pay for shipping costs; re-evaluating their portfolio of products and pausing their expansion into new products; reducing the corporate workforce by 20%; carefully managing payments to vendors, landlords, and other creditors; and other restructuring initiatives.

While the Debtors continued to generate revenues, these revenue streams—even when combined with their extensive cost-cutting measures—proved insufficient to cover the Debtors' ongoing cash requirements.  With these concerns in mind, and with their operating cash running low, the Debtors retained Jefferies LLC ("Jefferies") in November 2022 as investment banker to pursue a range of strategic alternatives, including additional financing, equity investments, and a sale of the Debtors' assets.  To support this process and liquidity, Hello Bello also received additional financing from the Investors at this time, who invested a further $30 million in the Prepetition Subordinated Notes.  In addition, beginning in August 2023, the Debtors retained Willkie Farr & Gallagher LLP, as corporate and restructuring counsel; Young Conaway Stargatt & Taylor, LLP, as co-counsel; and Emerald Capital Advisors Corp., as restructuring advisor.

The Debtors' initial outreach formally began in December 2022, and included outreach to a full universe of potential investors.  As part of this process, the Debtors, with the assistance of Jefferies, contacted approximately 155 parties, including 135 financial and/or equity investors and 20 strategic buyers (including the Stalking Horse Bidder), 80 of which executed nondisclosure agreements and were provided with initial financial and operational diligence materials.  Jefferies received four indications of interest in mid-February 2023, and invited each of them to continue with additional due diligence.  However, all four of these parties ultimately elected not to move forward in the process, citing, among other reasons, concerns regarding Hello Bello's capital structure and tightening liquidity.

While this initial bidder and investor group all passed, Jefferies and the Debtors continued to market a broad range of transaction opportunities, both with new and previously contacted

29

parties.  Over the course of spring and early summer 2023, dialogue continued with a range of strategic and financial parties, and two further indications of interest were received for varying potential transaction structures, one of which resulted in Hello Bello entering briefly into a non-binding, non-exclusive letter of intent in April 2023.  However, both of these parties declined to move forward after conducting further due diligence, also citing concerns with Hello Bello's outstanding debt structure and liquidity profile.  In early July 2023, a strategic buyer affiliated with Hildred Capital Management, LLC approached Jefferies with renewed interest in pursuing an acquisition of the Debtors' assets, which would likely require significant compromise from Hello Bello's creditors, but could potentially be executed under an out-of-court recapitalization scenario, subject to the results of preliminary due diligence and structuring work.  Through July 2023, Hello Bello and its advisors facilitated the Stalking Horse Bidder's due diligence, while continuing their dialing with other potential parties.  On July 28, 2023, the Debtors and the Stalking Horse Bidder entered into that certain letter of intent, which set forth the preliminary terms under which the Stalking Horse Bidder was willing to pursue a transaction, including requiring an in-court sale pursuant to Bankruptcy Code section 363.

The Letter of Intent also contained an exclusivity provision, which prohibited the Debtors from marketing, soliciting, or negotiating a competing transaction for a period of 30 days following its execution (the "Exclusivity Period").  Although diligence and negotiations with the Stalking Horse Bidder remained ongoing, the Exclusivity Period expired by its terms in late-September 2023 and the Debtors, consistent with their fiduciary obligations, continued to seek a value maximizing transaction.  The Debtors immediately reopened the marketing process by engaging potential bidders who had expressed interest in the assets during the Exclusivity Period.  At the same time, the Debtors and their advisors continued to negotiate the terms of an asset purchase agreement with the Stalking Horse Bidder.

The negotiations with the Stalking Horse Bidder continued through mid-October, and resulted in significant improvements to the terms of the Stalking Horse Bidder's proposed transaction and garnering the support of the Prepetition CIT Lenders, ultimately leading the Debtors to file these Chapter 11 Cases.

### 3.3     These Chapter 11 Cases.

(a)         *Generally.*

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of that date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  The Debtors operate their business and manage their properties as debtors and debtors in possession.  By order entered on October 24, 2023, these Chapter 11 Cases are being jointly administered for procedural purposes only [D.I. 48].  No trustee or examiner has been appointed in these Chapter 11 Cases.  On November 2, 2023, the Office of

the United States Trustee for the District of Delaware appointed the
Committee.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate
imposition of the automatic stay under Bankruptcy Code section 362, which, with limited
exceptions, enjoins all collection efforts and actions by creditors, the enforcement of liens
against property of the Debtors, and both the commencement and the continuation of prepetition
litigation against the Debtors.  With certain limited exceptions and/or modifications as permitted
by order of the Bankruptcy Court, the automatic stay will remain in effect through the Effective
Date of the Plan.

(b)  ***"First Day" Motions and Related Applications.***

Commencing on the Petition Date, the Debtors filed the following "first-day" motions and
applications designed to ease the Debtors' transition into chapter 11, maximize the value of the
Assets, and minimize the effects of the commencement of these Chapter 11 Cases:

i. Debtors' Motion for Order Authorizing Joint Administration of the
Debtors' Chapter 11 Cases [D.I. 2] (the "Joint Administration
Motion").

ii. Debtors' Application for Appointment of Stretto, Inc. as Claims
and Noticing Agent [D.I. 3] (the "Claims Agent Retention
Application").

iii. Debtors' Motion for Interim and Final Orders (I) Prohibiting
Utility Companies from Altering, Refusing, or Discontinuing
Utility Services, (II) Deeming Utility Companies Adequately
Assured of Future Payment, (III) Establishing Procedures for
Resolving Objections by Utility Companies and Determining
Additional Adequate Assurance of Payment, and (IV) Granting
Related Relief [D.I. 4] (the "Utilities Motion").

iv. Debtors' Motion for Interim and Final Orders (I) Authorizing
Debtors to Pay Certain Prepetition Taxes and Fees and Related
Obligations and (II) Authorizing the Bank to Honor and Process
Check and Electronic Transfer Requests Related Thereto [D.I. 5]
(the "Taxes Motion").

v. Debtors' Motion for Entry of Interim and Final Orders (I)
Authorizing Debtors to Redact Certain Personally Identifiable
Information, (II) Modifying Requirements Related to the List of
Equity Holders, (III) Authorizing Special Electronic Noticing
Procedures for DTC Customers, and (IV) Granting Related Relief
[D.I. 6] (the "Creditor Redaction Motion").

vi. Debtors' Motion for Entry of Interim and Final Orders (I)
Authorizing Debtors to (A) Pay Certain Prepetition Employment

31

Obligations and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief [D.I. 7] (the "Wages Motion").

vii.    Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Maintain Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions; (II) Extending Time to Comply with Section 345(b); and (III) Granting Related Relief [D.I. 8] (the "Cash Management Motion").

viii.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, (II) Authorizing the Bank to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief [D.I. 9] (the "Customer Programs Motion").

ix.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Certain Critical Vendors, Shippers & Logistics Providers and 503(b)(9) Claimants; and (II) Granting Related Relief [D.I. 10] (the "Critical Vendors Motion").

x.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, Granting Senior Postpetition Security Interests, and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief [D.I. 11] (the "DIP Motion").

On October 24, 2023, the Bankruptcy Court entered orders (i) approving the relief requested in the Joint Administration Motion [D.I. 48], the Claims Agent Retention Application [D.I. 49] on a final basis, and (ii) approving the relief requested in the Utilities Motion [D.I. 50], the Taxes Motion [D.I. 51], the Creditor Redaction Motion [D.I. 52], the Wages Motion [D.I. 53], the Cash Management Motion [D.I. 54], the Customer Programs Motion [D.I. 55], and the Critical Vendors Motion [D.I. 56] on an interim basis.  On October 25, 2023, the Bankruptcy Court entered an Order approving the DIP Motion [D.I. 63] on an interim basis.

On November 18, 2023, the Bankruptcy Court entered Orders approving, on a final basis, the relief requested in the Utilities Motion [D.I. 127], the Taxes Motion [D.I. 128], the Creditor Redaction Motion [D.I. 139], the Wages Motion [D.I. 129], the Cash Management Motion [D.I. 130], the Customer Programs Motion [D.I. 133], and the Critical Vendors Motion [D.I. 141].  On November 20, 2023, the Bankruptcy Court entered the Final DIP Order.

(c)     *Retention of Professional Advisors.*

Pursuant to Orders entered on November 18, 2023, the Bankruptcy Court authorized the Debtors to retain and employ (i) (a) Willkie Farr and Gallagher LLP [D.I. 138] and (b) Young Conaway Stargatt & Taylor LLP as their bankruptcy co-counsel [D.I. 137]; (ii) Emerald Capital Advisors Corp. as their financial advisor [D.I. 135]; (iii) Jefferies as their investment banker [D.I. 136]; and (iv) Stretto, Inc. as their Claims Agent [D.I. 134]. The Bankruptcy Court also authorized the Debtors to retain and employ certain professionals utilized by the Debtors in the ordinary course of business before the Petition Date [D.I. 132].

Pursuant to orders entered on December 27, 2023, the Bankruptcy Court authorized the Committee to retain and employ: (i) Hogan Lovells US LLP as its bankruptcy counsel, effective as of November 6, 2023 [D.I. 252]; and (ii) Force Ten Partners, LLC as its financial advisor, effective as of November 7, 2023 [D.I. 251]. In March 2024, the Committee's financial advisory professionals left Force 10 Partners to start a new firm, Genesis Credit Partners. A motion seeking retention of Genesis Credit Partners as the Committee's new financial advisor is pending before the Bankruptcy Court [D.I. 364].

(d)     *The Debtors' Sale Process.*

As set forth in the First Day Declaration, the Debtors' paramount goal in these Chapter 11 Cases is to maximize the value of the Estates for the benefit of the Debtors' creditor constituencies and other stakeholders through the sale of substantially all of the Assets. On the Petition Date, the Debtors filed a motion [D.I. 17] (the "Bidding Procedures Motion") seeking authority to proceed with a bidding and auction process to consummate the Sale (the "Sale Process"). In addition, the Bidding Procedures Motion sought authority to enter into the Stalking Horse Agreement to sell the Assets to the Stalking Horse Bidder in a transaction valued at approximately $64.9 million, free and clear of all liens, claims, encumbrances, and other interests (other than Assumed Liabilities and Permitted Liens, as defined in the Stalking Horse Agreement).

In addition, before the Petition Date, the Debtors and the Stalking Horse Bidder engaged in negotiations with the lessors under the Prepetition Equipment Leases to make material modifications to such lessor's Prepetition Equipment Leases. As a material component to reaching an agreement on the terms of the Stalking Horse Agreement, the Debtors, Stalking Horse Bidder, NFS, and 36th Street Capital entered into that certain *Transaction Support Agreement*, dated October 23, 2023 (the "Transaction Support Agreement"). The Transaction Support Agreement sets forth the material terms by which NFS and 36th Street Capital agree to support the sale transaction to the Stalking Horse Bidder and to the assumption and assignment of their respective leases upon closing of the sale transaction to the Stalking Horse Bidder, in accordance with amendments to their respective lease agreements. The bid submitted by the Stalking Horse Bidder (the "Stalking Horse Bid") represents the highest and best executable bid

33

the Debtors received through the prepetition marketing process. The Stalking Horse Bid established a floor for the purchase of substantially all of the Debtors' Assets.

To facilitate the Sale Process, the Debtors, in consultation with Jefferies and their other professional advisors, proposed certain customary bidding procedures (the "Bidding Procedures") to preserve flexibility in the Sale Process, generate the greatest level of interest in the Debtors' assets, and result in the highest or otherwise best value for those assets. Given the Debtors' liquidity situation at the outset of these Chapter 11 Cases, the Debtors believed that a timely sale of their Assets would maximize value to the greatest extent possible under the circumstances of these Chapter 11 Cases, and generate the highest possible recoveries in the most efficient and expeditious manner possible. Such a process would, in turn, inure to the benefit of the Debtors' creditors and other stakeholders. The Debtors also believed that such a timely sale would ensure, to the benefit of their Estates, that the market has certainty around the parameters of the Sale Process.

As set forth in the Bidding Procedures Motion and supporting declarations, the Debtors, in consultation with Jefferies and their other professional advisors, worked extensively to implement a robust and expeditious Sale Process. On November 20, 2023, the Bankruptcy Court entered the Bidding Procedures Order, approving the Bidding Procedures and establishing, among other things, December 1, 2023, as the bid deadline, December 4, 2023, as the auction date, and December 11, 2023, as the hearing to approve the Sale.

Understanding that time was of the essence, upon the Petition Date, Jefferies commenced the postpetition marketing process for the Assets by engaging or reengaging with prospective buyers, including various parties that had been contacted before the Petition Date, regarding the Assets and the Sale. Jefferies prepared and circulated marketing materials, which included a presentation detailing the Assets and the Sale Process as well as, among other things, process letters, communications, and information about these cases and an NDA. For the parties that executed an NDA, Jefferies provided them with the confidential information memorandum, provided access to the virtual data room, and provided all potential parties in interest with access to the management team, if desired.

Throughout the Sale Process, Jefferies supplemented its outreach efforts by sending periodic emails and/or calls to all interested parties with updates on the process, additions to the virtual data room, and other supplemental information as these Chapter 11 Cases progressed (including re-engaging with all potential parties in interest after the entry of the Bidding Procedures Order and sending an updated sale process letter reflecting the additional time available to submit binding bids, among other things). Jefferies spent considerable time, energy, and resources engaging with potential bidders and other parties.

Following the Petition Date, Jefferies contacted 200 prospective buyers for the Assets, including parties that the Debtors had engaged with prepetition, new parties that Jefferies reached out to the postpetition, and certain additional parties identified by the Committee. Based on these discussions, 11 prospective buyers that had executed non-disclosure agreements prepetition decided to reengage with Jefferies and, in turn, received access to the virtual data room. Further, the Debtors executed non-disclosure agreements with 13 prospective buyers postpetition and provided information regarding the Assets to such parties, including through management

presentations, facility tours, diligence requests, and data room access.  From November 2022, the Debtors, Jefferies, and the company's other advisors provided prospective buyers with access to a virtual data room containing thousands of files pertaining to the Debtors' Assets, finances, and general business operations.

During the postpetition marketing process, two potential bidders conducted extensive, additional due diligence, including frequently speaking and meeting with both the Debtors and Jefferies as well as touring the Debtors' facilities in Waco, Texas.  However, these parties ultimately elected not to move forward in the process.  Ultimately, the Debtors did not receive a bid from any party before the bid deadline of December 1, 2023.

Accordingly, the Debtors, in consultation with the Consultation Parties (as defined in the Sale Order, as defined below), cancelled the Auction and selected the Stalking Horse Bidder as the Successful Bidder in accordance with the Bidding Procedures (as defined in the Sale Order) and Bidding Procedures Order.  Moreover, the Debtors determined that the bid submitted by the Stalking Horse Bidder and memorialized in the Purchase Agreement (as defined in the Sale Order) is the Successful Bid.  The Court entered the *Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. 226] (the "Sale Order") on December 11, 2023.  The Sale closed on December 19, 2023 and, in connection with the consummation of the Sale, the DIP Loan Claims and the Prepetition CIT Loan Claims were Paid in Full in Cash and satisfied in full.

      (e)      ***Schedules and Bar Dates.***

      On November 18, 2023, the Bankruptcy Court entered the Bar Date Order, granting the relief requested in the Bar Date Motion [D.I. 131].  The Bar Date Order established the General Bar Date as December 28, 2023 at 5:00 p.m. (prevailing Eastern Time).

On November 28, 2023, the Debtors filed the Schedules.  Among other things, the Schedules set forth the Claims of known or putative creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.

On May 7, 2024, the Bankruptcy Court entered the Solicitation Procedures Order, establishing, among other things, various deadlines in connection with the solicitation of the combined Disclosure Statement and Plan, including a voting deadline of **June 8, 2024 at 4:00 p.m. (ET)**.

The projected recoveries set forth herein are based on certain assumptions, including the approval of the Plan Settlement and Debtors' estimates of the Claims that will eventually be Allowed in various Classes.  There is no guarantee that the ultimate amount of each of such categories of Claims will correspond to the Debtors' estimates.  The Debtors or the Litigation Trustee, as applicable, and their professionals will investigate Claims filed against the Debtors to determine the validity of such Claims.  The Debtors or the Litigation Trustee, as applicable, may file objections to Claims that are filed in improper amounts or classifications, or are otherwise subject to objection under the Bankruptcy Code or other applicable law.

(f)    ***The Wind-down of the Estates.***

Following the closing of the Sale, the Debtors have focused principally on efficiently winding down their businesses, preserving Cash held in the Estates, monetizing their remaining Assets, negotiating the Plan Settlement, and pursuing confirmation of the Plan.  The remaining Assets are expected to consist of, among other things, the Litigation Trust Assets, which will include not less than $330,000 in Cash.  This combined Disclosure Statement and Plan provides for the Assets, to the extent not already liquidated, to vest in the Litigation Trust and to be liquidated over time and the proceeds thereof to be distributed to Holders of Allowed Claims in accordance with the terms of the Plan and the treatment of Allowed Claims described more fully herein.  The Litigation Trustee will effect such liquidation and distributions.  The Debtors will be dissolved as soon as practicable after the Effective Date.

## ARTICLE  IV
### CONFIRMATION AND VOTING PROCEDURES

4.1    **Confirmation Procedure**.  The Solicitation Procedures Order, among other things, conditionally approves the combined Disclosure Statement and Plan for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject the Plan.  The Confirmation Hearing has been scheduled for **June 18, 2024 at 10:30 a.m. (prevailing Eastern Time)** at the Bankruptcy Court, 824 North Market Street, 5th Floor, Delaware 19801 to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125 and (b) confirmation of the Plan pursuant to Bankruptcy Code section 1129.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

4.2    **Procedure for Objections.**  Any objection to final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to Bankruptcy Code section 1125 or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (i) co-counsel for the Debtors, (a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Brian S. Lennon, Esq. (blennon@willkie.com), Debra M. Sinclair, Esq. (dsinclair@willkie.com), and Erin C. Ryan, Esq. (eryan@willkie.com) and (b) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn:  Edmon L. Morton, Esq. (emorton@ycst.com) and Matthew B. Lunn, Esq. (mlunn@ycst.com); (ii) proposed co-counsel to the Committee, (a) Hogan Lovells US LLP, 1999 Avenue of the Stars, Suite 1400, Los Angeles, CA 90067, Attn: Richard L. Wynne, Esq. (richard.wynne@hoganlovells.com), David P. Simonds, Esq. (david.simonds@hoganlovells.com), and Edward J. McNeilly, Esq. (edward.mcneilly@hoganlovells.com), and (b) Pachulski Stang Ziehl & Jones

LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899, Attn: Laura Davis Jones, Esq. (ljones@pszjlaw.com) and Edward A. Corma, Esq. (ecorma@pszjlaw.com); (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn:  Richard Schepacarter, Esq. (Richard.Schepacarter@usdoj.gov), and (iv) counsel to the DIP Secured Parties, (a) Holland & Knight LLP, One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, TX 75201, Attn: Robert W. Jones, Esq. (robert.jones@hklaw.com), Brian Smith, Esq. (brian.smith@hklaw.com), and Steven J. Levitt, Esq. (steven.levitt@hklaw.com) and (b) Wilson Sonsini Goodrich & Rosati, P.C., 222 Delaware Avenue, Suite 800, Wilmington, DE 19801, Attn: Erin R. Fay, Esq. (efay@wsgr.com) and Catherine C. Lyons, Esq. (clyons@wsgr.com); in each case, by no later than **June 8, 2024 at 4:00 p.m. (prevailing Eastern Time)**. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

4.3    **Requirements for Confirmation.**   The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of Bankruptcy Code section 1129. Among other requirements, the Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (ii) must be feasible.  The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

4.4    **Classification of Claims and Interests.**   Bankruptcy Code section 1123 provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Bankruptcy Code section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which, pursuant to Bankruptcy Code section 1123(a)(1), need not be, and have not been, classified).  The Debtors also are required, under Bankruptcy Code section 1122, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class, unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan

only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled before the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of Bankruptcy Code section 1122 and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of its Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

**EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.  Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by Creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

**4.5    Unimpaired Claims and Impaired Claims or Interests.**   Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in Bankruptcy Code section 1124) under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under Bankruptcy Code section 1126(g) and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Class 3 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims or Interests in Classes 4, 5, and 6 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and deemed to reject the Plan.

Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3.**

**4.6    Confirmation Without Necessary Acceptances; Cramdown.**   If any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in Bankruptcy Code section 1129(b).  Bankruptcy Code section 1129(b) requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.  Here, because Holders of Claims and Interests in Classes 4, 5, and 6 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in Bankruptcy Code section 1129(b).  The Debtors believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those in Classes 4, 5, or 6 are entitled to receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable."  To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

(a)   ***Secured Creditors.***

Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)   ***Unsecured Creditors.***

Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)   ***Interests.***

Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

**4.7**   **Feasibility.**   Bankruptcy Code section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of a debtor or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan).  Inasmuch as the Assets have been, or will be, liquidated and the Plan provides for the Distribution of all of the Cash proceeds of the Assets to Holders of Claims that are Allowed in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the Litigation Trustee to meet its obligations under the Plan.  Based on the Debtors' analysis, the Litigation Trustee will have sufficient assets to accomplish its tasks under the Plan.  Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

**4.8**   **Best Interests Test and Liquidation Analysis.**   Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  A liquidation analysis is attached hereto as **<u>Exhibit A</u>**.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case was converted to a case under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan.  However, the Debtors believe that, in a chapter 7 liquidation, (i) Holders of General Unsecured Claims may not receive the value greater than the value being provided under the Plan, and (ii) there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates under chapter 7 of the Bankruptcy Code.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the

trustee.  The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors by the Litigation Trustee.  Conversion also would likely delay the liquidation process and ultimate distribution of the Assets.  The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during these Chapter 11 Cases (such as compensation for Professionals) that are allowed in any chapter 7 case.

Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if these Chapter 11 Cases were converted to chapter 7 cases, and, therefore, the classification and treatment of Claims and Interests in the Plan complies with Bankruptcy Code section 1129(a)(7).

    **4.9**    **Acceptance of the Plan.**  The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan.  At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY SUBMIT THE BALLOT YOU RECEIVE.  PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AND CLAIMS AGENT (I) BY TELEPHONE AT: (855) 316-4223 OR (II) BY EMAIL AT: TEAMHELLOBELLO@STRETTO.COM.  THE SOLICITATION AND CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**HOLDERS OF CLAIMS IN CLASS 3 WHO REJECT THE PLAN AND DO NOT WISH TO PROVIDE THE RELEASES SET FORTH IN SECTION 14.2(c) OF THE PLAN MUST AFFIRMATIVELY INDICATE SO BY CHECKING THE "OPT-OUT" BOX ON THEIR BALLOT.**

**PLEASE BE ADVISED THAT ALL HOLDERS OF CLAIMS IN CLASS 4 THAT (I) VOTE TO ACCEPT THE PLAN OR (II) VOTE TO REJECT THE PLAN BUT DO NOT AFFIRMATIVELY MAKE THE OPT-OUT ELECTION ON THEIR BALLOT, SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN SECTION 14.2(c) OF THE PLAN.**

**ARTICLE V**
    CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW.

HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

     **5.1**    **The Plan May Not Be Accepted.**  The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the Creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar, or as favorable, to Creditors as those proposed in the Plan.

     **5.2**    **The Plan May Not Be Confirmed.**   Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan.  Even if the Bankruptcy Court determined that the combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met.  Moreover, there can be no assurance that modifications to the combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

If the Plan is not confirmed, the Plan will need to be revised, and it is unclear whether a chapter 11 reorganization or liquidation of the Debtors' assets could be implemented and what distribution the holders of Allowed Claims would receive.  If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative would be similar, or as favorable, to the Debtors' creditors as those proposed in the Plan.

**5.3** **Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections.** Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

**5.4** **Objections to Classification of Claims.** Bankruptcy Code section 1122 requires that a plan classify claims and interests. The Bankruptcy Code also provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that, under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues

or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

    5.5    **Failure to Consummate the Plan.** The Plan provides for certain conditions that must be satisfied (or waived) before the Confirmation Date and for certain other conditions that must be satisfied (or waived) before the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

    5.6    **Plan Releases May Not Be Approved.** There can be no assurance that the releases, as provided in Article XIV of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

    5.7    **Reductions to Estimated Creditor Recoveries.** The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to Creditors in such Class to be reduced substantially. The amount of Cash realized from the liquidation of the Debtors' remaining Assets could be less than anticipated, which could cause the amount of distributions to Creditors to be reduced substantially or cause the Plan Settlement to not be approved as part of confirmation of the Plan.

    5.8    **Certain Tax Considerations.** There are a number of material income tax considerations, risks, and uncertainties associated with the plan of liquidation of the Debtors described in the combined Disclosure Statement and Plan.

    **THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE, IN MANY CASES UNCERTAIN, AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**ARTICLE VI**
TREATMENT OF UNCLASSIFIED CLAIMS

    6.1    **Administrative Claims**. Except as otherwise set forth in this Article VI, or as soon as practicable after the Administrative Claim Bar Date, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim: (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other treatment as to which the Debtors or the Litigation Trustee, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

(a)     ***Final Administrative Claim Bar Date.***

Holders of Administrative Claims, other than Professional Fee Claims, shall file with the Claims Agent and serve on the Litigation Trustee requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, so as to actually be received on or before the Final Administrative Claim Bar Date.  The Effective Date Notice shall set forth the Administrative Claim Bar Date and shall constitute notice of such Bar Date.  Absent further Court order, any Final Administrative Claim not filed by the Administrative Claim Bar Date shall be deemed waived and the Holder of such Administrative Claim shall be forever barred from receiving payment on account thereof.

(b)     ***Objections by the Litigation Trustee.***

Objections to requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the requesting party by the Claims Objection Deadline.

(c)     ***Professional Fee Claims.***

All applications for allowance and payment of Professional Fee Claims shall be Filed on or before the Professional Fee Claims Bar Date. If an application for a Professional Fee Claim is not Filed by the Professional Fee Claims Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof.  The Effective Date Notice shall set forth the Professional Fee Claims Bar Date and shall constitute notice of such Professional Fee Claim Bar Date.  Objections to any Professional Fee Claims must be Filed and served on the Litigation Trustee and the requesting party by no later than twenty-one (21) days after service of the applicable final application for allowance and payment of Professional Fee Claims.  Allowed Professional Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court upon the earlier of (i) the Effective Date or (ii) the date upon which an order relating to any such Allowed Professional Fee Claim is entered, and in each case, as soon as reasonably practicable.  For the avoidance of doubt, Professionals or Entities retained pursuant to Bankruptcy Code section 363 shall not be required to file Professional Fee Claims, unless otherwise required by a Final Order of the Bankruptcy Court.  Unless required to file an application by the OCP Order, ordinary course professionals are not required to file a Professional Fee Claim.

(d) ***U.S. Trustee Fees.***

All fees payable on or before the Effective Date, pursuant to United States Code title 28 section 1930, shall be paid by the Debtors on or before the Effective Date. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file a request for Administrative Claims on account of the U.S. Trustee Fees.

(e) ***Source of Payment.***

All Allowed Administrative Claims and U.S. Trustee Fees shall be paid from the Debtors' Cash or Litigation Trust Assets. With respect to Professional Fee Claims, before the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals (other than professionals retained pursuant to the OCP Order). Each Holder of an Allowed Professional Fee Claim will be paid by the Debtors or the Litigation Trust in Cash from the Professional Fee Escrow Account. All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been Paid in Full shall vest in the Litigation Trust. If the Professional Fee Escrow Account is insufficient to pay the full amount of all Allowed Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims shall be promptly paid by the Litigation Trust from the Litigation Trust Assets.

**6.2** **DIP Loan Claims**. The DIP Loan Claims shall be Allowed in the full amount outstanding under the DIP Loan Agreement as of the Effective Date. All Claims under the DIP Loan Agreement are held by the DIP Secured Parties and/or their affiliates. All Allowed DIP Loan Claims (which shall include fees and interest as provided in the Final DIP Order) were Paid in Full in Cash and satisfied in full from the Sale Cash Consideration in accordance with the Final DIP Order and the DIP Credit Agreement upon the closing of the Sale.

**6.3** **Prepetition CIT Loan Claims**. The Prepetition Loan Claims shall be Allowed in the full amount outstanding under the Prepetition CIT Loan Documents as of the Effective Date. All Claims under the Prepetition CIT Loan Documents are held by the Prepetition CIT Agent, the Prepetition CIT Secured Parties and/or their affiliates. All Allowed Prepetition CIT Loan Claims were Paid in Full in Cash and satisfied in full from the Sale Cash Consideration in accordance with the Final DIP Order and the DIP Credit Agreement upon the closing of the Sale.**Priority Tax Claims**. Within the time period provided in Article X of the Plan, each Holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (i) Cash equal to the amount of such Allowed Priority Tax Claim; or (ii) such other treatment as to which the Debtors or the Litigation Trustee, as

applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

## ARTICLE VII
### TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

All Claims and Interests are classified in the Classes set forth below in accordance with Bankruptcy Code section 1122 and 1123(a)(1).  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied before the Effective Date

Unless the Holder of an Allowed Claim and the Debtors or the Litigation Trustee, as applicable, agree to a different treatment, each Holder of an Allowed Claim shall receive the following Distributions in accordance with Article X of the Plan:

7.1   **Class 1:  Priority Non-Tax Claims**.  Each Holder of an Allowed Priority Non-Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors or the Litigation Trustee, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing.

7.2   **Class 2:  Other Secured Claims**.  Each Holder of an Allowed Other Secured Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 2 Claim: (A) return of the collateral securing such Allowed Other Secured Claim; or (B) Cash equal to the amount of such Allowed Other Secured Claim; or (C) such other treatment which the Debtors or the Litigation Trustee, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing

7.3   **Class 3: General Unsecured Claims**.  Unless the Holder agrees to a different treatment, each Holder of a General Unsecured Claim shall receive such Holder's *pro rata* share of the liquidated value of the Litigation Trust Assets.

7.4   **Class 4: Subordinated Claims.**  Allowed Subordinated Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.

7.5   **Class 5: Intercompany Claims.**  Holders of Intercompany Claims shall receive no Distribution on account of their Intercompany Claims.

7.6   **Class 6: Interests**. On the Effective Date, all Interests shall be extinguished as of the Effective Date, and owners thereof shall receive no Distribution on account of

such Interests.  Upon conversion of the Prepetition Subordinated Notes Claims to Interests on the Effective Date as described in Section of the Plan, the Prepetition Subordinated Notes Claims shall receive the treatment provided to Class 6: Interests.

**7.7**   **Reservation of Rights Regarding Claims and Interests**.  Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE VIII
ACCEPTANCE OR REJECTION OF THE PLAN

**8.1**   **Class Entitled to Vote**.  Because Claims in Class 3 are Impaired and Holders thereof will receive or retain property or an interest in property under the Plan, only a Holder of Claims in Class 3 shall be entitled to vote to accept or reject the Plan.

**8.2**   **Acceptance by Impaired Classes of Claims or Interests**.  In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.  In accordance with Bankruptcy Code section 1126(d) and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Interests shall have accepted the Plan if such Plan is accepted by Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have timely and properly voted to accept or reject the Plan.

**8.3**   **Deemed Acceptance by Unimpaired Classes**.  Because Claims in Classes 1 and 2 are Unimpaired pursuant to Bankruptcy Code section 1126(f), Holders of Claims in Classes 1 and 2 are deemed to have accepted the Plan and, therefore, such Holders of Claims are not entitled to vote to accept or reject the Plan.

**8.4**   **Presumed Rejections by Impaired Classes**.  Because Holders of Claims or Interests in Classes 4, 5, and 6 are not entitled to receive or retain any property under the Plan, pursuant to Bankruptcy Code section 1126(g), such Holders of Claims or Interests are presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

**8.5**   **Confirmation Pursuant to Bankruptcy Code Section 1129(b)**.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to request confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code section 1129(b).  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan,

the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

**8.6     Controversy Concerning Impairment**.  If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**8.7     Elimination of Vacant Classes**.  Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

**ARTICLE IX**
IMPLEMENTATION OF THE PLAN AND THE LITIGATION TRUST

**9.1     Implementation of the Plan**.  The Plan will be implemented by, among other things, the establishment of the Litigation Trust, the vesting in and transfer to the Litigation Trust of the Litigation Trust Assets, and the making of Distributions by the Litigation Trust in accordance with the Plan, Litigation Trust Agreement, and the Litigation Trust Budget.

**9.2     ~~Substantive~~ Consolidation For Plan Purposes**. The Debtors analyzed their books and records, intercompany accounting practices, corporate structure, shared staff and services, financial reporting, and cash management practices.  Because the Debtors' businesses were operated as one consolidated enterprise, the Plan contemplates entry of an Order ~~substantively~~ consolidating the Estates and these Chapter 11 Cases as set forth below.  Absent the deemed substantive consolidation proposed under the Plan, the process of winding down the Estates and administering Distributions would be more time consuming and costly.  As such, given the limited amount of funds available for distribution and the expense involved in winding down the Estates and administering Distributions, recoveries will be maximized by consolidating the Assets and liabilities of the Debtors as provided herein.

    (a)     Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Code sections 105(a) and 1123(a)(5)(C), effective as of the Effective Date, of the deemed substantive consolidation of the Estates of the Debtors for the purposes of confirming and consummating the Plan, including, but not limited to, voting, Confirmation and Distributions.

    (b)     On and after the Effective Date, (i) all Assets and liabilities of the Debtors shall be treated as though they were pooled, (ii) each Claim filed or to be

filed against any Debtor, as to which two or more Debtors are jointly liable as a legal or contractual matter, shall be deemed filed as a single Claim against, and a single obligation of, the Debtors, (iii) all Claims held by a Debtor against any other Debtor shall be cancelled or extinguished, (iv) no Distributions shall be made under the Plan on account of any Claim held by a Debtor against any other Debtor, (v) all Interests shall be cancelled, (vi) no Distributions shall be made under the Plan on account of any Interest held by a Debtor in any other Debtor, (vii) all guarantees of any Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof executed by any other Debtor shall be treated as one Claim against the substantively-consolidated Debtors, and (viii) any joint or several liability of any of the Debtors shall be one obligation of the deemed substantively consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one Claim against the deemed substantively-consolidated Debtors.

(c)     The deemed substantive consolidation of the Debtors under the Plan shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) executory contracts or unexpired leases that were entered into during these Chapter 11 Cases or that have been or will be assumed or rejected, (iii) any agreements entered into by the Litigation Trust on or after the Effective Date, (iv) the Debtors' or the Litigation Trust's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (v) any Retained Causes of Action or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no substantive consolidation of the Estates of the Debtors, and (vi) distributions to the Debtors or the Litigation Trust from any insurance policies or the proceeds thereof.  Notwithstanding the deemed substantive consolidation called for herein, each and every Debtor shall remain responsible for the payment of U.S. Trustee Fees until its particular case is closed (pursuant to the Plan or otherwise), dismissed or converted.

(d)     This combined Disclosure Statement and Plan shall serve as, and shall be deemed to be, a motion for entry of an Order of the Bankruptcy Court approving the substantive consolidation of the Estates and Chapter 11 Cases for purposes of the Plan.  If no objection to the Plan is timely filed and served by any Holder of an Impaired Claim affected by the Plan as provided herein on or before the Voting Deadline or such other date as may be established by the Bankruptcy Court, the Plan, including the deemed substantive consolidation of the Estates and Chapter 11 Cases, may be approved by the Bankruptcy Court as part of the Confirmation Order.  If any such objections are timely filed and served, the Plan and the objections thereto shall be considered by the Bankruptcy Court at the Confirmation Hearing.

(e)     Nothing in this Section 9.2 shall augment or increase the property that constitutes collateral or any offset or similar right securing any Claim or otherwise increase the secured portion of any Claim under Bankruptcy Code section 506(a).

(f)     If the Bankruptcy Court determines that the deemed substantive consolidation of any given Debtors is not appropriate, then the Debtors may request that the Bankruptcy Court otherwise confirm the Plan and approve the treatment of and Distributions to the different Classes under the Plan on an adjusted, Debtor-by-Debtor basis.  Furthermore, the Debtors reserve their rights: (i) to seek confirmation of the Plan without implementing deemed consolidation of any given Debtor, and, in the Debtors' reasonable discretion, to request that the Bankruptcy Court approve the treatment of and Distributions to any given Class under the Plan on an adjusted, Debtor-by-Debtor basis; and (ii) to seek deemed consolidation of all Debtors whether or not all Impaired Classes entitled to vote on the Plane vote to accept the Plan.

**9.3     Debtors' Directors and Officers**.  On the Effective Date, each of the Debtors' directors and officers shall be terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.  From and after the Effective Date, the Litigation Trustee shall be deemed to be the sole officer and director of each Debtor (and all charters, bylaws, and other organic documents are deemed amended by this combined Disclosure Statement and Plan to permit and authorize such admission and appointment), and the Litigation Trustee shall serve in such capacity through the earlier of the date the applicable Debtor is dissolved in accordance with this combined Disclosure Statement and Plan and the date that such Litigation Trustee resigns, is terminated, or is otherwise unable to serve; <u>provided</u> that any successor Litigation Trustee shall serve in such capacities after the effective date of such appointment as the Litigation Trustee.

(a)     ***D&O Policy.***

As of the Effective Date, the Debtors shall be deemed to have assumed all of the D&O Policies pursuant to Bankruptcy Code sections 105(a) and 365(a), and coverage for defense and indemnity under any D&O Policy shall remain in full force and effect subject to the terms and conditions of such D&O Policy.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each D&O Policy.  Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an order of the Bankruptcy Court, confirmation of the Plan shall not impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Policies, and each such obligation will be deemed and treated as an executory contract that has been assumed by the Debtors under the Plan as to which no proof of Claim need be filed.  For the avoidance of doubt, the D&O Policies provide coverage for those insureds currently covered by such policies for the remaining term of such policies and runoff or tail coverage after the Effective Date to the fullest extent

permitted by such policies.  Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organization documents, board resolutions, indemnification agreements, employment contracts, D&O Policy, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (i) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order; (ii) remain intact, in full force and effect, and irrevocable; (iii) not be limited, reduced, or terminated after the Effective Date; and (iv) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place before the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date; provided, however, that all monetary obligations under this Section 9.3 shall be limited solely to available insurance coverage and none of the Litigation Trustee, the Litigation Trust, or any of the Litigation Trust Assets shall be liable for such obligations.  All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Litigation Trustee (subject to the proviso in the preceding sentence).  On and after the Effective Date, neither the Debtors nor the Litigation Trustee shall terminate or otherwise reduce the coverage under any of the D&O Policies in effect or purchased as of the Petition Date.

9.4    **Wind-Up and Dissolution of the Debtors**.  On the Effective Date or as soon thereafter as is reasonably practicable, the Litigation Trustee shall wind-up the affairs of the Debtors.  Upon completion of the winding-up of the Debtors' affairs and without the need for any corporate action or approval and without the need for any corporate filings, the Litigation Trustee shall dissolve the Debtors and neither the Debtors nor the Litigation Trustee shall be required to pay any taxes or fees to cause such dissolution.  The Litigation Trust shall bear the cost and expense of the wind-up of the affairs of the Debtors, if any, and the cost and expense of the preparation and filing of the final tax returns for the Debtors.

9.5    **Plan Settlement**.  Pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, the Plan shall constitute a good faith compromise and settlement by and among the Debtors, the Committee, VMG, 36th Street Capital and SCG as reflected in the 9019 Settlement Agreement pursuant to which, in accordance with the provisions of the 9019 Settlement Agreement and the Prepetition Subordinated Notes Documents, as applicable: (i) VMG shall receive (a) the $5 million VMG General Unsecured Claim and (b) the $30 million Class 6 Interest; (ii) SCG shall receive any payment or other distribution of any kind or character from the Debtors in respect of the VMG General Unsecured Claim; (iii) VMG shall receive for itself the releases set forth in Section 14.2(b) of the Plan; (iv) the Debtors' current officers and directors shall receive the exculpations and releases set forth in Sections 14.2(a) and (b) of the Plan; (v) 36th Street Capital and SCG consent to the conversion of the Prepetition Subordinated Notes Claims and shall provide a release to VMG as set forth in Section 14.2(c) of the Plan; and (vi) 36th Street Capital shall receive (a) an Allowed Administrative

Claim equal to 37.5% of the 36th Street Capital Claim and (b) the balance of the 36th Street Capital Claim shall be an Allowed General Unsecured Claim.

**9.6** **Creation and Governance of the Litigation Trust**.  On or before the Effective Date, the Debtors and the Litigation Trustee shall execute the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan and the beneficial interests therein, which shall be for the benefit of the Beneficiaries.  Additionally, on the Effective Date the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Trust all of their rights, title, and interest in and to all of the Litigation Trust Assets, and in accordance with Bankruptcy Code section 1141, except as specifically provided in the Plan or the Confirmation Order, the Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims, liens, encumbrances, or interests subject only to the Litigation Trust Interests and the Litigation Trust Expenses, as provided for in the Plan and the Litigation Trust Agreement, and Claims required to be paid by the Litigation Trust pursuant to the Plan with priority over General Unsecured Claims, including Administrative Claims and Professional Fee Claims; and such transfer shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax.  The Litigation Trustee shall be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3)(B).  The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee.  The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Section 9 of the Plan.  The Litigation Trust shall hold and distribute the Litigation Trust Assets in accordance with the provisions of the Plan and the Litigation Trust Agreement.  Other rights and duties of the Litigation Trustee and the Beneficiaries shall be as set forth in the Litigation Trust Agreement.  For the avoidance of doubt, after the Effective Date, the Debtors and the Estates shall have no interest in the Litigation Trust Assets, the transfer of the Litigation Trust Assets to the Litigation Trust is absolute, and the Litigation Trust Assets shall not be held or deemed to be held in trust by the Litigation Trustee on behalf of any of the Debtors or the Estates.

Without limiting the foregoing, following the occurrence of the Effective Date, the Litigation Trustee shall have access to, and control of, a complete of, a complete image of the Debtors' server (including all metadata), including all Outlook data files or other email data files (in each case, including all metadata) stored in such account that were hosted on the Debtors' servers on or before the Effective Date. Further, promptly after the Effective Date, the Debtors and/or the Debtors' Professionals shall transfer administrative account access including administrative control relating to all information technology accounts and systems to the Litigation Trustee.

**9.7** **Provisions with Respect to Retained Causes of Action**.  In pursuing any Retained Causes of Action, the Litigation Trustee shall be entitled to the tolling provisions provided under Bankruptcy Code section 108, and shall succeed to the

Debtors' rights with respect to the periods in which any of the Retained Causes of Action may be brought under Bankruptcy Code section 546.

In connection with the prosecution of the Retained Causes of Action, any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity attaching to any prepetition documents or communications relating to the Retained Causes of Action shall be transferred to and shall vest in the Litigation Trust. The Litigation Trust's receipt of such privileges associated with the Retained Causes of Action shall not operate as a waiver of those privileges possessed or retained by the Debtors, nor shall it operate to eliminate the rights of any co-defendant to any applicable joint privilege. The Litigation Trust shall also be vested with the Debtors' rights, as such rights existed before the Effective Date, to conduct discovery and oral examinations of any party under Bankruptcy Rule 2004. The Litigation Trust, however, shall not be considered a successor of any Debtor and shall not assume any obligations of the Debtors other than expressly provided for by the Plan and the Litigation Trust Agreement.

Any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity held by the Committee shall be transferred to and shall vest in the Litigation Trust. The Litigation Trust shall have access to all discovery obtained by the Committee in these Chapter 11 Cases, including discovery obtained pursuant to Bankruptcy Rule 2004.

    **9.8**    **Purpose of the Litigation Trust**.  The Litigation Trust shall be established in accordance with the Litigation Trust Agreement to administer post-Effective Date responsibilities of the Debtors and wind-down under the Plan, including, but not limited to: (i) being vested with, and pursuing or liquidating, the Litigation Trust Assets; (ii) pursuing, settling, compromising, or abandoning any existing or potential Causes of Action and Avoidance Actions (iii) reconciling and objecting to Claims, as provided for in the Plan; reconciling and objecting to Claims, as provided for in the Plan; (iv) making Distributions to the Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business; (v) winding down the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, to take other similar action with respect to each Debtor, including terminating the corporate or organizational existence of such Debtor; and (vi) performing all actions and executing all agreements, instruments, and other documents necessary to effectuate the purpose of the Litigation Trust.

    **9.9**    **Litigation Trustee and Litigation Trust Agreement.**  The Litigation Trust Agreement generally will provide for, among other things: (i) the payment of the Litigation Trust Expenses; (ii) the payment of other reasonable expenses of the Litigation Trust; (iii) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; (iv) the investment of Cash by the Litigation Trustee within certain limitations, including those specified in the Plan; (v) the orderly liquidation of the Litigation Trust Assets; (vi) litigation of any Retained Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action; (vii) the prosecution and resolution of objections to Claims; (viii) the

establishment of such Disputed Claim Reserves as the Litigation Trustee deems appropriate; and (ix) the appointment of an oversight board who shall oversee, and have certain approval and/or consultation rights over, the acts of the Litigation Trustee.

The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals (including those previously retained by the Debtors or the Committee) to assist in carrying out the Litigation Trustee's duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Litigation Trust Assets in accordance with the Plan, the Litigation Trust Agreement, and the Litigation Trust Budget.

The Litigation Trust Agreement provides that the Litigation Trustee shall be indemnified by and receive reimbursement from the Litigation Trust Assets against and from any and all loss, liability, expense (including reasonable attorneys' fees), or damage which the Litigation Trustee incurs or sustains, in good faith and without either willful misconduct, gross negligence or fraud, acting as Litigation Trustee under or in connection with the Litigation Trust Agreement.

On and after the Effective Date, the Litigation Trustee shall have the power and responsibility to do all acts contemplated by the Plan to be done by the Litigation Trustee and all other acts that may be necessary or appropriate in connection with the disposition of the Litigation Trust Assets and the distribution of the proceeds thereof, as contemplated by the Plan and in accordance with the Litigation Trust Agreement. In all circumstances, the Litigation Trustee shall act in its reasonable discretion in the best interests of the Beneficiaries pursuant to the terms of the Plan and the Litigation Trust Agreement.

**9.10**   **Compensation and Duties of Litigation Trustee**.  The salient terms of the Litigation Trustee's employment, including the Litigation Trustee's duties and compensation, shall be set forth in the Litigation Trust Agreement.  The Litigation Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.  The Litigation Trustee shall also be reimbursed for all documented, actual, reasonable, and necessary out-of-pocket expenses incurred in the performance of his or her duties under the Litigation Trust Agreement, subject to the Litigation Trust Budget.

**9.11**   **United States Federal Income Tax Treatment of the Litigation Trust, the Debtors, and Holders of Claims**

(a)   *General.*

**HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND ADVISORS.  THE BELOW TAX SUMMARY HAS BEEN PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY.  THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  NOTHING HEREIN SHALL CONSTITUTE TAX**

**ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.**

The following discussion summarizes certain United States federal income tax consequences of the Plan to the Debtors and to certain holders of Claims.  This discussion is based on the IRC, the Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rulings and pronouncements of the IRS, all as in effect on the date hereof.  Legislative, judicial, or administrative changes in law or its interpretation, as well as other events occurring after the date of this Disclosure Statement, and which may be retroactive, could materially alter the tax treatment described below.  Furthermore, this discussion is not binding on the IRS or any other tax authority.  There is no assurance that a tax authority will not take, or that a court will not sustain, a position with respect to the tax consequences of the Plan that differs from the tax consequences described below.  No ruling has been or will be sought from the IRS, no opinion of counsel has been or will be obtained, and no representations are made regarding any tax aspect of the Plan.

The following discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of such Holder's facts and circumstances, or to certain types of Holders subject to special treatment under the IRC (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction, or other integrated transaction, Holders that are or hold their Claims through a partnership or other pass-through entity, and Persons that have a functional currency other than the U.S. dollar).  This summary does not address state, local, or non-United States tax consequences of the Plan, nor does this summary address federal taxes other than income taxes.  Furthermore, this discussion generally does not address U.S. federal income tax consequences to Holders that are unimpaired under the Plan or that are not entitled to receive or retain any property under the Plan or to Persons who are deemed to have rejected the Plan.

      (b)    ***Litigation Trust.***

            i.    Grantor Trust.  It is intended that the Litigation Trust qualify as a grantor trust pursuant to sections 671 and 677 of the Internal Revenue Code, and that the Beneficiaries are treated as grantors of the Litigation Trust and the owners of the Litigation Trust Assets.  For U.S. federal income tax purposes, it is intended that the Litigation Trust (except with respect to the Disputed Claims, including any disputed ownership fund election that might be made) be classified as a liquidating trust under Treasury Regulation Section 301.7701-4 and Revenue Procedure 94-45, 1994-2 C.B. 684, with no objective to continue to engage in the conduct of a trade or business.  As described more fully in the Plan and the Disclosure Statement, the transfer of the Litigation Trust Assets will be treated for federal income tax purposes as a transfer

57

to the Beneficiaries, followed by a deemed transfer from such Beneficiaries to the Litigation Trust; provided, however, that the Litigation Trust Assets will be subject to any post-Effective Date obligations incurred by the Litigation Trust relating to the pursuit of Litigation Trust Assets.  Accordingly, the Beneficiaries will be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.  All items of income, gain, loss, deduction, and credit will be included in the income of the Beneficiaries as if such items had been recognized directly by the Beneficiaries in the proportions in which they own beneficial interests in the Litigation Trust.

ii.     Reporting.  The Litigation Trustee shall comply with all tax reporting requirements, including filing returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation § 1.671-4(a) and the guidelines set forth for a "Litigation Trust" in Revenue Procedure 94-95, 1994-2 C.B. 684. In connection therewith, the Litigation Trustee may require Beneficiaries to provide certain tax information as a condition to receipt of Distributions, including certification of the Beneficiary's Taxpayer or Employer Identification Number.

iii.    Valuation.  Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations or the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Litigation Trust as a liquidating trust for purposes of the IRC and applicable Treasury Regulations, as soon as reasonably practicable after the Litigation Trust Assets are transferred to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets.  Such valuation shall be made available from time to time to all parties to the Litigation Trust Agreement and to all Beneficiaries, to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

iv.     Tax Returns.  In accordance with the provisions of section 6012(b)(3) of the IRC, the Litigation Trustee shall cause to be prepared, at the cost and expense of the Litigation Trust, the corporate income tax returns (federal, state and local) that the Debtors are required to file (to the extent such returns have not already been filed by the Effective Date).  The Litigation Trustee

shall timely file each such tax return with the appropriate taxing authority and shall pay out of the Litigation Trust Assets all taxes due with respect to the period covered by each such tax return.

v.    <u>Disputed Ownership Fund Election</u>.  The Plan permits the Litigation Trustee to establish Disputed Claim Reserves.  The Litigation Trustee may, at the Litigation Trustee's sole discretion, file a tax election to treat any such Disputed Claim Reserve as a Disputed Ownership Fund as described in Treasury Regulation § 1.468B-9 or other taxable entity rather than as a part of the Litigation Trust for federal income tax purposes.  If such election is made, the Litigation Trust shall comply with all tax reporting and tax compliance requirements applicable to the Disputed Ownership Fund or other taxable entity, including, but not limited to, the filing of separate income tax returns for the Disputed Ownership Fund or other taxable entity and the payment of any federal, state or local income tax due.

vi.    <u>Attribution of Income</u>.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), attribution of Litigation Trust taxable income or loss shall be by reference to the manner in which any economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets.  The tax book value of the Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

vii.    <u>Income Taxed on a Current Basis</u>.  All income of the Litigation Trust will be subject to tax on a current basis. The Plan requires the Debtors, the Litigation Trust, and the Beneficiaries to report consistently  with characterization of the Litigation Trust as a grantor trust and requires the Litigation Trustee to file tax returns treating the Litigation Trust as a "grantor trust" pursuant to Treasury Regulation section 1.671-4(a) and to report to each Beneficiary a statement of the Beneficiary's share of Litigation Trust income, gain, loss, deduction, and credit for inclusion in the Beneficiary's U.S. federal income tax return.  Beneficiaries therefore may owe tax on Litigation Trust income, without regard

to whether cash distributions are made to beneficial owners by the Litigation Trust.

viii.    <u>Tax Identification Numbers</u>.  Amounts paid to Beneficiaries are subject to generally applicable withholding, information, and backup withholding rules.  The Litigation Trustee may require any Beneficiary to furnish to the Litigation Trustee its Employer or Taxpayer Identification Number as assigned by the IRS or certify to the Litigation Trustee's satisfaction that Distributions to the Beneficiary are exempt from backup withholding.  The Litigation Trustee may condition any Distribution to any Beneficiary upon receipt of such identification number.  If after reasonable inquiry, any Beneficiary fails to provide such identification number to the Litigation Trustee, the Litigation Trustee shall deem such Beneficiary's Claim as Disallowed and no Distribution shall be made on account of such Beneficiary's Claim.

ix.    <u>Notices</u>.  The Litigation Trustee shall distribute such notices to the Beneficiaries as the Litigation Trustee determines are necessary or desirable.

x.    <u>Expedited Determination</u>.  The Litigation Trustee may request an expedited determination of taxes of the Debtors or of the Litigation Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtors and the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

(c)    ***Federal Income Tax Consequences to the Debtors.***

i.    <u>Sale of Assets</u>.  The Sale will constitute a taxable disposition of the Debtors' assets.  The Debtors will recognize gain or loss equal to the difference between the amount received for those assets in the Sale and the Debtors' adjusted tax basis in those assets.  The Debtors expect to have tax losses generated from other activities in the current year that may be used to offset gain from the Sale.

ii.    <u>Cancellation of Indebtedness and Reduction of Tax Attributes</u>.  For U.S. federal income tax purposes, gross income generally includes income from cancellation of indebtedness ("COD").  In general, the Debtors will have COD income equal to the excess of the amount of debt discharged pursuant to the Plan over the adjusted issue price of the debt, less the amount of cash and the fair market value of property distributed to holders of the debt.  Various statutory or judicial exceptions limit the incurrence of COD income (such as where payment of the cancelled debt would have given rise to a tax deduction).  COD income also includes interest accrued on obligations of the Debtors but unpaid at the time of discharge.  An exception to the recognition of COD income applies to a debtor in a chapter 11 bankruptcy proceeding.  Bankrupt debtors generally do not include COD in taxable income, but must instead reduce certain tax attributes (such as capital losses, certain credits, and the excess of the tax basis of the debtor's

property over the amount of liabilities outstanding after discharge) by the amount of COD income that was excluded under the bankruptcy exception. Tax benefits are reduced after the tax is determined for the year of discharge.

(d)     ***Federal Income Tax Consequences to Holders.***

i.       <u>Characterization</u>. The tax treatment of Holders, and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and any Distributions pursuant to the Plan may vary, depending upon, among other things: (A) whether the Claim (or a portion of the Claim) is for principal or interest; (B) the type of consideration the Holder receives for the Claim; (C) whether the Holder receives Distributions under the Plan in more than one taxable year; (D) the manner in which the Holder acquired the Claim; (E) the length of time that the Claim has been held; (F) whether the Claim was acquired at a discount; (G) whether the Holder of the Claim has taken a bad debt deduction with respect to part or all of the Claim; (H) whether the Holder of the Claim has previously included in income accrued but unpaid interest on the Claim; (I) the Holder's method of tax accounting; (J) whether the Claim is an installment obligation for U.S. federal income tax purposes; (K) whether the Claim, and any instrument received in exchange for the Claim, is a "security" for U.S. federal income tax purposes; and (L) whether and the manner in which the "market discount" rules of the IRC apply to the holder of the Claim.

ii.      <u>Gain and Loss Recognition</u>. Holders that receive cash and property other than stock and securities for their Claim will recognize gain or loss for U.S. federal income tax purposes equal to the difference between the "amount realized" by the Holder and the Holder's tax basis in the Claim. The "amount realized" is the sum of the amount of cash and the fair market value of any other property received under the Plan in respect of the Claim (other than amounts received in respect of a Claim for accrued unpaid interest). The Holder's tax basis in the Claim (other than a Claim for accrued unpaid interest) is generally the Holder's cost, though tax basis could be more or less than cost depending on the specific facts of the Holder. Any gain or loss realized may be capital gain or loss or ordinary gain or loss, depending on the circumstances of the Holder.

iii.     <u>Interest Issues.</u> Holders that previously included in income accrued but unpaid interest on a Claim may be entitled to a deductible loss to the extent such interest is not satisfied under the Plan. Conversely, a Holder has ordinary income to the extent of the amount of cash or the fair market value of property received in respect of a Claim for (or the portion of a Claim treated as allocable to) accrued unpaid interest that was not previously included in income by the Holder. The Plan treats all amounts payable to a Holder as principal until the principal amount of the Claim has been paid in full. The Debtors' tax returns will be filed in a manner consistent with this allocation, but it is uncertain whether this allocation will be respected by the IRS. The IRS may take the position that payments should be allocated first to interest or should be pro-rated between principal and interest. If the IRS prevails in this assertion, Holders may be required to recognize ordinary interest income even though they have an overall loss (and possibly a capital loss, the deductibility of which may be limited) with respect to such Holder's Claims. Each Holder is urged to consult such Holder's own tax advisor regarding the amount of

such Holder's Claim allocable to accrued unpaid interest and the character of any loss with respect to accrued but unpaid interest that the holder previously included in income.

iv.     Bad Debt and Worthless Security Deductions. A Holder who receives, in respect of such Holder's Claim, an amount that is less than such Holder's tax basis in the Claim may be entitled to a bad debt or worthless securities deduction.  The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the Holder, the obligor, and the instrument with respect to which the deduction is claimed, including whether (i) the Holder is a corporation or (ii) the Claim constituted (a) a debt created or acquired (as the case may be) in connection with the Holder's trade or business or (b) a debt, the loss from worthlessness of which is incurred in the holder's trade or business.  A Holder that has previously recognized a loss or deduction in respect of such Holder's Claim may be required to include in income amounts received under the Plan that exceed the Holder's adjusted basis in its Claim.

v.     Installment Obligations. A Holder if a Claim that is an installment obligation for U.S. federal income tax purposes may be required to recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of section 453B of the IRC.

vi.     Market Discount.  A Holder of a Claim that acquires a Claim at a market discount generally is required to treat any gain realized on the disposition of the Claim as ordinary income to the extent of the market discount that accrued during the period the Claim was held by the Holder and that was not previously included in income by the Holder.

vii.     Withholding.  Amounts paid to Holders are subject to generally applicable withholding, information, and backup withholding rules.  The Plan authorizes the Debtors and the Litigation Trustee, as applicable, to withhold and report amounts required by law to be withheld and reported.  Amounts properly withheld from Distributions to a Holder and paid over to the applicable taxing authority for the account of such Holder will be treated as amounts distributed to such Holder.  Holders are required to provide the Debtors and the Litigation Trustee, as applicable, with the information necessary to effect information reporting and withholding as required by law.  Notwithstanding any other provision of the Plan, holders of Claims that receive a Distribution pursuant to the Plan are responsible for the payment and satisfaction of all tax obligations, including income, withholding, and other tax obligations imposed with respect to the Distribution, and no Distribution shall be made until a Holder has made arrangements satisfactory to the Debtors or the Litigation Trustee, as applicable, for the payment and satisfaction of such obligations.

viii.     Backup Withholding.  Holders may be subject to backup withholding on payments pursuant to the Plan unless the Holder (A) is not a corporation and is not otherwise

exempt from backup withholding and, when required, demonstrates that or (B) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of previous failure to report dividend and interest income.  Amounts withheld due to backup withholding will be credited against the Holder's federal income tax liability and excess withholding may be refunded if a timely claim for refund (generally, a U.S. federal income tax return) is filed with the IRS.

ix.    Certain Disclosure Requirements.  Treasury regulations require tax return disclosure of certain types of transactions that result in the taxpayer claiming a loss in excess of specified thresholds.  Holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and would require such disclosure.

9.12    **Abandonment, Disposal, and Destruction of Records.**  The Litigation Trustee shall be authorized pursuant to Bankruptcy Code section 554, in its sole discretion, without any further notice to any party or action, order or approval of the Bankruptcy Court, to abandon, dispose of, or destroy in any commercially reasonable manner all originals and/or copies of any documents, books and records, including any electronic records, of the Debtors that are transferred to the Litigation Trust and which the Litigation Trustee reasonably concludes are burdensome or of inconsequential value and benefit to the Litigation Trust. However, the Litigation Trustee will retain all documents and records necessary to comply with audit obligations.

9.13    **Distributions by Litigation Trustee**.  Following the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee shall make continuing efforts to liquidate all Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement; provided that the timing of all Distributions made by the Litigation Trustee to Beneficiaries shall be in accordance with the Litigation Trust Agreement.

9.14    **Cash Investments**.  Funds in the Litigation Trust shall be invested in demand and time deposits in banks or other savings institutions, or in other temporary, liquid investments, such as Treasury bills, consistent with the liquidity needs of the Litigation Trust as determined by the Litigation Trustee, in accordance with Bankruptcy Code section 345, unless the Bankruptcy Court otherwise requires; provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

9.15    **Dissolution of the Litigation Trust**.  The Litigation Trustee shall be discharged and the Litigation Trust shall be terminated, at such time as: (a) (i) all Disputed Claims have been resolved, (ii) all of the Litigation Trust Assets have been liquidated, (iii) all duties and obligations of the Litigation Trustee under the

Litigation Trust Agreement have been fulfilled, (iv) the determination of the Litigation Trust Oversight Committee and the Litigation Trustee that the continued prosecution of any Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit, (v) all Distributions required under the Plan and the Litigation Trust Agreement have been made, and (vi) these Chapter 11 Cases have been closed; or (b) as otherwise provided in the Litigation Trust Agreement.  Upon dissolution of the Litigation Trust, any remaining Litigation Trust Assets may be transferred by the Litigation Trustee to a charitable organization(s) or sold as part of a remnant asset sale.

9.16    **Control Provisions**.  To the extent there is any inconsistency between the combined Disclosure Statement and Plan as it relates to the Litigation Trust and the Litigation Trust Agreement, the terms of the combined Disclosure Statement and Plan shall control.

9.17    **Limitation of Liability; Indemnification**.  The Litigation Trustee and all of its respective designees, employees, agents, representatives or professionals shall not be liable for the act or omission of any other member, designees, agent or representative of the Litigation Trustee, nor shall they be liable for any act or omission taken or omitted to be taken in their respective capacities, other than acts or omission resulting from willful misconduct, gross negligence, or fraud.  The Litigation Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee.  The Litigation Trustee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with attorneys, accountants, financial advisors and agents, which consultation may act as a defense for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons.  Notwithstanding such authority, the Litigation Trustee shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence or fraud.  The Litigation Trust shall indemnify and hold harmless the Litigation Trustee and its designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of the Plan; provided, however, that no such indemnification will be made to such persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

9.18    **Corporate Action**.  On the Effective Date, all matters expressly provided for under the Plan that would otherwise require approval of the equity holders or directors of one or more of the Debtors, including but not limited to, the dissolution or merger of any of the Debtors, shall be deemed to have occurred and shall be in effect upon the Effective Date pursuant to the applicable general

corporation law of the states in which the Debtors are incorporated without any requirement of action by the equity holders or directors of the Debtors.

## ARTICLE X
### PROVISIONS GOVERNING DISTRIBUTIONS

**10.1    Distributions for Allowed Claims**

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Beneficiaries as of the applicable distribution date shall be made on or as soon as practicable after the applicable distribution date.  Distributions on account of Claims that first become Allowed Claims after the applicable distribution date shall be made pursuant to the terms of the Plan and on the day selected by the Litigation Trustee.

The Litigation Trustee may accelerate any Distribution date with respect to Distributions if the facts and circumstances so warrant and to the extent not inconsistent with the Plan.

Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth herein shall be deemed to have been made on such date.

**10.2    Interest of Claims**.  Except to the extent provided in Bankruptcy Code section 506(b), the Plan, or the Confirmation Order, postpetition interest shall not accrue or be paid on Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

**10.3    Distributions by Litigation Trustee as Disbursement Agent**.  From and after the Effective Date, the Litigation Trustee shall serve as the Disbursement Agent under the Plan with respect to Distributions to Holders of Allowed Claims; <u>provided</u> that the Litigation Trustee may hire professionals or consultants or sub-disbursing agents to assist with making disbursements or to act as the Disbursement Agent.  The Litigation Trustee shall cause to be made all Distributions required to be made to such Holders of Allowed Claims pursuant to the Plan and the Litigation Trust Agreement.  The Litigation Trust shall not be required to give any bond or surety or other security for the performance of the Litigation Trustee's duties as Disbursement Agent unless otherwise ordered by the Bankruptcy Court.

**10.4    Means of Cash Payment**.

Cash payments under the Plan shall be made, at the option, and in the sole discretion, of the Litigation Trustee, by wire, check, or such other method as the Litigation Trustee deems appropriate under the circumstances.  Cash payments to foreign creditors may be made, at the option, and in the sole discretion, of the Litigation Trustee, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.  Pursuant to Section 10.8 of the Plan, cash payments in the form of checks issued by the Litigation Trustee shall be null and void if not cashed within ninety (90) days of the date of the issuance thereof and deemed undeliverable Distributions.  Following the expiration of ninety (90) days after issuance of such null and void checks, in accordance with Section 10.14 of the Plan, amounts in respect of these

undeliverable Distributions shall be become unrestricted Litigation Trust Assets redistributed to the Beneficiaries after reserving as necessary for payment of Litigation Trust Expenses.  Such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Litigation Trust and any Litigation Trust Interests held by such Holder shall be deemed cancelled, and the Claims of such Holder shall be forever barred.

For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

10.5 **Fractional Distributions.**  Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

10.6 **De Minimis Distributions**.  Notwithstanding anything to the contrary contained in the Plan, the Litigation Trustee shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $50.  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $50 shall be forever barred from asserting such Claim against Litigation Trust Assets.

10.7 **Delivery of Distributions; Unclaimed Distributions**.  All Distributions to Holders of Allowed Claims shall be made at the address of such Holder as set forth in the claims register maintained in these Chapter 11 Cases (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, after the Effective Date, a change of address notification provided by a Holder in a manner reasonably acceptable to the Litigation Trustee) or, in the absence of a Filed proof of Claim, the Schedules.  The responsibility to provide the Litigation Trustee a current address of a Holder of Claims shall always be the responsibility of such Holder and at no time shall the Litigation Trustee have any obligation to determine a Holder's current address.  Nothing contained in the Plan shall require the Litigation Trustee to attempt to locate any Holder of an Allowed Claim. Amounts in respect of undeliverable Distributions made by the Litigation Trustee shall be held in trust on behalf of the Holder of the Claim to which they are payable by the Litigation Trust until the earlier of the date that such undeliverable Distributions are claimed by such Holder and the date ninety (90) days after the date the undeliverable Distributions were made.  Following the expiration of ninety (90) days after the date the undeliverable Distributions were made, the amounts in respect of undeliverable Distributions shall be become unrestricted Litigation Trust Assets redistributed to the Beneficiaries after reserving as necessary for payment of Litigation Trust Expenses.  Such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from

the Litigation Trust and any Litigation Trust Interests held by such Holder shall be deemed cancelled, and the Claims of such Holder shall be forever barred.

**10.8    Application of Distribution Record Date**.  At the close of business on the Distribution Record Date, the Debtors' claims registers shall be closed, and there shall be no further changes in the record holders of Claims or Interests. Beneficial interests in the Litigation Trust shall be non-transferable except upon death of the interest holder or by operation of law.  Except as provided herein, the Litigation Trustee and the Litigation Trustee's respective agents, successors, and assigns shall have no obligation to recognize any transfer of any Claim or Interest occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Entities or the date of such Distributions.

**10.9    Withholding, Payment and Reporting Requirements With Respect to Distributions**.  All Distributions under the Plan shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements.  The Litigation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  The Litigation Trustee may require, in the Litigation Trustee's sole and absolute discretion and as a condition to the receipt of any Distribution, that the Holder of an Allowed Claim complete and return to the Litigation Trust the appropriate Form W-8 or Form W-9, as applicable, to each Holder.  Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon the Litigation Trust in connection with such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Litigation Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Litigation Trust in connection with such Distribution.

**10.10   Setoffs**.  The Litigation Trust may, but shall not be required to, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtors or the Litigation Trust may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of

any Claim hereunder shall constitute a waiver or release by the Litigation Trust of any such claim that it may have against such Holder.

**10.11   No Distribution in Excess of Allowed Amounts**.  Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.

**10.12   Allocation of Distributions**.  The Litigation Trustee may, in the Litigation Trustee's sole discretion, make Distributions jointly to any Holder of a Claim and any other Entity who has asserted, or whom the Litigation Trustee has determined to have, an interest in such Claim; provided, however, that the Litigation Trust shall provide notice of such Distribution to any Holder of a Claim or other Entity that has asserted an interest in such Claim.

**10.13   Forfeiture of Distributions**.  If the Holder of a Claim fails to cash a check payable to it within the time period set forth in Section 10.4 of the Plan, fails to claim an undeliverable Distribution within the time limit set forth in Section 10.8 of the Plan, or fails to complete and return to the Litigation Trust the appropriate Form W-8 or Form W-9 within one hundred twenty (120) days of the request by the Litigation Trust for the completion and return to it of the appropriate form pursuant to Section 10.10 of the Plan, then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Litigation Trust and any Litigation Trust Interests held by such Holder shall be deemed cancelled, and the Claims of such Holder shall be forever barred.  The forfeited Distributions shall become unrestricted Litigation Trust Assets and shall be redistributed to the Beneficiaries after reserving as necessary for payment of Litigation Trust Expenses and otherwise in compliance with the Plan and the Litigation Trust Agreement.  In the event the Litigation Trustee determines, in the Litigation Trustee's sole discretion, that any such amounts are too small in total to redistribute cost-effectively to the Beneficiaries, the Litigation Trustee may instead donate them to a charitable organization(s) free of any restrictions thereon, notwithstanding any federal or state escheat laws to the contrary.

## ARTICLE XI
### PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS

**11.1   Claims Administration Responsibility**.  Except as otherwise specifically provided in the Plan and the Litigation Trust Agreement, after the Effective Date, the Litigation Trustee shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims, (b) to settle, compromise, or Allow any Claim or Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  Any agreement entered into by the Litigation Trustee (acting in accordance with the terms of the Litigation Trust Agreement)

with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim.

**11.2    Claims Objections.**  All objections to Claims shall be Filed by the Litigation Trustee on or before the Claims Objection Deadline, which date may be extended by the Bankruptcy Court upon a motion filed by the Litigation Trustee on or before the Claims Objection Deadline with notice only to those parties entitled to notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the filing of such motion.  If a timely objection has not been Filed to a proof of Claim or the Schedules have not been amended with respect to a Claim that was scheduled by the Debtors but was not set forth in the Schedules by the Debtors as contingent, unliquidated, and/or disputed, then the Claim to which the proof of Claim or the Claim set forth in the Schedules relates will be treated as an Allowed Claim.

**11.3    Estimation of Contingent or Unliquidated Claims.**  The Litigation Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute the Allowed amount of such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

**11.4    Distributions on Account of Disputed Claims.**  Distributions may be made on account of an undisputed portion of a Disputed Claim.  The Litigation Trustee shall, on the applicable distribution date, make Distributions on account of any Disputed Claim (or portion thereof) that has become an Allowed Claim.  Such Distributions shall be based upon the Distributions that would have been made to the Holder of such Claim under the Plan if such Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

**11.5    Amendments to Claims.**  On or after the Effective Date, a Claim may not be filed or amended to increase liability or to assert new liabilities without the prior authorization of the Bankruptcy Court or the Litigation Trustee and any such new or amended Claim filed without prior authorization shall be deemed Disallowed in full without any further action.

**11.6    Claims Paid and Payable by Third Parties**.  A Claim shall be Disallowed without an Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors, the Litigation Trust, or the Litigation Trustee.  Distributions

under the Plan shall be made on account of any Allowed Claim that is payable pursuant to one of the Insurance Contract(s) solely up to the amount of the portion of such Allowed Claim that is (i) within the self-insured retention under such Insurance Contract(s) and/or (ii) in excess of any aggregate limits under such Insurance Contract(s).  No Entity shall have any other recourse against the Debtors, the Estates, the Litigation Trust, or any of their respective properties or assets on account of a self-insured retention under an Insurance Contract; provided, however, that, except as otherwise required under the applicable Insurance Contracts and applicable non-bankruptcy law, an Insurer shall not be obligated to pay amounts within any self-insured retention or other self-insured layer.

11.7    **Adjustment to Claims Without Objection**.  Any Claim that has been paid or otherwise satisfied may be designated on the claims register as such at the direction of the Litigation Trustee by the Filing of a Notice of Satisfaction by the Litigation Trustee, and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE XII
EXECUTORY CONTRACTS

12.1    **Executory Contracts Deemed Rejected**.  On the Effective Date, subject to Section 9.3(a) of the Plan, all Executory Contracts will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of Bankruptcy Code sections 365 and 1123, except to the extent: (a) the Debtors previously have assumed, assumed and assigned or rejected such Executory Contract; (b) such Executory Contract is a D&O Policy or insurance policy; or (c) before the Effective Date, the Debtors have Filed a motion to assume, assume and assign, or reject an Executory Contract on which the Bankruptcy Court has not ruled.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts pursuant to this Article and Bankruptcy Code sections 365(a) and 1123. Any and all Claims arising from the rejection of Executory Contracts under the Plan must be filed and served on the Litigation Trustee no later than thirty days after the Effective Date; provided that the foregoing deadline shall apply only to Executory Contracts that are rejected automatically by operation of this Article XII of the Plan.

12.2    **Insurance Neutrality.**  Nothing in the Plan or the Confirmation Order, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any insurer, or (b) any rights or obligations of the Debtors or the Litigation Trust arising out of or under any Insurance Contract.  The insurers, Debtors, and Litigation Trust, as applicable, shall retain all rights and defenses under such Insurance Contracts, and such Insurance Contracts shall apply to, and be enforceable by and against, the insureds and the Debtors and the Litigation Trust

**ARTICLE  XIII**
CONFIRMATION AND CONSUMMATION OF THE PLAN

13.1 **Conditions Precedent to the Effective Date**.  Each of the following is a condition precedent to the occurrence of the Effective Date:

(a) The 9019 Settlement Agreement shall have been executed and the Plan Settlement shall have been approved pursuant to an order entered by the Bankruptcy Court (which may be the Confirmation Order) which shall be a Final Order and which shall be reasonably satisfactory to VMG (solely as it relates to the Plan Settlement);

(b) the Confirmation Order, in a form and substance reasonably satisfactory to VMG (solely as it relates to the Plan Settlement) and the Committee, shall have been entered by the Bankruptcy Court and shall be a Final Order;

(c) the Professional Fee Escrow Account shall have funded in accordance with the terms of the Plan; and

(d) the Litigation Trust Agreement shall have been executed.

13.2 **Notice of Effective Date**.  On or before five (5) Business Days after the Effective Date, the Litigation Trustee shall mail or cause to be mailed to all Holders of Claims a notice that informs such Entities of (a) the occurrence of the Effective Date, (b) notice of the Final Administrative Claim Bar Date and Professional Fee Claim Bar Date, and (c) such other matters as the Litigation Trustee deems appropriate or as may be ordered by the Bankruptcy Court.

13.3 **Waiver of Conditions Precedent to the Effective Date**.  The Debtors, with the prior written consent of the DIP Lenders, the Committee, and VMG (solely with respect to Section 13.1(a) of the Plan) may at any time, without notice or authorization of the Bankruptcy Court, waive in writing any or all of the conditions precedent to the Effective Date set forth in this Article, whereupon the Effective Date shall occur without further action by any Entity; provided, however, that, notwithstanding the foregoing, the condition specified in Section 13.1(b) of the Plan may not be waived.  The Debtors reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of the Plan.

13.4 **Effect of Non-Occurrence of Effective Date**.  If each of the conditions specified in this Article have not been satisfied or waived in the manner provided herein within sixty (60) calendar days after the Confirmation Date (or such later date as may be agreed to by the Debtors and the Committee), then: (i) the Confirmation Order shall be vacated and of no further force or effect; (ii) no Distributions under the Plan shall be made; (iii) the Debtors and all Holders of Claims against or Interests in the Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to Claims

71

and Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and the Plan shall be deemed withdrawn.  Upon such occurrence, the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

## ARTICLE XIV
### EFFECTS OF CONFIRMATION

**14.1    Compromise and Settlement of Claims, Interests, and Controversies**

By participating in the Plan by voting (as contemplated in Article IV above) or by accepting Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim or Interest extinguished, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to and accepted the terms of the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever.  For the avoidance of doubt, any holder of a Claim or Interest that opts out of the voluntary releases contained in Section 14.2 of the Plan by checking the "opt out" box on the Ballot, and returning it in accordance with the instructions set forth thereon, shall not be bound by the voluntary releases contained in Section 14.2 of the Plan.

Pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, the Plan Settlement is hereby settled and resolved.  The Plan shall be deemed a motion to approve the Plan Settlement and good faith compromise and settlement of the VMG Claims pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement under Bankruptcy Code section 1123 and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlement is fair, equitable, reasonable, and in the best interests of the Debtors, the Estates, and all parties in interest.

**14.2    Exculpation, Releases, and Injunctions**

The exculpations, releases, and injunctions provided for in Section 14.2 of the Plan shall be effective upon the Effective Date.

      (a)      **Exculpation and Limitation of Liability.  Notwithstanding any other provision of the Plan, the Exculpated Parties shall not have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or Affiliates, or any of**

their successors or assigns, for any act or omission relating to, in any way, or arising from the Petition Date through the Effective Date related to: (i) the filing or administration of these Chapter 11 Cases; (ii) the postpetition marketing and sale process; (iii) the DIP Credit Agreement or any related agreements, instruments, and other documents relating thereto, (iv) formulating, negotiating or implementing the combined Disclosure Statement and Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the combined Disclosure Statement and Plan; (v) the Sale; (vi) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring, sale or liquidation of the Debtors; (vii) the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan; or (viii) the administration of the Plan or the property (including the Litigation Trust Assets) to be distributed under the Plan, including the creation of the Litigation Trust, except for their gross negligence ~~or~~, willful misconduct, or actual fraud as determined by a Final Order, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability.  The Confirmation Order shall serve as a permanent injunction against any Entity seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to Section 14.2(a) of the Plan.

(b)      **Releases by the Debtors**.  Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, each of the Debtors, on their own behalf and as a representative of their respective Estates, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Debtor Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to any of the Debtors, their respective Assets, the Estates, Chapter 11 Cases, the Prepetition CIT Loan Documents and any related agreements, instruments, and other documents relating thereto, the Prepetition Subordinated Notes Documents and any related agreements, instruments, and other

73

documents relating thereto, the DIP Credit Agreement and any related agreements, instruments, and other documents relating thereto, the Final DIP Order, any of the Debtors' in- or out-of-court restructuring efforts, the prepetition and postpetition marketing and sale process, the Sale, the combined Disclosure Statement and Plan (including any Plan Supplement), the implementation and administration of the Plan, including the issuance or distribution of the Litigation Trust Assets pursuant to the Plan, the creation of the Litigation Trust, or the solicitation of votes with respect to the Plan, that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Debtor Released Parties, except for their gross negligence ~~or~~, willful misconduct, or actual fraud as determined by a Final Order, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(c)  <u>Consensual Third-Party Releases by Holders of Claims</u>.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties[5] shall be deemed to forever release, waive and discharge the Third-Party Released Parties of all Claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise that are or may be based in whole or in part, in connection with or related to any of the Debtors, their respective Assets, the Estates, these Chapter 11 Cases, the Prepetition CIT Loan Documents and any related agreements, instruments, and other documents relating thereto, the Prepetition Subordinated Notes Documents and any related agreements, instruments, and other documents relating thereto, the DIP Credit Agreement and any related agreements, instruments, and other documents relating thereto, the Final DIP Order, any of the Debtors' in- or out-of-court restructuring efforts, the prepetition and postpetition marketing and sale process, the Sale, the combined Disclosure Statement and Plan (including any Plan Supplement), the implementation and administration of the Plan, including the issuance or distribution of the Litigation Trust Assets pursuant to the Plan, the creation of the Litigation Trust, or the solicitation of votes with respect to the Plan, or any other act, omission, transaction, event, or other occurrence taking place or existing on or before the Effective

---

[5]  For the avoidance of doubt, Committee members who are providing releases under the Plan are doing so solely in their capacity as Committee members; <u>provided</u>, <u>however</u>, Committee members in their individual capacity are not releasing their individual Claims against the Debtors or the bankruptcy estate and they will individually determine if they are opting in or opting out of the third party release provisions on the Ballots submitted.

Date (other than the rights of Holders of Allowed Claims to enforce the obligations under the Confirmation Order and the Plan); provided, however, that nothing in this section shall be deemed a waiver or release of any right of such Releasing Party to receive a Distribution pursuant to the terms of the Plan or other rights set forth in the Plan or the Confirmation Order; provided, further, however, that nothing in this section shall operate as a release, waiver or discharge of any causes of action or liabilities ~~unknown to such Entity~~ as of the Petition Date arising out of gross negligence, willful misconduct, fraud, or criminal acts of any such Released Party as determined by a Final Order.

The foregoing release provisions in Section 14.2(c) of the Plan shall not operate to waive, release or otherwise impair the rights of Creditors with setoff, subrogation or recoupment rights against the Debtors.

Notwithstanding anything to the contrary in the Plan, the United States is not a Releasing Party under the Plan and is not providing a release.

~~For avoidance of doubt, unless a Related Party receives notice and elects to be a Releasing Party under the Plan, direct claims of Related Parties against the Released Parties are not released pursuant to Section 14.2(c) of the Plan.~~

(d)    **Non-Discharge of the Debtors; Injunction.**  In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan.  All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order~~.~~; _provided, however, that such Entities shall not be precluded from exercising their rights under and consistent with the terms of this Plan or the Confirmation Order.  For the avoidance of doubt and notwithstanding anything to the contrary in the Plan, the Debtors, their Estates, and the Litigation Trust are not receiving a discharge under Bankruptcy Code section 524(a) and the injunction set forth herein shall, with respect to the Plan, the Debtors, their Estates, and the Litigation Trust, terminate upon the later of (a) distribution of all of the Assets and Litigation Trust Assets under the Plan, and (b) the closing of these Chapter 11 Cases.  Upon the entry of the Confirmation Order, all Holders of Claims and Interests, and_

**other parties in interest, along with their Related Parties, shall be enjoined from taking actions to interfere with implementation or substantial consummation of the Plan in relation to any Claim extinguished, exculpated or released pursuant to the Plan.**

**Except as otherwise expressly provided for in the Plan ~~or in obligations issued pursuant to the Plan, all Entities are permanently~~, the Litigation Trust Agreement, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed by the Debtors or the Litigation Trustee (as applicable) and a holder of a Claim or Interest, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their Related Parties, are enjoined~~, on~~ from and after the Effective Date, ~~on account of any Claim or Interest, from:~~ through and until the date upon which all property of the Debtors' Estates vested in the Litigation Trust has been liquidated and distributed to creditors or otherwise in accordance with the terms of the Plan and the Litigation Trust Agreement and the Plan has been fully administered, subject to further extension or reduction by motion on notice, with all parties' rights with respect to such extension or reduction reserved, solely with respect to Claims, Interests, and Causes of Action that will be or are treated by the Plan from:**

(1)     ~~commencing~~**Commencing, conducting**  or continuing in any manner, **directly or indirectly,** any **suit,** action or other proceeding of any kind ~~against any of the Estates~~**(including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Litigation Trust or the Litigation Trustee, as applicable, or the property of any of the Debtors**, the Litigation Trust, ~~their successors and assigns, and any of their assets and properties~~**or the Litigation Trustee, as applicable**;

(2)     **enforcing, levying,** attaching **(including, without limitation, any prejudgment attachment**, collecting or **otherwise** recovering by any manner or means any judgment, award, decree or order against ~~any Estate~~**the Debtors**, the Litigation Trust, ~~their successors and assigns, and any of their assets and properties~~**or the Litigation Trustee, or the property of any of the Debtors or the Litigation Trust, as applicable**;

(3)     **creating, perfecting or otherwise enforcing in any manner, directly or indirectly,** any

76

encumbrance of any kind against ~~any Estate~~**the Debtors**, the Litigation Trust~~, their successors and assigns, and any of their assets and properties~~ **or any property of the Debtors, the Litigation Trust or the Litigation Trustee, as applicable**;

(4)     asserting any right of setoff or subrogation ~~of any kind~~**, directly or indirectly,** against any obligation due from ~~any Estate,~~**the Debtors or** the Litigation Trust ~~or their successors and assigns, as applicable~~**, as applicable**, or against ~~any of their assets and properties~~**property or interests in property of any of the Debtors or the Litigation Trust**, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed proof of Claim; or

(5)     ~~commencing or continuing~~**acting or proceeding** in any manner**, in** any ~~action or other proceeding of any kind in respect of any Claim or Interest or Cause of Action released under Article XIV~~**place whatsoever, that does not conform to or comply with the provisions** of the Plan.

**The injunctions in Section 14.2(d) of the Plan shall extend to any successors of the Debtors or the Litigation Trust, as applicable, and their respective property and interests in property.**

Any Entity injured by any willful violation of ~~such injunction~~**the injunctions in Section 14.2(d) of the Plan** may seek actual damages and, in appropriate circumstances, may seek punitive damages from the willful violator.

**14.3    Term of Bankruptcy Injunction or Stays.**  All injunctions or stays provided for in these Chapter 11 Cases under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of these Chapter 11 Cases.

**14.4    Release of Liens**. Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged.  To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective

Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Litigation Trustee that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of Uniform Commercial Code termination statements, deposit account control agreement terminations, and any other applicable filings or recordings, and the Litigation Trustee shall be authorized to file Uniform Commercial Code terminations or to make any other such filings or recordings on such Holder's behalf.

**ARTICLE XV**
RETENTION OF JURISDICTION

**15.1** **Exclusive Jurisdiction of Bankruptcy Court**.  Pursuant to Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, these Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether filed before or after the Effective Date and whether or not Contingent, Disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Claims or Interests, the resolution of any Objections to the allowance or priority of Claims or Interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest to the extent permitted under applicable law;

(b)     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)     hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider and act upon the compromise and settlement of any Claim or Interest, or Cause of Action;

(d)     determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;

(e)     ensure that all Distributions to Holders of Allowed Claims under the Plan and the performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

(f)     construe, take any action and issue such orders, before and following the Confirmation Date and consistent with Bankruptcy Code section 1142, as may be necessary for the enforcement, implementation, execution and Consummation of the Plan and all contracts, instruments, releases, other agreements or documents created in connection with the Plan, including the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with Bankruptcy Code sections 524 and 1141 following the occurrence of the Effective Date;

(g)     determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of the Plan (and all exhibits and schedules to the Plan) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

(h)     modify the combined Disclosure Statement and Plan or the Confirmation Order before or after the Effective Date, pursuant to Bankruptcy Code section 1127, as well as any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the combined Disclosure Statement and Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

(i)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k)     determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in

79

connection with the combined Disclosure Statement and Plan or the Confirmation Order;

(l)      determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

(n)      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with these Chapter 11 Cases;

(o)      determine and resolve controversies related to the Estates, the Debtors, or the Litigation Trust from and after the Effective Date;

(p)      hear and determine any other matter relating to the combined Disclosure Statement and Plan; and

(q)      enter a final decree closing any or all these Chapter 11 Cases.

## ARTICLE XVI
### MISCELLANEOUS PROVISIONS

**16.1**    **Modification of the Plan**.  The Debtors may alter, amend, or modify the Plan or any exhibits or schedules hereto under Bankruptcy Code section 1127(a) at any time before or after the Confirmation Date but before the substantial Consummation of the Plan; provided, however, that any such alteration, amendment or modification does not materially and adversely affect (a) the treatment of Holders of Claims or Interests under the Plan or (b) VMG and the 9019 Settlement Agreement and Plan Settlement.  Any Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

**16.2**    **Revocation, Withdrawal, or Non-Confirmation of the Plan**.  The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Hearing. If the Plan is revoked or withdrawn before the Confirmation Hearing, or if the Plan is not confirmed by the Bankruptcy Court, then:  the Plan, the Plan Settlement, and the 9019 Settlement Agreement shall be null and void in all respects; and

(b)      nothing contained in the combined Disclosure Statement and Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, or (iii) constitute an admission of any sort by the Debtors or any other Entity.

**16.3**     **Binding Effect**.  Except as otherwise provided in Bankruptcy Code section 1141(d)(3) and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

**16.4**     **Subordination Rights**.  The classification and manner of satisfying all Claims and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with the contractual, legal and equitable subordination rights relating thereto, whether arising under contract, general principles of equitable subordination, Bankruptcy Code section 510(b) or otherwise.  All subordination rights that a Holder of a Claim may have with respect to any Distribution to be made under the Plan shall be implemented through the Plan, and all actions by such Holder of a Claim related to the enforcement of such subordination rights shall be enjoined permanently.  The provisions of any contractual or structural subordination of Claims shall remain enforceable by the Litigation Trustee on behalf of the Estates after the occurrence of the Effective Date.  Without limitation hereunder, the Litigation Trustee, on behalf of the Estates, may likewise enforce any right of the Debtors or the Estates to equitably or otherwise subordinate Claims under Bankruptcy Code section 510, which rights are deemed transferred to, remain and are preserved in the Litigation Trust, except as otherwise expressly set forth herein or as expressly provided in a Final Order of the Bankruptcy Court in these Chapter 11 Cases.

**16.5**     **Severability of Plan Provisions**.  If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**16.6**     **Payment of Statutory Fees; Filing of Quarterly Reports**.  All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") before the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors and the Litigation Trust shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable.  The Debtors shall file all monthly operating reports

due before the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Debtors and Litigation Trust shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Notwithstanding anything called for in the Plan to the contrary, each and every one of the Debtors and the Litigation Trust, as applicable, shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee and make such reports until the earliest of any such Debtor case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

**16.7**   **Dissolution of the Committee**.  The Committee shall dissolve on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to these Chapter 11 Cases, except with respect to, and to the extent of any applications for Professional Fee Claims or expense reimbursements for members of such Committee.  The Committee and its retained Professionals may also participate in any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition creditors (including Holders of Allowed Priority Claims and 503(b)(9) Claims), including, but not limited to, any cases, controversies, suits or disputes arising in connection with the Consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order. The Professionals retained by the Committee shall not be entitled to assert any Administrative Claims nor shall they have an Allowed Administrative Claims for any services rendered or expenses incurred after the Effective Date except in respect of the preparation and prosecution of or any objection to any Filed fee application and participation in any appeals.

**16.8**   **Exemption from Bankruptcy Code Section 1146**.  Pursuant to Bankruptcy Code section 1146(a), under the Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; or (ii) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be taxed under any law imposing a stamp tax or similar tax.  To the extent that the Debtors or Litigation Trustee elect to sell any property before or after the Confirmation Date, such sales of property will be exempt from any transfer taxes in accordance with Bankruptcy Code section 1146(c).  All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in these Chapter 11 Cases shall be deemed to be or have been done in furtherance of the Plan.

**16.9**   **Closing of Chapter 11 Cases; Caption Change.**   Anytime subsequent to the Effective Date, the Litigation Trustee may file a motion to close these Chapter 11 Cases of all of the Debtors except for Unconditional Love, Inc., and changing the caption of these Chapter 11 Cases accordingly.  Nothing in the Plan shall

authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered.  Upon the Filing of a motion to close these Chapter 11 Case of Unconditional Love, Inc., the Litigation Trustee shall file a final report with respect to all of these Chapter 11 Cases pursuant to Local Rule 3022-1(c).

**16.10    Filing of Additional Documents**.  On or before the Effective Date of the Plan, the Debtors may issue, execute, deliver, and File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

**16.11    Insurance**.  Confirmation of the Plan and the occurrence of the Effective Date shall have no effect on insurance policies of the Debtors in which the Debtors are or were insured parties.  Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering, or delaying coverage on any basis regarding or related to these Chapter 11 Cases, the Plan or any provision within the Plan, including the treatment or means of liquidation set out within the Plan for insured Claims.

**16.12    Successors and Assigns**.  The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**16.13    Governing Law**.  Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws is applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the construction, implementation and enforcement of the Plan and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of Delaware or the United States of America.

**16.14    Service of Documents.**   Any notice, direction or other communication given regarding them matters contemplated by the Plan must be in writing, sent by personal delivery, electronic mail or courier, and addressed as follows:

| **Debtors** |
| --- |
| Unconditional Love Inc.<br>17383 Sunset Boulevard, Suite B200<br>Pacific Palisades, CA 90272<br>Attn: Erica Buxton |
| **Counsel to Debtors** |
| Willkie Farr & Gallagher LLP<br>787 Seventh Avenue |

New York, NY 10019
Attn: Brian S. Lennon, Debra M. Sinclair,
Erin C. Ryan, and Jessica D. Graber
Email: BLennon@willkie.com,
DSinclair@willkie.com,
ERyan@willkie.com, and
JGraber@willkie.com

-and-

Young Conaway Stargatt & Taylor LLP
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Attn: Edmon L. Morton, Matthew B. Lunn,
and Carol E. Cox
Email: EMorton@ycst.com,
mlunn@ycst.com, and
ccox@ycst.com

| **Counsel to the Committee** |
|---|

Hogan Lovells US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Attn: Richard L. Wynne, David P. Simonds,
and Edward J. McNeilly,
Email: rick.wynne@hoganlovells.com,
david.simonds@hoganlovells.com, and
edward.mcneilly@hoganlovells.com

-and-

Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
Attn: Katherine M. Lynn
Email: katherine.lynn@hoganlovells.com

-and-

Pachulski Stang Ziehl & Jones LLLP
919 North Market Street
17th Floor
Wilmington, DE. 19801
Attn: Laura Davis Jones and Edward A.

| |
|---|
| Corma<br>Email: ljones@pszjlaw.com and<br>ecorma@pszjlaw.com |
| **Counsel to VMG** |
| Ashby & Geddes, P.A.<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, Delaware 19899<br>Telephone: (302) 654-1888<br>Attn: Gregory A. Taylor<br>Email: GTaylor@ashbygeddes.com<br><br>-and-<br><br>Winston & Strawn LLP<br>200 Park Avenue<br>New York, NY 10166-4193<br>Telephone: (212) 294-6700<br>Attn: Carey D. Schreiber<br>Email: CSchreiber@winston.com |

**16.15   Exhibits and Schedules.**  All exhibits and schedules annexed hereto, and all documents submitted in support hereof, are incorporated into and are a part of the Plan as if set forth in full herein.  Holders of Claims and Interests may obtain copies of the Filed exhibits and schedules upon written request to the Debtors. Upon their Filing, the exhibits and schedules may be inspected in the Office of the Clerk of the Bankruptcy Court or its designee during normal business hours.  The documents contained in the exhibits and schedules shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  To the extent any exhibit or schedule annexed hereto is inconsistent with the Plan, the contents of the Plan shall control.

**16.16   Computation of Time**.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**16.17    Reservation of Rights**.  The Filing of the combined Disclosure Statement and Plan, any statement or provision contained in the combined Disclosure Statement and Plan, or the taking of any action by the Debtors with respect to the Plan shall not be, and shall not be deemed to be, an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

Dated: ~~May 8~~June 14, 2024

By:    */s/ Erica Buxton*
Name: Erica Buxton
Title: Chief Executive Officer

86

## EXHIBIT A

## LIQUIDATION ANALYSIS

**EXHIBIT B**

**9019 SETTLEMENT AGREEMENT**